THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| CATHERINE YANG WANG ANDERSON, Individually and on behalf of X.C.W. as the "Next Friend" of X.C.W., a minor, | ) ) ) ) ) ) | Case No. _____ |
| Plaintiff, | ) ) | COMPLAINT and JURY DEMAND |
| v. | ) ) ) | |
| THE STATE OF NEBRASKA, COUNTY OF DOUGLAS, NEBRASKA DEPARTMENT OF HEALTH AND HUMAN SERVICES, NEBRASKA FAMILIES COLLABORATIVE, KVC BEHAVIORAL HEALTHCARE NEBRASKA, INC., CHRISTIAN HERITAGE, COURTNEY PHILLIPS, DOUGLAS WEINBERG,MARK GENTILE, BRENDA WHEELER, CHAD MILLER, JENNIFER WHITE, DEANNA "NINA" SHELLER, SARA SMITH, EVAN WINANS, MATTHEW HEYS, GREGORY TIEMANN, MILLARD  PUBLIC SCHOOLS, ELIZABETH CRNKOVICH, SONIA DERR, JUDY MCAULIFFE-TREINEN, JENNICE REID-HANSEN, TYLER HANSEN, MARTIN HARRINGTON, M.D., KARA BEALS, CHRISTINA JOHNSON-GUNN, NICOLE PAUL, ANNA RICHARDSON, DAVID NEWELL, AMANDA GUROCK, TINA ANDERSON, ANNE PETZEL, JENNIFER RICHEY, CARLA HEATHERSHAW-RISKO, AMY SCHUCHMAN, NANCY E. PARKE, SUSAN BOYLES, CHILDREN'S HOSPITAL AND MEDICAL CENTER, LAUREATE PSYCHIATRIC CLINIC and HOSPITAL, INC., REMUDA RANCH CENTER FOR ANOREXIA AND BULIMIA,INC., PAPILLION LAVISTA COMMUNITY SCHOOLS, SARITA RUMA, JANINE UCCHINO, KERSTEN BORER, MERCEDES BROWN, and JOHN DOES 1-15, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |

1

COMES NOW Plaintiff Catherine Yang Wang Anderson, individually and on behalf of X.C.W., as the "Next Friend" of X.C.W., a minor child, by and through her counsel of record, and for her causes of action against Defendants, allege as follows:

**PARTIES**

1.  Plaintiff, Catherine Wang Anderson ("Wang Anderson") is a resident of Douglas County, Nebraska, and has been a resident of Douglas County, Nebraska at all times relevant to this Complaint.

2.  Plaintiff Wang Anderson is the natural and biological mother, and the "Next Friend" of X.C.W.  Bo Wang, M.D. ("Dr. Wang") is the natural and biological father of X.C.W.  Plaintiff and Dr. Wang raised X.C.W. for the first fifteen (15) years of her life.  During that time, Wang Anderson and Dr. Wang loved, protected, provided for, and guided X.C.W.  X.C.W. was in excellent health and excelled in all respects.

3.  X.C.W. is a minor child, aged eighteen (18), domiciled in Douglas County, Nebraska without any legal guardian or legal parent and has been Un-Constitutionally, and without jurisdiction, made a Ward of the State of Nebraska.  On information and belief, since October 9, 2013, X.C.W. has been, and is now, against her will and in violation of her liberty interests under the Constitution for the United States of America, in the wrongful custody of the Nebraska Department of Health and Human Services ("NDHHS").

4.  The Defendant NDHHS, and specifically its Division of Children and Family Services, is Nebraska's child protection and child welfare agency, and is responsible for providing and supervising all public child welfare services in the State of Nebraska.  At all relevant times, the mission of the Division of Children and Family Services has been  to provide the least disruptive services when needed, for only as long as needed to: give children the

opportunity to succeed as adults; and, help families care for themselves; resulting in healthier families and safer, more prosperous communities.

5.    The State of Nebraska is responsible for the actions of its agencies, agents, and employees, and subject to suit under Section 504 of the Rehabilitation Act of 1973 (29 U.S.C. § 794), 42 U.S.C. § 200d, and  the Nebraska State Tort Claims Act.

6.    The Defendant County of Douglas ("Douglas County") is a political subdivision situated within the State of Nebraska.

7.    The Defendant Nebraska Families Collaborative ("NFC") is a Nebraska Non Profit Corporation with its principal place of business in Omaha, Douglas County, Nebraska.  At all relevant times, NFC had a contract with NDHHS to provide case management and an individualized system of care for families and their children and youth who are wards of NDHHS involved in the Child Welfare or Juvenile Court System.  At all relevant times, NFC had a duty to abide by all policy requirements of the Nebraska Administrative Code; applicable state and federal statutes and regulations; and any other applicable codes; applicable written policy directives and interpretations from or as directed by NDHHS.  At all relevant times, NFC was responsible for providing case management and an individualized system of care for X.C.W. and the Wang family, including Wang Anderson and Dr. Wang.  NFC has caused, created, authorized, condoned, ratified, approved or knowingly acquiesced in illegal, unconstitutional, and inhumane conditions, actions, policies, customs and practices that prevail throughout the services it provides.  NFC has directly and proximately caused, and will continue to cause in the future, the damages, injuries and violations of rights set forth below.  This Defendant is entrusted to protect the Constitutional rights of those it encounters and at all times relevant hereto was acting within the scope of its duties and authority, under color or title of state law, supervised or

controlled one or more of the other individual Defendants herein, or acted in concert with one or more of the other individual Defendants in the performance or conduct of their actions.

8.    The Defendant KVC Behavioral Health Care Nebraska, Inc. ("KVC") is a Nebraska Non Profit Corporation which provides medical and behavioral health care, social services and education in the State of Nebraska.  On information and belief, at all relevant times, KVC had a contract with NDHHS or NFC to provide foster care services for X.C.W.  KVC has caused, created, authorized, condoned, ratified, approved or knowingly acquiesced in the illegal, unconstitutional, and inhumane conditions, actions, policies, customs and practices that prevail throughout the services it provides.  KVC has directly and proximately caused, and will continue to cause in the future, the damages, injuries and violations of rights set forth below.  This Defendant is entrusted to protect the Constitutional rights of those it encounters and at all times relevant hereto was acting within the scope of its duties and authority, under color or title of state law, supervised or controlled one or more of the other individual Defendants herein, or acted in concert with one or more of the other individual Defendants in the performance or conduct of their actions.

9.    The Defendant Christian Heritage ("Christian Heritage") is a Nebraska Non Profit Corporation which provides medical and behavioral health care, social services and education in the State of Nebraska.  On information and belief, at all relevant times, Christian Heritage had a contract with NDHHS or NFC to provide foster care services for X.C.W.  Christian Heritage has caused, created, authorized, condoned, ratified, approved or knowingly acquiesced in the illegal, unconstitutional, and inhumane conditions, actions, policies, customs and practices that prevail throughout the services it provides.  Christian Heritage has directly and proximately caused, and will continue to cause in the future, the damages, injuries and violations of rights set forth below.

This Defendant is entrusted to protect the Constitutional rights of those it encounters and at all times relevant hereto was acting within the scope of its duties and authority, under color or title of state law, supervised or controlled one or more of the other individual Defendants herein, or acted in concert with one or more of the other individual Defendants in the performance or conduct of their actions.

10. The Defendant Courtney N. Phillips ("Phillips") is the current chief executive officer of the NDHHS and is liable for her actions in her official capacity done under color of state law. This Defendant is entrusted to protect the Constitutional rights of those she encounters and at all times relevant hereto was acting within the scope of her duties and authority, under color or title of state law, supervised or controlled one or more of the other individual Defendants herein, or acted in concert with one or more of the other individual Defendants in the performance or conduct of their actions.

11. The Defendant Douglas J. Weinberg ("Weinberg") is the director of the Division of Children and Family Services of NDHHS and is liable for his actions in his official capacity done under color of state law. This Defendant is entrusted to protect the Constitutional rights of those he encounters and at all times relevant hereto was acting within the scope of her duties and authority, under color or title of state law, supervised or controlled one or more of the other individual Defendants herein, or acted in concert with one or more of the other individual Defendants in the performance or conduct of their actions.

12. The Defendant David Newell ("Newell") is the current chief executive officer of NFC and is liable for his actions in his official capacity done under color of state law. This Defendant is entrusted to protect the Constitutional rights of those he encounters and at all times relevant hereto was acting within the scope of her duties and authority, under color or title of

state law, supervised or controlled one or more of the other individual Defendants herein, or acted in concert with one or more of the other individual Defendants in the performance or conduct of their actions.

13. The Defendant Mark Gentile ("Gentile") was a lietenant employed by the Sheriff of Douglas County, Nebraska, and is liable for his actions in his individual capacity done under color of state law. This Defendant is entrusted to protect the Constitutional rights of those he encounters and at all relevant times was acting under the color or title of state law, or acted in concert with one or more of the other Defendants in the performance or conduct of their actions.

14. The Defendant Brenda Wheeler ("Wheeler") was a deputy of the Sheriff of Douglas County, Nebraska, and is liable for her actions in her individual capacity done under color of state law. This Defendant is entrusted to protect the Constitutional rights of those she encounters and at all relevant times was acting under the color or title of state law, or acted in concert with one or more of the other Defendants in the performance or conduct of their actions.

15. The Defendant Chad Miller ("Miller") was a deputy of the Sheriff of Douglas County, Nebraska, and is liable for his actions in his individual capacity done under color of state law. This Defendant is entrusted to protect the Constitutional rights of those he encounters and at all relevant times was acting under the color or title of state law, or acted in concert with one or more of the other Defendants in the performance or conduct of their actions.

16. The Defendant Jennifer White ("White") is a resident of the State of Nebraska, and at all relevant times was employed by NDHHS and/or Project Harmony, as a social worker. This Defendant is entrusted to protect the Constitutional rights of those she encounters and at all relevant times was acting under the color or title of state law, or acted in concert with one or more of the other Defendants in the performance or conduct of their actions.

6

17.    The Defendant Deanna "Nina" Sheller ("Sheller") is a resident of the State of Nebraska, and at all relevant times was employed by NDHHS, as a Family Engagement Specialist.   This Defendant is entrusted to protect the Constitutional rights of those she encounters and at all relevant times was acting under the color or title of state law, or acted in concert with one or more of the other Defendants in the performance or conduct of their actions.

18.   The Defendant Sara Smith ("Smith") is a resident of the State of Nebraska, and at all relevant times has been employed by NFC as a family permanency specialist or family permanency specialist supervisor.  At all relevant times, Smith has been the family permanency specialist for X.C.W. and her family.  This Defendant is entrusted to protect the Constitutional rights of those she encounters and at all relevant times was acting under the color or title of state law, or acted in concert with one or more of the other Defendants in the performance or conduct of their actions.

19.   The Defendant Evan Winans ("Winans") is a resident of the State of Nebraska, and at all relevant times has been employed by NFC as a family permanency specialist supervisor. At all relevant times, Winans has been the family permanency specialist supervisor for X.C.W. and her family.  This Defendant is entrusted to protect the Constitutional rights of those she encounters and at all relevant times was acting under the color or title of state law, or acted in concert with one or more of the other Defendants in the performance or conduct of their actions.

20.    The Defendant Anna Richardson ("Richardson") is a resident of the State of Nebraska, and at all relevant times has been employed by NFC as a family permanency specialist or family permanency specialist supervisor.   At all relevant times, Richardson has been the family permanency specialist for X.C.W. and her family.  This Defendant is entrusted to protect the Constitutional rights of those she encounters and at all relevant times was acting under the

7

color or title of state law, or acted in concert with one or more of the other Defendants in the performance or conduct of their actions.

21. The Defendant Nicole Paul ("Paul") is a resident of the State of Nebraska, and at all relevant times has been employed by NFC as a family permanency specialist supervisor. She was also a licensed mental health practitioner and marriage and family therapist. At all relevant times, Paul has been the family permanency specialist supervisor for X.C.W. and her family. This Defendant is entrusted to protect the Constitutional rights of those she encounters and at all relevant times was acting under the color or title of state law, or acted in concert with one or more of the other Defendants in the performance or conduct of their actions.

22. The Defendant Anne Petzel (hereinafter "Petzel") is a resident of the State of Nebraska, and, at all relevant times has been employed by NFC as a family permanency specialist or family permanency specialist supervisor. At all relevant times, Petzel has been the family permanency specialist for X.C.W. and her family. This Defendant is entrusted to protect the Constitutional rights of those she encounters and at all relevant times was acting under the color or title of state law, or acted in concert with one or more of the other Defendants in the performance or conduct of their actions.

23. The Defendant Jennifer Richey (hereinafter "Richey") is a resident of the State of Nebraska, and at all relevant times has been employed by NFC as a family permanency specialist supervisor. At all relevant times, Richey has been the family permanency specialist supervisor for X.C.W. and her family. This Defendant is entrusted to protect the Constitutional rights of those she encounters and at all relevant times was acting under the color or title of state law, or acted in concert with one or more of the other Defendants in the performance or conduct of their actions.

24.   The Defendant Matthew D. Heys (hereinafter "Heys") is a resident of the State of Nebraska, and, at all relevant times has been employed by Millard Public Schools as a teacher at Millard West High School.  Heys was one of Y.C.W.'s teachers.  This Defendant is entrusted to protect the Constitutional rights of those he encounters and at all relevant times was acting under the color or title of state law, or acted in concert with one or more of the other Defendants in the performance or conduct of their actions.

25.   The Defendant Gregory Tiemann (hereinafter "Tiemann") is a resident of the State of Nebraska, and, at all relevant times has been employed by Millard Public Schools as a principal at Millard West High School.  This Defendant is entrusted to protect the Constitutional rights of those he encounters and at all relevant times was acting under the color or title of state law, or acted in concert with one or more of the other Defendants in the performance or conduct of their actions.

26.   The Defendant Millard Public Schools ("MPS") was the public school district for the City of Millard.   On information and belief, MPS has caused, created, authorized, condoned, ratified, approved or knowingly acquiesced in illegal, unconstitutional, and inhumane conditions, actions, policies, customs and practices that prevail throughout the services it provides.  MPS has directly and proximately caused, and will continue to cause in the future, the damages, injuries and violations of rights set forth below.  This Defendant is entrusted to protect the Constitutional rights of those it encounters and at all times relevant hereto was acting within the scope of its duties and authority, under color or title of state law, supervised or controlled one or more of the other individual Defendants herein, or acted in concert with one or more of the other individual Defendants in the performance or conduct of their actions.

27.   The Defendant Papillion La Vista Community Schools ("PLCS") was the public school district for the City of Millard.  On information and belief, PLCS has caused, created, authorized, condoned, ratified, approved or knowingly acquiesced in illegal, unconstitutional, and inhumane conditions, actions, policies, customs and practices that prevail throughout the services it provides.  PLCS has directly and proximately caused, and will continue to cause in the future, the damages, injuries and violations of rights set forth below.  This Defendant is entrusted to protect the Constitutional rights of those it encounters and at all times relevant hereto was acting within the scope of its duties and authority, under color or title of state law, supervised or controlled one or more of the other individual Defendants herein, or acted in concert with one or more of the other individual Defendants in the performance or conduct of their actions.

28.   The Defendant Elizabeth Crnkovich ("Judge Crnkovich") who, upon information and belief, at all relevant times has been, and currently is a Judge of the Separate Juvenile Court for Douglas County, Nebraska, and during relevant times to this Complaint acted as a witness to events set forth in this Complaint, is liable for her acts and omissions in her individual and official capacities done under color of state law.  This Defendant is entrusted to protect the Constitutional rights of those she encounters and at all times relevant hereto was acting within the scope of her duties and authority, under color or title of state law and acted in concert with one or more of the other individual Defendants in the performance or conduct of their actions. This Judge, by her actions or omissions, has acted in violation of the Plaintiff and X.C.W.'s Constitutional Rights without jurisdiction, has facilitated and enabled NDHHS and NFC to continually and invidiously violate the rights of Plaintiff and X.C.W., and others similarly situated as parents in the State of Nebraska, without consequence or enforcement of the Constitution of the United States of America.

10

29.    The Defendant Judy McAuliffe Treinen ("Treinen") is a resident of Clackamas County, Oregon.  At all relevant times, Treinen was a licensed mental health practitioner, social worker, and professional counselor in the State of Nebraska.  On information and belief, Treinen provided health services, including therapy, to Y.C.W. from October of 2013 through May of 2014, in the State of Nebraska.  This Defendant is entrusted to protect the Constitutional rights of those she encounters and at all relevant times was acting under the color or title of state law, or acted in concert with one or more of the other Defendants in the performance or conduct of their actions.

30.    The Defendant Amanda Gurock ("Gurock") is a resident of Albany County, New York.  At all relevant times, Treinen was a licensed mental health practitioner, social worker, and professional counselor in the State of Nebraska.  On information and belief, Treinen provided health services, including therapy, to Y.C.W. from October of 2013 through May of 2014, in the State of Nebraska.  This Defendant is entrusted to protect the Constitutional rights of those she encounters and at all relevant times was acting under the color or title of state law, or acted in concert with one or more of the other Defendants in the performance or conduct of their actions.

31.    The Defendant Martin Harrington, M.D. (hereinafter "Dr. Harrington") is a resident of the State of Nebraska, and is a licensed physician who practices psychiatry in Omaha, Nebraska.  At all relevant times, Dr. Harrington has been the medical director of the Children's Hospital and Medical Center Eating Disorders Program, and has provided health care services to X.C.W.  This Defendant is entrusted to protect the Constitutional rights of those he encounters and at all relevant times was acting under the color or title of state law, or acted in concert with one or more of the other Defendants in the performance or conduct of their actions.

32.  The Defendant Kara Beals ("Beals") is a resident of the State of Nebraska, and is licensed independent mental health practitioner in the State of Nebraska.  Beals has provided health services to X.C.W. at various times since October, 2013.  This Defendant is entrusted to protect the Constitutional rights of those she encounters and at all relevant times was acting under the color or title of state law, or acted in concert with one or more of the other Defendants in the performance or conduct of their actions.

33.  The Defendant Sarita L. Ruma ("Ruma") is a resident of the State of Nebraska, and is a licensed independent mental health practitioner in the State of Nebraska.  Ruma has provided health services to X.C.W. at various times from September, 2014 through at least December, 2016.  This Defendant is entrusted to protect the Constitutional rights of those she encounters and at all relevant times was acting under the color or title of state law, or acted in concert with one or more of the other Defendants in the performance or conduct of their actions.

34.  The Defendant Nancy E. Parke ("Parke") is a resident of the State of Oklahoma, and is a registered nurse and a licensed professional counselor in the State of Oklahoma.  At all relevant times, Parke was employed by Laureate Psychiatric Hospital and provided health services to X.C.W. at various times since January 23, 2014.  This Defendant is entrusted to protect the Constitutional rights of those she encounters and at all relevant times was acting under the color or title of state law, or acted in concert with one or more of the other Defendants in the performance or conduct of their actions.

35.  The Defendant Susan Boyles ("Boyles") is a resident of the State of Arizona, and is a therapist or licensed professional counselor in the State of Arizona.  At all relevant times, Boyles was employed by Remuda and provided health services to X.C.W. at various times since November, 2014.  This Defendant is entrusted to protect the Constitutional rights of those she

encounters and at all relevant times was acting under the color or title of state law, or acted in concert with one or more of the other Defendants in the performance or conduct of their actions.

36. The Defendant Christina ("Tina") Johnson Gunn ("Gunn") is a resident of the State of Nebraska, and is licensed independent mental health practitioner in the State of Nebraska. Gunn has provided health services to X.C.W., Wang Anderson, and Dr. Wang at various times since March, 2015. This Defendant is entrusted to protect the Constitutional rights of those she encounters and at all relevant times was acting under the color or title of state law, or acted in concert with one or more of the other Defendants in the performance or conduct of their actions.

37. The Defendant Kersten Borer (hereinafter "Borer") is a resident of the State of Nebraska, and is a licensed mental health practitioner who provides mental health services in Omaha, Nebraska. Borer has provided health care services to X.C.W. since January, 2017. This Defendant is entrusted to protect the Constitutional rights of those she encounters and at all relevant times was acting under the color or title of state law, or acted in concert with one or more of the other Defendants in the performance or conduct of their actions.

38. The Defendant Sonia Derr (hereinafter "Derr") is a resident of Douglas County, Nebraska. At all relevant times, Derr was a licensed foster parent. From about October 9, 2013 through January, 2014, X.C.W. was placed Derr's care. On information and belief, Derr provided foster care services to X.C.W. and her sister, Y.C.W. pursuant to a contract or agreement with the State of Nebraska, NDHHS, NFC, or KVC. This Defendant is entrusted to protect the Constitutional rights of those she encounters and at all relevant times was acting under the color or title of state law, or acted in concert with one or more of the other Defendants in the performance or conduct of their actions.

39. The Defendant Tina Anderson (hereinafter "Anderson") is a resident of Sarpy County, Nebraska. At all relevant times, Anderson provided respite care for Y.C.W., pursuant to a contract or agreement with the State of Nebraska, NDHHS, or NFC. This Defendant is entrusted to protect the Constitutional rights of those she encounters and at all relevant times was acting under the color or title of state law, or acted in concert with one or more of the other Defendants in the performance or conduct of their actions.

40. The Defendant Jennice Reid-Hansen (hereinafter "Reid-Hansen") is a resident of Washington County, Nebraska. At all relevant times, Reid-Hansen was one of the foster parents of X.C.W. On information and belief, Reid-Hansen provided foster care services to X.C.W. pursuant to a contract or agreement with the State of Nebraska, NDHHS, NFC, or KVC. This Defendant is entrusted to protect the Constitutional rights of those she encounters and at all relevant times was acting under the color or title of state law, or acted in concert with one or more of the other Defendants in the performance or conduct of their actions.

41. The Defendant Tyler Hansen (hereinafter "Hansen") is a resident of Washington County, Nebraska. At all relevant times, Hansen was one of the foster parents of X.C.W. On information and belief, Hansen provided foster care services to X.C.W. pursuant to a contract or agreement with the State of Nebraska, NDHHS, NFC, or KVC. This Defendant is entrusted to protect the Constitutional rights of those he encounters and at all relevant times was acting under the color or title of state law, or acted in concert with one or more of the other Defendants in the performance or conduct of their actions.

42. The Defendant Mercedes Brown (hereinafter "Brown") is a resident of the State of Nebraska, and at relevant times, was a foster parent of X.C.W. On information and belief, Hansen provided foster care services to X.C.W. pursuant to a contract or agreement with the

State of Nebraska, NDHHS, or NFC. This Defendant is entrusted to protect the Constitutional rights of those she encounters and at all relevant times was acting under the color or title of state law, or acted in concert with one or more of the other Defendants in the performance or conduct of their actions.

43.    The Defendant Carla Heathershaw-Risko ("Risko") is a resident of the State of Nebraska, and at all relevant times has been a duly licensed attorney, employed by the State of Nebraska, and has represented NDHHS in the Juvenile Court proceeding and other matters related to the minor children X.C.W. and Y.C.W. This Defendant is entrusted to protect the Constitutional rights of those she encounters and at all relevant times was acting under the color or title of state law, or acted in concert with one or more of the other Defendants in the performance or conduct of their actions.

44.    The Defendant Amy Schuchman ("Schuchman") is a resident of the State of Nebraska, and at all relevant times has been a duly licensed attorney employed as a deputy county attorney by Douglas County, Nebraska, and has represented the State in the Juvenile Court proceeding related to the minor children X.C.W. and Y.C.W. This Defendant is entrusted to protect the Constitutional rights of those she encounters and at all relevant times was acting under the color or title of state law, or acted in concert with one or more of the other Defendants in the performance or conduct of their actions.

45.    The Defendant Janine Ucchino ("Ucchino") is a resident of the State of Nebraska, and at all relevant times has been a duly licensed attorney. Ucchino was appointed by Judge Crnkovich in the Juvenile Court proceeding as guardian ad litem for X.C.W. and Y.C.W. since July 10, 2014. This Defendant is entrusted to protect the Constitutional rights of those she

encounters and at all relevant times was acting under the color or title of state law, or acted in concert with one or more of the other Defendants in the performance or conduct of their actions.

46.    The Defendant Children's Hospital and Medical Center ("Children's") is a Nebraska Non Profit Corporation.   Children's provided health care and other services to X.C.W. and visitation services to Wang Anderson between October 31, 2013 and the present.    On information and belief, Children's has caused, created, authorized, condoned, ratified, approved or knowingly acquiesced in illegal, unconstitutional, and inhumane conditions, actions, policies, customs and practices that prevail throughout the services it provides.   Children's has directly and proximately caused, and will continue to cause in the future, the damages, injuries and violations of rights set forth below.   This Defendant is entrusted to protect the Constitutional rights of those it encounters and at all times relevant hereto was acting within the scope of its duties and authority, under color or title of state law, supervised or controlled one or more of the other individual Defendants herein, or acted in concert with one or more of the other individual Defendants in the performance or conduct of their actions.

47.    The Defendant Laureate Psychiatric Clinic and Hospital, Inc. ("Laureate Psychiatric") is an Oklahoma Not For Profit Corporation.   Laureate Psychiatric provided health care and other services to X.C.W. and visitation services to Wang Anderson or Dr. Wang between January 23, 2014 and July 1, 2014, pursuant to a contract or agreement with NDHHS and/or NFC.   On information and belief, Laureate Psychiatric has caused, created, authorized, condoned, ratified, approved or knowingly acquiesced in illegal, unconstitutional, and inhumane conditions, actions, policies, customs and practices that prevail throughout the services it provides.   Laureate Psychiatric has directly and proximately caused, and will continue to cause in the future, the damages, injuries and violations of rights set forth below.   This Defendant is

16

entrusted to protect the Constitutional rights of those it encounters and at all times relevant hereto was acting within the scope of its duties and authority, under color or title of state law, supervised or controlled one or more of the other individual Defendants herein, or acted in concert with one or more of the other individual Defendants in the performance or conduct of their actions.

48.    The Defendant Remuda Ranch Center for Anorexia and Bulimia, Inc. ("Remuda") is a Delaware Corporation with its principal place of business in Wickenburg, Arizona. Remuda provided health care and other services to X.C.W. and family therapy and visitation services to Wang Anderson or Dr. Wang between October 1, 2014 and March 1, 2015, pursuant to a contract or agreement with NDHHS and/or NFC. On information and belief, Remuda has caused, created, authorized, condoned, ratified, approved or knowingly acquiesced in illegal, unconstitutional, and inhumane conditions, actions, policies, customs and practices that prevail throughout the services it provides. Remuda has directly and proximately caused, and will continue to cause in the future, the damages, injuries and violations of rights set forth below. This Defendant is entrusted to protect the Constitutional rights of those it encounters and at all times relevant hereto was acting within the scope of its duties and authority, under color or title of state law, supervised or controlled one or more of the other individual Defendants herein, or acted in concert with one or more of the other individual Defendants in the performance or conduct of their actions.

49.  John Does 1-15 to be named currently as fictitiously named defendants, who in their individual and/or official capacities are liable for their acts and omissions. Plaintiff reserves the right to amend the names of these defendants, or join additional defendants, upon further discovery.

50.   All of the above-referenced Defendants have acted and continue to act under the Color of State Law at all times relevant to the Complaint herein.

51.   Plaintiff sues all defendants, both in their official and individual capacities.

## JURISDICTION AND VENUE

52.   The jurisdiction of this Court is invoked by Plaintiff pursuant to 28 U.S.C. §§ 1331, 1333, 1343 and 1367 which confer original jurisdiction upon this Court on the grounds that the instant action arises under the First, Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution, the Civil Rights Act of 1871, as amended, 42 U.S.C. §§ 1981, 1983, 1985, 1986, and 1988, and 28 U.S.C. § 2254.

53.   Venue in the District of Nebraska is properly laid pursuant to 28 U.S.C. § 1391, as a substantial part of the events or omissions alleged herein, which form the factual and legal basis of the claims of the Plaintiff, arose or occurred within the geographical limits of this District.

## EXHAUSTION

54.   Plaintiff has exhausted all available administrative remedies regarding the matters described in this Complaint.

## FACTUAL BACKGROUND

55.   Wang Anderson and Dr. Wang are the natural and biological parents, of X.C.W. and Y.C.W.   Wang Anderson and Dr. Wang are, and at all relevant times have been, husband and wife.   Wang Anderson was born and raised in Shanghai, China.   Dr. Wang was born and raised in Chengdu, Sichuan, China.   Both Dr. Wang and Wang Anderson immigrated to the United States when they were young adults, more than 28 years ago, and have been naturalized U.S. Citizens for more than 18 years.

56.  From shortly after her birth in Omaha until October 9, 2013, X.C.W. and Y.C.W. were continuously in the care and custody of Wang Anderson and Dr. Wang, most recently in Omaha, Nebraska.  While in the care and custody of their parents, X.C.W. and Y.C.W. were in excellent physical, emotional and mental health.  As of October 9, 2013, X.C.W. and Y.C.W. had been attending Millard West High School and were exceptional students.

57.  On the night of October 7, 2013, Wang Anderson discovered certain text messages between (1) Y.C.W. and Heys and (2) Y.C.W. and an adult friend who was experiencing transgender issues.  Wang Anderson became highly concerned about these sexual messages because she was concerned that the adult friend was sexually exploiting Y.C.W, and that Heys was engaging in an inappropriate relationship with Y.C.W.  Wang Anderson had become so concerned that she immediately reached out for help and contacted the Nebraska State Patrol that evening.

58.  On information and belief, since August, 2012, Heys had engaged in an inappropriate relationship and inappropriate interaction and discussions with Y.C.W. which went beyond the scope of his duties and privileges as a teacher, and violated Wang Anderson's Constitutional right to direct the education and moral development of Y.C.W.

59.  On information and belief, Tiemann knew of this inappropriate interaction and relationship between Heys and Y.C.W. and failed to take action to stop it, in violation of Wang Anderson's Constitutional right to direct the education and moral development of Y.C.W.

60.  On information and belief, MPS had policies, practices, customs and usages which allowed employees and agents to engage in inappropriate relationships, discussion and interactions with students, in violation of the rights of parents to direct the education and moral development of their children.

61. As a direct and proximate result of Heys' inappropriate relationship and interactions with Y.C.W., which was allowed by his supervisor, Tiemann, and the unconstitutional policies, practices, customs and usages of MPS, Wang Anderson's ability to communicate with Y.C.W. was undermined and a breakdown in her relationship with Y.C.W occurred.

**Removal of Children**

62. On the morning of October 8, 2013, without a warrant, Deputy Miller went to Wang Anderson's home following his interview with Y.C.W. Wang Anderson and X.C.W. were present at the home when Deputy Miller arrived. Wang Anderson spoke with Deputy Miller at her home. Miller did not tell Wang Anderson why he had come to her home. Shortly after Deputy Miller's arrival, at approximately 1:00 p.m., Douglas County Sheriff's Lieutenant Mark Gentile and Sergeant Pankonin arrived at Wang Anderson's home in order to make contact with X.C.W. and observe the living conditions inside of Wang Anderson's home. The officers arrived at her residence at approximately 1:00 p.m. They knocked on the door and Wang Anderson answered. When she heard the knocking, Wang Anderson was preparing a meal and handling raw chicken. She answered the door wearing a kitchen glove to protect herself from contamination. While at Wang Anderson's home, these law enforcement officers spoke with X.C.W. (who was home from school because she was not feeling well) and observed the living conditions of Wang Anderson's home. Following these personal interactions and observations, these law enforcement officers determined that it was safe for X.C.W. to remain in Wang Anderson's home and care, and allowed her to continue to remain in Wang Anderson's home.

63. Lt. Gentile made a report after the visit and noted that Wang Anderson was wearing a clear rubber glove when she answered the door. As set forth in his report, Lt. Gentile made the following unsubstantiated conclusion from this interaction with Wang Anderson: "It was evident

to GENTILE that WANG ANDERSON was apparently suffering from some type of OCD/mental condition." Lt. Gentile's conclusion was not based on a medical doctor's diagnosis, a report of an examining psychologist or other professional assessment, or questions asked to Wang Anderson to determine whether she had mental or emotional condition(s).

64. On information and belief, the other Defendants have seized on Lt. Gentile's conclusion that Wang Anderson has some type of OCD or mental health issue. His unsupported conclusion has been relied on by all of the other providers, representative and court officials to maintain that Wang Anderson has a mental problem.

65. Neither Wang Anderson nor Dr. Wang have ever been diagnosed with any mental health disorder or conditions or had any family history of mental illness for several generations, except for adjustment disorder which was caused by the removal of the children.

66. On or about October 8, 2013, Y.C.W. was removed from Wang Anderson's custody by Douglas County Sheriff's deputy Chad Miller, without a warrant or court order, based solely on an interview with Y.C.W. at Millard West, and placed in the temporary custody of NDHHS. On information and belief, Miller removed Y.C.W. from Wang Anderson's custody without conducting a proper investigation, despite the fact that he had repeatedly observed Wang Anderson and her children at Millard West, where he was regularly on duty as an officer. Y.C.W. was then placed in foster care with Derr, who was a non-relative licensed foster care provider.

67. On October 8, 2013, during the evening, NDHHS Child and Family Services Specialist Jennifer White ("White") and NDHHS worker Archie Scott went to Wang Anderson's residence. White and Scott interviewed X.C.W. privately in the garage of Wang Anderson's home and then searched Wang Anderson's residence without a warrant. After the interview of

X.C.W. and the home search, White and Scott determined it was safe to allow X.C.W. to remain in Wang Anderson's home and allowed her to remain there.

68.    On the morning of October 9, 2013, Wheeler and White returned to Wang Anderson's home to speak further with Wang Anderson, and Wang Anderson cooperated with them.

69.    On or about October 9, 2013, after she had gone to school, X.C.W. was removed from Wang Anderson's custody by Douglas County Sheriff's deputy Brenda Wheeler, without a warrant or court order, and placed in the temporary custody of NDHHS.  Before removing X.C.W. from Wang Anderson's custody, reasonable efforts to allow X.C.W. to remain in the parental home were not made by Wheeler, NDHHS, or White.

70.    On October 9, 2013, and before, X.C.W. was not endangered in her surroundings and it was not reasonable for Wheeler to conclude that immediate removal was necessary for X.C.W.'s protection.  Wheeler's superior officers, Lt. Gentile and Sgt. Pankonin, as well as Jennifer White and Archie Scott had all recently determined that it was safe for X.C.W. to remain in the home with Wang Anderson.  Wheeler's seizure and removal of X.C.W. from Wang Anderson's custody was unreasonable and contrary to law.

71.    On information and belief, White, Wheeler, and Miller did not conduct a fair and proper investigation regarding the accusations against Wang Anderson made by Y.C.W., or as to the safety of her home or care.  On information and belief, White, Wheeler, and Miller also failed to consider or discuss with Wang Anderson any less restrictive options to allow X.C.W. to continue to remain in Wang Anderson's home, such as monitoring or other in-home services, which Wang Anderson would have cooperated with.

72.   Wheeler and Miller failed to inform the Juvenile Court in their respective affidavits that at least two other law enforcement officers and two social workers had recently determined that it was safe for X.C.W. to remain in Wang Anderson's home in her care, and that since that determination, no intervening incidents concerning the children's safety had occurred.

**First Foster Placement – Sonia Derr**

73.   On October 9, 2013, X.C.W. was placed in foster care with Derr.

74.   At all relevant times, X.C.W. had a clearly established Constitutional right to, and all Defendants had an obligation to provide her with adequate medical care, protection and supervision.  See *Norfleet v. Arkansas Dept. of Human Svcs.,* 989 F.2d 289, 293 (8th Cir. 1993).

75.   The constitutional substantive due process right to family integrity, including under the Fourteenth Amendment, protects: a) the child's right to be raised and nurtured by her biological parent; b) the right of both parent and child to each other's companionship; and, c) the parent's right to the companionship, care, custody, and management of his or her child.  Both parents and their children have cognizable substantive due process rights to the parent-child relationship.

76.   The Supreme Court has also noted that it is "cardinal with us that the custody, care and nurture of the child reside first in the parents, whose primary function and freedom include preparation for the obligations the state can neither supply nor hinder."  *Prince v. Massachusetts,* 321 U.S. 158, 166 (1944).  Parents have a fundamental liberty interest in directing the education of their children.  *Troxel v. Granville,* 530 U.S. 57,  120 S.Ct. 2054, 147 L.Ed.2d 49 (2000); *Washington v. Glucksberg*, 521 U.S. 702, 117 S.Ct. 2258, 117 S.Ct. 2302, 138 L.Ed.2d 772 (1997); *Pierce v. Society of Sisters,* 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070 (1925); *Meyer v. Nebraska,* 262 U.S. 390, 43 S.Ct. 625, 67 L.E. 1042 (1923).  The Supreme Court has historically

recognized that freedom of personal choice in matters of family life is a fundamental interest protected by the Fourteenth Amendment. *Quilloin v. Walcott,* 434 U.S. 246, 255 (1978). The integrity of the family unit has found protection in the Due Process Clause of the Fourteenth Amendment, the Equal Protection Clause of the Fourteenth Amendment, and the Ninth Amendment. *Stanley v. Illinois,* 405 U.S. 645, 651, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972)

77. A prompt detention hearing is required in order to protect a parent against the risk of an erroneous deprivation of his or her parental interest. Continued detention pending adjudication is not permitted under the Nebraska Juvenile Code unless the State can establish by a preponderance of the evidence at an adversarial hearing that such detention is necessary for the welfare of the juvenile. That required evidence includes proof that reasonable efforts were made to preserve and reunify the family when required under Neb. Rev. Stat. §43-283.01 (Reissue 1998). This hearing is a parent's opportunity to be heard on the need for the removal and the satisfaction of the State's obligations under § 43-283.01, and it is not optional when a child is detained for any significant period of time. *In re Interest of Mainor T.,* 267 Neb. 232, 674 N.W.2d 442, 456-457 (Neb. 2004). A delay of 18 days between removal and hearing has been held to be a denial of a parent's right to due process. *In re Interest of Mainor T.,* 674 N.W.2d at 457. A delay of 14 days between entry of ex parte order and a detention hearing, even where a parent was allowed to visit children in the interim, was found to "poise the procedures employed...on the brink of unreasonableness." *In re Interest of R.G.,* 238 Neb. 405, 423, 470 N.W.2d 780 (1991).

78. At all relevant times, it was the written policy of NDHHS that:

a. It is vital to maintain a child's connection to his/her family while the child is in out-of-home care. Ensuring regular and quality parenting time

24

maintains and supports the parent-child relationship. The importance of continuing the parent-child attachment and preserving the child's sense of belonging as a part of their family, community, and culture is necessary for the child and family's well-being.

b. For any ward in out-of-home placement, reunification will be the first permanency objective considered…Alternatives to reunification will be considered only when the family has been given reasonable opportunities to reunify and those efforts haven't been successful.

c. Contact between the child and parent(s) is important for: maintenance of attachments and "primary family" role; validation for the parent(s) and child that both are continuing to work toward return home of the child; assurance to the child that he/she has not been abandoned or kidnapped; an opportunity for the parent(s) to observe and practice positive parenting skills.

d. When a child is in out-of-home placement and the case plan's permanency objective is reunification, a written visitation plan will be developed to maintain opportunities for regular contact between a child and her family. Frequent and regular contact between parent(s) and child(ren) is critical to reunification.

60. At all relevant times, the following "Visitation Plan Guidelines" were the written policy of NDHHS:

a. The worker will develop a written visitation plan identifying all parties' important role in establishing guidelines for visitation, and in assuring that visitation is successful for all family members and that all parties (parents, child,

foster care providers, person supervising if not the foster care provider) understand their roles and responsibilities.

b. The visitation plan will address, but is not limited to such issues as: dates, times and location of visits; how arrangements will be made; who will be present; arrangements for monitoring or supervision, if any; plan for handling emergency situations; and, procedures for handling problems with visitation.

79.  At all relevant times, NDHHS regulations (390 NAC 390 7.001.02; NDHHS Case Management for Child Abuse, Neglect and Dependency Guidebook) and policy (Protection and Safety Procedure #28-2016) required NDHHS, its employees, and designated agents to do the following regarding visitation between the parent and minor child in out-of-home placement situations:

a.  Develop an individualized parenting time plan with the parent(s) within 48 hours of the child's removal from the home.

b.  "Parenting time guidelines" provide for a minimum of two visits per week for children ages eight to nineteen.

c.  The Parenting Time Plan will be documented in N-FOCUS-Visitation Plan.

d.  Supervisory approval of any parenting time less than the "parenting time guidelines", will be documented by the supervisor (or designee) in N-FOCUS-Visitation Plan – Other Issues.

e.  Determine the supervision level of parenting time and make efforts to safely decrease the level of supervision based on assessment of the child's safety and the child's needs, utilizing the information from the safety plan or parenting time sections of the SDM Reunification Assessment to evaluate supervision of parenting time.

26

80.   From the date of removal of the children through the present, the State, NDHHS, NFC, White, Sheller, Smith, Winans, Richardson, Paul, Petzel, and Richey failed to create a plan for visitation between Wang Anderson and the children or between Dr. Wang and the children, as required by, and in compliance with the aforementioned written regulations and policies.

81.   On information and belief, NFC, Christian Heritage, and KVC all had ongoing policies, practices, or customs of not following said regulations and policies regarding visitation and parental contact, of not properly or promptly developing visitation plans or encouraging family visitation, imposing burdensome and unnecessary conditions or restrictions on visitation, not making timely, proper, or adequate referrals to service providers for visitation, all of which were unconstitutional.

82.   NDHHS, NFC, Christian Heritage, KVC, White, Sheller, Smith, Winans, Richardson, Paul, Petzel, Richey, Derr, Reid-Hansen, and Hansen did not involve Wang Anderson, Dr. Wang, or either of the children to try to develop a workable plan for contact and visitation plan from the date of removal through the present.  On information and belief, these Defendants also failed and refused to encourage X.C.W. or Y.C.W. to engage in contact or visitation with Wang Anderson or Dr. Wang, and made no efforts to ensure ongoing meaningful contact or communication of any kind between X.C.W. and her parents.

83.   Although Y.C.W. and X.C.W. were both in ongoing therapy during that time period, the State, NDHHS, NFC, Smith and Winans failed to require or request that resuming contact with their parents be a goal of therapy.

84.   All Defendants failed throughout the Juvenile Court proceeding to make any efforts to encourage or strengthen the parent-child relationship.  See *Santosky v. Kramer,* 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982).

85.   On October 9, 2013, X.C.W. reported to NDHHS Family Engagement Specialist Nina Sheller that she: "feels safe with her mother and hopes to return to her home".   Wheeler, White, Sheller, Miller, Derr, and NDHHS all knew, or should have known of this information. On information and belief, Douglas County knew or should have known of this information. Despite this information, none of these defendants returned X.C.W. to Wang Anderson's care or informed the Juvenile Court of the information.

86. On information and belief, on October 10, 2013, based upon information provided to him by Wheeler, White, Sheller, and Miller, Deputy Douglas County Attorney Michael Cimino filed a Petition in the Separate Juvenile Court of Douglas County, Nebraska, styled as *In the Interest of Y.C.W. and X.C.W.*, JV13-1903, (hereinafter "Juvenile Proceeding"), alleging that Y.C.W. and X.C.W. came within the meaning of Nebraska Revised Statutes, 1943, Section 43-247(3a).

87.   As to Wang Anderson, the Petition specifically alleged:

A.   Said children have been subjected to inappropriate and dangerous discipline by their mother, Catherine Wang Anderson;

B.   Catherine Wang Anderson has failed to provide said children safe, stable and/or appropriate housing;

C.   Catherine Wang Anderson has failed to provide proper parental care, support and/or supervision for said children;

D.   Catherine Wang Anderson was observed to be acting in a manner consistent with untreated mental health needs;

E.   Due to the above allegations, said children are at risk for harm.

88.  On information and belief, the allegation that Wang Anderson "was observed to be acting in a manner consistent with untreated mental health needs" was made by Douglas County, through its deputy county attorneys, with no basis in fact, and without evidence of the same. This allegation harmed Wang Anderson throughout the proceedings.

89.  As to Dr. Wang, the Petition specifically alleged:

A.  Bo Wang has failed to protect said children from inappropriate and dangerous discipline by their mother, Catherine Wang Anderson;

B.  Bo Wang has failed to provide said children safe, stable and/or appropriate housing;

C.  Bo Wang has failed to provide proper parental care, support and/or supervision for said children;

D.  Due to the above allegations, said children are at risk for harm.

90.  The same day, Cimino filed a Motion for Temporary Custody in the Juvenile Proceeding dated October 10, 2013, along with an Affidavit for Removal of Juvenile(s) from Parental Custodial Home by Deputy Miller dated October 8, 2013; and an Affidavit for Removal of Minor Child from Parental/Custodial Home by Deputy Wheeler dated October 10, 2013.  On October 10, 2013, without notice to Wang Anderson or Dr. Wang, Judge Crnkovich rendered an ex parte Order for Immediate Custody which continued custody of Y.C.W. and X.C.W. with NDHHS for placement in foster care or other appropriate placement.

91.  The educational rights of Wang Anderson and Dr. Wang with respect to X.C.W. have never been suspended or terminated.

92. The first hearing in the Juvenile Proceeding was not held until October 18, 2013, eight days after entry of the ex parte order for temporary custody.  The hearing was a "First

Appearance and Protective Custody" hearing. Both Wang Anderson and Dr. Wang were present for the hearing. Y.C.W. and X.C.W. were not present for the hearing.

93. To sustain the continued temporary custody of a child, the State must prove the requirements of Neb. Rev. Stat. §43-254 by a preponderance of the evidence. *In re Interest of Borius H. et al.,* 251 Neb. 397, 558 N.W. 2d 31 (1997). These requirements include showing that: a) continuation of the juvenile in his or her home would be contrary to the health, safety, or welfare of the juvenile; and, b) that reasonable efforts were made to preserve and reunify the family, if required under Neb. Rev. Stat. §43-283.01.

94. At the October 18, 2013 hearing, the State, through the Douglas County Attorney, its counsel, did not present any evidence to prove the requirements of Neb. Rev. Stat. §43-254, and Judge Crnkovich did not make a written determination that: a) continuation of the juvenile in his or her home would be contrary to the health, safety, or welfare of the children; or b) that reasonable efforts were made to preserve and reunify the family; or c) that any exception to the requirement of reasonable efforts was applicable.

95. At the October 18, 2013 hearing, Judge Crnkovich told Wang Anderson and Dr. Wang the following with respect to their due process rights to an immediate evidentiary hearing:

As I was saying, the only issue today is whether the kids remain in foster care. You, of course, have an absolute right to object to that or you can agree to it. It's up to you. But if you object to that temporary foster care placement, you have a right *today* to have a more formal hearing…

96. Even though Wang Anderson and Dr. Wang resisted temporary detention and requested a hearing on the issue of detention on October 18, 2013, the hearing was continued for another twenty days until November 7, 2013. As a direct and proximate result of the Douglas

County's failure to present evidence to support the State's continued detention of X.C.W., nearly one month passed after the entry of the ex parte temporary custody order before Wang Anderson or Dr. Wang were afforded a detention hearing.

97.    The State, NDHHS and NFC all failed to present a plan for visitation between X.C.W. and Wang Anderson and Dr. Wang, or between Y.C.W. and Wang Anderson and Dr. Wang, to the Juvenile Court at the October 18, 2013 hearing.  As a result, the Juvenile Court did not order a meaningful or enforceable visitation plan at that hearing.

98.  On October 28, 2013, Judge Crnkovich improperly appointed a guardian ad litem for Wang Anderson, on its own motion, without notice to Wang Anderson and without a hearing. Judge Crnkovich did not specify the legal or factual basis for this appointment in its Order dated October 28, 2013.  Implicit in Judge Crnkovich's appointment of a guardian ad litem for Wang Anderson was a determination that Andersen was incapacitated or incompetent.  By appointing a guardian ad litem for Wang Anderson without notice, a hearing, or evidence, and by implicitly determining that Wang Anderson was incompetent to direct her own litigation in the Juvenile Proceeding, Judge Crnkovich denied Wang Anderson her Constitutional right to due process in the Juvenile Proceeding.

99.  During the pendency of the Juvenile Proceeding, two psychologists and a psychiatrist examined and evaluated Wang Anderson, and determined that she had no mental illness, other than adjustment disorder which was developed following the removal of her children.

100.  Judge Crnkovich wrongfully caused a stigma of mental illness to attach to Wang Anderson by her October 28, 2013 order appointing a guardian ad litem.  This stigma caused great prejudice to Wang Anderson throughout the entire Juvenile Court proceeding.

101.  On information and belief, during the time period from October 9, 2013 through October 31, 2013, X.C.W.'s mental and physical condition were not properly assessed, documented, or reported by NFC, NDHHS, Smith, Winans, Treinen, Gurock, Derr, or Christian Heritage.

102.  On information and belief, during that same time period, X.C.W. was not adequately monitored or supervised.  On information and belief, between October 9, 2013 and October 31, 2013, X.C.W. and Y.C.W. began to show signs of mental, emotional, and physical distress caused by her removal from her parents' home.  Derr failed to timely report those signs to any health care provider.  On information and belief, Christian Heritage, NDHHS, NFC, Smith, Winans, Gurock, and Treinen were also aware of these signs during that time period, and failed to timely and appropriately respond.

103.  On information and belief, on or before October 23, 2013, while in the care and custody of NDHHS, NFC, and Derr, X.C.W. was showing signs of distress, and was allowed to obtain large numbers of laxatives and other harmful diet medications or pills.

104.  On or about October 23, 2013, Derr, Trienen, NDHHS, NFC, Smith, Winans, and Christian Heritage knew or should have known that X.C.W. had obtained those medications or pills, and that X.C.W.'s possession of those medications or pills was dangerous to her.

105.  Derr, Trienen, NDHHS, NFC, Smith, Winans, and Christian Heritage all failed to timely seek immediate care and treatment, despite X.C.W.'s life-threatening condition, or report this information to any medical provider, to X.C.W.'s parents, or to the Court.

106.  On information and belief, during that time period, X.C.W.'s mental and emotional condition deteriorated as a direct and proximate result of: a) being removed from Wang Anderson's care; and, b) failure of Derr, Christian Heritage, Smith, Winans, Trienen, NFC, and

NDHHS to properly monitor and supervise X.C.W. and to timely report and respond to the signs X.C.W. was showing of mental, emotional, and physical distress and illness.

107.  On or about October 31, 2013, Derr took X.C.W. to the emergency room at Bergan Mercy Hospital in Omaha, Nebraska.

108.  On information and belief, X.C.W. was referred to the Eating Disorders Program of Children's Hospital and Medical Center ("Children's Eating Disorders Program") on October 31, 2013.

109.  On information and belief, Defendants Beals and Dr. Harrington did an intake and mental status assessment of X.C.W. on October 31, 2013.  On information and belief, this was done without informed consent or notice to X.C.W.'s parents.  On information and belief, Beals and Dr. Harrington failed to obtain and consider necessary information regarding X.C.W.'s developmental, family, and medical history before making diagnoses and recommendations for X.C.W.  Beals and Dr. Harrington failed to obtain and consider X.C.W.'s health records and failed to consult with either her mother or her father regarding her health history.  These failures constituted a departure from the standard of care by Beals and Dr. Harrington.

110.  On information and belief, based on their October 31, 2013 assessment, Beals and Dr. Harrington formed diagnostic impressions and recommended that X.C.W. attend the Children's Eating Disorders Program.

111.  On information and belief, prior to recommending such a high level of treatment, Beals and Dr. Harrington did not first offer or attempt to treat X.C.W. with a less restrictive level of treatment.

**Admission to Children's Hospital Partial Program**

112.  On information and belief, on or about October 31, 2013, X.C.W. was admitted to the partial hospitalization program part of the Children's Eating Disorders Program in Omaha, Nebraska by Dr. Harrington and Kara Beals, with the assent of NFC, Derr, and Smith.  She was admitted to the Children's Eating disorders Program until about January 23, 2014.  At all times when X.C.W. was admitted to this program, she was under the health care of Dr. Harrington and Beals.  While she was admitted to this program, X.C.W. continued to reside with Derr and Y.C.W., but was physically present at the Children's Eating Disorders Program during most daytime hours.

113.  On information and belief, the admission of X.C.W. to the partial hospitalization part of the Children's Eating Disorders Program isolated X.C.W. from her parents and from other normal social interactions, to the detriment of her health and well-being.  On information and belief, her admission to and daily participation this program also caused X.C.W. to become excessively preoccupied with her nutrition, weight, appearance, and health, and distracted her from the normal age-appropriate occupations and responsibilities.  As a proximate result of her admission to the partial hospitalization part of the Children's Eating Disorders Program, X.C.W.'s condition worsened.

114.  At all relevant times, the Children's Eating Disorders Program treatment components included medical management, individual therapy, family therapy, group therapy, nutrition, and recreation therapy.

115.  As of the time of X.C.W.'s admission to the partial hospitalization program, she had never been prescribed prescription medications other than antibiotics (on one occasion), and was not taking any prescription medications.

34

116.  At all relevant times, family therapy was an "integral" part of an eating disorder patient's recovery, and was mandated by insurance companies if the patient was a minor.  The standard of care for treatment of eating disorders required family therapy.

117.  Family therapy was not offered or provided to X.C.W. and her parents from October 31, 2013 through January 23, 2014.

118.  At all relevant times, the continuum of care for the Children's Eating Disorders Program included outpatient services, partial hospitalization and evening outpatient.

119.  On information and belief, Children's Hospital, Dr. Harrington and Beals could have provided X.C.W. with the appropriate standard of care for the symptoms of October 31, 2013 through outpatient services or evening outpatient care, rather than immediately recommending the more restrictive and isolating partial hospitalization.

120.  On information and belief, Children's Hospital and Medical Center, Dr. Harrington and Beals admitted X.C.W. to the partial hospitalization part of the Children's Eating Disorders Program over her initial objection and without first obtaining proper informed voluntary consent, in violation of X.C.W.'s Constitutional right to have her parents make decisions with regard to her health care and in violation of the right of Wang Anderson and Dr. Wang to direct the health care of X.C.W.

121.  On information and belief, neither Derr, nor Smith, nor Winans, nor NFC had authority to consent to health care for X.C.W. at any time.  NHHHS did not have authority to consent to hospitalization of X.C.W.

122.  Neither Wang Anderson nor Dr. Wang were consulted with, informed about or consented to the admission of X.C.W. to the Children's Eating Disorders Program.

123.   Neither Wang Anderson nor Dr. Wang were consulted with, were informed about or consented to X.C.W.'s school attendance being suspended, altered, or discontinued on or after October 31, 2013.

124.   On information and belief, X.C.W. attended Millard West High School until she was admitted to the Children's Eating Disorders Program.

125.   As a direct and proximate result of her admission to the Children's Eating Disorders Program, X.C.W. did not attend school from October 31, 2013 through January 23, 2014.   On information and belief, NDHHS, NFC, Winans, Smith and Derr failed to ensure that X.C.W. was attending school during that time period, and failed to retrieve and deliver school work for X.C.W. on a timely and regular basis. In fact, the admission of X.C.W. to the Children's Eating Disorders Program proximately caused her to fail her classes at Millard West High School during the 2013 fall semester.

126.   Wang Anderson offered on numerous occasions to retrieve and deliver X.C.W.'s school assignments to her and deliver them to the school upon completion of work, but those offers were all declined by NDHHS, NFC, Smith and Winans, and those Defendants accused Wang Anderson of being controlling.

127.   On information and belief, NDHHS, NFC, Smith and Winans all failed to ensure that X.C.W. attended school during the 2014 spring semester.   In fact, X.C.W. did not attend school during the 2014 spring semester and did not complete classes for that semester.

128.   As a direct and proximate result of her admission to the Children's Eating Disorders Program, X.C.W. was denied her right to education and her liberty was restrained.

36

129.   As a direct and proximate result of X.C.W.'s admission to the Children's Eating Disorders Program, Dr. Harrington, Beals, NFC, Smith, NDHHS, and Derr violated the Constitutional right of Wang Anderson and Dr. Wang to direct X.C.W.'s education.

130.   On November 7, 2013, 28 days after removal, a protective custody (detention) hearing was held in the Juvenile Proceeding.  Wang Anderson and Dr. Wang were present, but neither Y.C.W. nor X.C.W. was present at the detention hearing.  Following the hearing, Judge Crnkovich ordered that Y.C.W. and X.C.W. remain in the temporary custody of NDHHS.

131.   At the November 7, 2013 hearing, neither the State nor NDHHS presented any evidence regarding the issue of parental visitation with the minor children.  At that hearing, and without prior notice to Wang Anderson or Dr. Wang, NDHHS attorney Carla Heathershaw-Risko asked that "all contact with the parents be therapeutic in nature."  Although she did not present any evidence in support of this recommendation, Risko stated that "The visitations have been supervised and have had to end early due to continued inappropriate behavior by Ms. Wang Anderson at those visits, including pressuring the girls and making them feel guilty about the fact that this case is involved with the Juvenile Court."

132.   On information and belief, Risko's statement was false, inaccurate, and misled the Court.

133.   On or about November 7, 2013, based upon Risko's representation, Judge Crnkovich ordered that Wang Anderson "shall have reasonable rights of therapeutic visitation as arranged by the Nebraska Department of Health and Human Services."

134.   On information and belief, there was no proper basis for the November 7, 2013 NDHHS recommendation stated by Risko.

135.  Judge Crnkovich's order for "therapeutic" visitation was an improper delegation of a matter for constitutionally authorized judicial determination, in at least two respects.  First, arrangement of the "therapeutic" visitation was left to the discretion of NDHHS.  The Nebraska Juvenile Code does not authorize NDHHS to determine or place restrictions on parental visitation rights.  Parental visitation rights, as a subject within the Nebraska Juvenile Code, are matters for judicial determination.  *In re Interest of C.A.,* 235 Neb. 893, 900, 457 N.W.2d 822 (1990).  Second, the commencement, occurrence, or non-occurrence of visitation was subject to and conditioned upon the availability and approval of a therapist, presumably to be chosen by NDHHS.   Not only was this an improper delegation of a matter for judicial determination to an undetermined and unknown therapist, it also implicitly required Wang Anderson to submit to mental health services prior to adjudication, which the Court did not have jurisdiction to do.

136.  NDHHS, NFC, Winans, Smith and Risko knew that requesting such a condition was contrary to NDHHS policy as there was no such thing as "therapeutic" visitation provided in its policies.  (See Case Management for Child Abuse, Neglect and Dependency Cases Guidebook, page 30)  These defendants also knew or should have known that visitation between the children and their parents would not occur or would be delayed as a direct result of the condition that the visits be therapeutic in nature.

137.  Requesting and imposing such a limitation on Wang Anderson's visitation rights was a barrier to reunification created by NDHHS, Risko, NFC, Smith and Winans.  This limitation led to delayed and infrequent visitation and contact between the children and Wang Anderson, which was foreseeable to NDHHS, Risko, NFC, Smith and Winans at the time the recommendation for "therapeutic visitation" was made to the Juvenile Court.

138.  On information and belief, NDHHS, NFC, Risko, Winans, and Smith did not make a referral for, or otherwise coordinate or arrange for therapeutic visitation between X.C.W. and Wang Anderson or between X.C.W. and Dr. Wang in a timely fashion.

139.  From November 7, 2013 through January 23, 2014, Wang Anderson's visits with X.C.W. were supervised by therapist Beals and took place at the Children's Eating Disorder Program.  These visits were provided to X.C.W. and Wang Anderson less than once per week during that time period, largely due to the unavailability of Beals or other therapist to supervise the visits.

140.  From November 7, 2013 through January 23, 2014, Wang Anderson was not allowed to see or visit with X.C.W. during the following holidays: Thanksgiving of 2013, Christmas of 2013, New Year's Day of 2014, or the Chinese New Year of 2014.

141.  During that time period, Children's, Beals and Dr. Harrington interfered with the visits between X.C.W. and Wang Anderson in the following respects: a) requiring Wang Anderson's court-appointed guardian ad litem to be present for all visits; b) causing or allowing frequent interruptions to visits; c) not giving sufficient notice to Wang Anderson of visits; and d) speaking for, interrupting, or not allowing X.C.W. to speak for herself when communicating with Wang Anderson during visits.

142.  By requiring Wang Anderson's guardian ad litem to be present for all visits with X.C.W., Children's, Beals and Dr. Harrington communicated to X.C.W. that Wang Anderson was not mentally fit to have visits with X.C.W. by herself, causing further deterioration of the parent-child relationship between Wang Anderson and X.C.W.

143.  Treinen provided therapy services for Y.C.W. from October, 2013 through May, 2014.  On information and belief, during that time period, Treinen did not encourage Y.C.W. to

engage or participate in contact or communication with Wang Anderson or Dr. Wang, which was contrary to reunification. On information and belief, during that time period, Treinen repeatedly informed Y.C.W. that she had a "right to refuse" visitation with her parents, and Treinen supported her right to refuse, rather than encouraging Y.C.W. to engage or participate in contact or visitation with Wang Anderson and Dr. Wang.

144. On information and belief, Treinen did not provide any services to X.C.W. between October, 2013 and May, 2014. On information and belief, Treinen improperly rendered an opinion in October, 2013 which suggested limitations on visitation between Wang Anderson and X.C.W., and which was a proximate cause of Risko recommending that visitation between Wang Anderson and X.C.W. be therapeutic. As Treinen had never provided services to X.C.W., she had no basis in fact from which to form an opinion.

145. Between October 9, 2013 and January 23, 2014, Wang Anderson repeatedly asked NDHHS, NFC, Smith, and Winans to provide her additional visits with X.C.W. Wang Anderson even offered to pay the cost of an additional therapist to supervise the visits. NDHHS, NFC, Smith and Winans all failed to respond to Wang Anderson's requests, and did not provide additional visits during that time period. On information and belief, even X.C.W.'s health care providers had recommended or approved additional visitation between X.C.W. and Wang Anderson during that time period.

146. On information and belief, the mental health of Y.C.W. declined between October 31, 2013 and January 23, 2014. While Y.C.W.'s mental health was declining, X.C.W. was residing with her. Exposure of X.C.W. to Y.C.W.'s declining mental state between October 13, 2013 and January 23, 2014 proximately caused X.C.W. to suffer from serious anxiety.

147.   On information and belief, between October 31, 2013 and January 23, 2014, Dr. Harrington and Beals learned that Y.C.W.'s mental health was declining, and that X.C.W.'s exposure to Y.C.W.'s declining mental health while at Derr's home had caused X.C.W.'s mental and emotional health to decline.

147.   On information and belief, between October 31, 2013 and January 23, 2014, Dr. Harrington or Beals informed NDHHS, NFC, Winans, and Smith of the negative impact of Y.C.W.'s declining mental health on X.C.W., and recommended to them that X.C.W. be placed in a different foster home from Y.C.W.

148.   On information and belief, NDHHS, NFC, Winans, and Smith were aware that exposing X.C.W. to Y.C.W.'s declining mental health between October 9, 2013 until January 23, 2014 was harming X.C.W., and said Defendants did not take steps to remove X.C.W. from the placement and situation in Derr's home.

149.   On December 10, 2013, a Case Settlement Conference was held in the Juvenile Proceeding.  At that time, the adjudication hearing was scheduled to begin on March 12, 2014, approximately five (5) months after the minor children were removed from the care and custody of Wang Anderson.

150.   Neb. Rev. Stat. § 43-278 generally requires that all cases filed under Neb. Rev. Stat. § 43-247(3) must have an adjudication hearing not more than 90 days after the petition is filed. The court may only continue the case beyond the 90-day period upon a showing of good cause. No showing of good cause for continuance was made by the State of Nebraska or any other party to the Juvenile Proceeding, and Judge Crnkovich failed to make a finding of good cause when it set the adjudication hearing for March 12, 2014.

151.  On about December 11, 2013, Dr. Harrington recommended and prescribed the drug Zoloft for X.C.W.  X.C.W. began taking Zoloft on that date.  Neither Dr. Harrington, Beals, nor any other health care provider informed Dr. Wang or Wang Anderson regarding the Zoloft recommendation before it was prescribed for and administered to X.C.W.  Neither Dr. Wang nor Wang Anderson gave consent to X.C.W. taking the drug Zoloft; they both disagreed with it.  On information and belief, X.C.W. stated her disagreement with being treated by Zoloft.  On information and belief, Dr. Harrington prescribed Zoloft for X.C.W. without obtaining voluntary informed consent.

152.  On December 17, 2013, therapist Beals stated to Wang Anderson: "I am unable to provide any additional therapeutic visits/therapy sessions other than those scheduled, at this time. My availability for the foreseeable future will only allow for me to have one therapeutic session/visit per week."

153. Due to serious, life-threatening decline in X.C.W.'s health, on December 20, 2013, Martin Harrington, M.D., recommended that X.C.W. be transferred immediately to an inpatient eating disorder program to allow for more intensive monitoring and treatment to address her eating disorder and anxiety symptoms.  Dr. Harrington opined that it would be essential for X.C.W.'s success "that the program have expertise in addressing her anxiety via appropriate therapy techniques and family issues through family therapy as well as addressing and monitoring her eating disordered behaviors aggressively."   On December 27, 2013, Dr. Harrington specifically recommended placement at one of the following facilities: Brandywine Hospital in Coatsville, Pennsylvania; Roger's Memorial Hospital in Oconomowok, Wisconsin; and Children's Medical Center in Plano, Texas.

154. On information and belief, X.C.W.'s condition had become life-threatening as early as December 20, 2013, because she had not been eating and had very limited fluid intake for four days, while in Derr's care. X.C.W. was admitted to the emergency room on or about December 25, 2013 because she had fainted and lost consciousness. On information and belief, X.C.W. was not properly supervised while in Derr's care. X.C.W. was found lying on the hard bathroom floor unconscious. X.C.W. was released back to Derr's care even though Dr. Harrington had warned that X.C.W. needed to be transferred to inpatient 24/7 care.

155. As of December 31, 2013, neither NDHHS, NFC, Winans, Smith nor any of their respective employees, agents, or designees had made efforts for X.C.W. to be placed at any of the three recommended facilities (Brandywine, Pennsylvania; Roger's Memorial, Wisconsin; or, Children's Medical Center, Texas), or made any other efforts to provide X.C.W. with proper health care, notwithstanding the life-threatening condition X.C.W. was in.

156. On December 31, 2013, based on the written recommendations of Dr. Harrington, and based on her own post-graduate and advanced medical training, Wang Anderson filed a Motion in the Juvenile Court requesting an order directing NDHHS and NFC to seek immediate placement of X.C.W. for inpatient treatment at Children's Medical Center in Plano, Texas or other facility approved by Dr. Harrington.

157. During the time period between October 8, 2013 and the present, necessary and appropriate health care and other necessary services have not been coordinated, arranged, or provided for X.C.W. or Wang Anderson or Dr. Wang in a timely manner by NFC, NDHHS, Smith, Winans, Richardson, Paul, Petzel, Richey, or Dr. Harrington. Wang Anderson repeatedly had to contact providers directly to request necessary services for X.C.W. in order to get those

services arranged.  On information and belief, but for Wang Anderson's persistent requests and contacts, many of those services would not have been arranged at all.

158.   The Juvenile Court heard Wang Anderson's Motion regarding inpatient treatment on January 9, 2014.  NDHHS, NFC, Smith and Winans failed to even make application for placement of X.C.W. at any of the three facilities recommended by Harrington until January 9, 2014, which was two weeks after Dr. Harrington's recommendation was made.  Although NDHHS, NFC, Smith, Winans and their respective employees, agents and designees were aware of the three facilities recommended by Dr. Harrington, application was made to only one facility, the facility in Wisconsin (which was known to be not suitable due to an age limitation) on that date.  No application was made to Children's Medical Center in Plano, Texas, despite the fact that the Plano facility was in close proximity to Dr. Wang's usual residence and more conducive to including him in family therapy.

159.   Despite the fact that Judge Crnkovich knew from Wang Anderson's motion and evidence at the January 9, 2014 hearing that X.C.W.'s condition was so extremely dangerous that she needed to be transferred to an inpatient eating disorder facility immediately, she denied Wang Anderson's December 31, 2013 Motion.

160.   In her order of January 10, 2014, Judge Crnkovich sought input from NDHHS and the "mental health professionals" as to whether the current level of supervision of Wang Anderson's visits was appropriate, and whether other visitation arrangements would better serve the children's needs.

161.   On January 15, 2014, therapist Beals confirmed that X.C.W. had stated to her that "she enjoys the visits with her mother".  Beals recommended "one (1) therapeutic visit a week (supervised by a therapist, as well as Teresa Nutzman, Catherine Wang Andersons, GAL) as well

as one (1) supervised visit a week to be supervised by a visitation specialist provided by the state."

162.  On or about January 15, 2014, Beals stated in an email to Risko: "I also believe it is in the pts best interest that family therapy occur.  Family Therapy is an integral part of the pts recovery, and is mandated by most insurance companies if the pt. is a minor.  If this cannot be done due to the case being in the pre-adjudication phase, I believe a meeting between a therapist, the pt., the pts mother and the pts mother GAL, is beneficial to discuss the pts progress in the program, to help aide in improving the communication between the pt. and her mother, as well as to discuss any concerns regarding the eating disorder treatment that the pt. is receiving."

163.  The ongoing failure and refusal by NDHHS, NFC, Risko, Smith, and Winans to provide family therapy to X.C.W. and her parents was detrimental to X.C.W.'s health; excluded Wang Anderson and Dr. Wang from participating in X.C.W.'s health care; was a barrier to improving communication between X.C.W. and her parents; and prevented Wang Anderson and Dr. Wang from being able to communicate their concerns regarding X.C.W.'s eating disorder treatment with the appropriate providers.

164.  A hearing was held in the Juvenile Proceeding on January 16, 2014.  At that hearing, the Court received evidence which included a letter by Wang Anderson, and correspondence and letters from Dr. Harrington, Therapist Kara Beals, and NFC Family Permanency Specialist Supervisor Evan Winans regarding visitation between Wang Anderson and X.C.W.  The evidence received at that hearing did not include a visitation or parenting time plan prepared by NDHHS, NFC, Winans, or Smith.  After receiving that evidence, Judge Crnkovich ordered a specific plan for visitation between Wang Anderson and X.C.W., which

included "one therapeutic session per week and 2-3 visits per week supervised by an experienced Family Support Worker" in its Order dated January 29, 2014.

165.   As all of the evidence demonstrated at the January 16, 20114 hearing, X.C.W. and Wang Anderson were deprived of meaningful and crucial time together, contact and communication, for months, as a direct and proximate result of: a) the failure of NDHHS, White, Sheller, NFC, Winans, and Smith to prepare a clear visitation or parenting time plan; and b) The impossible prior recommendation by Risko and NDHHS that visitation be "therapeutic in nature".

166.   As of October 9, 2013 and thereafter, NDHHS, NFC, Winans, Smith and their respective employees, agents, and designees knew that frequent visitation between X.C.W. and each of her parents was essential to X.C.W.'s reunification with her parents, and that a written individualized parenting time or visitation plan was required.  As of October 31, 2013, NDHHS, NFC, Children's, Dr. Harrington, Beals, Winans, Smith and their respective employees, agents, and designees knew, or should have known, that family therapy was an "integral" part of X.C.W.'s recovery from her eating disorder and the standard of care for such a disorder.

**Placement at Laureate Psychiatric Hospital Program**

167.   On January 23, 2014, NDHHS filed a Notice of Change of Placement which stated that X.C.W.'s placement was being changed from foster care with Sonia Derr in Omaha, Nebraska to inpatient hospitalization at the Laureate Psychiatric Hospital Eating Disorder Program ("Laureate") in Tulsa, Oklahoma.  In fact X.C.W. was placed at Laureate Psychiatric in Tulsa, Oklahoma on or about that date.

168. Between January 23, 2014 and February 7, 2014, X.C.W. called Wang Anderson by telephone and talked with her nearly every evening under supervision. This communication was determined by supervising nurses to be very appropriate.

169. Between January 23, 2014 and February 7, 2014, X.C.W. was also communicating frequently with her sister, Y.C.W. On information and belief, these communications between X.C.W. and Y.C.W. were interfering with X.C.W.'s participation in treatment while at Laureate, which staff at Laureate Psychiatric was aware of.

170. At all relevant times, NDHHS, NFC, Laureate, Parke, Smith, Winans and their respective employees, agents and designees had an ongoing duty to ensure, protect, and maintain the safety, health, and welfare of the minor children in their care, including Y.C.W. and X.C.W.

171. At all relevant times, NDHHS, NFC, Smith, Winans and their respective employees, agents and designees had an ongoing duty to provide Wang Anderson and Dr. Wang with a reasonable opportunity to reunify. This duty included an obligation to make ongoing efforts to ensure frequent and regular contact between X.C.W. and each of her parents. Essential to these efforts was a clear, written plan for visitation or parenting time, especially when X.C.W. was being transferred out of state to a totally new environment in the care of staff not familiar with the ongoing family situation.

172. On January 23, 2014, NDHHS, NFC, Smith, Winans and their respective employees, agents and designees had a duty to inform Laureate Psychiatric staff that: a) family therapy was an "integral" part of X.C.W.'s treatment of, and recovery from her eating disorder; b) that the current and sole permanency objective was reunification with X.C.W.'s parents; and, c) that providing X.C.W. with regular and frequent contact with her parents was critical to reunification. At that time, NDHHS, NFC, Smith, Winans and their respective employees,

47

agents and designees had a duty to provide Laureate Psychiatric Hospital and its Eating Disorder Program staff with a clear written plan regarding parental visitation or parenting time and other communication regarding X.C.W.'s care and progress.  NDHHS, NFC, Smith, Winans and their respective employees, agents and designees failed and refused to prepare or provide such a plan to Laureate.

173.   On information and belief, NDHHS, NFC, Smith, Winans and Risko all failed to provide Laureate Psychiatric staff with a copy of the January 29, 2014 Juvenile Court order in which Judge Crnkovich provided: "that Catherine Wang Anderson and X.C.W. Wang a.k.a. X.C.W. Wang shall have one therapeutic session per week and 2-3 visits per week supervised by an experienced Family Support Worker."

174.   As a direct and proximate result of the failure of NDHHS, NFC, Risko, Winans, and Smith to provide a written visitation plan or a copy of the January 28, 2014 Juvenile Court Order to Laureate Psychiatric Staff, meaningful, effective and successful visitation, communication, or contact between X.C.W. and her parents at Laureate Psychiatric was never implemented or achieved.  This created a barrier to reunification, caused further deterioration of the relationship between X.C.W. and each of her parents, and foreclosed Wang Anderson and Dr. Wang from having a reasonable opportunity to reunify with X.C.W.

175.   As of January 23, 2014, Dr. Harrington and Kara Beals had a duty to inform Laureate Psychiatric staff of the integral importance of family therapy, and that one or both of them had recently recommended family therapy including X.C.W. and one or both of her parents..  On information and belief, they did not provide Laureate Psychiatric staff with such information.

176.   On information and belief, weekly family therapy was a standard and critical component of the Laureate Psychiatric eating disorder treatment program at all relevant times. In fact, the prevailing standard of care for inpatient and other eating disorder treatment at all relevant times included weekly family therapy.

177.   NDHHS, NFC, Smith, Winans, Parke, and Dr. Harrington failed to arrange, coordinate or provide timely and appropriate family therapy including X.C.W. and either of her parents during the time period when X.C.W. was placed at Laureate Psychiatric hospital.

178.   As a direct and proximate result of these failures by NDHHS, NFC, Smith, Winans, Parke, and Dr. Harrington, effective family therapy was not provided to X.C.W. while she was at Laureate, to the detriment of her health, safety and welfare, and to the detriment of her relationships with her parents.

179.   On January 28, 2014, Deputy Douglas County Attorney Amy Schuchman filed a Supplemental Petition in the Juvenile Proceeding, seeking to terminate the parental rights of Dr. Wang with respect to Y.C.W. and X.C.W., and an Amended Petition in the Juvenile Proceeding, seeking to terminate the parental rights of Wang Anderson with respect to Y.C.W. and X.C.W.

180.   On information and belief, upon her arrival to Laureate, X.C.W. was assessed by Laureate Psychiatric medical staff.

181.   On information and belief, NDHHS, NFC, Winans, Smith, Dr. Harrington, and Beals all failed to provide Laureate Psychiatric staff with accurate information regarding X.C.W.'s parents.

182.   On information and belief, at all relevant times, it was the policy of Laureate Psychiatric to communicate with a patient's family members upon admission. On information

and belief, neither Parke nor any other Laureate Psychiatric staff communicated with Wang Anderson or Dr. Wang regarding X.C.W. as part of their assessment of "family concerns".

183.   From about January 24, 2014, for nearly two weeks, X.C.W. had some limited contact with Wang Anderson and Dr. Wang.  Both Wang Anderson and Dr. Wang were invited and had planned to attend "Family Week" and to visit X.C.W. in person.

184.   At all relevant times, each month Laureate Psychiatric hosted Family Week – a three-day family involvement and education program.  Family Week included: a) a comprehensive review of eating disorders including the history, misconceptions and detailed explanations of each illness as well as an overview of how the brain is affected by an eating disorder; b) an overview of medical and psychiatric considerations in the treatment of eating disorders, including how malnutrition affects the body as well as co-occurring conditions like depression, anxiety and obsessive-compulsive disorder; c) a thorough discussion of nutrition therapy for eating disorders. *Adolescent parents will be educated about the "exchange" system in preparation for their daughter's discharge;* d) a presentation to help families understand how to navigate their insurance company and how to advocate for themselves; e) an in-depth explanation of the philosophy and day-to-day activities of the adolescent and adult programs; f) support groups for family members and loved ones including a separate support group for men and women; g) the opportunity to ask patients questions without your loved one being present.

185.   Parke began providing therapy to X.C.W. about one week after admission.  Prior to commencing therapy with X.C.W., Parke did not review any health records regarding X.C.W. from her prior hospitalizations.  On information and belief, as of March 7, 2014, Parke had not reviewed any records from X.C.W.'s prior hospitalizations, and the only health records regarding

X.C.W. that Parke had reviewed as of that date were records of assessment and care of X.C.W. while she had been at Laureate.

186.  On or about February 6, 2014, Parke wrote a letter regarding X.C.W.'s contact with her parents.  In her letter, Parke gave the following opinion:  "At this time I believe contact with parents is counterproductive.  Whether intentional or not they are sabotaging her potential recovery.  I would appreciate consideration around limiting contact until X.C.W. is not so vulnerable."  (Contrary to this letter, Parke testified later at the adjudication trial in the Juvenile Proceeding that the reason she was recommending "limiting" contact was due to X.C.W.'s medical condition.  She also testified that supervised visitation and family therapy with Dr. Wang had been very helpful and productive.)

187.  On information and belief, Parke's February 6, 2014 opinion was almost entirely based on hearsay and was not at all based on her personal observations of either Wang Anderson or Dr. Wang.  In fact, prior to writing the February 6, 2014 letter, Parke had only supervised or observed one (1) phone call between X.C.W. and Wang Anderson, and none with Dr. Wang.

188.  Parke's opinion was improper and without any reasonable basis in fact.

189.  On information and belief, Parke made no efforts to communicate with Wang Anderson or Dr. Wang, hold a family therapy session or a family conference, or make any other efforts to ensure meaningful and beneficial contact between X.C.W. and her parents, and did not independently verify the reports from X.C.W. before recommending "limiting contact" between X.C.W. and her parents.

190.  On information and belief, Parke knew or should have known that her February 6, 2014 letter would be presented to the Juvenile Court.  It was foreseeable to Parke at the time she

wrote the letter that her opinion would cause limitation or suspension of X.C.W.'s contact with Wang Anderson and Dr. Wang.

191.  On information and belief, Parke never had any communication with Risko about her February 6, 2014 letter or otherwise prior to her deposition on March 7, 2014.

192.  On February 7, 2014, Risko filed a Motion to Suspend Contact on behalf of NDHHS in the Juvenile Proceeding, asking to suspend all contact between X.C.W. and her parents until "such time as her therapist recommends contact resume".  Notice of the motion was not provided to Wang Anderson or Dr. Wang or their counsel until late in the day on February 6, 2014, less than 24 hours before the hearing on the motion.  Parke's February 6, 2014 letter was attached to the motion.

193.  In her Motion to Suspend Contact, Risko represented the following to the Court: "5.  Ms. Parke followed up this recommendation with an e-mail clarifying that her recommendation was no contact with Ms. Wang Anderson and Mr. Wang at this time, with a plan to re-evaluate when X.C.W. is eating her meal without having to supplement, not hiding food and eating on time."  Parke testified later that she never had sent such an email.  Risko knowingly made a false statement and misled the Court in her Motion to Suspend Contact.

194.  At the hearing, Risko also fabricated to the Court that Parke had recommended that contact between X.C.W. and her parents should be "stopped" until X.C.W. made further progress in her eating disorder program.  By making this statement, Risko deliberately misled the Juvenile Court, at a critical stage in the proceeding.

195.  Contrary to Risko's statement to the Juvenile Court, Parke testified at her March 7, 2014 deposition that she did <u>not</u> make a recommendation that X.C.W. should not have contact

with Wang Anderson or Dr. Wang. Parke also testified that she had told Smith that X.C.W., Dr. Wang and Wang Anderson should have a "family session."

196.  As a direct and proximate result of Parke's February 6, 2014 letter and opinion, and of  Risko's misrepresentation to the Juvenile Court, Judge Crnkovich suspended all contact between X.C.W. and Wang Anderson and between X.C.W. and Dr. Wang from February 7, 2014 until June 25, 2014.  This directly and proximately caused further deterioration of the familial parent-child relationships between X.C.W. and Wang Anderson and X.C.W. and Dr. Wang.

197.  In an email of February 10, 2014, three (3) days after the February 7, 2014 Juvenile Court order suspending parental contact with X.C.W. was entered, Parke told Smith that X.C.W. had stopped eating, and said: "I think this is all in response to not having contact with her parents."

198.  On information and belief, Smith never presented this information to the Court or made other efforts to arrange for X.C.W. to have contact with her parents, when she knew that, in X.C.W.'s therapist's opinion, X.C.W. was starving herself as a result of the suspension of parental contact, which resulted in a life-threatening condition and permanent damage.

199.  Parke testified at her March 7, 2014 deposition that she thought it had been difficult for X.C.W. to not have contact with either parent.

200.  As a direct and proximate result of Parke's February 6, 2014 letter, Risko's misrepresentation to the Juvenile Court on February 7, 2014, and Smith's failure to implement the recommendations of X.C.W.'s therapist or communicate her concerns to the Court, X.C.W. was cut off from her parents and her health declined from February 7, 2014 through June 25, 2014.

201.  As a direct and proximate result of these same acts or omissions by Parke, Risko, and Smith, Wang Anderson and Dr. Wang were cut off from their daughter, rendered unable to support her, kept in the dark in regards to her health and welfare, prevented from learning about her condition and care, and denied the opportunity to participate in or facilitate her recovery from February 7, 2014 and June 25, 2014.

202.  As a direct and proximate result of these same acts and omissions, X.C.W. suffered the detriment of not having the support of her parents while she was at Laureate.

203.  As a direct and proximate result of these same acts and omissions, X.C.W. remained admitted to an out-of-state mental institution, away from her parents, and out of Nebraska.

204.  On information and belief, during the entire time period when X.C.W. was admitted to Laureate, she was not attending school.

205.  On information and belief, NDHHS, NFC, Smith, and Winans all failed to communicate with Wang Anderson or Dr. Wang regarding decisions regarding X.C.W.'s education or health care while she was at Laureate.

206.  On information and belief, NDHHS, NFC, Smith, and Winans all failed to make arrangements for X.C.W. to attend school during the second (spring) semester of the 2013-2014 school-year, or to obtain and complete school work so that she received credit for school during that semester.

207.  The adjudication hearing in the Juvenile Proceeding on the State's Supplemental Petition and Amended Petition was held on March 12, 2014, March 13, 2014, March 28, 2014, May 2, 2014, and June 6, 2014.

208.   From October 8, 2013 through June 6, 2014, NDHHS, NFC, White, Sheller, Winans, Smith, Treinen, Beals, and Parke failed and refused to formulate, discuss, or implement a plan for family therapy, therapeutic visitation, or other visitation between either minor child and Wang Anderson and Dr. Wang.  Family therapy, therapeutic visitation, and visitation are all services customarily designed, calculated and intended to strengthen and improve the parent-child relationship.  As a direct and proximate result of said failures, the relationship between X.C. W. and Wang Anderson and Dr. Wang continued to deteriorate up to the time of the adjudication.

209.   Judge Crnkovich rendered her Adjudication Order on June 25, 2014, which adjudged Y.C.W. and X.C.W. as children within the meaning of Section 43-247(3a) of the Nebraska Juvenile Code, as to Wang Anderson and Dr. Wang, by a preponderance of the evidence.  By this order, Judge Crnkovich continued Y.C.W. and X.C.W. in the temporary custody of the NDHHS for appropriate care and placement, set the matter for disposition, and determined that those counts of the petitions which sought termination of parental rights were dismissed for failure to present a prima facie case.

210.   The State of Nebraska first appealed the Juvenile Court's denial of its requests to terminate the parental rights of Wang Anderson and Dr. Wang.  Wang Anderson and Dr. Wang then cross-appealed the adjudication.

211.   On information and belief, in late June of 2014, Derr falsely told at least one health care provider for Y.C.W. that the Juvenile Court had terminated the parental rights of Wang Anderson and Dr. Wang as to Y.C.W. and X.C.W.   On information and belief, Derr made the same false statement to Y.C.W., whereby alienating Y.C.W. from Wang Anderson and Dr.

Wang, to the detriment of their family relationships and causing significant distress, anxiety and depression.

212.   In its June 25, 2014 Adjudication Order, the Juvenile Court ordered that Wang Anderson and Dr. Wang should have reasonable rights of visitation with X.C.W. and Y.C.W. as arranged supervised by the Nebraska Department of Health and Human Services.  After hearing days of evidence, the Juvenile Court found no basis for requiring that contact between X.C.W. and Wang Anderson be "therapeutic" only.

213.   In May of 2014, Wang Anderson received notice that X.C.W. was to be discharged from Laureate.  After receiving this notice, Wang Anderson actively asked NDHHS and NFC to arrange for X.C.W.'s return, including making foster care arrangements as soon as possible.  At that time, Smith told Wang Anderson that Sonia Derr had informed NDHHS and NFC that Derr would not be capable of providing foster care for X.C.W. upon her return from Laureate.  Smith told Wang Anderson that the reason for the delay of X.C.W.'s discharge from Laureate was the unavailability of a foster home.  Wang Anderson then informed Smith that her relative Mei Zhang ("Zhang") and Zhang's husband Qi Dong ("Dong") were willing and able to accept placement of X.C.W.  Initially, Smith was willing to consider this possible placement, asked for the names and contact information for Zhang and Dong, and provided an application package.  Shortly thereafter, Smith and her supervisor Winans failed and refused to consider or explore this possible placement further.  On information and belief, even though this was a possible relative placement which should have been given prior consideration over any prospective agency-licensed or approved foster placement, NFC and Smith failed and refused to consider or explore this possible placement for discriminatory reasons, including because it was a Chinese family.

56

214.    Shortly thereafter, still in May of 2014, after Wang Anderson had informed NDHHS and NFC that she had filed an official complaint with HHS Civil Rights Division, Wang Anderson personally brought Mei Zhang and Qi Dong to the NFC waiting area for Smith, who finally showed up with Winans.  Both declined and refused to do the homestudy.  Wang Anderson also repeatedly asked supervisor Dan Little (hereinafter "Little") to do the home study.  Only then did NDHHS and NFC make a referral to Child Saving Institute to do a home study of the home of Zhang and Dong.  This referral was not made until June 24, 2014.  The home study was completed on August 29, 2014.  The recommendation from the home study was that Zhang and Dong "be allowed to foster their niece, [X.C.W.] in their home, until she is reunified with her biological parents or a permanency plan is in place."  On information and belief, NFC, NDHHS, Richardson, Risko, and Ucchino were all aware of this recommendation as early as August 29, 2014.

215.  On information and belief, the State, NDHHS, Smith, Winans, and NFC refused to place X.C.W. with Zhang and Dong upon her return from Laureate, which was June 30, 2014.

**Placement With Reid-Hansen and Hansen**

216.  On or about July 1, 2014, the State, NDHHS, Smith, Winans and NFC were aware of the available relative placement with Chinese relatives, (which, pursuant to Nebraska regulations and NDHHS policies, was to be preferred over a non-relative licensed foster home).  Nonetheless, these Defendants places X.C.W. with Reid-Hansen and Hansen, who were non-relative licensed foster care providers, with little experience as foster parents, and who were not acquainted or familiar with X.C.W.  At that time Reid-Hansen and Hansen were residing in Bellevue, Nebraska.  X.C.W. is not related to Reid-Hansen or Hansen and they are not Chinese or familiar with Chinese culture.  Familiarity with Chinese culture, (including, for example, the

dietary practices), was very important because X.C.W. was raised for 15 years with Chinese food, which is very different from local dietary practices. On information and belief, this disregard for X.C.W.'s dietary needs contributed to her eating disorder.

217. At the time X.C.W. was placed with Reid-Hansen and Hansen, there were at least eight (8) other minor children residing in their home, including four other foster children of various ages. Throughout the time period when X.C.W. was placed with Reid-Hansen and Hansen, they did not have the capacity provide appropriate and necessary care, guidance or supervision for X.C.W. On information and belief, Hansen and Reid-Hansen were unable to provide transportation for X.C.W. when she needed it during the time when she was placed in their care.

218. On information and belief, NDHHS, KVC, NFC, Reid-Hansen, and Hansen all knew or should have known that Reid-Hansen and Hansen did not have the experience or capacity to provide appropriate and necessary care or supervision for X.C.W., from June 20, 2014 through March 29, 2017. Around the time of X.C.W.'s initial placement with Reid-Hansen and Hansen, NFC, KVC, NDHHS, Winans, and Smith discussed concerns that Reid-Hansen and Hansen would be overwhelmed by, or incapable of, taking on X.C.W. as an additional foster child. Despite these concerns, NDHHS, NFC, KVC, Winans, and Smith arranged, approved, or allowed X.C.W. to be placed with Reid-Hansen and Hansen.

219. By placing X.C.W. with Reid-Hansen and Hansen, NDHHS, NFC, KVC, Smith and Winans knowingly placed her in a dangerous situation. By accepting the placement, Reid-Hansen and Hansen knowingly placed X.C.W. in a dangerous situation. As a direct and proximate result of the actions of NDHHS, NFC, KVC, Smith, Winans, Reid-Hansen, and

Hansen in placing X.C.W. with Reid-Hansen and Hansen, X.C.W. was physically, emotionally, mentally, and psychologically harmed, and Wang Anderson and Dr. Wang suffered damage.

220.  NDHHS, NFC, KVC, Smith, Winans, Richardson, Paul, Richey and Petzel placed X.C.W. with Reid-Hansen and Hansen at various times, including: from July 1, 2014 through October 29, 2014; from February 2, 2015 through May 11, 2016; and from December 14, 2016 through May 29, 2017.  As a direct and proximate result of Reid-Hansen and Hansen's inability to provide appropriate care, guidance and supervision during those time periods, X.C.W. has been harmed, including being sexually exploited through electronic media and otherwise, and has been sexually abused and sold over money, repeatedly, including, without limitation, in August of 2014, March of 2015, September of 2015, and other unknown or undisclosed occasions.

221.  On information and belief, NDHHS, NFC, KVC, Smith, Winans, Richardson, Paul, Petzel, Richey, Reid-Hansen, and Hansen have all failed, refused and neglected to protect X.C.W. from these foreseeable incidents; and to timely discover, investigate, report, and respond to each incident when X.C.W. has been sexually abused, exploited or sexually assaulted and sold repeatedly over money.  They have failed and refused to properly supervise, monitor, or restrict her use of electronic devices, allowed her to be employed in dangerous locations, failed to educate her regarding appropriate relationships and attire, failed to timely or adequately inform her parents or the Court regarding these incidents, failed to provide proper medical care, including timely examination, testing, and treatment, failed to provide proper education regarding medical care, testing, and treatment, failed to make appropriate critical incident reports following each incident.

222.  Upon her discharge from Laureate Psychiatric Hospital and return to foster care in Nebraska, X.C.W. continued to require regular treatment for her eating disorder at Children's Hospital and Medical Center in Omaha, Nebraska, under the care of Dr. Harrington and therapist Kara Beals.

223.  The standard of care for treatment of eating disorders, including anorexia nervosa included regular individual and family therapy, at all relevant times.  At all relevant times, NDHHS, NFC, Sara Smith, Anna Richardson, Nicole Paul, Anne Petzel, Jennifer Richey, Dr. Harrington, Laureate Psychiatric Hospital, Remuda Ranch, Parke, Boyles, and Kara Beals were aware of X.C.W.'s health condition and diagnoses, and that the standard of care included individual and family therapy as necessary components of treatment.

224.  Wang Anderson repeatedly requested that NDHHS, NFC, Winans, Smith, Paul, Richardson, Richey, and Petzel arrange for family therapy to include X.C.W. and her during the time period from October 8, 2013 through the present.  These Defendants did not timely or appropriately offer the family therapy Wang Anderson requested, did not make timely or appropriate referrals to providers for family therapy, did not formulate or develop a plan for therapy that clearly identified the needs of X.C.W. and Wang Anderson to be addressed in therapy, and improperly impeded, blocked, or suspended family therapy.  As a result of these failures by NDHHS, NFC, Winans, Smith, Paul, Richardson, Richey, and Petzel, Wang Anderson's due process rights were violated, X.C.W.'s health and safety was compromised, and efforts at reunification were undermined.

225.  On July 14, 2014, Deputy County Attorney Amy Schuchman filed a Notice of Intention to Appeal the June 25, 2014 Juvenile Court Adjudication Order.

226. On July 25, 2014, Wang Anderson filed a Notice of Appeal from the Adjudication Order.

227. NDHHS, NFC, Smith, and Winans did not prepare any plan or offer any visits to Wang Anderson until July 24, 2014, almost a full month after X.C.W. had returned from Laureate Psychiatric Hospital. Without involving Wang Anderson, NDHHS, NFC, Smith, and Winans unilaterally prepared a plan for visits on or about July 24, 2014. The "plan" for visits only provided for them if and when X.C.W. "wished" to begin them. In a Court Report dated July 24, 2014, these Defendants stated that:

> The plan for these visits with [X.C.W.] and Catherine Wang Anderson is for them to take place every Saturday, with two phone calls taking place during the week, dependent on [X.C.W.]'s treatment schedule. To date, [X.C.W.] has only indicated interest in phone calls, and not face to face visits, whenever [X.C.W.] has indicated she wishes to begin face to face visits the schedule will be adjusted accordingly to allow additional time for visits.

228. On information and belief, from and after June 25, 2014 through the present, NDHHS, NFC, Smith, Winans, Paul, Richardson, Richey, Petzel, Ruma, Dr. Harrington, Treinen, Beals, Parke, Boyles, Ruma, Gunn, Reid-Hansen and Hansen have all failed to encourage X.C.W. to engage in visitation or other contact with Wang Anderson. In fact, these Defendants all implicitly encouraged no contact. In essence, these Defendants communicated to X.C.W. and Y.C.W. that they were free to avoid contact with their parents indefinitely if that is what X.C.W. or Y.C.W. wanted.

229. On information and belief, and at all relevant times, it was the unconstitutional policy, practice, custom, or usage of NDHHS, NFC, KVC, and Christian Heritage to allow the

minor children in their care to dictate and/or determine: a) the terms and conditions of case plans, visitation and/or parenting plans, and plans for reunification; b) whether and to what extent case plans, visitation and/or parenting plans, or plans for reunification are implemented; and, c) whether and to what extent those children will participate in those plans.

230.   On information and belief, and at all relevant times, it was the unconstitutional policy, practice, custom, or usage of NDHHS, NFC, KVC, and Christian Heritage to communicate to children in their care that those children were not required to visit or have contact with their parents if they did not want to do so.

231.   On information and belief, and at all relevant times, it was the unconstitutional policy, practice, custom or usage of NDHHS, NFC, KVC and Christian Heritage to not provide guidance or direction to their respective employees regarding encouraging unwilling children to engage in communication, contact, or visitation with their parents.

232.   The sparse and limited visits that took place between Wang Anderson and X.C.W. were reported to be appropriate and positive for X.C.W.'s "therapeutic" well-being. Nonetheless, during this time period, Wang Anderson was not provided any visits with Y.C.W., even though Y.C.W. had initiated contact with her parents by sending them her graduation photo, a letter, and emails.  In addition, when Y.C.W. expressed that the contact was too shallow, none of the Defendants made efforts to improve or increase contact between Y.C.W. and her parents.

233.   X.C.W. was under the care of Dr. Harrington from July 1, 2014 through October 29, 2014, in the Partial Hospitalization Program at Children's Hospital and Medical Center.

234.   From July 1, 2014 through October 29, 2014, NDHHS, NFC, KVC, Richardson, Paul, Reid-Hansen and Hansen were responsible and had a duty to transport X.C.W. to and from Children's Hospital and Medical Center on a daily basis.  Reid-Hansen and Hansen were unable

to provide transportation for X.C.W. during that time period on many occasions, and X.C.W. was instead transported by Camelot Transportation, Inc. ("Camelot"). Often, Camelot would transport X.C.W. with other adult male passengers. Ucchino and NFC repeatedly refused Wang Anderson's offer to pay cash for individual transportation and Zhang's offers to provide transportation for X.C.W.

235.   Prior to this time, Smith had asked Wang Anderson to provide a phone for X.C.W.. In compliance with Smith's request, Wang Anderson did provide the phone. However, when Wang Anderson realized that X.C.W.'s use of the phone was not properly supervised, Wang Anderson took away the phone as a safety precaution. Rather than supporting Wang Anderson's decision to protect X.C.W. by not allowing her to retain the phone, Ucchino and NFC accused Wang Anderson of being controlling and pressured her to return the phone to X.C.W., which Wang Anderson declined to do.

236.   On information and belief, during the time period from July 1, 2014 through October 29, 2014, NDHHS, NFC, Paul, Richardson, Reid-Hansen and Hansen failed to protect or adequately supervise X.C.W. while she was being transported by Camelot between July 1, 2014 and October 29, 2014, and at other times. As a direct and proximate result of this failure to protect and adequately supervise, on August 7, 2014, X.C.W. became acquainted with, and was lured, sexually abused and sexually exploited by another Camelot adult passenger named Matthew Kimball, (who, on information and belief, was under NDHHS care), and suffered permanent physical, psychological, mental and emotional damage.

237.   Ucchino, as guardian ad litem for X.C.W., waited until September 9, 2014, over a month after the August 7, 2014 incident, to file an Ex Parte Motion for Restraining Order with the Juvenile Court seeking an order restraining Matthew Kimball from having contact in any

manner with X.C.W.   This motion stated: "on August 7, 2014, the minor child was being transported by Camelot transportation service along with Matthew Kimball, aged 29.  [X.C.W.] and Matthew Kimball exchanged phone numbers on that date and were reportedly texting one another during the transportation.  On that date, Matthew Kimball attempted to kiss [X.C.W.]; on August 27, 2014, Jenice Reid-Hansen had a conversation with the minor child at which time [X.C.W.] admitted to sending "Matt" naked pictures of herself.  She identified "Matt" as being the person she met while being transported by Camelot Transportation Services.  [X.C.W.] stated that she was in love with "Matt"; on August 25, 2014, Jennice Reid-Hansen read journal entries of dated August 14, 2014 stating that Matt had asked her to sneak out to meet him in the woods near her foster home where the two would have sex and make a sex tape."  The restraining order was not issued by the Juvenile Court until October 6, 2014.  Kimball also broke into the Reid-Hansen's neighbor's home (mistakenly) in order to pick up X.C.W.

238.   As a direct and proximate result of these incidents involving Matthew Kimball, X.C.W.'s condition deteriorated.   Following these incidents, X.C.W. was not provided appropriate and necessary protection, health care, counseling, therapy, supervision, or education by NDHHS, NFC, Paul, Richardson, Reid-Hansen, Hansen, or Ucchino.  NDHHS, Richardson, Paul, NFC, Reid-Hansen, Hansen and Ucchino all caused X.C.W. to remain placed in the care of foster parents incapable of providing her with the protection, care and supervision that she required, and exposed her to dangerous individuals, including Matthew Kimball and others.  As a direct and proximate result of these failures, X.C.W.'s condition continued to deteriorate.  This was despite Wang Anderson's repeated warning to said defendants that Anorexia has a very high relapse rate.  NDHHS, NFC, Paul, Richardson, Reid-Hansen, Hansen and Ucchino failed to take any action to provide X.C.W. with proper care and protection following the incident, but instead

accused Wang Anderson of interfering, which accusations resulted in Judge Crnkovich ordering Wang Anderson not to contact X.C.W.'s service providers.

239.  On September 28, 2014, X.C.W. stopped eating again.  On information and belief, Richardson lied and deliberately did not send X.C.W. to an available and appropriate medical facility.  As a result, X.C.W. slowly starved and suffered permanent damage, including from seizures and loss of consciousness, and repeated trips to the emergency room.

240.  As a direct and proximate result of the aforementioned failures by NDHHS, NFC, Richardson, Paul, Reid-Hansen, Hansen, and Ucchino, X.C.W.'s condition deteriorated to the point that on or about October 29, 2014, she had to be placed in inpatient care at Children's, and remained there until about November 5, 2014.

241.  On August 7th, 2014, there was a permanency planning hearing in the Juvenile Proceeding.  In her Permanency Planning Order of August 12, 2014, Judge Crnkovich found that "the permanency objective is reunification".

242.  On August 12, 2014, Judge Crnkovich made several orders directly affecting the Constitutional rights of Dr. Wang and Wang Anderson.  She did so outside of all judicial authority and without prior notice or other due process to either parent.  First, Judge Crnkovich ordered that: "School records and information may be provided to Bo Wang and Catherine Wang Anderson via communication from the family permanency specialist only, until further order of the Court."  This order effectively foreclosed Wang Anderson and Dr. Wang from communicating with any school staff or professionals regarding their children and exercising their educational rights with respect to the children.  Second, Judge Crnkovich ordered that: "With the exception of family team meetings, all communication, e-mail or otherwise between Catherine Wang Anderson and service providers, including the family permanency specialist

must be through her counsel and guardian ad litem until further order of the Court." This order foreclosed Wang Anderson from being informed about the welfare of her children; from verifying the information she was given by NFC, NDHHS, Petzel, Richey, Richardson, Paul, Smith, and Winans; from expressing her concerns and advocating for the health, safety, and welfare of X.C.W. and Y.C.W.; from exercising her First, Fifth and Fourteenth Amendment rights; and from obtaining and challenging evidence in the Juvenile Proceeding.

243.   The August 12, 2014 order restraining Wang Anderson's communication with "service providers" was a "prior restraint" on Wang Anderson's speech which violated her First Amendment right to free speech. (See *In re Interest of T.T.,* 18 Neb.App. 176, 779 N.W.2d 602 (Neb.App. 2009))

244.   But for the failure of NDHHS, NFC, Winans, Smith, Beals, Paul, Richardson, and ReidHansen to arrange necessary services in a timely manner and to effectively communicate information regarding the children to Wang Anderson and Dr. Wang, this restriction on Wang Anderson's communication would not have been imposed by the Court.

245.   On September 5, 2014, Deputy County Attorney Amy Schuchman filed a Notice of Intention to Appeal from the Juvenile Court's August 12, 2014 Permanency Planning Order on behalf of the State of Nebraska.

246.   On September 5, 2014, notwithstanding the Juvenile Court's finding that the permanency objective was reunification, Risko stated in an email to then family permanency specialist Richardson, stating:

"I know the CA [county attorney] is appealing the order to the extent the motion for termination of parental rights was denied; but even if the appeal fails and parental rights remain intact, it does not mean that the PO will be reunification.

My recollection from prior discussions in this case (and I believe the 1184 meeting) was that we most likely would NOT be recommending reunification. If that is the case (ie we are not going to be working to reunify X.C.W. with her mom), is family therapy with mom appropriate? The letter from the eating disorder program doctor recommends family therapy, but does not specify with whom the family therapy should take place. Perhaps family therapy with the foster parent would be more appropriate?"

By her email, Risko tacitly or expressly suggested to the NFC family permanency specialist, Richardson that she need not plan for reunification or work to reunify X.C.W. with her mother. In essence, Risko was suggesting disregarding the Juvenile Court's recent order regarding permanency. By her email, Risko also derailed any efforts to arrange or resume family therapy between X.C.W. and her parents, even though the "eating disorder program doctor" [Dr. Harrington] was recommending family therapy. Risko planted the harmful idea that "family therapy" could, and should occur without the family (i.e., Wang Anderson and Dr. Wang), and instead with the foster parent. As a direct and proximate result of this email, X.C.W. was not provided with the prevailing standard of health care and the relationships between X.C.W. and each of her parents were harmed and interfered with, from and after September 5, 2014.

247. Between June 25, 2014 and November 6, 2014, while X.C.W. was in foster care in Bellevue, Nebraska with Reid-Hansen and Hansen, Wang Anderson and Dr. Wang repeatedly asked Smith, NDHHS, NFC, Winans and others to allow, coordinate, and arrange for the provision of family therapy to include X.C.W. and Wang Anderson and Dr. Wang. During this time period of over four months, these Defendants failed and refused to provide timely or appropriate family therapy to X.C.W., Wang Anderson, or Dr. Wang.

**Placement at Remuda Ranch Program**

248.  On or about November 6, 2014, X.C.W. was placed by NDHHS, NFC, Richardson Dr. Harrington, and Paul at Remuda in Wickenburg, Arizona, and admitted there for inpatient eating disorder treatment.   During that time period, Boyles provided X.C.W. with health services, including therapy.

249.  X.C.W. remained admitted and placed at Remuda from about November 6, 2014 through January 31, 2015.   During the time when X.C.W. was placed at Remuda, Wang Anderson and Dr. Wang made great efforts to visit, contact, and participate in therapy with X.C.W.   Wang Anderson even temporarily relocated to Arizona so that she could be near X.C.W. and regularly participate in therapy and visitation with her.   Wang Anderson's three-hour round-trip commute from the Phoenix area to Wickenburg was labeled as another indicator of mental illness.

250.  During the entire time period when X.C.W. was at Remuda, the operative order of the Juvenile Court (dated June 25, 2014) provided Wang Anderson and Dr. Wang with "reasonable rights of visitation as arranged supervised by the Nebraska Department of Health and Human Services".

251.  On many occasions between November 6, 2014 through February 1, 2015, NDHHS, NFC, Richardson, and Paul deliberately failed and refused: a) to comply with the Juvenile Court's visitation order; b) to create and implement a visitation schedule of any kind; and c) to arrange or allow visitation between Wang Anderson and X.C.W. and between Dr. Wang and X.C.W.

252.  Throughout the time period from November 6, 2014 through February 1, 2015, NDHHS, NFC, Richardson, Paul, and Boyles deliberately failed and refused to encourage X.C.W. to engage in contact, communication, visitation, or therapy with either of her parents.

253.  Remuda therapist Shaul Austin repeatedly inquired and told Wang Anderson that as part of therapeutic treatment, the Remuda Eating Disorder Program strongly advocated for, encouraged and recommended that their patients have contact with relatives.  He said to Wang Anderson repeatedly that he had and would again let Richardson know of this.  Richardson did not follow those recommendations and did not arrange for or ensure X.C.W.'s contact with her family or placement with her relatives upon her discharge from Remuda.  During the latter part of the time period when X.C.W. was placed at Remuda, Dr. Wang and Wang Anderson were cut off and prevented by NFC, NDHHS, Boyles, Richardson, and Paul from having meaningful visits, contact, or participation in family therapy with X.C.W.

254.  On information and belief, as of September 5, 2014, NDHHS, Risko, NFC, Richardson, Paul, Dr. Harrington, and Reid-Hansen were all aware that the standard of care for treatment of X.C.W.'s condition, (including her eating disorder), required family therapy.  From September 5, 2014 through February 2, 2015, appropriate family therapy between X.C.W. and Wang Anderson and between X.C.W. and Dr. Wang was not arranged, provided or allowed by NDHHS, Risko, NFC, Richardson, Paul, Dr. Harrington, Remuda, Boyles, or Reid-Hansen.  On information and belief, by failing to arrange, allow, or provide appropriate family therapy, NDHHS, Risko, NFC, Richardson, Paul, Dr. Harrington, Remuda, Boyles, and Reid-Hansen were deliberately indifferent to the health care needs of X.C.W. while she was in the care and custody of NDHHS, in violation of her Constitutional rights.

255.  On information and belief, during the time period from November 6, 2014 through February 2, 2015, at the direction of Risko and NDHHS, NDHHS, NFC, Richardson, Paul, Dr. Harrington, and Reid-Hansen arranged and provided therapy that included Reid-Hansen, (rather than Wang Anderson or Dr. Wang) as the "family" for therapy purposes.  This was contrary to the prevailing standard of care, and amounted to deliberate indifference to the health needs of X.C.W. and violation of the Constitutional rights of familial association and care of X.C.W., Wang Anderson, and Dr. Wang.  On information and belief, said Defendants did so with the motive and intention of pursuing a permanency goal other than family reunification, as suggested by Risko on September 5, 2014, in direct violation of the Court-ordered permanency objective in effect at that time.  As a direct and proximate result, Wang Anderson and Dr. Wang were not informed, educated, trained or otherwise made aware of the health, safety and welfare of X.C.W. during that time period.

256.  In November of 2014, during a supervised telephone call, a nurse who supervised the call asked Wang Anderson to provide X.C.W. with an iPod Touch electronic communication device.  Wang Anderson asked the supervising nurse if Remuda would permit X.C.W. to have such a device, and the supervising nurse indicated that it was permissible.  Wang Anderson still had concerns about the safety of giving X.C.W. such a device.  Due to those concerns, rather than give the device to X.C.W., Wang Anderson later gave the iPod Touch directly to Remuda Therapist Shaul Austin, who told Wang Anderson that he would keep it in storage.  During Wang Anderson's next visit to the Remuda clinic, during her only family therapy session with therapist Susan Boyles, Wang Anderson asked to have the iPod Touch returned to her.  She explained her concerns regarding the device to Boyles, and Boyles promised to return it to Wang Anderson.

257.  Boyles never replied or responded to Wang Anderson's attorney's repeated request for returning the iPod Touch, and never returned the iPod Touch to Wang Anderson.

258.  In December, 2014, Dr. Wang was informed that X.C.W. had been missing from Remuda for an unknown period of time at night in the Arizona desert.  Therapist Susan Boyles had discussed with Dr. Wang during a family therapy session regarding how dangerous the desert is.  Dr. Wang and Wang Anderson repeatedly asked Richardson, NDHHS, NFC, and Ucchino to address this concern regarding the safety of X.C.W.  On information and belief, none of those defendants discussed this concern with X.C.W. or otherwise documented, investigated, or reported this incident to the Juvenile Court.

259.  In December, 2014, X.C.W. expressed to Dr. Wang and to Remuda Therapist Susan Boyles that she wanted to be placed with her relative Mei Zhang and Qi Dong upon her discharge.  Dr. Wang and Wang Anderson then requested that X.C.W. be placed, upon discharge from Remuda, with Zhang and Dong.

260.  On or about December 30, 2014, Boyles told Richardson that X.C.W. had expressed to Boyles her wish to be placed with Zhang and Dong upon her return from Remuda.  On or about December 31, 2014, Richardson sent an email to Boyles indicating that Richardson did not have a real preference between Zhang's home and Reid-Hansen's home for placement of X.C.W., if in fact X.C.W. wanted to go to Zhang's home.  In her December 31, 2014 email to Boyles, Richardson stated: "I can get either foster parent [Zhang or Reid-Hansen] on board to at least do family therapy over the phone and prepare to have [X.C.W.] in their home, but I'm just not sure which one you feel would be a better fit."  On information and belief, neither Boyles nor any other Remuda staff provided Richardson, NFC, NDHHS or anyone else with a recommendation regarding the post-discharge placement of X.C.W. until at least a week after

71

December 31, 2014. In fact, no written recommendation was provided by Boyles or Remuda until about January 28, 2015, at the request of Richardson, after the decision to place X.C.W. with Reid-Hansen had already been made.

261. On information and belief, as of December 31, 2014, Richardson had not contacted Reid-Hansen about accepting placement of X.C.W. following her discharge from Remuda. It was not until January 2, 2015 that Richardson contacted Reid-Hansen about taking X.C.W. back.

262. On January 2, 2015, Richardson sent an email to Dr. Harrington informing him that her plan (and the plan of NDHHS and NFC) for X.C.W.'s placement following discharge was to place X.C.W. with Reid-Hansen.

263. On information and belief, it was not until after January 2, 2015, after the plan to place X.C.W. with Reid-Hansen had been made, that Reid-Hansen began communicating with Boyles or other Remuda staff or X.C.W., telephonically, and she did so on only a few occasions.

264. After X.C.W. had expressed her preference to live with Zhang and Dong, Wang Anderson and Dr. Wang were immediately cut off from regular visits, contact and family therapy with X.C.W. On information and belief, Wang Anderson and Dr. Wang were cut off at the direction of NDHHS, NFC, Remuda, Boyles, Richardson, Ucchino, and Risko. On information and belief, this was done in retaliation for the request of X.C.W. and her parents regarding her placement, and their efforts to visit, communicate with, and participate in therapy and treatment with X.C.W., in violation of the Constitutional Rights of X.C.W., Wang Anderson, and Dr. Wang, including those provided by the First, Fifth, and Fourteenth Amendments.

265. At all relevant times, Zhang and Dong have been, and continue to be a qualified and available placement for X.C.W. In fact, there was a home study recommendation for X.C.W.'s placement with them as early as August, 2014, and in December, 2014, Richardson did not have

a personal belief that Reid-Hansen was a more or less appropriate placement than Zhang and Dong.  Richardson even said in her December 31, 2014 email to Boyles that she could "get either foster parent [Zhang or Reid-Hansen] on board to at least do family therapy over the phone and prepare to have [X.C.W.] in their home."  All other factors being equal, the fact that Zhang and Dong were Chinese relatives indicated that the most appropriate placement for X.C.W. following discharge from Remuda Ranch was with Zhang and Dong.

266.   At all relevant times, NDHHS, NFC, Smith, Winans, Richardson, Paul, Petzel, Richey, and Ucchino had a duty, pursuant to 390 NAC 7-004.01 to give prior consideration to placement with a relative over a licensed or approved foster home.  From May, 2014 through the present, Dr. Wang and Wang Anderson have repeatedly asked NDHHS, NFC, Smith, Winans, Richardson, Paul, Petzel, Richey, and Ucchino to consider and place X.C.W. with Zhang and Dong.  At all relevant times, said Defendants have failed and refused to do so, in breach of their duty under said regulation, and in violation of the Constitutional rights of X.C.W., Dr. Wang, and Wang Anderson.

267.  On January 22, 2015, NDHHS, NFC, and Richardson caused a Notice of Change of Placement to be filed in the Juvenile Court.  The Notice indicated a "Requested Placement" with "Jennice Reid-Hansen".  The "Anticipated Date of Placement" was February 2, 2015.

268.  On January 27, 2015, Dr. Wang and Wang Anderson filed a joint Objection to Change of Placement requesting a stay of the change of placement and hearing on their Objection.  Dr. Wang and Wang Anderson alleged in their Objection that: a) the proposed placement with Reid-Hansen was not in X.C.W.'s best interests; b) that X.C.W.'s behaviors and actions while previously living with Reid-Hansen directly resulted in her inpatient hospitalization; c) that the proposed foster placement was overcrowded and overwhelmed with

other children requiring supervision and oversight by the Reid-Hansen and Hansen; and, d) that the dangerous behaviors and specific needs of X.C.W. required special consideration to be given to her proposed placement in the community, and that there had been no showing from NDHHS that more appropriate foster homes were unavailable. The Objection further alleged that "absent such a showing, returning the minor child to the same home that led, in part, to her most recent hospitalization is not in the minor child's best interests and is contrary to her safety, health and well being."

269.   The Objection to Change of Placement was heard in the Juvenile Proceeding on January 30, 2015. Wang Anderson and Dr. Wang were not afforded Due Process at the hearing, and Judge Crnkovich denied them equal protection of the laws, by overruling all of their foundational objections to the exhibits offered by NDHHS and by sustaining the foundational objections by NDHHS and Ucchino to exhibits offered by Dr. Wang, including the home study which contained the recommendation to place X.C.W. with Zhang and Dong.

270.   Prior to the hearing, and before any professional recommendation was made by Remuda staff as to the appropriate post-discharge placement for X.C.W., NDHHS, NFC, Boyles, Richardson, and Paul had disregarded the preference of X.C.W. to be placed with her Chinese family member Zhang and Dong, which she had expressed to her therapist, and formulated their own plan for placement with Reid-Hansen. As a direct and proximate result, NDHHS, NFC, Richardson, and Paul: a) gave Reid-Hansen the opportunity to communicate with X.C.W., participate in communications with Remuda staff, and establish rapport with X.C.W. and Remuda Staff between January 2, 2015 and February 2, 2015; b) denied Zhang and Dong the same opportunity; and, c) elicited a recommendation in support of their placement plan from Remuda and Susan Boyles. But for these actions, NFC, NDHHS, Richardson, and Paul would

74

not have obtained a recommendation from Boyles in support of Reid-Hansen, and would have been compelled by their own policies and preferences that to place X.C.W. with Zhang and Dong. The actions of NFC, NDHHS, Richardson, and Paul violated the Constitutional right to family association of X.C.W., Wang Anderson, and Dr. Wang.

271. On January 30, 2015, through her counsel Mary "Peg" Stevens, Wang Anderson sent an email to Susan Boyles asking for the return of Wang Anderson's iPod Touch. Boyles did not respond.

272. On February 2, 2015, Judge Crnkovich overruled the Objection to Change of Placement by Wang Anderson and Dr. Wang and found that "the placement proposed by the Nebraska Department of Health and Human Services, in the foster home of Jennice Reid-Hansen" was in X.C.W.'s best interest.

**Second Placement With Reid-Hansen and Hansen**

273. On or about February 2, 2015, X.C.W. was discharged from Remuda and placed by NDHHS, NFC, Richardson, and Paul in the foster home of Reid-Hansen and Hansen in Bellevue, Nebraska. Reid-Hansen and Hansen accepted the placement of X.C.W. on that date.

274. During the time period from February 2, 2015 through February 24, 2016, NDHHS, NFC, and KVC allowed and permitted X.C.W. to be placed and remain in an overcrowded and overwhelmed licensed foster home which had more than the maximum allowable number of children under the age of majority, in clear violation of 395 NAC (Nebraska Administrative Code) 3-001.10.

275. On information and belief, at all relevant times, both Reid-Hansen and Hansen lacked the judgment, good moral character, and truthfulness necessary to appropriately care for any foster children. In 2014, around the time X.C.W. was placed with them, Hansen made a

material false statement to the District Court of York County, Nebraska, in a request he made to that court to set aside a prior drug conviction. Reid-Hansen made false reports to NFC regarding X.C.W.'s reaction to visits with Dr. Wang. Reid-Hansen and Hansen both failed to report to NDHHS, NFC, Petzel, or Richey when they discovered that X.C.W. was in danger while living in a dormitory at the University of Nebraska-Lincoln (hereinafter, "UNL").

276. Due to the order by Judge Crnkovich of August 12, 2014, Wang Anderson had been prohibited from communicating directly with health care or other service providers for her X.C.W. or Y.C.W. The only way Wang Anderson could obtain information from providers regarding the children's ongoing condition, care and health needs was through her "counsel and guardian ad litem". Even those efforts were ignored or blocked by Judge Crnkovich. As a direct and proximate result, Wang Anderson was foreclosed from advocating for the best interests of her children or learning their health needs so that she could become able to help attend to those needs.

277. Between August 12, 2014 and February 2, 2015, Wang Anderson was unable to obtain critical health care information regarding the children, even though she had tried to obtain it by asking her attorney or guardian ad litem to request the information from the providers.

278. On February 2, 2015, because all other efforts to obtain information about the health and care of her children had failed, Wang Anderson's counsel issued notice of her intention to subpoena health care records from the various health care providers involved in the children's care. As no objections had been served or filed within the time frame allowed by court rules, Wang Anderson's counsel issued the subpoenas upon the various providers.

279. On February 6, 2015, Richardson informed Wang Anderson's counsel Stevens and others that X.C.W. had been in contact with Matthew Kimball (against whom there was a

restraining order) about two months prior, while she was at Remuda Ranch.  On information and belief, although NDHHS, NFC, Richardson, Paul, Reid-Hansen, and Ucchino were all informed of this incident, they all failed to properly investigate and report this incident to the Juvenile Court, to properly address it with X.C.W., to take the necessary steps to treat and protect her, and to make efforts to prosecute Kimball for violation of the restraining order.  On information and belief, any "safety planning" that occurred around this time did not include monitoring, supervising, restricting, or prohibiting X.C.W.'s access to electronic communication devices or telephones.

280.  As of February 5, 2015, NDHHS, NFC, Richardson, Paul, Reid-Hansen, and Ucchino all knew or should have known that it was dangerous to X.C.W. for her to have access to electronic communication devices or cellular telephones without proper restrictions, limitations, supervision and monitoring.  They all knew or should have known that in fact she did have such access at that time, and it was foreseeable to all of them that she would be harmed if such access continued to be allowed.

281.  On February 11, 2015, after X.C.W. had returned from Remuda Ranch, Stevens sent a second email to Boyles, asking for a response from her or another Remuda Ranch staff member to the January 30, 2015 email, in further effort to get the iPod Touch away from X.C.W.  On information and belief, neither Boyles nor anyone else from Remuda Ranch ever responded.

282.  NDHHS, NFC, Richardson, Paul, Reid-Hansen, Hansen, and Ucchino all continued to permit X.C.W. to have unrestricted access to the iPod Touch and other electronic communication devices from and after February 5, 2015.

283.  At all relevant times, the standard of care for treatment of an eating disorder such as X.C.W. had been diagnosed with included family therapy.  At all relevant times, it was

foreseeable to NDHHS, NFC, Smith, Winans, Richardson, Paul, Petzel, Richey, Dr. Harrington, Reid-Hansen, and Hansen that X.C.W. needed family therapy with her parents, that without family therapy, X.C.W.'s condition would not improve and any improvement would be temporary and not sustainable. Even though they knew of the standard of care and the risk of harm to X.C.W., said Defendants did not provide the necessary and appropriate family therapy.

284. The constant failure by NDHHS, NFC, Smith, Winans, Richardson, Paul, Petzel, Richey, Dr. Harrington, Reid-Hansen, and Hansen to provide appropriate family therapy and regular visitation between X.C.W. and her parents proximately caused the deterioration of the family relationship between X.C.W. and each of her parents. This failure also resulted in the decrease in X.C.W.'s desire to engage in a relationship with either of her parents and her willingness to work toward reunification with either of them.

285. In February, 2015, Children's, Dr. Harrington, Beals, and Ruma continuously refused to provide family therapy through the Children's eating disorders program, even though they routinely provided family therapy to other eating disorder patients and their families. Instead of providing this care through his program, Dr. Harrington recommended to the Department, NFC, Richardson, and Paul to tell Dr. Wang and Wang Anderson to locate and identify a family therapist, which those Defendants did.

286. For the next three months after February, 2015 Wang Anderson and Dr. Wang submitted the names and information of many prospective therapists to NDHHS, NFC, Richardson and Paul for referral.

287. NDHHS, NFC, Richardson, Paul and Dr. Harrington did not arrange or provide family therapy services, through Defendant Gunn, and those services did not commence, until May, 2015, three months after X.C.W.'s discharge from inpatient care at Remuda Ranch. This

failure to provide timely, necessary, and appropriate care constitutes deliberate indifference to X.C.W.'s known health care need, was a failure to meet the standard of care, disrupted continuity of X.C.W.'s care, stalled and interfered with efforts at reunification, and further destroyed the family relationship between X.C.W. and Wang Anderson and Dr. Wang.

288.  Failure to provide these services during this time period was extraordinarily harmful to X.C.W., Dr. Wang and Wang Anderson because of repeated sexual abuse and sexual exploitation of X.C.W. that was continuing to occur.

289.  On information and belief, from February, 2015 through at least February 1, 2016, as part of X.C.W.'s eating disorder treatment plan, Dr. Harrington ordered or recommended that X.C.W. be fully supervised during all meals, and that her physical activities were to be limited.

290.  On March 6, 2015, even though it was several weeks past the objection deadline, Ucchino filed an Objection to Subpoena Ducas Tecum and Motion to Quash the subpoenas that Wang Anderson's counsel had served.

291.   On March 12, 2015, a hearing was held regarding the intended subpoenas, objection, and motion to quash.  The evidence received consisted of letters by two service providers, Dr. Harrington and Komi Amededji, and an affidavit by Wang Anderson dated March 12, 2015.  On March 13, 2015, the Objection was sustained by the Juvenile Court and Wang Anderson was not allowed to issue her subpoenas.  Wang Anderson's affidavit supported the issuance of the subpoenas.  The other evidence was neither competent nor sufficient to support Judge Crnkovich's order sustaining the objections as to the records requested.

292.  Once Judge Crnkovich had entered her March 13, 2015 order, Wang Anderson had not only been barred from communicating with service providers, she had now been precluded from receiving, even through her counsel or through discovery, critical information regarding the

health and care of her children.   This information was critical for her to work toward reunification, including correcting the deficiencies alleged in the Juvenile Court Petition, and for her to advocate for and protect her children.

293.   Even though the health of the minor children was a central concern for the duration of the Juvenile Proceeding, in her March 13, 2015 Order, Judge Crnkovich also foreclosed Wang Anderson and Dr. Wang from obtaining or reviewing health care information prior to the dispositional review hearing regarding the children.   Instead, the Court ordered that "The Nebraska Department of Health and Human Services is to provide progress notes and/or reports to the Court and the parties at the review hearing that has been set by the Court.   These are not to be provided in advance of the hearing."   By placing such severe restrictions on Dr. Wang and Wang Anderson's access to relevant information, Judge Crnkovich violated their right to due process at subsequent hearings, including by denying them meaningful and timely access to evidence.

294.   On information and belief, NDHHS, NFC, Richardson, Paul, Reid-Hansen, and Hansen made arrangements for or allowed X.C.W. to attend a meeting at Project Everlast in Omaha, Nebraska on March 14, 2015, near 24th and Lake Streets.

295.   On information and belief, X.C.W. attended the Project Everlast meeting on march 14, 2015.   NDHHS, NFC, Richardson, Reid-Hansen, Hansen, and KVC all failed to protect and to ensure that X.C.W. was properly supervised before, during and after this meeting at Project Everlast, and failed to notify Project Everlast that it was medically necessary, and essential to X.C.W.'s safety for her to be constantly supervised and for her physical activities to be limited, including restricted exercise.   On information and belief, NDHHS, NFC, Richardson, Reid-Hansen, Hansen, KVC, and Dr. Harrington all failed to have an appropriate safety plan in place

or communicate any such plan to Project Everlast when X.C.W. attended the March 14, 2015 meeting. As a direct and proximate result of these failures, X.C.W. was lured and sexually assaulted or sexually exploited by an unknown adult male during and after the lunch hour for an unknown length of time. This incident was life-threatening, and as a direct and proximate result of this incident, X.C.W. suffered severe physical, emotional, psychological, and mental damage.

296. On information and belief, NDHHS, NFC, KVC, Richardson, Paul, Ucchino, Reid-Hansen and Hansen failed to timely discover, investigate, or report the March 14, 2015 incident.

297. On information and belief, before, during and after the March 14, 2015, NDHHS, NFC, KVC, Richardson, Paul, Reid-Hansen and Hansen failed to properly supervise or monitor X.C.W.'s electronic communications. X.C.W. had sent text messages from her phone to other girls on March 14, 2015, describing the incident. The incident was not discovered until Reid-Hansen was reviewing X.C.W.'s text messages on March 21, 2015, which was seven days after the incident occurred. As a direct and proximate result, X.C.W. was not provided with timely care, examination, treatment, or education following the incident. As a further result, a timely investigation was not commenced, immediate action to prevent the recurrence of such an event was not taken by any of said Defendants, and none of said Defendants brought the incident to the attention of the Juvenile Court in a timely manner.

298. On information and belief, NDHHS, NFC, KVC, Richardson, Paul, Ucchino, Reid-Hansen, and Hansen all failed to provide X.C. W. with the appropriate and necessary care, testing, examination, treatment, or prevention education related to the March 14, 2015 critical incident at any time thereafter. As a direct and proximate result of these failures, X.C.W.'s ability to identify or spot dangerous, harmful, or high risk situations was diminished, her judgment was impaired, and she became more vulnerable to similar incidents and situations

recurring. Due to her increased vulnerability and susceptibility to being exploited, assaulted, or otherwise harmed, sexually and otherwise, X.C.W. was in even greater need of supervision following this incident.

299. In addition to requesting proper care, testing, examination, treatment, and education for X.C.W. following this incident, Dr. Wang and Wang Anderson repeatedly requested a police investigation of the incident. Despite the fact that Richardson and Risko promised the same, on information and belief, they failed to initiate such an investigation and no such investigation was ever done. On information and belief, even though Wang Anderson had notified NDHHS, NFC, Richardson, and others that X.C.W. had subconjunctival hemorrhages in both eyes resulting from the sexual assault, had difficulty speaking, and became violently ill, no appropriate action was taken by NFC, NDHHS, Richardson, Paul, Reid-Hansen, Hansen, Dr. Harrington, or others.

300. As a direct and proximate result of the aforementioned failures, X.C.W. suffered further physical, mental, and emotional harm, her ability or willingness to engage in necessary treatment and therapy diminished, and her relationship with her parents deteriorated.

301. On information and belief, NDHHS, NFC, Reid-Hansen, Hansen, Richardson, Paul and KVC all failed to have in place or to follow their own policies and protocol regarding the occurrence of critical incidents following the occurrence of this March 14, 2015 incident.

302. NDHHS, NFC, Reid-Hansen, Hansen, Ucchino, Richardson, and Paul failed to inform Dr. Wang or Wang Anderson of the March 14, 2015 incident until March 23, 2015. These defendants did not inform the Juvenile Court of the incident.

303. Wang Anderson brought the incident to the attention of the Juvenile Court as soon as she was able, by filing an Ex Parte Motion for Immediate Relief and supporting affidavit on

March 31, 2015, through her attorney.  True and accurate copies of that motion and affidavit are attached hereto and incorporated herein by reference.

304.  No one else brought this critical and life-threatening incident to the Juvenile Court's attention before or after that.

305.  Judge Crnkovich denied Wang Anderson's Ex Parte Motion for Immediate Relief the same day and did not even provide Wang Anderson with a hearing on this motion.  By doing so, Judge Crnkovich denied the due process rights of Wang Anderson and X.C.W.

306.  Within the limited visits they were provided with X.C.W., Wang Anderson and Dr. Wang tried to address the March 14, 2015 critical incident and how to properly respond to it with X.C.W., but were interrupted.  However, NDHHS, Reid-Hansen, Hansen, Ucchino, Richardson, and Paul failed and refused to appropriately address or reinforce these efforts.  These defendants also failed to arrange or provide appropriate family therapy to provide the best scenario in which Wang Anderson and Dr. Wang could have constructively discussed the issues surrounding the March 14, 2015 incident with X.C.W.  As a result, the relationship between X.C.W. and her parents deteriorated further.

307.  On April 14, 2015, the Juvenile Court held a "check" hearing in chambers, which Wang Anderson and Dr. Wang were excluded from, and no verbatim record of the discussion in chambers was made.  On April 15, 2015, Judge Crnkovich rendered an order suspending contact between Wang Anderson and X.C.W. "until further order of the Court".  Judge Crnkovich rendered this order on her own motion, without any prior notice to Wang Anderson or Dr. Wang, without any supporting evidence or evidence that suspension of contact was in X.C.W.'s best interest, and without giving Wang Anderson or Dr. Wang any opportunity to be heard or any other due process.  Judge Crnkovich actions in rendering this order constituted state action that

completely deprived X.C.W. and Wang Anderson of their Constitutional familial rights with respect to each other, entirely without due process of law, and outside of Judge Crnkovich's jurisdiction and judicial authority.

308.  On April 14, 2015, the Juvenile Court held a hearing in the courtroom on Ucchino's Motion for Return of Personal Property of the minor child Y.C.W.  On April 15, 2015, Judge Crnkovich denied the Motion for Return of Personal Property.  However, in that order, and without prior notice of her intent to Wang Anderson or Dr. Wang, and without a hearing, on her own motion, Judge Crnkovich ordered that "any gifts, clothing items, books, etc., must not be purchased or provided to said children except with approval of the Court."

309.  Judge Crnkovich was negligent and acted in violation of the Constitutional rights of Wang Anderson, Dr. Wang, and X.C.W. when she rendered these April 15, 2015 orders without notice, evidence, a verbatim record, or any other due process.

310.  On or about May 13, 2015, the Department filed a Notice of Change of Placement with the Juvenile Court indicating that X.C.W. would be moving from Bellevue, Nebraska to Blair, Nebraska because Reid-Hansen and Hansen were moving.  The Notice also stated that X.C.W. would be changing schools and moving to the Blair School District, which was to be the third school change.

311.  Dr. Wang and Wang Anderson both filed objections to this change of placement with the Juvenile Court on May 15, 2015 and May 19, 2015, respectively.  True and accurate copies of those objections are attached hereto and incorporated herein by this reference.

312.  The objections filed by Dr. Wang and Wang Anderson warned Judge Crnkovich, the State, the Department, Reid-Hansen, Hansen, NFC, Richardson and Paul and put them on notice that it would be dangerous and contrary to X.C.W.'s health, safety, and welfare for her to

move to Blair, Nebraska at that time. The objections were overruled at a hearing on May 30, 2015.

313. At the close of that hearing, Judge Crnkovich reinforced her restrictions on Wang Anderson and Dr. Wang's ability to direct their counsel within the Juvenile Court proceeding, stating, to Dr. Wang's and Wang Anderson's respective attorneys: "So you may not file any pleadings without the express permission of the guardian ad litems, Mr. Wurth and Mrs. Stevens."

314. As a result of the April 15, 2015 order by Judge Crnkovich suspending contact between X.C.W. and Wang Anderson, Wang Anderson was not permitted to participate at all in family therapy until around June 17, 2015.

315. Between May, 2015 and January, 2016, Gunn provided family therapy for X.C.W. and Dr. Wang. The family therapy also included Wang Anderson for a short time beginning in late June, 2015, until Wang Anderson was improperly and unfairly not allowed to participate in family therapy by Gunn, after Wang Anderson tried to address the topic of sex trafficking.

316. Gunn departed from the appropriate standard of therapeutic care in several respects between May, 2015 and January, 2016, including: failing to formulate a proper therapy or treatment plan; failing to follow a therapy or treatment plan; improperly discontinuing therapy sessions; intimidating and using force; excluding Wang Anderson from therapy; not recommending or allowing Wang Anderson to resume family therapy; coercing Dr. Wang to dissolve his marriage to Wang Anderson, and doing so in the presence of X.C.W.; threatening to discontinue family therapy if Dr. Wang did not dissolve his marriage to Wang Anderson; improperly counseling X.C.W. regarding sexual behavior and prostitution; and lying to the Department and NFC.

317.   Wang Anderson filed a Request for Lack of Reasonable Efforts Finding in the Juvenile Court proceeding on August 12, 2015.  Her counsel issued notice that the hearing on that request would take place on August 18, 2015.  On August 17, 2015, counsel for NDHHS moved to continue the hearing, and the hearing on the request was continued to October 20, 2015.

318.   On August 18, 2015, a disposition and permanency planning hearing was commenced in the Juvenile Court proceeding.  However, the hearing had to be continued because of the inconsistency and incompleteness of the report by NDHHS and NFC to the Court.  At the hearing, Judge Crnkovich stated:  "I am continuing this disposition.  And I will expect a new report that details – or hand over your file if that is what it takes.  And, Mrs. Risko, as counsel for the Department, who contracts with NFC, I want you to make sure that what the Court receives is absolutely thorough.  And it should give all facts and not edit."

319.   A "check" hearing was held on September 8, 2015 in the Juvenile Court proceeding.  However, the matter was continued again to October 15, 2015, so that Wang Anderson and Dr. Wang could have an opportunity to cross-examine the author(s) of the supplemental report which had been prepared by NFC for NDHHS and the Juvenile Court, and offer other evidence related to the report.

320.   As a direct and proximate result of the failure of NFC, NDHHS, Richardson, Richey, and Petzel to prepare a proper report for the Court, the disposition and permanency planning hearing was delayed almost two months, and the Court was not provided accurate and complete information regarding the health, safety and welfare of X.C.W. during that time period between August 18, 2015 and October 15, 2015.  This delay directly caused harm to X.C.W. and Wang Anderson and Dr. Wang.

86

321.   During the April, May, June, July, and September, 2015 family team meetings, Wang Anderson and Dr. Wang repeatedly voiced their concerns and objections to the Department, NFC, Dr. Harrington, Richardson, Paul, Richey, Petzel, Ucchino, and Risko because X.C.W. was being allowed to work at a restaurant in Blair, Nebraska where alcohol and hard liquor were served, which exposed her to dangerous clientele without supervision.  Wang Anderson informed the Department, Risko, NFC, Richardson, and KVC about the complete lack of supervision of X.C.W., and pointed out specific occasions when X.C.W. was seen on the street scantily dressed and alone.  During the time period from May, 2015 until September, 2015, X.C.W. was employed at a restaurant in Blair, Nebraska, and worked in the evenings.  During this time period, X.C.W. was sometimes not provided transportation by her foster parents or anyone else, and was required to walk to or from work without supervision, sometimes after dark.  During this time period, X.C.W. also had access to one or more electronic communication devices, and her use of these devices was not adequately supervised or monitored.  X.C.W. was not supervised while she was at work.

322.   On September 30, 2015, X.C.W. was working a shift that was to end at 9:00 pm. Reid-Hansen expected X.C.W. to return home on foot, rather than picking her up, immediately following her shift.  X.C.W. did not return home after her shift, but instead was picked up by an unknown man named Michael Griffin and sexually abused and exploited.  On information and belief, electronic communications to arrange this encounter had begun several days before September 30, 2015, when X.C.W. was contacted by Griffin on her iPod Touch or other electronic communication device using an application.  On information and belief, X.C.W.'s electronic communications were not regularly monitored or supervised during the time when she lived with Reid-Hansen and Hansen.

323.  On information and belief, X.C.W. was sexually assaulted and exploited by Griffin and other unknown men on multiple other occasions while she was in the custody of the Department, the responsibility of NFC, and the care of Reid-Hansen and Hansen between July 1, 2014 and May, 2016.

324.  At the time of the September 30, 2015 incident with Griffin occurred, the Department, NFC, Richey, Petzel, KVC, Reid-Hansen, and Hansen all knew or should have known that X.C.W. had previously been sexually assaulted or sexually exploited when left unsupervised, including, without limitation, the August, 2014 incidents involving Matthew Kimball and the March, 2014 critical incident at Project Everlast mentioned above.  Each of these Defendants knew or should have known of the foreseeable risk of X.C.W. being sexually assaulted or exploited if left unsupervised.  There were other warning signs which these defendants ignored, including the attire X.C.W. was permitted by Reid-Hansen and Hansen to wear during the entire time period when she was in their care.

325.  The Department, NFC, Reid-Hansen, Hansen, Richardson, Paul, Richey, Petzel and KVC all failed to protect or appropriately supervise X.C.W. on September 30, 2015 and all other occasions when she was sexually assaulted or sexually exploited and at all other times.

326.  The Department, NFC, Reid-Hansen, Hansen, Richardson, Paul, Richey, Petzel and KVC all failed to provide necessary transportation for X.C.W. and allowed her unmonitored access to electronic communication devices and the internet, despite the fact that Dr. Wang and Wang Anderson made repeated requests to these defendants to prohibit or limit or adequately supervise X.C.W.'s access to the same.

327. As a direct and proximate result of the negligence of the Department, Reid-Hansen, Hansen, NFC, Richey, Petzel and KVC, the September 30, 2015 incident with Michael Griffin occurred, and X.C.W. suffered physical, psychological, mental and emotional damage.

328. After the September 30, 2015 incident involving Michael Griffin, the Department, Petzel, Richey, NFC, KVC, Dr. Harrington, Reid-Hansen and Hansen all failed to provide X.C.W. with timely and appropriate health care, testing, therapy and education. As a direct and proximate result of these failures, X.C.W. suffered physical, psychological, mental and emotional damage.

329. The Department, Petzel, Richey, NFC, KVC, Dr. Harrington, Reid-Hansen and Hansen all failed to bring the September 30, 2015 incident to the attention of the Juvenile Court.

330. The only individuals or entities who took steps to adequately protect, treat, educate, provide guidance to, or supervise X.C.W. following this incident were Wang Anderson and Dr. Wang. On October 7, 2015, Wang Anderson filed an Ex Parte Motion for Increased Protective Measures, Change of Placement, and Appointment of Counsel for the Minor Children, and a Motion for Emergency Hearing. True and accurate copies of these motions and supporting affidavit(s) are attached hereto and incorporated herein by reference.

331. Wang Anderson's Ex Parte Motion was denied the same day. Her counsel filed a similar Motion for Emergency Hearing on October 7, 2015, and the same was set for hearing on October 15, 2015.

332. On October 15, 2015, a hearing was commenced in the Juvenile Court proceeding, but Judge Crnkovich determined that she could not take up the issues of disposition, Wang Anderson's Motion for Emergency Hearing, or Wang Anderson's Request for Lack of Reasonable Efforts Finding, without first clarifying the role of the guardians ad litem whom

Judge Crnkovich had appointed for the parents.  At that hearing, the Court commented, in reference to Wang Anderson and Dr. Wang, without evidence, that: "the mental health challenges are profound.  They are apparent in every interaction.  They are apparent in every motion.  And they are impairing the attorneys' ability to represent the client adequately."  At that hearing, the Court also reiterated its prior restraint on the autonomy of Wang Anderson and Dr. Wang, stating to counsel for Ms. Wang Anderson:  "You will take your direction from Mrs. Nutzman, as will Mr. Wurth from Mr. Finley.  Is that clear?"  In its Continuance Order filed October 16, 2015, without providing any particulars or citing any evidence, Judge Crnkovich implied that the parents' "wishes or desires" were "IRRATIONAL".

333.  As a direct and proximate result of Judge Crnkovich's failure to afford notice and a hearing to Wang Anderson and Dr. Wang regarding the appointment of guardians ad litem for them, and her failure to specify or explain the role of the guardians ad litem at the time of the appointment(s), disposition and resolution of all pending motions were "calendared for the time being" in order to allow counsel for the parties to brief the issue of the role of the guardian ad litem.

334.  On November 4, 2015, Judge Crnkovich terminated the appointments of the guardians ad litem which she had appointed for Wang Anderson and Dr. Wang, essentially acknowledging that those appointments were made in error and without due process to Wang Anderson or Dr. Wang.

335.  In July, 2015, Wang Anderson brought up the seriousness and life-threatening consequences of being sexually abused and sexually trafficked with X.C.W. during a family therapy session, to try to educate and protect her.  Rather than assist Wang Anderson in

discussing this important and germane topic with X.C.W., Gunn immediately asked Wang Anderson to leave and cut her off from therapy completely.

336. Wang Anderson tried to resume family therapy with X.C.W. after that, but was wrongly prevented from participating by Gunn, to the detriment of her relationship with X.C.W.

337. Between August 1, 2015 and January of 2016, Gunn departed from the therapeutic standard of care when she made suggestions to X.C.W. regarding how to safely or legally engage in prostitution, shortly after X.C.W. had been sold for money.

338. Between August 1, 2015 and January of 2016, Hansen had inappropriate conversations with X.C.W. regarding travel to Las Vegas, Nevada, in breach of his duty to provide proper foster care for X.C.W..

339. Between October 1, 2015 and January 15, 2016, Reid-Hansen made false reports to NFC, Richey, Dr. Harrington, Petzel, and others regarding the mental and emotional effects that parental visitation was having on X.C.W., in breach of her duty to provide proper foster care to X.C.W. As a direct and proximate result of these false reports, ongoing successful family therapy between X.C.W. and Dr. Wang was abruptly stopped, and the therapeutic alliance Gunn and the family was destroyed.

340. From late May, 2015 through January, 2016, X.C.W. was successfully engaging in family therapy with Dr. Wang and Gunn. According to Gunn, at that time, progress was being made toward reunification with Dr. Wang. In January of 2016, the State, the Department, NFC, Richey, and Petzel all negligently and improperly terminated or discharged Gunn as the family therapist between X.C.W. and Dr. Wang, in breach of their ongoing duty to provide care for X.C.W. and services to her and her family.

341.   In January of 2016, the State, NDHHS, Ucchino, NFC, Richey, Petzel, Dr. Harrington, and Ruma were all agreed and decided to terminate effective ongoing health care provided by Gunn for X.C.W. and ongoing services for the family.  They did so without first arranging and commencing the services of a new family therapist to ensure continuity of care. As a direct and proximate result, X.C.W. has not been able to form an effective treatment alliance with any provider since then, and her mental and physical health has declined.

342.  In April of 2016, Y.C.W. reached the age of majority and is therefore no longer subject to the same Juvenile Court jurisdiction.

343.   On April 8, 2016, a dispositional hearing was held in the Juvenile Court Proceeding.  At that hearing, two psychologists testified that Wang Anderson has not had, and does not have a mental illness or disorder, other than possible adjustment disorder caused by the circumstances of the Juvenile Proceeding.  Another psychologist testified that Dr. Wang has not had, and does not have a mental illness or disorder, other than possible adjustment disorder caused by the circumstances of the Juvenile Proceeding.

344.   On information and belief, NDHHS, NFC, Richey, and Petzel presented false, misleading, or inaccurate information to the Juvenile Court at the April 8, 2016 hearing.

345.   On or about May 6, 2016, Judge Crnkovich entered a Disposition Order which changed the permanency objective to Independent Living, denied Wang Anderson's requests for visitation or contact with X.C.W., despite X.C.W.'s verbal request to see her mother, and relieved NDHHS from any obligation to provide further efforts toward reunification.  Wang Anderson and Dr. Wang have appealed this order, and the appeal is still pending.

346.  X.C.W. was placed in foster care with Zach and Libbie Appleby-Leo from May 12, 2016 through August 15, 2016.

347.   On or about August 15, 2016, X.C.W. was placed in an independent living arrangement and moved into a dormitory at the University of Nebraska-Lincoln, in Lincoln, Nebraska, where she remained until about December 14, 2016.

348.   From October, 2013 through the present, NFC's own court reports demonstrate that NDHHS, NFC, Winans, Smith, Paul, Richardson, Richey, and Petzel have had a lack of regard or appreciation for, ignored, or deliberately failed to disclose the serious health and safety concerns of X.C.W.   On information and belief, as of August 15, 2016, X.C.W. had not demonstrated sufficient maturity and still needed supervision.   She continued to be very vulnerable.   It was therefore contrary to her health, safety, and welfare to place her into an independent living arrangement at that time.

349.   The State, NDHHS, NFC, Richey, and Petzel failed to involve Wang Anderson or Dr. Wang in the planning of or transition to an independent living arrangement for X.C.W. prior to her placement on August 15, 2016 and failed to notify Wang Anderson or Dr. Wang of X.C.W.'s move to independent living seven days in advance of the August 15, 2016 change of placement.   On information and belief, these Defendants failed to establish or determine any conditions for X.C.W.'s independent living arrangement which commenced on August 15, 2016, failed to adequately discuss the conditions with X.C.W., and failed to define those conditions in writing in a written service agreement signed by X.C.W.; and, failed to establish, define, or determine X.C.W.'s responsibilities with respect to the independent living arrangement and the consequences of failure to comply with the conditions.

350.   During the time period from August, 2016, through December, 2016, Wang Anderson was provided with only limited information regarding X.C.W. by NFC, Ucchino, Richey and Petzel.

351.   During that time period, NDHHS, NFC, Weinberg, Dr. Harrington, Phillips, Richey and Petzel all failed to protect, supervise, maintain sufficient contact with, or ensure proper health care for X.C.W.   As a result, X.C.W.'s health, safety and welfare all declined, including failure to continue with therapy, drug and alcohol use, continued sexual abuse and exploitation, and she failed or was forced to withdraw from her classes.

352.   Between August, 2016 and December, 2016, Wang Anderson developed concerns regarding the health, safety, and welfare of X.C.W.   She repeatedly communicated those concerns regarding X.C.W.'s health, safety and welfare to NDHHS, Weinberg, Phillips, NFC, Richey, and Petzel.   She received no response to those communications.   Wang Anderson repeatedly requested a meeting with Petzel and Ucchino, which eventually occurred on December 9, 2016.   Wang Anderson, Petzel, Richey, Risko, and Ucchino all attended that meeting, along with Wang Anderson's counsel.   During the meeting, it was apparent that Petzel, Richey, Risko, and Ucchino were all unaware of X.C.W.'s declining condition.   Wang Anderson again communicated her concerns regarding X.C.W.'s health, safety and welfare, and these Defendants intimidated Wang Anderson in response.

353.   On or about December 14, 2016, X.C.W. NDHHS, NFC, Petzel, and Richey removed X.C.W. from independent living at UNL and placed her back in foster care with Reid-Hansen and Hansen in Blair, Nebraska.   On information and belief, these actions by these Defendants were in reaction to the information provided to them by Wang Anderson at the December 9, 2016 meeting.

354.   Since at least August, 2016, Petzel, Richey, the Department, NFC, and Ucchino have repeatedly withheld vital information from Wang Anderson and Dr. Wang regarding X.C.W.'s health, safety and welfare.   While the Department, NFC, Ucchino, Petzel and Richey

94

have known that Reid-Hansen was 8-months pregnant, with four additional biological children (under the age of 9), one 4-month-old foster baby, and 3 other minor foster children, knowing the absolute impossibility of providing the most basic and essential supervision and care, they have deliberately withheld this information from the Court, Wang Anderson and Dr. Wang.

355.  On or about March 29, 2017, X.C.W. was placed with agency-based foster parent Mercedes Brown in Omaha, Nebraska, where she remains as of the date of filing of this Complaint.

356.  Since October 9, 2013, Wang Anderson has repeatedly reported her concerns regarding the care and treatment of her children by the State, NDHHS, NFC, and the other Defendants to Weinberg, Phillips, and other responsible officials, and her reports have been ignored or brushed aside.

357.  Wang Anderson and Dr. Wang have been foreclosed from obtaining accurate information regarding X.C.W.'s health, safety, and welfare throughout the pendency of the Juvenile Proceeding.  Accordingly, Wang Anderson reserves the right to amend this Complaint upon further discovery.

## FIRST CAUSE OF ACTION

## 42 U.S.C. § 1983 – FOURTH AMENDMENT AND FOURTEENTH AMENDMENTS

### Procedural Due Process, Unlawful Seizure, and Familial Association

### Against Defendants Wheeler, Miller, Sheller, White, Heys, and Tiemann

358.  Plaintiffs replead and incorporate by reference the allegations contained in paragraphs 1 through 357 above, as if fully set forth here.

359.  Under the circumstances of this case outlined above, X.C.W. had the right to be free from unreasonable seizure under the Fourth Amendment of the United States Constitution, which

right was "clearly established" as of the time of the seizure, such that a reasonable law enforcement officer or social worker in Defendants' situation would know that it is wrong to interfere in a child's right to remain with her parent in the absence of exigent circumstances, and that such right may not be impinged upon without first obtaining a warrant or other court order to do so.

360.   Under the circumstances of this case outlined above, X.C.W. and Wang Anderson had the right to be free from the severance of their familial association without due process of law under the Fourth Amendment of the United States Constitution, which right was "clearly established" as of the time of the seizure, such that a reasonable law enforcement officer, school official or social worker in Defendants' situation would know that it is wrong to interfere in a parent's right to the care and custody of her child in the absence of exigent circumstances, and that such right may not be impinged upon without first obtaining a warrant or other court order to do so and other due process.

361.   The actions of Deputy Wheeler, Deputy Miller, Lt. Gentile, Sheller, White, Heys, and Tiemann caused or contributed to the unlawful seizure, detention, and removal of X.C.W. from Wang Anderson's care and custody without proper justification or authority, without a warrant, in the absence of exigent circumstances, an emergency or probable cause, without consent, court order, or any other legal basis for the removal of X.C.W. from the care and custody of Wang Anderson.

362.   Defendants' actions were taken with deliberate indifference to Plaintiffs' rights.

363.   As a direct and proximate result of these Defendants' actions, Plaintiffs have suffered, and will continue to suffer economic, physical, mental and emotional injury, all to an extent and in an amount subject to proof at trial.

364.    Defendants Gentile, Wheeler, Miller, Sheller, White, Heys, and Tiemann are vicariously responsible for the conduct of each other and Does 1 through 15, inclusive, under applicable statutory and case law.

365.    On information and belief, Gentile, Wheeler, Miller, Sheller, White, Heys, and Tiemann and Does 1 through 15, inclusive, and each of them were motivated by evil motive or intent, or acted with reckless or callous indifference to Plaintiff's federally protected rights. Thus, Plaintiffs are entitled to an award of punitive damages.

## SECOND CAUSE OF ACTION

## 42 U.S.C. § 1983 – MONELL-RELATED CLAIMS

**Against County of Douglas, Nebraska Families Collaborative, KVC Behavioral Healthcare Nebraska, Inc., Christian Heritage, Children's Hospital and Medical Center, Laureate Psychiatric Hospital, Remuda Ranch, Millard Public Schools, Papillion La Vista Community Schools, and Does 1 through 15, Inclusive**

366.    Plaintiffs replead and incorporate by reference the allegations contained in paragraphs 1 through 365 above, as if fully set forth here.

367.    On information and belief, Defendant County of Douglas, (including through its entities Douglas County Sheriff and Douglas County Attorney), and Defendants NFC, KVC, Christian Heritage, Children's Hospital and Medical Center, Laureate Psychiatric, Remuda Ranch, Millard Public Schools, Papillion La Vista Community Schools, and Does 1 through 15, inclusive, established and/or followed policies, procedures, customs, usages and/or practices (hereinafter referred to collectively as "policy" or "policies") which policies were the moving force behind the violations of Plaintiffs' constitutional rights as alleged hereinabove, including those arising under the First, Fourth, Fifth, Ninth and Fourteenth Amendments to the United States Constitution, by and through, but not limited to, the following policies, practices, customs, usages and/or procedures:

97

a.  the custom of detaining and/or removing children from their family and homes without exigent circumstances (imminent danger of serious physical injury), court order and/or consent;

b.  the custom of removing children from their family and their homes without first obtaining a warrant or other court order when no exigency exists;

c.  the custom of examining (medically) children without exigency, need, or proper court order, and without the presence and/or consent of their parent or guardian;

d.  the custom of removing and detaining children, and continuing to detain them for an unreasonable period after any alleged basis for detention is negated;

e.  the custom of using trickery, duress, fabrication and/or false testimony and/or evidence, and in failing to disclose exculpatory evidence, in preparing and presenting reports and court documents to the Court, causing an interference with Plaintiffs' rights, including those as to familial relations;

e.  the custom or policy of not conducting proper intake assessments, safety assessments, family assessments and other assessments or evaluations as to the strengths and needs of children and families who are the subjects of intervention;

f.  the custom or policy of not arranging, coordinating, referring, or providing services, in a clear and timely fashion, which are appropriate and reasonably calculated to address the needs of those children and families;

g.  by acting with deliberate indifference in implementing a policy of inadequate training, and/or by failing to train its officers, agents, employees and state actors, in providing the constitutional protections guaranteed to individuals, including

those under the First, Fourth, Fifth, Ninth, and Fourteenth Amendments, when performing actions related to child abuse, neglect or dependency type proceedings.

h.  by acting with deliberate indifference in implementing a policy of inadequate supervision, and/or by failing to adequately supervise its officers, agents, employees and state actors, in providing the constitutional protections guaranteed to individuals, including those under the First, Fourth, Fifth, Ninth, and Fourteenth Amendments, when performing actions related to child abuse, neglect or dependency type proceedings.

i.  the policy of making false or unfounded allegations in Juvenile Petitions, i.e. alleging that a parent was observed to be acting in a manner consistent with untreated mental health needs under Neb. Rev. Stat. § 43-247(3a), where there is no evidentiary basis to support the charge.

j.  by acting with deliberate indifference in implementing a policy which allows for arranging or providing health care for a child without first obtaining proper informed consent.

k.  the policy of improperly influencing, manipulating, or controlling the services and opinions of health care providers and other professionals, or attempting to do so, as those services relate to the assessment, evaluation, diagnosis, treatment, or other care provided by those providers or other professionals; and,

l.  the policy of placing children in over-crowded foster homes.

(This list is not exhaustive due to the pending nature of discovery and the privileged and protected records of investigative and juvenile proceedings.

Plaintiffs reserve the right to amend this pleading as more information becomes available.)

368.    County of Douglas, NFC, KVC, Christian Heritage, Children's Hospital and Medical Center, Laureate Psychiatric Hospital, Remuda Ranch, Millard Public Schools, La Papillion La Vista Community Schools, and John Does 1 through 15, Inclusive, all breached their duties and obligations to Plaintiffs by, including but not limited to, failing to establish, implement and follow the correct and proper Constitutional policies, procedures, customs, usages, and practices; by failing to properly select, supervise, train, control, and review their agents and employees as to their compliance with Constitutional safeguards with deliberate indifference; and by knowingly, or with deliberate indifference, permitting one or more of the individual Defendants herein to engage in unlawful and unconstitutional conduct as herein alleged.

369.    County of Douglas, NFC, KVC, Christian Heritage, Children's Hospital and Medical Center, Laureate Psychiatric Hospital, Remuda Ranch, Millard Public Schools, Papillion La Vista Community Schools, and John Does 1 through 15, Inclusive knew, or should have known, that by breaching the above-mentioned duties and obligations that it was foreseeable that said failure would, and did, cause Plaintiffs to be injured and damaged, and their constitutional rights to be impaired, by the wrongful policies and acts as alleged herein, and that such breaches occurred in contravention of public policy and Defendants' legal duties and obligations to Plaintiffs; and that such policies, practices, and customs and procedures were the moving force behind the constitutional violations alleged herein above.

370.    These actions, and/or inactions, of County of Douglas, NFC, KVC, Christian Heritage, Children's Hospital and Medical Center, Laureate Psychiatric Hospital, Remuda

Ranch, Millard Public Schools, Papillion La Vista Community Schools, and John Does 1 through 15, Inclusive were the direct and proximate cause of Plaintiffs' injuries, as alleged herein; and as a result, Plaintiffs have sustained general and special damages, to an extent and in an amount to be proven at trial.

**THIRD CAUSE OF ACTION**

**NEGLIGENCE**

**All Defendants**

371.   Plaintiffs replead and incorporate by reference the allegations contained in paragraphs 1 through 371 above, as if fully set forth here.

372.   From October 8, 2013 through the date of this Complaint, each of the named Defendants herein was negligent in one or more of the following respects:

A.  failing to maintain the connection of X.C.W. to her parents while she was in out-of-home care;

B.  failing to ensure regular and quality parenting time between X.C.W. and Wang Anderson and Dr. Wang to maintain and support the parent-child relationship;

C.  failing to continue the parent-child attachment or preserve X.C.W.'s sense of belonging as a part of her family, community and culture;

D.  failing to consider reunification as the primary permanency objective;

E.  failing to develop and implement a plan designed to achieve the court-ordered permanency objective of reunification with a parent;

F.  considering alternative permanency objectives before Wang Anderson and Dr. Wang had been given reasonable opportunities to reunify and not succeeded;

101

G.  failing to provide frequent and regular contact between X.C.W. and Wang Anderson and Dr. Wang, which was critical to reunification;

H.  failing to develop, recommend, request, provide, or implement a timely and appropriate plan for visitation, parenting time, or other contact between X.C.W. and Wang Anderson;

I.  failing to develop, recommend, request, provide, or implement a timely and appropriate plan for visitation, parenting time, or other contact between X.C.W. and Dr. Wang;

J.  failing to follow applicable laws, statutes, policies and procedures regarding the development and implementation of a plan for visitation or parenting time between X.C.W. and Wang Anderson or between X.C.W. and Dr. Wang;

K.  failing to encourage or make efforts to strengthen the parent-child relationship between X.C.W. and Wang Anderson or between X.C.W. and Dr. Wang;

L.  failing to place X.C.W. in the least restrictive environment consistent with her best interests;

M.  failing to provide appropriate and necessary care, protection and a safe and stable living environment for X.C.W.;

N.  failing to assure the development of X.C.W.'s capacities for a healthy personality, physical well-being, and useful citizenship;

O.  failing to make reasonable efforts to preserve and reunify the family relationships between X.C.W. and Wang Anderson and between X.C.W. and Dr. Wang;

P.   failing to acknowledge or recognize the efforts toward reunification which were made by Dr. Wang and X.C.W.;

Q.   failing to conduct an appropriate investigation of the circumstances of X.C.W. designed to establish a safe and appropriate plan for the rehabilitation of X.C.W. and the family unit, immediately following her removal from the family home;

R.   failing to complete or conduct necessary assessments throughout the pendency of the Juvenile Court proceeding, including, without limitation: initial assessment; family assessment; family issues, strengths and needs assessment; and family and child assessment; reunification assessment, and other necessary assessments;

S.   failing to provide or arrange necessary services appropriate to, and matched with the desired outcome of reunification, based upon a proper family assessment and clear identification of family and child goals;

T.   terminating or discontinuing effective services, including visitation, family therapy, and other contact between X.C.W. and Wang Anderson and Dr. Wang.

U.   failing to provide "guaranteed services" as required by 390 NAC 5-004;

V.   failing to develop, implement, and update appropriate written case plans;

W.   failing to involve Wang Anderson or Dr. Wang in the development of case plans;

X.   failing to make accurate and timely reports to the Juvenile Court about the condition, placement, circumstances, and needs of X.C.W.;

Y.   making false or untrue statements in reports or to the Juvenile Court;

Z. making recommendations without any supporting evidence;

AA.  failing to provide X.C.W. timely, proper and appropriate care, placement, medical services, psychiatric services, or training;

BB.  consenting to health care for X.C.W. without being informed about the risks and benefits of the treatment;

CC.  disregarding and failing to timely consider and investigate X.C.W.'s Chinese relatives as a placement, on multiple occasions; and,

DD.  disregarding and failing to place X.C.W. with an available Chinese relative which had priority over a non-relative, non-kinship foster placement, in violation of applicable regulations and policies, on multiple occasions.

373.  From October 8, 2013 through the date of this Complaint, Defendants NDHHS, Dr. Harrington, Ruma, Beals, NFC, Winans, Smith, Paul, Richardson, Risko, Richey, Petzel, Ried Hansen and Hansen have been negligent in the following respects:

A.  repeatedly failing to protect X.C.W.;

B.  repeatedly placing X.C.W. in a dangerous environment;

C.  repeatedly placing or allowing X.C.W. to be placed in an overcrowded foster home;

D.  placing or allowing X.C.W. to be placed in a foster home when the maximum number of foster children permitted by regulation, or more, were already placed in the foster home;

E.  failing to provide necessary supervision and monitoring of X.C.W.;

F.  failing to provide transportation to X.C.W.;

G.  allowing X.C.W. to be employed in a dangerous environment; and,

H. making false or misleading statements regarding family therapy and other false

statements.

374.    From October 8, 2013 through the present, Defendants Children's, Laureate, Remuda, Dr. Harrington, Treinen, Beals, Parke, Ruma, Boyles, and Gunn have been negligent in one or more of the following respects, and as more particularly described elsewhere in this Complaint:

A.  Failing to provide the appropriate standard of health care to X.C.W.;

B.  Failing to properly assess and diagnose X.C.W.;

C.  Failing to obtain or consider necessary health information regarding X.C.W.;

D.  Providing care to X.C.W. without informed consent;

E.  Failing to provide the least restrictive care for X.C.W.;

F.  Excluding Wang Anderson or Dr. Wang from family therapy;

G.  Making recommendations regarding parental contact which are outside the scope of the expertise and care provided by each such provider;

H.  Prescribing prescription medications, including Zoloft, which were contra-indicated or contrary to the standard of care for X.C.W.;

I.  Failing to provide family therapy;

J.  Failing to provide individual therapy;

K.  Discussing prostitution with a minor child;

L.  Excluding the parents of a minor child from the child's care;

M.  Admitting X.C.W. for in-patient care without first contacting or discussing the recommended care with Wang Anderson or Dr. Wang; and,

N.  Recommending in-patient care without first recommending an appropriate outpatient option.

375.   From October 8, 2013 through the present, Defendants NDHHS, NFC, KVC, MPS, PLCS, Children's Hospital, Dr. Harrington, Laureate, Remuda, Winans, Paul, and Richey have been negligent in failing to properly train and supervise employees of those entities or agencies.

376.   Defendants NDHHS, NFC, KVC, Christian Heritage, MPS, PLCS, Children's, Laureate, and Remuda are vicariously liable for the negligent acts mentioned in the preceding paragraphs under a theory of respondeat superior.

377.   As a direct and proximate result of each of the aforementioned negligent acts or omissions, X.C.W., Wang Anderson, and Dr. Wang all suffered damage.

378.   But for each of the aforementioned negligent acts or omissions, X.C.W., Wang Anderson, and Dr. Wang would not have suffered damage.

379.   Plaintiff has timely complied with the requirements of the Nebraska State Tort Claims Act, to the extent it applies to any State Defendant, by filing her claim on or about March 13, 2017.

380.   Based upon all of the harm that X.C.W. suffered while in the care of Reid Hansen and Hansen, she would suffer irreparable harm if placed in their care.

WHEREFORE, in addition to the general prayer for relief set forth below, Plaintiff requests an order enjoining Reid Hansen or Hansen from caring for or having any contact with X.C.W.

### FOURTH CAUSE OF ACTION

### 42 U.S.C. § 1983 – VIOLATION OF SUBSTANTIVE DUE PROCESS RIGHTS TO FAMILY INTEGRITY AND THE PARENT-CHILD RELATIONSHIP UNDER THE FOURTEENTH AMENDMENT

### Against all Individual Defendants

381.   Plaintiffs replead and incorporate by reference the allegations contained in paragraphs 1 through 380 above, as if fully set forth here.

382.   Parents and their children have a recognized unique and legal interest in, and a constitutionally protected right to, companionship.  The substantive due process right to family integrity protects not only the parent's right to the companionship, care, custody, and management of his or her child, but also protects the child's reciprocal right to be raised and nurtured by his or her biological parent.  It is clear that both parents and their children have cognizable substantive due process rights to the parent-child relationship.  *Amanda C. ex rel. Richmond v. Case,* 275 Neb. 757 (Neb. 2008).

383.   From October 8, 2013 through the present, X.C.W., Wang Anderson, and Dr. Wang have all had a constitutionally protected substantive due process right to family integrity.

384.   From October 8, 2013 through the present, each of the individual Defendants have violated the substantive due process right to family integrity of X.C.W., including her right to the companionship of her parents and her rights to be raised, guided and nurtured by her parents, in one or more of the following respects:

A.   Removal from the family home even though X.C.W. said she felt safe with her mother;

B.   Denial of, and failure to provide or arrange visitation;

C.   Recommending the imposition of excessive and unwarranted restrictions and limitations on visitation;

D.   Filing or recommending the filing of a petition to terminate parental rights without sufficient evidence;

E.  Improperly requesting the suspension of contact between X.C.W. and her parents;

F.  Failing and refusing to place X.C.W. with her Chinese relative, even though she requested it;

E.  Making decisions with regard to the education of X.C.W. without notifying Wang Anderson or Dr. Wang, obtaining their consent or approval, or affording them an opportunity to be heard regarding the decisions, including decisions to remove X.C.W. from school, transfer her to a different school, discontinue or change classes, assess, identify, or evaluate X.C.W. and other decisions;

F.  Repeatedly failing to ensure and maintain meaningful parental contact and to encourage X.C.W.'s engagement with her parents.

385.    From October 8, 2013 through the present, each of the individual Defendants violated the substantive due process right to family integrity of Wang Anderson and Dr. Wang, including their right to the companionship, care, custody and management of their children, in one or more of the following respects:

A.  Removal of their children from the family home even though X.C.W. said she felt safe with her mother;

B.  Denial of visitation;

C.  Recommending the imposition of excessive and unwarranted restrictions and limitations on visitation;

D.  Filing a petition to terminate parental rights without sufficient evidence;

E.  Improperly requesting the suspension of contact between X.C.W. and her parents;

F.  Failing and refusing to place X.C.W. with her Chinese relative, even though X.C.W. and they requested it;

G.  Failing to conduct a proper investigation;

H.  Failing to perform proper assessments and/or evaluations;

I.  Not developing, preparing, or maintain a proper written visitation plan;

J.  Deliberately, or with deliberate indifference, failing to make efforts toward reunification and encouraging other Defendants to not make efforts toward reunification;

K.  Withholding information regarding X.C.W. from Wang Anderson and Dr. Wang;

L.  Making false, misleading, or inaccurate statements or representations to the Juvenile Court.

386.  From October 28, 2013 through the present, Judge Crnkovich, acting outside of all judicial authority and jurisdiction, violated Wang Anderson's right to due process, and is not protected from liability for the same by judicial immunity, in the following respects:

A.  Appointing a guardian ad litem for her without notice, evidence, a hearing, or other due process;

B.  Continuing the appointment of a guardian ad litem for Wang Anderson throughout the Juvenile Proceeding, without ever affording Wang Anderson an opportunity to be heard regarding her mental health, capacity, competency, the appropriateness of a guardian ad litem;

C.  Not defining the role of the guardian ad litem for Wang Anderson from October 28, 2013 through November 3, 2015;

D.    Disregarding, ignoring, or unreasonably misconstruing Wang Anderson's affidavits, statements in court, and pleadings filed by her counsel (which were all filed or made in an effort to protect her children) as indicating that Wang Anderson had ongoing mental health problems;

E.    Criticizing and demeaning Wang Anderson in the presence of other parties to the Juvenile Proceeding during hearings;

F.    Imposing unconstitutional restraints on Wang Anderson's ability to exercise her parental rights, including , without limitation, the health care and education of her children, without notice, a hearing, evidence, or other due process;

G.    Imposing unconstitutional restraints on Wang Anderson's ability avail herself of due process in the Juvenile Proceeding in other respects without notice, a hearing, or other due process;

H.    Suspending Wang Anderson's contact with X.C.W. on at least two occasions without proper notice, hearing, evidence, or other due process;

I.    Communicating to the parties to the Juvenile Proceeding, including NDHHS and its agents, at the October, 2013 hearing that, in essence, she would not require the minor children to visit their parents.

I.    Imposing restraints on Wang Anderson's First Amendment rights, including to free speech, in barring her from communicating with service providers and other individuals or entities affecting her children, without notice, a hearing, or other due process.

387.  On or about April 1, 2016, Defendants Derr and Anderson violated the substantive due process right to family integrity of Wang Anderson, including her right to the

companionship, care, custody or management of their children, by filing a petition to have Y.C.W. declared to be incapacitated and requesting that they be appointed as her co-guardians without any proper basis, and by asking the Douglas County Court to allowed them to proceed on their petition without providing any notice to Wang Anderson, and without providing any notice to Wang Anderson of said guardianship proceeding.

388.   On information and belief, Defendants NDHHS, NFC, KVC, Christian Heritage, Douglas County, MPS, PLCS, Children's, Laureate Psychiatric, Remuda are liable for the aforementioned violations because they were committed in furtherance of unconstitutional policies and customs of NFC, and because the violations consist of actions taken by NFC representatives which inflicted injuries redressable by section 1983.

389.   On information and belief, Defendants State of Nebraska, NDHHS, NFC, KVC, Christian Heritage, Douglas County, MPS, PLCS, Children's, Laureate, Remuda committed all relevant actions in reliance on governmental assistance or benefits.

390.   On information and belief, Defendants State of Nebraska, NDHHS, NFC, KVC, Christian Heritage, Douglas County, MPS, PLCS, Children's, Laureate, Remuda were all performing traditional governmental functions when they acted as described elsewhere in this Cause of Action.

391.   As a direct and proximate result of these Defendants' actions, Plaintiffs have suffered, and will continue to suffer economic, physical, mental and emotional injury, all to an extent and in an amount subject to proof at trial.   On information and belief, said Defendants acted with malice, and Plaintiffs are therefore entitled to punitive damages.

## FIFTH CAUSE OF ACTION

## 42 U.S.C. § 1983 – DELIBERATE INDIFFERENCE

**Against All Individual Defendants**

392.   Plaintiffs replead and incorporate by reference the allegations contained in paragraphs 1 through 391 above, as if fully set forth here.

393.   By virtue of the acts and omissions alleged above, each of the individual Defendants failed to protect and was deliberately indifferent to the serious health and safety needs of X.C.W., in violation of the Due Process Clause of the Fourteenth Amendment.

394.   As a direct and proximate result of these Defendants' actions, Plaintiffs have suffered, and will continue to suffer economic, physical, mental and emotional injury, all to an extent and in an amount subject to proof at trial.   On information and belief, said Defendants acted with malice, and Plaintiffs are therefore entitled to punitive damages.

## SIXTH CAUSE OF ACTION

## 42 U.S.C. § 1983 - RETALIATION FOR PROTECTED ACTIVITY

### Against Defendants Crnkovich, NDHHS, NFC, Richey, Petzel, Reid-Hansen

395.   Plaintiffs replead and incorporate by reference the allegations contained in paragraphs 1 through 394 above, as if fully set forth here.

396.  Plaintiff Wang Anderson, individually, has made efforts or attempted to exercise her free speech, due process and appeal rights in the Juvenile Proceeding, including, without limitation, in the following respects:

A.  requesting a prompt and fair detention or protective custody hearing;

B.  objecting to the appointment of a guardian ad litem for her;

C.   refusing to discuss the allegations of the juvenile court petition during "therapeutic visits" with X.C.W.;

D.  filing a motion for placement of X.C.W. in an inpatient facility on December 31, 2013;

E.  contesting adjudication and termination of her parental rights;

F.  filing a motion to recuse Judge Crnkovich as the trial judge in the Juvenile Court proceeding on January 15, 2014;

G.  appealing the Adjudication Order rendered June 25, 2014 in the Juvenile Court;

H.  requesting, through subpoena or otherwise, health care, educational, and other records regarding X.C.W. and Y.C.W. from October, 2013 through the present;

I.  taking depositions for use in the Juvenile Proceeding;

J.  filing various motions for emergency protective relief to protect X.C.W.; and,

K.  subpoenaing witnesses to testify at court hearings.

397.  Defendants NDHHS, NFC, Richardson, Paul, Richey, and Petzel retaliated against Wang Anderson for one or more of these actions by referring them in their reports to the Court and other reports, in a way which put Wang Anderson in a negative light.

398.  On information and belief, Defendants NDHHS, NFC, Richey, Petzel, and Reid-Hansen have openly criticized Wang Anderson for said actions in the presence of X.C.W.

399.  Defendant Crnkovich retaliated against Wang Anderson for filing her Ex Parte Motion for Immediate Relief to protect her daughter on March 31, 2015 in the Juvenile Proceeding, by suspending Wang Anderson's contact with X.C.W. indefinitely without notice, hearing, evidence, or verbatim record, leading to Wang Anderson having almost no contact with X.C.W. for over two years thereafter.

400.   As a direct and proximate result of these Defendants' actions, Plaintiffs have suffered, and will continue to suffer economic, physical, mental and emotional injury, all to an extent and in an amount subject to proof at trial.  On information and belief, said Defendants acted with malice, and Plaintiffs are therefore entitled to punitive damages.

## SEVENTH CAUSE OF ACTION

## 42 U.S.C. § 1983 – FIRST AMENDMENT

## Judge Crnkovich

401.   Plaintiffs replead and incorporate by reference the allegations contained in paragraphs 1 through 400 above, as if fully set forth here.

402.   Judge Crnkovich violated Wang Anderson's First Amendment right to free speech when she imposed restraints on her ability to communicate with service providers and other individuals, by requiring her to communicate through her attorney <u>and</u> her guardian ad litem, and by prohibiting her counsel from filing motions or other pleadings without the approval of her guardian ad litem.

403.   As a direct and proximate result of this Defendant's actions, Plaintiff has suffered, and will continue to suffer economic, physical, mental and emotional injury, all to an extent and in an amount subject to proof at trial.  On information and belief, said Defendant acted with malice, and Plaintiff is therefore entitled to punitive damages.

## EIGHTH CAUSE OF ACTION

## 42 U.S.C. § 2000d – DISCRIMINATION

## Against Defendants State of Nebraska, NDHHS, Wheeler, Gentile, NFC, Winans, Smith, Parke, Paul, Richardson, Richey, Petzel,

404.   Plaintiffs replead and incorporate by reference the allegations contained in paragraphs 1 through 403 above, as if fully set forth here.

114

405.  X.C.W. and Wang Anderson were, on the ground of race, color, or national origin, excluded from participating in, denied benefits of, or were subjected to discrimination under one or more programs or activities receiving Federal financial assistance.

406.  On information and belief, on the grounds that Wang Anderson and X.C.W. are Asian and of Chinese origin:

A.  NDHHS, NFC, Wheeler and Gentile did not conduct a fair investigation prior to or after removal of X.C.W. or Y.C.W. from the Wang Anderson home, and failed to consider and recognize that the characteristics of Wang Anderson and her residence observed by these Defendants were consistent with the traditions, customs, and mores of Chinese culture.

B.  White, Winans, Smith, Paul, Richardson, Richey, and Petzel did not place X.C.W. on one or more occasions with her Chinese relatives Zhang and Dong, despite the requests of X.C.W. and Wang Anderson and the applicable regulations which required preference of relative placements over other placements.  On information and belief, Smith or Richardson deliberately did not place X.C.W. with these relatives precisely because they were of her same race and national origin, including because of cultural norms, traditions, mores of the Chinese people.  On or about June 5, 2014, Parke made a recommendation to Smith not place X.C.W. with a Chinese family because it would be "traumatic" for X.C.W., which recommendation was the basis for the decision by NDHHS, NFC, Smith and Winans to not place X.C.W. with a Chinese relative family, and instead place her in a foster home already overwhelmed with too many children.

C    Said Defendants failed to make or implement a plan for reunification or

visitation as they would have for non-Asian or non-Chinese families.

407.  As a direct and proximate result of these Defendants' actions, Plaintiff has suffered,

and will continue to suffer economic, physical, mental and emotional injury, all to an extent and

in an amount subject to proof at trial.  On information and belief, said Defendants acted with

malice, and Plaintiff is therefore entitled to punitive damages.

## NINTH CAUSE OF ACTION

## SECTION 504 OF REHABILITATION ACT OF 1973

### Against Defendants State of Nebraska, Crnkovich, NDHHS, NFC, Richardson, Paul And Papillion La Vista Community Schools

408.    Plaintiffs replead and incorporate by reference the allegations contained in

paragraphs 1 through 407 above, as if fully set forth here.

409.  On information and belief, Defendants State of Nebraska, NDHHS, NFC, Smith, La

Vista Public Schools failed to establish or implement, with respect to actions regarding the

identification, evaluation, or educational placement of a person who, because of handicap, need

or are believed to need special instruction or related services, a system of procedural safeguards

that includes notice, an opportunity for the parents or guardian of the person to examine relevant

records, an impartial hearing with opportunity for participating by the person's parents or

guardian and representation by counsel, and a review procedure.

410.  In 2014, a "Section 504 Accommodation Plan" was developed and implemented for

X.C.W., by said Defendants.  However, each of said Defendants did not afford Wang Anderson,

whose parental educational rights have always been intact, with any of the aforementioned

safeguards or process.

116

411.  As a direct and proximate result of these Defendants' actions, Plaintiff has suffered, and will continue to suffer economic, physical, mental and emotional injury, all to an extent and in an amount subject to proof at trial.  On information and belief, said Defendants acted with malice, and Plaintiff is therefore entitled to punitive damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for a judgment against each of the aforementioned defendants, jointly and severally, for general damages, pain and suffering, economic loss, physical, psychological, mental, and emotional damage, hedonic, punitive and other damages, costs of suit, attorney fees, for injunctive relief as more specifically requested above, and for such other and further relief as the Court deems appropriate.

Dated:  June 16, 2017.


_____

Catherine Yang Wang Anderson,
Individually and as Next Friend
of X.C.W., Minor Child, Plaintiff


By: */s/ Joshua D. Barber*_____
    Her Attorney


Joshua D. Barber        #22624
Barber & Barber, P.C., L.L.O.
P.O. Box 4555
300 North 44th Street, Suite 205
Lincoln, NE  68503
(402) 434-5429
joshuabarber@yahoo.com
Attorney for Plaintiff

117