IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| CATHERINE YANG WANG ANDERSON, Individually and on behalf of X.C.W. as the "Next Friend" of X.C.W., a minor,<br><br>Plaintiff,<br><br>vs.<br><br>THE STATE OF NEBRASKA, et al.,<br><br>Defendants. | 4:17-CV-3073<br><br>MEMORANDUM AND ORDER |

This matter is before the Court on the motion to dismiss (filing 203) filed by Janine Ucchino. The Court will grant Ucchino's motion and dismiss the claims against her.

BACKGROUND

The plaintiff, Catherine Yang Wang Anderson (Wang Anderson) is the mother of two girls, X.C.W. and Y.C.W. Filing 154 at 2. Wang Anderson's husband, Bo Wang (Wang) is their father. Filing 154 at 2. X.C.W. was a minor when this case was filed, and Wang Anderson is suing both in her own capacity and as "next friend" of X.C.W. Filing 154 at 2. Very generally, Wang Anderson alleges that X.C.W. was unlawfully made a ward of the State of Nebraska and held by the State against her will. Filing 154 at 2.

It was Y.C.W., however, who first drew the attention of authorities. According to Wang Anderson, Y.C.W. had an "inappropriate" personal relationship with a teacher at her high school because Y.C.W. was permitted and encouraged to confide in him about personal problems. Filing 154 at 24-

28. According to the teacher, Y.C.W. told him she had sexual identity issues. Filing 154 at 35. Wang Anderson blames Y.C.W.'s friendship with her teacher for a "breakdown" in her own relationship with Y.C.W., who reported to school officials on October 8, 2013 that Wang Anderson had threatened her. Filing 154 at 28.

Based on Y.C.W.'s report that she didn't feel safe going home, sheriff's officers removed Y.C.W. from Wang Anderson's residence and took her to Project Harmony for a temporary foster placement. Filing 154 at 33. One of the sheriff's deputies observed that when Wang Anderson answered the door, she was wearing a rubber glove, and suspected that Wang Anderson might be mentally ill. Filing 154 at 29-31. Investigators from the Nebraska Department of Health and Human Services (DHHS) went to Wang Anderson's residence that evening, and reported hazardous conditions. Filing 154 at 35. So, after X.C.W. went to school the next day, she was also placed in the temporary custody of DHHS. Filing 154 at 36. X.C.W. and Y.C.W. were placed with the same foster parent, and both girls were evaluated at Project Harmony. Filing 154 at 34, 37, 43.

A juvenile proceeding was initiated in the Separate Juvenile Court of Douglas County, Nebraska. Filing 154 at 44. The petition alleged—Wang Anderson says wrongly—that X.C.W. and Y.C.W. had been subjected to inappropriate discipline, not provided with safe housing, deprived of proper parental care and support, and that Wang Anderson had been seen acting in a manner consistent with untreated mental health needs. Filing 154 at 44-45. An ex parte juvenile court order placed the girls in the temporary custody of DHHS, then after a hearing, the juvenile court continued DHHS's temporary custody. Filing 154 at 45-46.

Wang Anderson claims that both girls began to show signs of "mental, emotional and physical distress" that went unnoted and untreated. Filing 154 at 48-49. Both girls were diagnosed with mental health disorders; Wang Anderson claims the diagnoses were inaccurate. Filing 154 at 52. She also alleges, as a basis for liability, that the girls' mental health providers did not encourage them to communicate with her, and that both girls were told they had a right to refuse contact with her. Filing 154 at 53.

X.C.W. was sent to a program for treating eating disorders. Filing 154 at 54. She was partially hospitalized—her time was split between the hospital and her foster home. Filing 154 at 54-55. On the suggestion of the girls' therapists, DHHS recommended to the juvenile court that all parental visitation be therapeutic, and the juvenile court agreed. Filing 154 at 57. But visitation between Wang Anderson and Y.C.W. was suspended. Filing 154 at 57. Wang Anderson alleges that Y.C.W.'s therapists approved "certain ways of life, behaviors or actions that were inappropriate, morally corruptive, harmful and detrimental. . . ." Filing 154 at 58.

On January 28, 2014, the Douglas County Attorney petitioned the juvenile court to terminate Wang and Wang Anderson's parental rights. Filing 154 at 75. The juvenile court dismissed the termination petitions, but the girls were finally adjudicated as being juveniles within the meaning of Neb. Rev. Stat. § 43-247(3). Filing 154 at 81. And visitation was ordered. Filing 154 at 82. Shortly thereafter, Ucchino enters the narrative: she was appointed as guardian ad litem for X.C.W. and Y.C.W. on July 10, 2014. Filing 154 at 19.

Meanwhile, X.C.W. had been held out of school during her eating disorder program. Filing 154 at 60. Her condition had deteriorated and more intensive treatment was recommended. Filing 154 at 68. She was placed at

the Laureate Psychiatric Clinic and Hospital in Tulsa, Oklahoma. Filing 154 at 73. Eventually, X.C.W. was discharged from Laureate and put into a new foster placement, and she continued treatment for her eating disorder at Children's Hospital in Omaha. Filing 154 at 83-84, 86.

Sometimes, X.C.W.'s foster parents were unable to take her to Children's, so transportation was provided by Camelot Transportation. Filing 154 at 89. She rode with other passengers, some adult men. Filing 154 at 89. Wang Anderson alleges that she offered to pay cash so X.C.W. could be transported individually, but that Ucchino, among others, refused that offer. Filing 154 at 89. According to Wang Anderson, X.C.W. was "lured, sexually abused and sexually exploited" by another Camelot Transportation passenger. Filing 154 at 90. Or, to be more specific, a juvenile court filing asserted that the two had exchanged telephone numbers and texted one another, and eventually X.C.W. sent him a nude picture of herself and expressed romantic feelings toward him. Filing 154 at 90. Wang Anderson alleges that Ucchino knew about that incident but waited over a month to act on it. Filing 154 at 90. And, Wang Anderson alleges, Ucchino was partly responsible for letting X.C.W. have access to electronic communications, which Wang Anderson claims Ucchino should have known was dangerous. Filing 154 at 105.

X.C.W.'s anorexia relapsed, and she was again hospitalized. Filing 154 at 91-92. In November 2014, she was placed at Remuda Ranch, a treatment facility in Arizona. Filing 154 at 94. Wang Anderson alleges that at Remuda Ranch—and generally throughout X.C.W.'s mental health treatment—X.C.W.'s care providers didn't appropriately include X.C.W.'s family in her therapy. Filing 154 at 96. Eventually, visitation was cut off, allegedly in

retaliation for Wang Anderson's efforts to contact X.C.W. and participate in her treatment. Filing 154 at 99.

After discharge from Remuda Ranch, X.C.W. was returned to her previous foster placement. Filing 154 at 102. She was not, over Wang Anderson's objection, placed with relatives, despite a rule Wang Anderson says should have preferred such a placement. Filing 154 at 100. Wang Anderson blames Ucchino, in part, for that decision. Filing 154 at 100. Wang Anderson also alleges that the foster parents' home was overcrowded, and that Ucchino, among others, allowed X.C.W. to remain with foster parents who were incapable of providing the care and supervision she required. Filing 154 at 91. Ucchino, Wang Anderson says, was partly responsible for recommending that Wang Anderson's visitation be cut off. Filing 154 at 99.

Then, X.C.W. was permitted to attend a Project Everlast meeting at which, Wang Anderson alleges, X.C.W. was again "lured and sexually assaulted or sexually exploited by an unknown adult male during and after the lunch hour." Filing 154 at 108-09. Wang Anderson says the incident wasn't discovered for a week, and alleges that X.C.W. was injured. but no treatment was provided, and no law enforcement investigation was initiated. Filing 154 at 109-10. Ucchino, she alleges, "failed to timely discover, investigate, or report" the incident, and did not respond to it appropriately. Filing 154 at 109-11.

Starting in June 2015, Wang Anderson was permitted to participate in family therapy, but she was excluded again after she "tried to address the pertinent and urgent topic of sex trafficking with X.C.W." Filing 154 at 113. Specifically, Wang Anderson alleges that she brought up "the seriousness and life-threatening consequences of being sexually abused and sexually trafficked with X.C.W. during a family therapy session, to try and educate

and protect her." Filing 154 at 119. But the therapist asked Wang Anderson to leave, Wang Anderson alleges, instead of "assist[ing] Wang Anderson in discussing this important and germane topic with X.C.W." Filing 154 at 119. Then, Wang Anderson alleges, the therapist "departed from the therapeutic standard of care" by, allegedly, making "suggestions to X.C.W., regarding how to safely or legally engage in prostitution, shortly after X.C.W. had been sold for money." Filing 154 at 119.

Meanwhile, X.C.W. was allowed by her foster parents—who lived in Blair, Nebraska—to work part-time in a Blair restaurant. Filing 154 at 115-16. Sometimes she walked to and from work. Filing 154 at 115. Wang Anderson complained to various authorities about instances in which X.C.W. was seen "scantily dressed," and she alleges that various defendants ignored "the attire X.C.W. was permitted . . . to wear" by her foster parents. Filing 154 at 115-16. And according to Wang Anderson, X.C.W. arranged to be picked up by a man who, again, "sexually abused and exploited" her. Filing 154 at 115-16.

In May 2016, the juvenile court changed the permanency objective for X.C.W. to independent living. Filing 154 at 121. She moved to another foster home, then to an "independent living arrangement," then to a dormitory at the University of Nebraska-Lincoln. Filing 154 at 121. Wang Anderson alleges that X.C.W.'s condition was declining during that period, but that Ucchino, among others, was unaware of it. Filing 154 at 123. In December 2016, X.C.W. was returned to her foster home in Blair. Filing 154 at 123. After that, she was sent to another foster placement, where she remained when this complaint was filed. Filing 154 at 124.

Wang Anderson asserts several federal and state-law claims against sixty-nine different defendants, on behalf of herself and X.C.W. Filing 154 at

1-2. She claims a number of federal constitutional violations, including violation of their rights to due process and familial association, unlawful seizure, a deliberately indifferent failure to protect, retaliation for constitutionally protected activity, violation of Wang Anderson's First Amendment rights, and discrimination against Wang and Wang Anderson because of their Chinese origin. Filing 154 at 124-30, 137-47. She also claims X.C.W. wasn't provided with accommodations required by § 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794. Filing 154 at 147-48. And, she says, she and X.C.W. were denied statutory rights arising under 42 U.S.C. §§ 621 *et seq.* & 670 *et seq.* Filing 154 at 150-57. Finally, she asserts state-law claims including negligence, negligent and intentional infliction of emotional distress, and a civil rights claim pursuant to Neb. Rev. Stat. § 20-148. Filing 154 at 131-37, 148-50. Specifically, as to Ucchino, Wang Anderson asserts the following six claims: negligence, § 1983 due process and deliberate indifference, § 20-148, and the emotional distress claims. Filing 154 at 130, 137, 142-43, 148-49. Ucchino moves to dismiss those claims on the basis of quasi-judicial immunity. *See* filing 204.

STANDARD OF REVIEW

To survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6), a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face. *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009). A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Id.* While the Court must accept as true all facts pleaded by the non-moving party and grant all reasonable inferences from the pleadings in favor of the non-moving party, *Gallagher v. City of Clayton,* 699 F.3d 1013, 1016 (8th Cir. 2012), a pleading

that offers labels and conclusions or a formulaic recitation of the elements of a cause of action will not do. *Iqbal,* 556 U.S. at 678. Determining whether a complaint states a plausible claim for relief will require the reviewing court to draw on its judicial experience and common sense. *Id.* at 679.

## DISCUSSION

Ucchino argues that Wang Anderson's complaint fails to state a claim against her because her alleged actions all fell within the scope of her service as guardian ad litem, so she is entitled to absolute immunity. Filing 204 at 3. That argument has merit.

The Eighth Circuit has repeatedly held that a guardian ad litem, acting within the scope of his or her role within the judicial process, is an integral part of the judicial process entitled to absolute immunity. *Dornheim v. Sholes,* 430 F.3d 919, 925 (8th Cir. 2005); *McCuen v. Polk Cty., Iowa,* 893 F.2d 172, 174 (8th Cir. 1990); *Myers v. Morris,* 810 F.2d 1437, 1466-67 (8th Cir. 1987), *abrogated on other grounds by Burns v. Reed,* 500 U.S. 478 (1991). Nonjudicial persons who fulfill quasi-judicial functions intimately related to the judicial process have absolute immunity for damage claims arising from their performance of the delegated functions. *Myers,* 810 F.2d at 1466-67.

So, when a guardian ad litem is appointed to fulfill quasi-judicial responsibilities under court direction, they are accorded absolute immunity that protects them from having to litigate the manner in which they performed their delegated functions. *See id.* at 1467. The juvenile court's task is to determine whether children have been neglected or abused, and to secure appropriate placement and care for them—so, the quasi-judicial responsibilities associated with that task include investigating the alleged neglect or abuse, determining the children's needs, protecting their interests,

and making reports and recommendations to the juvenile court. *See id.* at 1466-67; *accord McCuen*, 893 F.2d at 174.

Nebraska state law is to the same effect: the Nebraska Supreme Court has held that "a guardian ad litem is entitled to absolute immunity from any suit for damages based upon the performance of duties which are within the scope of such guardian's authority." *Billups v. Scott*, 571 N.W.2d 603, 607 (Neb. 1997); *accord Anthony K. v. Nebraska Dep't of Health & Human Servs.*, 855 N.W.2d 788, 796 (Neb. 2014). The Court explained that an officer acting in a quasi-judicial capacity is usually given immunity from liability to persons who may be injured as the result of an erroneous decision, provided the acts complained of are done within the scope of the officer's authority, and without willfulness, malice, or corruption. *Billups*, 571 N.W.2d at 605-06. Additionally, immunity is provided to officials acting in a ministerial capacity in obedience to a court process. *See id.* at 606. Accordingly, "a guardian ad litem has absolute immunity for actions that he or she takes as part of the judicial process." *Anthony K.*, 855 N.W.2d at 796.

Wang Anderson claims that her allegations against Ucchino fall "outside the scope of Ucchino's authority, duties and responsibilities as guardian ad litem for [Wang Anderson]'s children." Filing 282 at 18. She argues that she "has pleaded actions and omissions by Ucchino which were both outside the scope of her authority and duties as guardian ad litem, and which were either misconduct or irresponsible, abusive, malicious, and/or in bad faith." Filing 282 at 12. But those arguments are simply unsupported by the *substance* of Wang Anderson's factual allegations. What Wang Anderson actually alleges are ways in which, she says, Ucchino didn't do the job of a guardian ad litem properly. So, when Wang Anderson argues that she has "properly alleged that Ucchino's acts and omissions were outside the scope of

her authority and duties as guardian ad litem, especially her duties to investigate, report, and protect X.C.W."—all she is really doing is equating the scope of Ucchino's authority as guardian ad litem with what *she* thinks Ucchino should have done with that authority. That's precisely the sort of argument the Nebraska Supreme Court persuasively rejected in *Anthony K.*:

> The plaintiffs' claim that [the guardian ad litem] failed to perform his duties did not allege that he had acted outside the scope of his duties as guardian ad litem but merely expressed dissatisfaction with how he carried out those duties. Such an allegation was not enough to overcome the absolute immunity to which [the guardian ad litem] was entitled in the performance of his judicially delegated duties.

855 N.W.2d at 979-98; *see also Martin v. Hendren*, 127 F.3d 720, 722 (8th Cir. 1997) (absolute quasi-judicial immunity would afford only illusory protection if it were lost the moment an officer acted improperly).

In sum, the Court finds that all of Wang Anderson's allegations against Ucchino fall within the scope of Ucchino's performance of her duties as guardian ad litem.[1] Accordingly, she is entitled to absolute immunity, and the claims against her will be dismissed.

---

[1] The Court recognizes that Ucchino was sued in both her official and individual capacities, filing 154 at 22, and that quasi-judicial immunity only extends to claims against defendants sued in their individual—not official—capacities, *VanHorn v. Oelschlager*, 502 F.3d 775, 779 (8th Cir. 2007). But Ucchino no longer *has* an "official capacity" relevant to this case, and Wang Anderson "does not maintain that any of the acts or omissions complained of regarding Ucchino were performed in her official capacity . . . ." Filing 282 at 12. So, the Court does not understand any official capacity claims to be at issue.

IT IS ORDERED:

1. Ucchino's motion to dismiss ([filing 203](#)) is granted.

2. Ucchino is terminated as a party.

Dated this 3rd day of May, 2018.

BY THE COURT:

*[signature: John M. Gerrard]*

John M. Gerrard
United States District Judge
