## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| CATHERINE YANG WANG ANDERSON, Individually and on behalf of X.C.W. as the "Next Friend" of X.C.W., a minor,<br><br>Plaintiff,<br><br>vs.<br><br>THE STATE OF NEBRASKA, et al.,<br><br>Defendants. | 4:17-CV-3073<br><br><br>MEMORANDUM AND ORDER |

This matter is before the Court on the motions to dismiss filed by Sonia Derr (filing 242), Jennice Reid-Hansen and Tyler Hansen (filing 251), and Tina Anderson ("Anderson") (filing 266). The Court will grant each motion to dismiss. In addition, Reid-Hansen and Hansen filed a motion to strike (filing 410) the plaintiff's Index in Opposition (filing 387) to their motion to dismiss. The motion to strike will be denied as moot.

## I. BACKGROUND

The plaintiff, Catherine Yang Wang Anderson ("Wang Anderson")[1] is the mother of two girls, X.C.W. and Y.C.W. Filing 154 at 2. Wang Anderson's husband, Bo Wang ("Wang") is their father. Filing 154 at 2. X.C.W. was a minor when this case was filed, and Wang Anderson is suing both in her own capacity and as "next friend" of X.C.W. Filing 154 at 2. Each defendant whose motion to dismiss is addressed in this memorandum and order provided, at

---

[1] Wang Anderson and Tina Anderson are not related. Filing 154 at 18; filing 268-1 at 3.

some point, respite care[2] or foster care for X.C.W. or Y.C.W.

Very generally, Wang Anderson alleges that X.C.W. was unlawfully made a ward of the State of Nebraska and held by the State against her will. Filing 154 at 2. But it was Y.C.W. who first drew the attention of authorities. According to Wang Anderson, Y.C.W. had an "inappropriate" personal relationship with a teacher at her high school because Y.C.W. was permitted and encouraged to confide in him about personal problems. Filing 154 at 24-28. According to the teacher, Y.C.W. told him she had sexual identity issues. Filing 154 at 35. Wang Anderson blames Y.C.W.'s friendship with her teacher for a "breakdown" in her own relationship with Y.C.W., who reported to school officials on October 8, 2013 that Wang Anderson had threatened her. Filing 154 at 28.

Based on Y.C.W.'s report that she didn't feel safe going home, sheriff's officers removed Y.C.W. from Wang Anderson's residence and took her to Project Harmony for a temporary foster placement with Derr. Filing 154 at 33-34. One of the sheriff's deputies observed that when Wang Anderson answered the door, she was wearing a rubber glove, and suspected that Wang Anderson might be mentally ill. Filing 154 at 29-31. Investigators from the Nebraska Department of Health and Human Services (NDHHS) went to Wang Anderson's residence that evening, and reported hazardous conditions. Filing 154 at 35. So, after X.C.W. went to school the next day, she was also placed in the temporary custody of the NDHHS. Filing 154 at 36. X.C.W. was also placed in foster care with Derr, and both girls were evaluated at Project Harmony. Filing 154 at 34, 37, 43.

---

[2] "Respite care" is support for foster parents, "especially in cases where the child's needs are high or foster parents have several children. Respite can be provided by a family member of the foster parent or by a provider. " 390 Neb. Admin. Code § 7-001.10.

A juvenile proceeding was initiated in the Separate Juvenile Court of Douglas County, Nebraska. Filing 154 at 44. The petition alleged—Wang Anderson says wrongly—that X.C.W. and Y.C.W. had been subjected to inappropriate discipline, not provided with safe housing, deprived of proper parental care and support, and that Wang Anderson had been seen acting in a manner consistent with untreated mental health needs. Filing 154 at 44-45. An ex parte juvenile court order placed the girls in the temporary custody of the NDHHS, then after a hearing, the juvenile court continued the NDHHS's temporary custody. Filing 154 at 45-46. During this period, on October 25, 2013, Anderson watched X.C.W. and Y.C.W. for Derr. Filing 268-1 at 2.[3]

Wang Anderson claims that both girls began to show signs of "mental, emotional and physical distress" that went unnoted and untreated. Filing 154 at 48-49. Both girls were diagnosed with mental health disorders; Wang Anderson claims the diagnoses were inaccurate. Filing 154 at 52. She also alleges, as a basis for liability, that the girls' mental health providers did not encourage them to communicate with her, and that both girls were told they had a right to refuse contact with her. Filing 154 at 53.

X.C.W. was sent to a program for treatment of eating disorders. Filing 154 at 54. She was partially hospitalized—her time was split between the hospital and her foster home. Filing 154 at 54-55. On the suggestion of the girls' therapists, the NDHHS recommended to the juvenile court that all parental visitation be therapeutic, and the juvenile court agreed. Filing 154 at 57. But visitation between Wang Anderson and Y.C.W. was suspended. Filing 154 at 57. Wang Anderson alleges that Y.C.W.'s therapists approved

_____

[3] The Court recognizes that this fact is found in Anderson's affidavit, not Wang Anderson's pleading. But it does not contradict the pleading, and is used only for clarity and context.

"certain ways of life, behaviors or actions that were inappropriate, morally corruptive, harmful and detrimental. . . ." Filing 154 at 58.

On January 28, 2014, the Douglas County Attorney petitioned the juvenile court to terminate Wang and Wang Anderson's parental rights. Filing 154 at 75. The juvenile court dismissed the termination petitions, but the girls were finally adjudicated as being juveniles within the meaning of Neb. Rev. Stat. § 43-247(3). Filing 154 at 81. And visitation was ordered. Filing 154 at 82.

Meanwhile, X.C.W. had been held out of school during her eating disorder program. Filing 154 at 60. Her condition had deteriorated and more intensive treatment was recommended. Filing 154 at 68. She was placed at the Laureate Psychiatric Clinic and Hospital in Tulsa, Oklahoma. Filing 154 at 73. Eventually, X.C.W. was discharged from Laureate and put into a new foster placement, with Reid-Hansen and Hansen. Filing 154 at 84. She continued treatment for her eating disorder at Children's Hospital in Omaha. Filing 154 at 83-84, 86.

Sometimes, Reid-Hansen and Hansen were unable to take X.C.W. to Children's, so transportation was provided by Camelot Transportation. Filing 154 at 89. She rode with other passengers, some adult men. Filing 154 at 89. According to Wang Anderson, X.C.W. was "lured, sexually abused and sexually exploited" by another passenger. Filing 154 at 90. Or, to be more specific, a juvenile court filing indicates the two exchanged telephone numbers and texted one another, and X.C.W. sent him a nude picture of herself and expressed romantic feelings toward him. Filing 154 at 90.

X.C.W.'s anorexia relapsed, and she was again hospitalized. Filing 154 at 91-92. In November 2014, she was placed at Remuda Ranch, a treatment facility in Arizona. Filing 154 at 94. Wang Anderson alleges that at Remuda

Ranch—and generally throughout X.C.W.'s mental health treatment—X.C.W.'s care providers didn't appropriately include X.C.W.'s family in her therapy. Filing 154 at 96. Eventually, visitation was cut off, allegedly in retaliation for Wang Anderson's efforts to contact X.C.W. and participate in her treatment. Filing 154 at 99.

After discharge from Remuda Ranch, X.C.W. was returned to Reid-Hansen and Hansen. Filing 154 at 102. She was not, over Wang Anderson's objection, placed with relatives, despite a rule Wang Anderson says should have preferred such a placement. Filing 154 at 100. Then, X.C.W. was permitted to attend a Project Everlast meeting at which, Wang Anderson alleges, X.C.W. was again "lured and sexually assaulted or sexually exploited by an unknown adult male during and after the lunch hour." Filing 154 at 108-09. Wang Anderson says the incident wasn't discovered for a week, and alleges that X.C.W. was injured, but no treatment was provided, and no law enforcement investigation was initiated. Filing 154 at 109-10.

Starting in June 2015, Wang Anderson was permitted to participate in family therapy, but she was excluded again after she "tried to address the pertinent and urgent topic of sex trafficking with X.C.W." Filing 154 at 113. Specifically, Wang Anderson alleges that she brought up "the seriousness and life-threatening consequences of being sexually abused and sexually trafficked with X.C.W. during a family therapy session, to try and educate and protect her." Filing 154 at 119. But the therapist asked Wang Anderson to leave, Wang Anderson alleges, instead of "assist[ing] Wang Anderson in discussing this important and germane topic with X.C.W." Filing 154 at 119. Then, Wang Anderson alleges, the therapist "departed from the therapeutic standard of care" by, allegedly, making "suggestions to X.C.W., regarding

how to safely or legally engage in prostitution, shortly after X.C.W. had been sold for money." Filing 154 at 119.

Meanwhile, X.C.W. was allowed by Reid-Hansen and Hansen—who lived in Blair, Nebraska—to work part-time in a Blair restaurant. Filing 154 at 115-16. Sometimes she walked to and from work. Filing 154 at 115. Wang Anderson complained to various authorities about instances in which X.C.W. was seen "scantily dressed," and she alleges that various defendants ignored "the attire X.C.W. was permitted . . . to wear" by Reid-Hansen and Hansen. Filing 154 at 115-16. And according to Wang Anderson, X.C.W. arranged to be picked up by a man who, again, "sexually abused and exploited" her. Filing 154 at 115-16.

Y.C.W. was apparently still in foster care—the complaint is not particularly clear about what was happening with Y.C.W. after mid-2014. Anderson represents that she provided respite care to Y.C.W. for 32 days between February and April, 2016. Filing 268-1 at 2. As for X.C.W., in May 2016, the juvenile court changed her permanency objective to independent living. Filing 154 at 121. She moved to another foster home, then to an "independent living arrangement," then to a dormitory at the University of Nebraska-Lincoln. Filing 154 at 121. But in December 2016, she was returned to Reid-Hansen and Hansen in Blair. Filing 154 at 123. After that, she was sent to another foster placement, where she remained when this complaint was filed. Filing 154 at 124.

Wang Anderson asserts several federal and state-law claims against sixty-nine different defendants, on behalf of herself and X.C.W. Filing 154 at 1-2. She claims a number of federal constitutional violations, including violation of their rights to due process and familial association, unlawful seizure, a deliberately indifferent failure to protect, retaliation for

constitutionally protected activity, violation of Wang Anderson's First Amendment rights, and discrimination against Wang and Wang Anderson because of their Chinese origin. Filing 154 at 124-30, 137-47. She also claims X.C.W. wasn't provided with accommodations required by § 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794. Filing 154 at 147-48. And, she says, she and X.C.W. were denied statutory rights arising under 42 U.S.C. §§ 621 et seq. & 670 et seq. Filing 154 at 150-57. Finally, she asserts state-law claims including negligence, negligent and intentional infliction of emotional distress, and a civil rights claim pursuant to Neb. Rev. Stat. § 20-148. Filing 154 at 131-37, 148-50.

Specifically, as to this set of defendants, Wang Anderson asserts these claims: negligence, § 1983, § 20-148, and negligent and intentional infliction of emotional distress. Filing 154 at 130, 137, 142-43, 148-49. Each defendant moves to dismiss pursuant to Fed. R. Civ. P. 12(b)(1) and (6). Filing 242; filing 251; filing 266.

## II. STANDARD OF REVIEW

A complaint must set forth a short and plain statement of the claim showing that the pleader is entitled to relief. Fed. R. Civ. P. 8(a)(2). This standard does not require detailed factual allegations, but it demands more than an unadorned accusation. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The complaint need not contain detailed factual allegations, but must provide more than labels and conclusions; and a formulaic recitation of the elements of a cause of action will not suffice. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). For the purposes of a motion to dismiss a court must take all of the factual allegations in the complaint as true, but is not bound to accept as true a legal conclusion couched as a factual allegation. *Id.*

A motion pursuant to Rule 12(b)(1) challenges whether the court has subject matter jurisdiction. The party asserting subject matter jurisdiction bears the burden of proof. *Great Rivers Habitat Alliance v. FEMA*, 615 F.3d 985, 988 (8th Cir. 2010). Rule 12(b)(1) motions can be decided in three ways: at the pleading stage, like a Rule 12(b)(6) motion; on undisputed facts, like a summary judgment motion; and on disputed facts. *Jessie v. Potter*, 516 F.3d 709, 712 (8th Cir. 2008). It appears to the Court that the defendants are advancing a "facial attack" to subject matter jurisdiction, based on the pleadings. *See Branson Label, Inc. v. City of Branson, Mo.*, 793 F.3d 910, 914 (8th Cir. 2015). Accordingly, the Court restricts itself to the pleadings and Wang Anderson receives the same protections as she would defending against a motion brought under Rule 12(b)(6). *Hastings v. Wilson*, 516 F.3d 1055, 1058 (8th Cir. 2008).

To survive a motion to dismiss under Rule 12(b)(6), a complaint must also contain sufficient factual matter, accepted as true, to state a claim for relief that is plausible on its face. *Iqbal*, 556 U.S. at 678. A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Id.* Where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but has not shown—that the pleader is entitled to relief. *Id.* at 679.

When deciding a motion to dismiss under Rule 12(b)(6), the Court is normally limited to considering the facts alleged in the complaint. If the Court considers matters outside the pleadings, the motion to dismiss must be converted to one for summary judgment. Fed. R. Civ. P. 12(d). However, the Court may consider exhibits attached to the complaint and materials that are necessarily embraced by the pleadings without converting the motion. *Mattes*

*v. ABC Plastics, Inc.*, 323 F.3d 695, 697 n.4 (8th Cir. 2003). Documents necessarily embraced by the pleadings include those whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the pleading. *Ashanti v. City of Golden Valley*, 666 F.3d 1148, 1151 (8th Cir. 2012).

## III. DISCUSSION

The defendants generally advance the same arguments: they contend that Wang Anderson lacks standing to prosecute X.C.W.'s claims, that Wang Anderson has insufficiently alleged the state action necessary to support § 1983 claims, that § 20-148 does not provide an independent claim for relief, and that Wang Anderson's allegations are insufficient to state a claim for intentional or negligent infliction of emotional distress. *See* filing 242; filing 251; filing 267. In addition, Anderson argues that the complaint simply fails to describe her actions or inactions, filing 267 at 6-7, while Derr, Reid-Hansen and Hansen argue the complaint fails to allege facts establishing a tort duty owed to Wang Anderson, filing 242 at 2; filing 251 at 3.

### 1. STANDING/REAL PARTY IN INTEREST

The first argument the Court must address is whether Wang Anderson has standing to represent X.C.W.'s interests—or, perhaps more precisely, whether Wang Anderson is the real party in interest.[4] Fed. R. Civ. P. 17(a) provides that an action must be prosecuted in the name of the real party in

---

[4] Those are distinct concepts. *See Curtis Lumber Co. v. Louisiana Pac. Corp.*, 618 F.3d 762, 770 n.2 (8th Cir. 2010); *Lucas v. Lucas*, 946 F.2d 1318, 1322-23 (8th Cir. 1991); *Walker Mfg., Inc. v. Hoffmann, Inc.*, 220 F. Supp. 2d 1024, 1030 n.6 (N.D. Iowa 2002). But the Court need not explore the distinction: Wang Anderson neither has standing nor is the real party in interest. *See Curtis*, 618 F.3d at 770 n.2.

interest. A minor or incompetent person may be represented by a guardian or next friend. *See* Rule 17(c). Wang Anderson purports to sue as X.C.W.'s next friend. Filing 154 at 2-3. A next friend is one who, in the absence of a guardian, acts for the benefit of an infant or incapacitated person. *In re Adoption of Amea R.*, 807 N.W.2d 736, 741 (Neb. 2011).

But a necessary condition for "next friend" standing is a showing by the proposed "next friend" that the real party in interest is unable to litigate his own cause due to mental incapacity, lack of access to court, or other similar disability. *Whitmore v. Arkansas*, 495 U.S. 149, 165 (1990); *see Dafoe v. Dafoe*, 69 N.W.2d 700, 705 (Neb. 1955). And in this case, it is expressly alleged that X.C.W. is not a minor, filing 154 at 2, and there has been no showing of mental incapacity or disability.[5]

Accordingly, Wang Anderson has lost whatever standing she once might have had to prosecute X.C.W.'s claims,[6] and cannot represent X.C.W.'s

---

[5] The Court notes that in opposing some other defendants' motions to dismiss—but not in opposing these motions—Wang Anderson has argued that the allegations of the amended complaint "amount to a claim that X.C.W. is incapable of bringing this action on her own behalf because of her poor physical, mental, and emotional health[.]" *E.g.* filing 442 at 56. They don't. While the allegations of the complaint reflect an eating disorder and other mental health issues, there is nothing to suggest, for instance, that X.C.W. is presently unable to appreciate her position and make a rational choice with respect to continuing or abandoning litigation. *See Smith By & Through Missouri Pub. Def. Comm'n v. Armontrout*, 812 F.2d 1050, 1056 (8th Cir. 1987) (citing *Rees v. Peyton*, 384 U.S. 312 (1966)).

[6] The Court is aware of the Eighth Circuit's holding that because standing is determined as of the lawsuit's commencement, the Court considers the facts as they existed at that time. *A.J. ex rel. Dixon v. UNUM*, 696 F.3d 788, 789 (8th Cir. 2012). But the Eighth Circuit has also said that standing must persist throughout all stages of litigation. *E. Iowa Plastics, Inc. v. PI, Inc.*, 832 F.3d 899, 903 (8th Cir. 2016); *see also Hollingsworth v. Perry*, 570 U.S. 693, 705 (2013) (citing *Arizonans for Official English v. Arizona*, 520 U.S. 43, 64 (1997)); *cf.*

interests pursuant to Rule 17(c). *See, e.g., Adm'r-Benefits for Exxon Mobil Sav. Plan v. Williams*, 567 F. App'x 97, 100-01 (3d Cir. 2014); *Tate v. Cty. of Kern*, No. 1:14-CV-159, 2014 WL 1819327, at *2 (E.D. Cal. May 7, 2014), *report and recommendation adopted,* No. 1:14-CV-159, 2014 WL 2506152 (E.D. Cal. May 29, 2014); *Bender v. Metro. Nashville Bd. of Educ.*, No. 3:13-CV-470, 2013 WL 3777197, at *3 (M.D. Tenn. July 18, 2013); *Bell v. Children's Protective Serv.*, No. 3:13-CV-104, 2013 WL 12113750, at *3 (S.D. Tex. Apr. 22, 2013), *report and recommendation adopted sub nom. Bell v. Children's Protective Serv.*, No. 3:13-CV-104, 2013 WL 12113751 (S.D. Tex. May 31, 2013), *aff'd sub nom. Bell v. Children's Protective Servs.*, 547 F. App'x 453 (5th Cir. 2013); *Broussard v. Waldron Sch. Dist.*, 866 F. Supp. 2d 1042, 1046 (W.D. Ark. 2011); *T.P.R. ex rel. Patterson-Rudolph v. Montgomery Pub. Sch.*, No. 2:08-CV-813, 2010 WL 2489180, at *2 (M.D. Ala. May 26, 2010), *report and recommendation adopted,* No. 2:08-CV-813, 2010 WL 2489054 (M.D. Ala. June 17, 2010); *Unger v. Compton*, No. 6:05-CV-186, 2006 WL 1737567, at *4 (E.D. Tex. June 23, 2006), *aff'd,* 249 F. App'x 346 (5th Cir. 2007); *Oliver v. Dallas Indep. Sch. Dist.*, No. 3:01-CV-2627, 2003 WL 22272304, at *3 (N.D. Tex. Sept. 29, 2003).

Wang Anderson's argument against dismissing X.C.W.'s claims is threefold. First, Wang Anderson argues that X.C.W. was a minor when the case was filed. Filing 341 at 12. Perhaps so, but she's not one now. *See id.* Second, she argues that she is the "only adult likely to seek vindication of

---

*Summers v. Earth Island Inst.*, 555 U.S. 488, 494 (2009). There is some reason to question, in this case, whether Wang Anderson was an appropriate next friend for X.C.W. even when the case was filed. But in any event, X.C.W.'s minority ended before the operative amended complaint was filed—and when a plaintiff files a complaint in federal court and then voluntarily amends the complaint, courts look to the amended complaint to determine jurisdiction. *Rockwell Int'l Corp. v. United States*, 549 U.S. 457, 473-74 (2007).

X.C.W.'s constitutional rights." Filing 341 at 12. That argument isn't sufficient either, because it doesn't explain why X.C.W.—an adult—isn't likely to seek vindication of *her own* rights. Even as a general matter, the argument that if Wang Anderson doesn't have standing, no one would have standing, isn't a reason to find standing. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 420 (2013). But Wang Anderson isn't even arguing that much, and cannot explain why she should be conferred with standing simply because the person who actually does have standing doesn't seem likely to exercise it.

And finally, Wang Anderson cites *Garza v. Fliedner*, No. 5-15-01067-CV, 2016 WL 7438756, at *5 n.3 (Tex. App. Dec. 27, 2016), *review denied* (Jan. 26, 2018), for the proposition that "there is not an automatic loss of jurisdiction over a minor's claims when that minor reaches the age of majority during the pendency of the litigation." Filing 341 at 13. True enough. *See* Rule 17(a)(3). But *Garza* doesn't help Wang Anderson at all, because it explains that

> minors lack the capacity to bring a legal claim and claims belonging to them must be asserted through a legal guardian, a next friend, or guardian ad litem. But the authority of a next friend to act on a minor's behalf expires when the minor reaches the age of majority. . . . When the minor reaches majority, the suit does not abate but may proceed in the name of the minor at the minor's election. The record, however, should show the suit is prosecuted by the plaintiff herself, and it is proper to strike out the name of the next friend. An election can be inferred from conduct showing the former minor recognized the later prosecution of the action for the former minor's benefit, such as

knowingly allowing the action to be carried on in the former minor's name or in the name of the next friend.

2016 WL 7438756, at *3. In other words, *Garza* is wholly consistent with the authority set forth above, and to the extent that decision is relevant here, it stands for the unremarkable proposition that if X.C.W.'s claims are to be prosecuted in this case, there must be something to show they are being prosecuted by X.C.W. And there isn't.

In sum, an objection to Wang Anderson's standing has been pending for over 7 months now, *see* filing 221, which is certainly a "reasonable time" for X.C.W. "to ratify, join, or be substituted into the action." *See* Rule 17(a)(3); *Kuelbs v. Hill*, 615 F.3d 1037, 1042-43 (8th Cir. 2010). X.C.W. has not appeared, and nothing indicates she will. Accordingly, the Court will dismiss X.C.W.'s claims without prejudice.

## 2. NEGLIGENCE CLAIMS

To begin with, the way in which Wang Anderson's negligence claims are pled is a problem: the complaint lists 33 broadly stated charges against every defendant—making no effort to parse out which of the 69 defendants did what—then adds dozens more charges (many overlapping with the first set) against different sets of defendants.[7] *See* filing 154 at 131-37. Rule 8(a) requires a pleading to contain "a short and plain statement of the claim showing that the pleader is entitled to relief." The purpose of Rule 8(a) is to give the defendant fair notice of what the claim is and the grounds on upon which it rests. *Twombly*, 550 U.S. at 555.

---

[7] Even Wang Anderson's *brief* fails to narrow the field to the allegations relating to the defendants at issue. *E.g.* filing 386 at 3-53.

But there is nothing short or plain about Wang Anderson's complaint. The effect of the pleading is essentially to provide every defendant with "notice" that they're expected to defend every decision they made over the course of 4 years. It's the very model of a "kitchen sink" or "shotgun" complaint—"in which a plaintiff brings every conceivable claim against every conceivable defendant"—and it "fails to state a claim for relief because it does not provide fair notice of the grounds for the claims made against a particular defendant." *See Tatone v. SunTrust Mortg., Inc.*, 857 F. Supp. 2d 821, 831 (D. Minn. 2012).

For example—and this is just an example—the complaint accuses *every* defendant of being negligent by "disregarding and failing to timely consider and investigate X.C.W.'s Chinese relatives as a placement, on multiple occasions[.]" Filing 154 at 134. But that obviously can't be true of every defendant, so how do we know which one is *really* accused? True, it might be possible to provide some specificity by comparing that accusation to the 124 pages of factual allegations that describe what happened in more detail. But that still can't be accomplished with any confidence, and it's the plaintiff's job in the first place. The Court, despite significant effort, *really can't tell* whether, or why, Wang Anderson thinks that these particular defendants breached a duty toward her. The complaint narrates the previous 4 years of Wang Anderson's life, then invites the Court to decide whether anything in there might have been tortious. That's not an invitation the Court is obliged, or inclined, to accept.

But basic principles of tort law can be broadly applied to the few things that are reasonably clear: who these parties are. In order to prevail in a negligence action, a plaintiff must establish the defendant's duty to protect the plaintiff from injury, a failure to discharge that duty, and damages

proximately caused by the failure to discharge that duty. *Bell v. Grow With Me Childcare & Preschool LLC*, 907 N.W.2d 705, 713 (Neb. 2018). The threshold issue in any negligence action is whether the defendant owes a legal duty to the plaintiff. *Id.* And whether a legal duty exists for actionable negligence is a question of law dependent on the facts in a particular situation. *Id.*

The Court can find nothing in Wang Anderson's complaint suggesting the existence of a legal duty owed to her by Derr, Reid-Hansen, Hansen, or Anderson.[8] Wang Anderson suggests that the "duties established by [the Nebraska statutes and regulations regarding foster care] apply to all foster caregivers, and are owed to both the child and the child's parents." Filing 386 at 73; *see* filing 341 at 21; filing 449 at 14.

A court may determine that a statute gives rise to a tort duty to act in the manner required by the statute where the statute is enacted to protect a class of persons which includes the plaintiff, the statute is intended to prevent the particular injury that has been suffered, and the statute is intended by the Legislature to create a private liability as distinguished from one of a public character. *Claypool v. Hibberd*, 626 N.W.2d 539, 545 (Neb. 2001); *accord Stonacek v. City of Lincoln*, 782 N.W.2d 900, 909 (Neb. 2010). But where the Legislature has not by its express terms or by implication provided for civil tort liability, under principles of judicial restraint, it is prudent that the Court not do so. *Stonacek*, 782 N.W.2d at 909. And nothing in the applicable statutes and regulations—which are discussed in

---

[8] Because X.C.W.'s claims will be dismissed, only Wang Anderson's claims are at issue, and the Court does not understand Wang Anderson to be alleging that any defendant's affirmative conduct created a risk of physical harm to her. So, the Restatement (Third) of Torts § 7 is not applicable here. *See id.* at 718.

significantly more detail below—"expressly or by implication indicate[s] that they create a private tort liability[.]" *Id.* at 910.

*Claypool*, 626 N.W.2d 539, is instructive. There, a juvenile tragically committed suicide after he was cited for theft by law enforcement, then released without his parents being notified. *Id.* at 542-43. His mother sued, alleging that a tort duty to contact his parents existed by virtue of Neb. Rev. Stat. § 43-250, which by its terms would have required such notice. But the Nebraska Supreme Court found that the statute was intended to protect the due process rights of juveniles, not to prevent self-harm or create a civil remedy. *Id.* at 546.

Similarly, the primary purpose of the regulatory scheme upon which Wang Anderson relies here is the protection of foster children. A secondary purpose is to clearly establish the roles to be played by the many people responsible for a juvenile placement. But there is no indication that the statutes or regulations were intended to create an actionable tort duty to the natural parents of foster children. To conclude otherwise, in fact, would place contradictory and impossible demands on foster parents and others in the juvenile system. For instance, Wang Anderson suggests that the defendants had a duty to maintain the connection of X.C.W. and Y.C.W. to their parents while in foster care. *See* filing 341 at 22. But there is undoubtedly a separate, and arguably more compelling, duty for foster parents to act in the best interest of their wards—and in many cases, those duties would be likely to conflict. To infer a tort duty of foster parents to reunite children with their natural parents, from the existence of statutes and regulations governing foster care, would almost amount to imposing strict liability on foster parents for doing their jobs. The Court can find no basis for Nebraska law to "give

recognition and effect" to conform to that standard of conduct. *See Erickson v. U-Haul Int'l, Inc.*, 738 N.W.2d 453, 460 (Neb. 2007).

In sum: Wang Anderson's complaint is deficient, because it fails to provide any given defendant with fair notice of what *that defendant* is alleged to have done that was negligent. But the complaint also fails to state a claim for negligence against these defendants because it does not allege facts from which it can be inferred, under Nebraska law, that they owed a tort duty to Wang Anderson—and if there is no duty owed, there can be no negligence. *McReynolds v. RIU Resorts & Hotels, S.A.*, 880 N.W.2d 43, 47 (Neb. 2016). Wang Anderson's negligence claims as to these defendants will be dismissed.

### 3. CONSTITUTIONAL CLAIMS - STATE ACTION

Wang Anderson asserts various constitutional claims against the defendants pursuant to § 1983. But the defendants were not employees of either the state or a political subdivision of the state, and "[t]o state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, *and must show that the alleged deprivation was committed by a person acting under color of state law*." *West v. Atkins*, 487 U.S. 42, 48 (1988) (emphasis supplied). "[A]cting under color of state law requires that the defendant in a § 1983 action have exercised power possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law." *West*, 487 U.S. at 49 (quotation omitted).

A private actor can be considered to act under color of state law "if, though only if, there is such a close nexus between the State and the challenged action that seemingly private behavior may be fairly treated as that of the State itself." *Brentwood Acad. v. Tennessee Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 295 (2001) (quotation omitted). This "close

nexus" exists where the private party is "a willful participant in joint activity with the State in denying a plaintiff's constitutional rights." *Magee v. Trustees of Hamline Univ., Minn.*, 747 F.3d 532, 536 (8th Cir. 2014) (quotation omitted). Thus, to survive a motion to dismiss, a "plaintiff must plausibly allege a mutual understanding, or a meeting of the minds, between the private party and the state actor." *Id.* In doing so, the plaintiff must allege something more than "multiple contacts" between the private party and the state; rather, she must plead "specific facts plausibly connecting" the alleged concerted action to the alleged violation. *Id.*

Inquiry into the nexus between the state and the challenged action "is necessarily fact intensive," *Ramirez-Peyro v. Holder*, 574 F.3d 893, 901 (8th Cir. 2009), but the Supreme Court has identified "a host of facts that can bear on the fairness of" attributing the challenged action to the state, *see Brentwood Acad.*, 531 U.S. at 296.

> We have, for example, held that a challenged activity may be state action when it results from the State's exercise of coercive power, when the State provides significant encouragement, either overt or covert, or when a private actor operates as a willful participant in joint activity with the State or its agents. We have treated a nominally private entity as a state actor when it is controlled by an agency of the State, when it has been delegated a public function by the State, when it is entwined with governmental policies, or when government is entwined in its management or control.

*Id.* (cleaned up). And in applying those principles, courts have consistently

held that the decisions of foster parents are not state action.[9] *See Ismail v. Cty. of Orange*, 693 F. App'x 507, 512 (9th Cir. 2017), *cert. denied sub nom. Ismail v. Orange Cty., Cal.*, 138 S. Ct. 1329 (2018); *Leshko v. Servis*, 423 F.3d 337, 341 (3d Cir. 2005); *Rayburn ex rel. Rayburn v. Hogue*, 241 F.3d 1341, 1348 (11th Cir. 2001); *Milburn by Milburn v. Anne Arundel Cty. Dep't of Soc. Servs.*, 871 F.2d 474, 479 (4th Cir. 1989); *Brown v. Hatch*, 984 F. Supp. 2d 700, 708-09 (E.D. Mich. 2013) (collecting cases); *Castonguay v. Fleener*, No. 8:09-CV-393, 2009 WL 5033974, at *2 (D. Neb. Dec. 14, 2009); *P.G. v. Ramsey Cty.*, 141 F. Supp. 2d 1220, 1226 (D. Minn. 2001); *Lintz v. Skipski*, 807 F. Supp. 1299, 1306 (W.D. Mich. 1992), *aff'd,* 25 F.3d 304 (6th Cir. 1994); *see also Key v. Drake*, 111 F.3d 133 (7th Cir. 1997); *Malachowski v. City of Keene*, 787 F.2d 704, 710-11 (1st Cir. 1986); *cf. United States v. Peneaux*, 432 F.3d 882, 896 (8th Cir. 2005); *Myers v. Morris*, 810 F.2d 1437, 1467 (8th Cir. 1987), *abrogated on other grounds by Burns v. Reed*, 500 U.S. 478 (1991).

---

[9] Wang Anderson argues that the Eighth Circuit held, in *Norfleet By & Through Norfleet v. Arkansas Dep't of Human Servs.*, 989 F.2d 289 (8th Cir. 1993), that "§ 1983 claims arising out of foster care services are allowed against foster parents." Filing 386 at 65. It is true that in *Norfleet*, the Eighth Circuit permitted a § 1983 claim to proceed against a "certified foster parent operating a foster home for [the Arkansas Department of Human Services." *Id.* at 290. But in neither the district court decision nor the Court of Appeals is there any discussion of the elements of state action, and "[q]uestions which merely lurk in the record, neither brought to the attention of the court nor ruled upon, are not to be considered as having been so decided as to constitute precedents." *Cooper Indus., Inc. v. Aviall Servs., Inc.*, 543 U.S. 157, 586 (2004) (citing *Webster v. Fall*, 266 U.S. 507, 510 (1925)). In fact, the foster parent in *Norfleet* conceded that she was a state official, as the premise of a qualified immunity defense. *See Norfleet By & Through Norfleet v. State of Ark. Dep't of Human Servs.*, 796 F. Supp. 1194, 1201 n.3 (E.D. Ark. 1992), *aff'd sub nom Norfleet*, 989 F.2d 289. And as discussed below, nothing *precludes* foster parents from being state actors in any given case—it simply depends on the facts of the case.

Generally speaking, a foster parent's decisions within the scope of that position are not dictated by the coercive power of the state, overtly or covertly encouraged by the state, or jointly undertaken with the state. *See Brentwood Acad.*, 531 U.S. at 296; *see also Leshko*, 423 F.3d at 341; *Milburn*, 871 F.2d at 479; *Lintz*, 807 F. Supp. at 1306. Nor have foster parents been delegated with a public function by the state. *See id.*; *see also Malachowski*, 787 F.2d at 711; *Lintz*, 807 F. Supp. at 1306. And while the provision of foster care is extensively regulated, that does not mean that it is controlled by or entwined with the state. *See Rayburn*, 241 F.3d at 1348; *Brown*, 984 F. Supp. 2d at 708-09; *Lintz*, 807 F. Supp. at 1306; *see also Rendell-Baker v. Kohn*, 457 U.S. 830, 841 (1982).

Wang Anderson's argument to the contrary relies on the Nebraska statutes and regulations governing provision of foster care. *See* filing 386 at 56-60. And foster care is well-regulated. Foster care placements are tracked in a statewide register maintained by the Foster Care Review Office. Neb. Rev. Stat. § 43-1303. Local foster care review boards conduct regular reviews for each case of a child in a foster care placement. Neb. Rev. Stat. § 43-1308. Foster parents are required, when a juvenile court reviews a dispositional order, to complete a form requesting information about the child, including information about the child's medical condition; emotional condition; education; activities and relationships; behavior before, during, and after visitation; and whether the child is receiving all necessary services. Neb. Rev. Stat. § 43-1314.02.

Non-relative foster parents must be licensed by the NDHHS. Neb. Rev. Stat. § 71-1902(2)(a). Before issuing a foster care license, the NDHHS must investigate the foster home and conduct a background check on the prospective foster parents. Neb. Rev. Stat. § 71-1903. The foster home may be

re-inspected at any time. *Id.* And foster parents are reimbursed by the State for their expenses and services. *See* Neb. Rev. Stat. § 43-4210 *et seq.*; 390 Neb. Admin. Code §§ 7-004.05 & 7-004.06.

NDHHS regulations set forth the respective roles and responsibilities for the various actors in the foster care system in some detail. *See* 390 Neb. Admin. Code § 7-001. Generally described, the NDHHS may assume the role of legal custodian or guardian for a child, *see* 390 Neb. Admin. Code § 7-001.01, and the NDHHS case worker assumes primary responsibility for locating an appropriate placement for the child, *see* 390 Neb. Admin. Code § 7-001.02A. The case worker has a number of specific responsibilities, including sharing information with the foster parent (or "care provider") and establishing the visitation plan for the child and his or her family. *Id.*

The specific responsibilities of the foster parent are also set forth in substantial detail. The foster parent must:

– Communicate and work cooperatively as a team member with the [case] worker, parents and service providers toward the goals of the case plan;

– Communicate and work cooperatively as a team member with the parents;

– Work toward the goal of permanence as outlined in the case plan;

– Regularly discuss with the [case] worker the child's progress, needs and behaviors;

– Notify the [case] worker of law violations by the child or law enforcement contact with the child;

– Notify the [case] worker of emergencies including medical problems and runaway behavior;

–   Arrange for routine and emergency medical care for the child and advise the [case] worker. Use the medical provider covered by the parents' insurance, if applicable, or the provider identified by the [case] worker;

–   Secure specific care and treatment for the child such as medical, psychological or school evaluations, under the guidance of the [case] worker as outlined in the case plan;

–   Recognize respite care as a necessary support to provide quality care to the child;

–   Cooperate with the development and implementation of the visitation plan;

–   Advocate for the child's educational rights and help the school staff understand the child's emotional and educational needs;

–   Arrange for or provide transportation for the child;

–   To the [case] workers, provide written documentation regarding the child's progress and contacts with parents and other family members; and

–   Attend pre-service and ongoing training if licensure is involved.

390 Neb. Admin. Code § 7-001.05. A foster parent's daily child care decisions must be made in accordance with NDHHS policies and guidelines and licensing requirements, although "[s]pecial conditions about daily care will be determined by the [case] worker." 390 Neb. Admin. Code § 11-001. The foster parent is required to permit the foster-child to participate in age-appropriate activities, practice his or her religious beliefs, and "[e]xercise the Reasonable and Prudent Parent Standard" in making those determinations. 395 Neb.

Admin. Code § 3-001.09. And the foster parent must provide "age appropriate discipline" for the child, not to include denying necessities, restraint, abuse, physical punishment or threat of physical punishment, or denying visitation. 395 Neb. Admin. Code § 3-001.11.

Wang Anderson contends that those statutes and regulations "clearly demonstrate that in Nebraska, foster caregivers are state actors. . . ." Filing 386 at 59. But while that possibility is not foreclosed, it is certainly not compelled either: the inquiry is "necessarily fact-bound" and the issue is "whether, under the facts of this case, [the defendants], who are private parties, may be appropriately characterized as 'state actors.'" *Lugar v. Edmondson Oil Co., Inc.*, 457 U.S. 922, 939 (1982). And that depends, not just on the regulatory framework, but the conduct that is alleged to constitute state action.

The Supreme Court's decision in *Blum v. Yaretsky* is instructive: the defendants were private nursing homes that were reimbursed by Medicaid for the reasonable cost of health care services provided to Medicaid patients. 457 U.S. 991, 993-94 (1982). Each nursing home was required by federal regulations to establish a utilization review committee to decide whether patients were receiving the appropriate level of care, and to decide whether they should be discharged or transferred to a facility with a different level of care. *Id.* at 994-95. The plaintiffs were patients whom a committee had decided should be transferred to facilities with a lower level of care. *Id.* at 995. They alleged that their Due Process rights had been violated by the failure to provide them with "adequate notice either of [committee] decisions and the reasons supporting them or of their right to an administrative hearing to challenge those decisions." *Id.* at 996.

But the Supreme Court found that the decisions at issue weren't "state action" for constitutional purposes. *Id.* at 1012. In the Court's view, while regulations required the nursing homes to try and transfer patients to an appropriate level of care—and imposed penalties on nursing homes that failed to do so—their ultimate decision was a medical judgment made by a private party. *Id.* at 1008. Nor did the state's decision whether to approve or disapprove continued Medicaid payments after a change constitute approval or disapproval of that decision. And the fact that nearly all the patients in the nursing homes had their expenses paid by the state did not make the state a "joint participant" in discharge and transfer of Medicaid patients, even in conjunction with state licensing and regulation. *Id.* at 1010.

The Court explained that "privately owned enterprises providing services that the State would not necessarily provide, even though they are extensively regulated, do not fall within the ambit" of caselaw finding state action where there was a symbiotic relationship between the private actor and the state. *Id.* at 1011 (citing *Burton v. Wilmington Parking Auth.*, 365 U.S. 715 (1961)). "That programs undertaken by the State result in substantial funding of the activities of a private entity is no more persuasive than the fact of regulation of such an entity in demonstrating that the State is responsible for decisions made by the entity in the course of its business." *Id.* Nor, the Court said, did nursing homes provide a function that had traditionally been the exclusive prerogative of the state. *Id.* "[D]ecisions made in the day-to-day administration of a nursing home[,]" the Court said, are not "the kind of decisions traditionally and exclusively made by the sovereign for and on behalf of the public." *Id.* at 1012.

And when Wang Anderson's complaint is examined with those principles in mind, it becomes apparent that the actions complained of were

parental decisions, not state action. To begin with, the allegations themselves are sparse, when facts relating solely to X.C.W.'s dismissed claims are disregarded. Wang Anderson repeatedly alleges that Derr, Reid-Hansen, Hansen, and Anderson failed to properly monitor, supervise, or provide care and support for X.C.W. and/or Y.C.W.—but those allegations do not support a claim for relief that Wang Anderson has standing to assert. *See* filing 154 at 48, 53-54, 84-86, 89, 91, 105, 108-11, 116, 120. Wang Anderson also alleges that Reid-Hansen made false reports about X.C.W.'s response to visitation with their father. Filing 154 at 103. But, in the context of this case, it is not clear how that allegation connects to a violation of Wang Anderson's rights.

Other allegations do implicate Wang Anderson's asserted rights, such as allegedly failing to arrange visitation or family therapy. Filing 154 at 63, 88, 96, 106, 111, 120-21. But nothing is alleged to connect those actions to the state, as opposed to routine, discretionary child care decisions. The closest Wang Anderson comes is when she alleges that

> Derr, Hansen, and Reid-Hansen were permitted to supervise and control parental contact or communication between X.C.W. or Y.C.W. and their parents, pursuant to unconstitutional policies, practices, customs, or usages of NDHHS, [the Nebraska Families Collaborative], KVC [Behavioral Healthcare Nebraska Inc.], or Christian Heritage [Children's Home]. On information and belief, NDHHS, NFC, KVC, or Christian Heritage were complicit in this interference.

Filing 154 at 67. But that's the kind of conclusory, formulaic recitation of a claim (in this instance, a *Monell* claim) that the Supreme Court has instructed is "not entitled to be assumed true." *Iqbal*, 556 U.S. at 681. In

sum, Wang Anderson's complaint "does not contain any factual allegation sufficient to plausibly suggest" that the child care decisions made by Derr, Reid-Hansen, Hansen, and Anderson were attributable to the state. *See id.*

Finally, Wang Anderson alleges that Derr and Anderson

> violated the substantive due process right to family integrity of Wang Anderson, including her right to the companionship, care, custody or management of their children, by filing a petition to have Y.C.W. declared to be incapacitated and requesting that they be appointed as her co-guardians without any proper basis, and by asking the Douglas County Court to allow them to proceed on their petition without providing any notice to Wang Anderson, and without providing any notice to Wang Anderson of said guardianship proceeding.

Filing 154 at 141-42. But that, again, alleges nothing to suggest that the act of filing a petition for guardianship was attributable to the state. Nor, in fact, does it allege an actual harm to Wang Anderson—nowhere is it alleged that the county court *acted* on the petition in a way that affected Wang Anderson's rights, and the complaint in fact clearly alleges that legal custody of X.C.W. and Y.C.W. was placed with the NDHHS pursuant to a petition filed by the Douglas County Attorney. Filing 154 at 44-45; *see* Neb. Rev. Stat. § 43-905(1).

In sum, the facts alleged would not support a finding with respect to these defendants' conduct that the state "has exercised coercive power or has provided such significant encouragement, either overt or covert, that the choice must in law be deemed to be that of the State." *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 52 (1999). "Action taken by private entities with the mere approval or acquiescence of the State is not state action." *Id.* As the

Eighth Circuit explained at length in rejecting a claim that "state action" was involved in a nursing home's decision to limit a resident's visitation,

> if the full reach of plaintiff's argument were accepted, every decision of a private individual with a sufficient degree of power in fact over another's life would be "state action" reviewable by the courts, primarily, one suspects, the federal courts, under constitutional standards. We decline to accept such a result. The whole history of Fourteenth Amendment jurisprudence counsels that there is and must be a large area of private action not subject to constitutional challenge. Much of that private action, and nursing homes are surely one of the best examples, is thoroughly regulated by one government or another, so the public is hardly left without legal protection. For much the same reason, we reject [the plaintiff]'s argument that the guardians' acquiescence in [the] decisions about [the resident]'s care amounted to state action. If we were to agree with [the plaintiff], the action of all executors, administrators, guardians, conservators, and trustees appointed by the state courts would be subject to oversight in § 1983 actions. We are aware of no case that has ever so held. Many decisions in our society, right or wrong, simply must be left to the good judgment and discretion of private individuals, including physicians and other professionals, subject to whatever statutes or regulations may validly be issued by one or another level of government. In short, we agree with the District Court that there is no "state action" in this case.

*Hoyt v. St. Mary's Rehab. Ctr.*, 711 F.2d 864, 866-67 (8th Cir. 1983). The Court finds the same to be true here: the challenged conduct of Derr, Reid-Hansen, Hansen, and Anderson was not "state action."

### 4. SECTION 20-148

Wang Anderson's complaint asserts a claim with the heading "Neb. Rev. Stat. § 20-148 et seq. - Civil Rights" against all defendants. Filing 154 at 148. Under that heading, she asserts that the defendants deprived her of "rights, privileges, or immunities secured by the United States Constitution or the Constitution and laws of the State of Nebraska, and are liable to Plaintiffs under Neb. Rev. Stat. § 20-148." Filing 154 at 148.

But § 20-148 is a procedural statute which does not create any new substantive rights. *Goolsby v. Anderson*, 549 N.W.2d 153, 157 (Neb. 1996). In other words, to the extent Wang Anderson has stated a claim under § 20-148, that claim is wholly dependent upon, and coextensive with, the substance of her other claims. (She has not, for instance, identified a state law claim for which she is pursuing an alternative remedy. *See Parrish v. Immanuel Med. Ctr.*, 92 F.3d 727, 734 (8th Cir. 1996)).

So, Wang Anderson's § 20-148 claim is at best redundant. But in fact, it fails to state a claim for the same reasons that her other claims fail. *See Hauschild v. Nielsen*, 325 F. Supp. 2d 995, 1009 (D. Neb. 2004); *Dossett v. First State Bank, Loomis, Nebraska*, 627 N.W.2d 131, 139 (Neb. 2001). Moreover, to the extent that Wang Anderson purports to assert claims under § 20-148 against state actors, those claims are barred: § 20-148 "is a procedural statute designed to allow plaintiffs to bypass administrative procedures in discrimination actions against private employers; it does not operate to waive sovereign immunity and has no application here." *Potter v. Bd. of Regents of the Univ. of Nebraska*, 844 N.W.2d 741, 750 (Neb. 2014); *see*

*Wiseman v. Keller*, 358 N.W.2d 768, 771-72 (1984); *Cole v. Clarke*, 598 N.W.2d 768, 772 (Neb. Ct. App. 1999).

Wang Anderson has identified no § 20-148 claim that is separate from—or fares any better than—her other claims. Accordingly, her § 20-148 claim, to the extent it is a separate claim, will be dismissed.

5. EMOTIONAL DISTRESS CLAIMS

Next, Wang Anderson advances state-law claims for negligent and intentional infliction of emotional distress. But she has failed to state a claim for relief under either theory. To begin with, Wang Anderson's emotional distress claims suffer from the same deficiency as her negligence claims: on page 149 of her complaint, she asserts that the "negligent acts or omissions of the Defendants previously alleged herein" and the "aforementioned acts and omissions of all Defendants" support her emotional distress claims. Filing 154 at 149. No defendant could be expected, from that, to reasonably understand precisely what they're accused of doing. The complaint does not provide "fair notice of what the claim is and the grounds on upon which it rests." *Twombly*, 550 U.S. at 555 (quotation omitted). But each emotional distress claim suffers from other deficiencies as well.

(a) Negligent Infliction of Emotional Distress

Where there is no impact or physical injury to the plaintiff, the plaintiff seeking to bring an action for negligent infliction of emotional distress must show either (1) that he or she is a reasonably foreseeable "bystander" victim based upon an intimate familial relationship with a seriously injured victim of the defendant's negligence or (2) that the plaintiff was a "direct victim" of the defendant's negligence because the plaintiff was within the zone of danger of the negligence in question. *Catron v. Lewis*, 712 N.W.2d 245, 248-

49 (Neb. 2006). In addition, such plaintiffs must show that their emotional distress is medically diagnosable and significant and is so severe that no reasonable person could have expected to endure it. *Id.* at 249.

Because Wang Anderson was not "immediately threatened with physical injury," this is a "bystander" case. *See id.* And Wang Anderson certainly has the requisite "marital or intimate familial relation" to the alleged direct victims. *See Hamilton v. Nestor,* 659 N.W.2d 321, 327-28 (2003). But she has not alleged the required emotional distress. In order to be recoverable, emotional distress must have been so severe that no reasonable person could have been expected to endure it, and must be medically diagnosable and must be of sufficient severity that it is medically significant. *Id.* at 329. Wang Anderson's allegations, while sparse and conclusory, may support medical significance: she alleges "possible adjustment disorder" attributable to the juvenile proceeding.[10] But the Nebraska Supreme Court has set a very high bar for the severity of recoverable emotional distress, and Wang Anderson does not clear it.

For instance, in *Hamilton*, the plaintiff presented evidence that he suffered from posttraumatic stress disorder resulting from an automobile accident in which two people had been killed. *Id.* at 323. But the Nebraska Supreme Court found that the plaintiff's emotional injury "cannot, as a matter of law, be considered so severe that no reasonable person could be

---

[10] An "adjustment disorder" is characterized by the development of clinically significant emotional or behavioral symptoms in response to an identifiable stressor, as evidenced by "[m]arked distress that is out of proportion to the severity or intensity of the stressor, taking into account the external context and the cultural factors that might influence symptom severity and presentation" or "significant impairment in social, occupational, or other important areas of functioning." Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* 286 (5th ed. 2013).

expected to endure it." *Id.* at 330. In *Andreasen v. Gomes*, the Court found that the plaintiffs' "emotional distress manifested by headaches, nightmares, loss of sleep, and nausea," resulting from a stillborn baby allegedly caused by the defendants' negligence, was insufficient as a matter of law to support their emotional distress claim. 504 N.W.2d 539, 542 (Neb. 1993), *disapproved on other grounds by Darrah v. Bryan Mem'l Hosp.*, 571 N.W.2d 783 (Neb. 1998). "Emotional distress," the Court explained, "passes under various names such as mental suffering, mental anguish, nervous shock, and includes all highly unpleasant mental reactions, such as fright, horror, grief, shame, embarrassment, anger, chagrin, disappointment, and worry. However, it is only when emotional distress is extreme that possible liability arises." *Id.* (citing *Hassing v. Wortman*, 333 N.W.2d 765, 768 (Neb. 1983)); *see also* Restatement (Second) of Torts § 46 cmt. j (1965). And in *Sell v. Mary Lanning Mem'l Hosp. Ass'n*, the plaintiff had been mistakenly told her son was dead. 498 N.W.2d 522, 523 (Neb. 1993). "Without minimizing plaintiff's apparent and understandable heartache upon being told of her son's death," the Court found her emotional distress insufficient as a matter of law. *Id.* at 525.

Wang Anderson's allegations, even if proved, are no more extreme than the evidence which was held insufficient in *Hamilton*, *Andreasen*, and *Sell*. She alleges a "possible adjustment disorder." Filing 154 at 121; *see* filing 154 at 31, 48. She refers to "significant distress, anxiety and depression." Filing 154 at 82. She conclusorily asserts "severe physical, psychological, mental and emotional damage." Filing 154 at 117. And, in her most particular allegations, she claims "extreme and highly unpleasant mental reactions, including fright, horror, grief, shame, humiliation, embarrassment, anger, chagrin, disappointment, worry, and nausea." Filing 154 at 149-50. But that's just the list of possible symptoms from the Restatement, *supra* § 46, which

was mostly recapitulated in *Andreasen,* 504 N.W.2d at 542—a case in which the plaintiffs' emotional distress was found to be insufficiently extreme.[11] In sum, none of Wang Anderson's allegations separate this case from a mine-run case of mental suffering, which is insufficient to support recovery unless conjoined with another injury.[12] *See Kant v. Altayar,* 704 N.W.2d 537, 540-41 (Neb. 2005).

There is also a more fundamental problem: Wang Anderson's negligent infliction of emotional distress claim is derived from the defendants' alleged negligence with respect to X.C.W. and Y.C.W.—and under Nebraska law, "an unemancipated minor cannot maintain an action against his parent, *or any other person standing in that relation to the minor,* to recover damages for negligence." *Frey v. Blanket Corp.,* 582 N.W.2d 336, 341 (Neb. 1998) (cleaned up) (citing *Pullen v. Novak,* 99 N.W.2d 16, 25 (Neb. 1959)). Accordingly, in *Frey*, the Nebraska Supreme Court declined to extend quasi-judicial immunity to a court-appointed guardian, reasoning that it was unnecessary to do so because "a minor may recover in tort only for brutal, cruel, or inhuman treatment inflicted by a parent or person standing in loco parentis" and "the guardian cannot have such liability by virtue of the quasi-parental nature of the guardian's duty[.]" *Id.* at 341-42 (quotation omitted). The same could be said of foster parents. *See Nichol v. Stass,* 735 N.E.2d 582, 590 (Ill. 2000); *Mitchell v. Davis,* 598 So. 2d 801, 804-05 (Ala. 1992); *but see Doe v.*

---

[11] Not to mention that the almost word-for-word iteration of a basic proposition of law brings these "factual" allegations perilously close to being the sort of "formulaic recitation" that the Supreme Court has cautioned against. *See Iqbal,* 556 U.S. at 681.

[12] Nor, it should be noted, does she allege that her shock was, in part, a result of the manner in which she became aware of the alleged injury to the direct victim. *See Nichols v. Busse,* 503 N.W.2d 173, 181 (Neb. 1993).

*Shults-Lewis Child & Family Servs., Inc.*, 718 N.E.2d 738, 746 (Ind. 1999); *Mayberry v. Pryor*, 374 N.W.2d 683, 689 (Mich. 1985).

Courts have disagreed on the applicability of the parental immunity doctrine to foster parents. *See id.* But the Court sees no basis to distinguish guardians and foster parents, so the Nebraska Supreme Court's decision in *Frey* answers that question. There is little helpful authority on whether that immunity extends beyond a parent's liability to a child for negligence, and immunizes a parent from a third party's claim based on being a bystander to the parent's negligence. But it would be peculiar to permit such a claim, the ultimate effect of which would be to subject the parent to liability for acts to which immunity would ordinarily apply. *Cf. Pullen*, 99 N.W.2d at 26. Accordingly, the Court concludes that, even had Wang Anderson sufficiently alleged the emotional distress necessary to support her claim, such a claim against a foster parent is impermissible under Nebraska law.

(b) Intentional Infliction of Emotional Distress

Wang Anderson's claim of intentional infliction of emotional distress fares no better. To recover for intentional infliction of emotional distress, a plaintiff must prove (1) intentional or reckless conduct (2) that was so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency and is to be regarded as atrocious and utterly intolerable in a civilized community and (3) that the conduct caused emotional distress so severe that no reasonable person should be expected to endure it. *Roth v. Wiese*, 716 N.W.2d 419, 431 (Neb. 2006). And as a starting point, Wang Anderson's allegations of severe emotional distress are insufficient for this claim for the same reasons they were insufficient for her negligent infliction of emotional distress claim.

So too are her allegations of outrageous and extreme conduct insufficient, at least as to these defendants. Whether conduct is extreme and outrageous is judged on an objective standard based on all the facts and circumstances of the particular case. *Id.* And Nebraska relies on the Restatement, *supra* § 46. *See Brandon ex rel. Estate of Brandon v. Cty. of Richardson*, 624 N.W.2d 604, 621 (Neb. 2001). The rule stated in that section

> applies where the actor desires to inflict severe emotional distress, and also where he knows that such distress is certain, or substantially certain, to result from his conduct. It applies also where he acts recklessly . . . in deliberate disregard of a high degree of probability that the emotional distress will follow.

Restatement, *supra* § 46 cmt. i.

Wang Anderson does allege more than the "mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities that result from living in society." *Heitzman v. Thompson*, 705 N.W.2d 426, 431 (Neb. 2005). But there is still a "high hurdle for establishing outrageous conduct." *Id.* And even giving Wang Anderson every reasonable inference from her allegations, all indications here are that the defendants' conduct was not directed at Wang Anderson—it was, rather, concerned with X.C.W. and Y.C.W., and Wang Anderson's feelings were incidental. Nothing in the complaint intimates that the defendants intended anything more than the duties assigned to them by the foster care system. *Cf. Twombly*, 550 U.S. at 566. That does not satisfy the Restatement criteria for when a defendant's conduct is "intentional" or "reckless"—and, to find a claim for relief in such allegations would again amount to imposing strict liability on caregivers for foster children merely for doing their jobs. Simply put, the conduct alleged of

the foster parents here is typical of most any juvenile adjudication, not "extreme" or "outrageous."

The closest Wang Anderson comes is her allegation that in June 2014, Derr erroneously told one of Y.C.W.'s health care providers, and Y.C.W. herself, that the juvenile court had terminated her parents' parental rights. But it is not at all clear how that conduct, even if intentional, contributed to any emotional distress of Wang Anderson. Nor, for that matter, are there any facts to suggest that Derr acted to cause Wang Anderson emotional distress, or even with reckless disregard for her feelings. There is nothing alleged to suggest that these incidents—even if they happened that way—were part of a nefarious plot to hurt Wang Anderson, instead of simple mistakes or misunderstandings. In sum, read in the context of the complaint, the allegations Wang Anderson levels at Derr, Reid-Hansen, Hansen, and Anderson do not describe intentional or reckless conduct that was so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency and is to be regarded as atrocious and utterly intolerable in a civilized community. *See Roth*, 716 N.W.2d at 431.

## 6. MOTION TO STRIKE

Finally, Reid-Hansen and Hansen move to strike the index of evidence (filing 387) filed by Wang Anderson in opposition to their motion to dismiss. Filing 410. They argue that because they presented a facial attack to the sufficiency of the complaint, the Court should not consider matters beyond the pleading. Filing 411 at 2. Wang Anderson responds that the regulations and court documents she filed are permissible, because they are judicially noticeable. Filing 439 at 2.

That's true at least to a point: the Court is not precluded, in reviewing a Rule 12 motion, from taking notice of items in the public record. *Levy v.*

*Ohl*, 477 F.3d 988, 991 (8th Cir. 2007). Court records and administrative regulations are, at least generally, fair game. *See id.*; *Taradejna v. Gen. Mills, Inc.*, 909 F. Supp. 2d 1128, 1133 n.4 (D. Minn. 2012). But the purpose of the juvenile court filings that Wang Anderson presents isn't clear—that is, it's not clear whether Wang Anderson is presenting them as evidence that they were made, or as *substantive* evidence of the facts they contain. That can make a difference: public records might not be judicially noticeable when offered for the truth of the matters asserted in them. *See Whitten v. City of Omaha*, 199 F. Supp. 3d 1224, 1231 (D. Neb. 2016). And it certainly looks like Wang Anderson is presenting some of her exhibits as substantive proof of her allegations. *See* filing 386 at 28, 38, 50, 76.

But given the Court's resolution of the merits of the parties' claims, the Court need not parse out which of Wang Anderson's exhibits are properly judicially noticeable and which are not: because the Court has disposed of each of Wang Anderson's claims against Reid-Hansen and Hansen on their merits, their motion to strike is moot, and will be denied as such.

IT IS ORDERED:

1.    X.C.W.'s claims are dismissed without prejudice.

2.    The Clerk of the Court is directed to modify the case caption with respect to Wang Anderson by striking "Individually and on behalf of and as the 'Next Friend' of minor X.C.W."

3.    Derr's motion to dismiss (filing 242) is granted.

4.  Reid-Hansen and Hansen's motion to dismiss (filing 251) is granted.

5.  Tina Anderson's motion to dismiss (filing 266) is granted.

6.  Reid-Hansen and Hansen's motion to strike (filing 387) is denied as moot.

7.  Derr, Reid-Hansen, Hansen, and Tina Anderson are terminated as parties.

Dated this 15th day of June, 2018.

BY THE COURT:

John M. Gerrard
United States District Judge