## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEBRASKA

CATHERINE YANG WANG
ANDERSON,

                Plaintiff,

vs.

THE STATE OF NEBRASKA, et al.,

                Defendants.

4:17-CV-3073

MEMORANDUM AND ORDER
NUNC PRO TUNC

This matter is before the Court on motions to dismiss filed by:

- Christina Johnson-Gunn, M.S., L.M.H.P. (filing 217);

- Children's Hospital and Medical Center (Children's); Suzanne Haney, M.D.; Martin Harrington, M.D.; Michael Vance; Kara Beals; and Sarita Ruma (collectively, the "Children's Defendants") (filing 249); and

- Alegent Creighton Clinic and Shashi Bhatia, M.B.B.S. (the "Alegent Defendants") (filing 254).

The Court will grant Johnson-Gunn's motion to dismiss, and the Alegent Defendants' motion to dismiss. The Court will substantially grant the Children's Defendants' motion to dismiss, with the exception of a single claim: a 42 U.S.C. § 1983 claim asserted against Haney.

## BACKGROUND

The plaintiff, Catherine Yang Wang Anderson (Wang Anderson) is the mother of two girls, X.C.W. and Y.C.W. Filing 154 at 2. Wang Anderson's husband, Bo Wang (Wang) is their father. Filing 154 at 2. And the movants all provided health care services to X.C.W. or Y.C.W.

Specifically, Johnson-Gunn is a licensed mental health practitioner. Filing 154 at 17. Children's is an Omaha health care organization that treated X.C.W., most pertinently in its program for treatment of eating disorders. Filing 154 at 19, 54. Harrington is a psychiatrist and directed that program. Filing 154 at 14. Haney is a physician who was, according to Wang Anderson, employed by Douglas County or Project Harmony.[1] Filing 154 at 8. Vance is a psychologist employed by Children's, and Beals is a licensed independent mental health practitioner also employed by Children's. Filing 154 at 15. Ruma is a licensed independent mental health practitioner who also seems to have been associated with Creighton. Filing 154 at 16; *see* filing 154 at 106. Finally, Alegent was a regional health care network that treated Y.C.W., and Bhatia the psychiatrist who provided that treatment.[2] Filing 154 at 15, 20.

Very generally, Wang Anderson alleges that X.C.W. was unlawfully made a ward of the State of Nebraska and held by the State against her will. Filing 154 at 2. But it was Y.C.W. who first drew the attention of authorities. According to Wang Anderson, Y.C.W. had an "inappropriate" personal relationship with a teacher at her high school because Y.C.W. was permitted and encouraged to confide in him about personal problems. Filing 154 at 24-28. Y.C.W. told him she had sexual identity issues. Filing 154 at 35. Wang Anderson blames Y.C.W.'s friendship with her teacher for a "breakdown" in

---

[1] Although Wang Anderson associates Haney with Project Harmony, it appears that Haney is also associated with Children's, and she's being represented by counsel in conjunction with the other Creighton defendants.

[2] Alegent changed its name to CHI Health in August 2014, but Wang Anderson's allegations seem to relate primarily to late 2013 and early 2014. *See* filing 154 at 67. Wang Anderson refers to this defendant as Alegent, and the Court will do the same.

her own relationship with Y.C.W., who reported to school officials on October 8, 2013 that Wang Anderson had threatened her. Filing 154 at 28.

Based on Y.C.W.'s report that she didn't feel safe going home, sheriff's officers removed Y.C.W. from Wang Anderson's residence and took her to Project Harmony for a temporary foster placement. Filing 154 at 33. One of the sheriff's deputies observed that when Wang Anderson answered the door, she was wearing a rubber glove, and suspected that Wang Anderson might be mentally ill. Filing 154 at 29-31. Investigators from the Nebraska Department of Health and Human Services (DHHS) went to the home that evening, and reported hazardous conditions. Filing 154 at 35. So, after X.C.W. went to school the next day, she was also placed in the temporary custody of DHHS. Filing 154 at 36. X.C.W. and Y.C.W. were placed with the same foster parent, and both girls were evaluated at Project Harmony. Filing 154 at 34, 37, 43. Wang Anderson alleges that Haney was among those who, at Project Harmony, were negligent in evaluating and treating X.C.W. and Y.C.W. Filing 154 at 43.

A juvenile proceeding was initiated in the Separate Juvenile Court of Douglas County, Nebraska. Filing 154 at 44. The petition alleged—Wang Anderson says wrongly—that X.C.W. and Y.C.W. had been subjected to inappropriate discipline, not provided with safe housing, deprived of proper parental care and support, and that Wang Anderson had been seen acting in a manner consistent with untreated mental health needs. Filing 154 at 44-45. An ex parte juvenile court order placed the girls in the temporary custody of DHHS, then after a hearing, the juvenile court continued DHHS's temporary custody. Filing 154 at 45-46.

Wang Anderson claims that both girls began to show signs of "mental, emotional and physical distress" that went unnoted and untreated. Filing 154 at 48-49. Both girls were diagnosed with mental health disorders; Wang

Anderson claims the diagnoses were inaccurate. Filing 154 at 52. She also alleges, as a basis for liability, that the girls' mental health providers did not encourage them to communicate with her, and that both girls were told they had a right to refuse contact with her. Filing 154 at 53.

X.C.W. was admitted to a program at Children's for treatment of eating disorders. Filing 154 at 54. Wang Anderson alleges that Harrington and Beals assessed X.C.W. on intake and departed from the standard of care when doing so. Filing 154 at 54. X.C.W. was partially hospitalized as part of the eating disorders program—her time was split between the hospital and her foster home. Filing 154 at 54-55. Wang Anderson claims that X.C.W.'s participation in the Children's eating disorders program actually worsened her condition, and that she should have been treated without the partial hospitalization. Filing 154 at 55, 59. She also claims that Children's, Harrington, and Beals violated her constitutional rights as a parent by admitting X.C.W. without her permission. Filing 154 at 59, 61. And she alleges that X.C.W. was prescribed medications without parental consent. Filing 154 at 66.

On the suggestion of the girls' therapists at that time, DHHS recommended to the juvenile court that all parental visitation be therapeutic, and the juvenile court agreed. Filing 154 at 57. Wang Anderson alleges that Y.C.W.'s therapists approved "certain ways of life, behaviors or actions that were inappropriate, morally corruptive, harmful and detrimental. . . ." Filing 154 at 58. Alegent and Bhatia, she says, did not meet the standard of care in treating Y.C.W., which "interfered with the familial liberty interests of Wang Anderson and Y.C.W." Filing 154 at 66-67. She also claims that her right to visitation with X.C.W. was interfered with by Children's, Harrington, Vance, and Beals, damaging the parent-child relationship. Filing 154 at 63-64. That visitation, she says, "was essential to X.C.W.'s reunification with her parents,"

and "family therapy was an 'integral' part of X.C.W.'s recovery from her eating disorder and the standard of care for such a disorder." Filing 154 at 71-72.

On January 28, 2014, the Douglas County Attorney petitioned the juvenile court to terminate Wang and Wang Anderson's parental rights. Filing 154 at 75. The juvenile court dismissed the petitions, but the girls were finally adjudicated as being juveniles within the meaning of Neb. Rev. Stat. § 43-247(3). Filing 154 at 81. And visitation was ordered. Filing 154 at 82.

Meanwhile, X.C.W. had been held out of school during her eating disorder program. Filing 154 at 60. Her condition had deteriorated and more intensive treatment was recommended. Filing 154 at 68. She was placed at the Laureate Psychiatric Clinic and Hospital in Tulsa, Oklahoma. Filing 154 at 73. Family therapy was not provided at Laureate, allegedly because Harrington and Beals failed to arrange it or inform Laureate of its importance. Filing 154 at 75. Harrington and Beals were also among those whom Wang Anderson alleges "failed to provide Laureate Psychiatric staff with accurate or sufficient information regarding X.C.W.'s parents." Filing 154 at 76.

Eventually, X.C.W. was discharged from Laureate and put into a new foster placement, and she continued treatment for her eating disorder at Children's Hospital in Omaha. Filing 154 at 83-84, 86. Sometimes, X.C.W.'s foster parents were unable to take her to Children's, so transportation was provided by Camelot Transportation. Filing 154 at 89. She rode with other passengers, some adult men. Filing 154 at 89. According to Wang Anderson, X.C.W. was "lured, sexually abused and sexually exploited" by another passenger. Filing 154 at 90. Or, to be more specific, a juvenile court filing indicates that the two had exchanged telephone numbers and texted one another, and eventually X.C.W. sent him a nude picture of herself and expressed romantic feelings toward him. Filing 154 at 90.

At around the same time,[3] the juvenile court entered an order restricting Wang Anderson's and Wang's contact with school officials. Filing 154 at 92. Wang Anderson alleges that except for the failure of various officials and care providers, including Beals, "to arrange necessary services in a timely manner and to effectively communicate information regarding the children to Wang Anderson and Dr. Wang, this restriction on Wang Anderson's communication would not have been imposed by the [juvenile court]." Filing 154 at 93.

X.C.W.'s anorexia relapsed, and she was again hospitalized. Filing 154 at 91-92. In November 2014, she was placed at Remuda Ranch, a treatment facility in Arizona. Filing 154 at 94. Wang Anderson alleges that while at Remuda Ranch—and generally throughout X.C.W.'s mental health treatment—X.C.W.'s care providers didn't appropriately include X.C.W.'s family in her therapy. Filing 154 at 96. Harrington and Beals are among those singled out for failing to implement family therapy. Filing 154 at 81, 86. Eventually, visitation was cut off, allegedly in retaliation for Wang Anderson's efforts to contact X.C.W. and participate in her treatment. Filing 154 at 99. Wang Anderson complains that Johnson-Gunn, Harrington, Beals, Ruma, and Bhatia all "failed to encourage X.C.W. or Y.C.W. to engage in visitation or other contact with Wang Anderson." Filing 154 at 88. And she says that the ongoing failure to provide family therapy, attributable to Children's, Harrington, Beals, and Ruma among others, was contrary to the standard of care and a violation of X.C.W.'s constitutional rights. Filing 154 at 56, 106-07.

After discharge from Remuda Ranch, X.C.W. was returned to her

---

[3] Because Wang Anderson's 160-page complaint does not follow a clear chronological or thematic order and often seems to be redundant, *see* filing 154, *passim*, the sequence of alleged events is not always clear.

previous foster placement. Filing 154 at 102. She was not, over Wang Anderson's objection, placed with relatives, despite a rule Wang Anderson says should have preferred such a placement. Filing 154 at 100. Then, X.C.W. was permitted to attend a Project Everlast meeting at which, Wang Anderson alleges, X.C.W. was again "lured and sexually assaulted or sexually exploited by an unknown adult male during and after the lunch hour." Filing 154 at 108-09. Wang Anderson says the incident wasn't discovered for a week, and alleges that X.C.W. was injured. But no treatment was provided, and no law enforcement investigation was initiated. Filing 154 at 109-10. Harrington was among those that Wang Anderson blames for failing "to have an appropriate safety plan in place or communicate any such plan to Project Everlast when X.C.W. attended the March 14, 2015 meeting." Filing 154 at 109.

For a period of time, "family therapy" was arranged, by Harrington among others, that included X.C.W.'s foster parent, rather than Wang Anderson or Wang, as the family member. Filing 154 at 97. This was, according to Wang Anderson, contrary to the standard of care and unconstitutional. Filing 154 at 97. At around the same time, several defendants, including Children's, Harrington, Alegent, and Bhatia, allegedly refused to provide health information about X.C.W. and Y.C.W. to Wang Anderson, despite being asked for it. Filing 154 at 104.

Starting in June 2015, Wang Anderson was permitted to participate in family therapy with Johnson-Gunn. Filing 154 at 113. But Wang Anderson was excluded again after she "tried to address the pertinent and urgent topic of sex trafficking with X.C.W." Filing 154 at 113. Specifically, Wang Anderson alleges that she brought up "the seriousness and life-threatening consequences of being sexually abused and sexually trafficked with X.C.W. during a family therapy session, to try to educate and protect her." Filing 154 at 119. But

Johnson-Gunn asked Wang Anderson to leave, Wang Anderson alleges, instead of "assist[ing] Wang Anderson in discussing this important and germane topic with X.C.W." Filing 154 at 119. Then, Wang Anderson alleges, Johnson-Gunn "departed from the therapeutic standard of care" by, allegedly, making "suggestions to X.C.W. regarding how to safely or legally engage in prostitution, shortly after X.C.W. had been sold for money." Filing 154 at 119.

But in January 2016, several officials and care providers—including Harrington and Ruma—allegedly "agreed and decided to terminate effective ongoing health care provided by [Johnson-Gunn] for X.C.W. and ongoing services for the family." Filing 154 at 120. Despite having accused Johnson-Gunn of departing from the standard of care by encouraging sex trafficking, Wang Anderson *also* claims that removing Johnson-Gunn as the family therapist harmed X.C.W., falling below the standard of care and violating her constitutional rights. Filing 154 at 120.

Meanwhile, X.C.W. was allowed by her foster parents—who lived in Blair, Nebraska—to work part-time in a Blair restaurant. Filing 154 at 115-16. Sometimes she walked to and from work. Filing 154 at 115. Wang Anderson complained to various authorities about instances in which X.C.W. was seen "scantily dressed," and she alleges that various defendants ignored "the attire X.C.W. was permitted . . . to wear" by her foster parents. Filing 154 at 115-16. And according to Wang Anderson, X.C.W. arranged to be picked up by a man who, again, "sexually abused and exploited" her. Filing 154 at 115-16. Harrington, among others, allegedly "failed to provide X.C.W. with timely and appropriate health care, testing, therapy and education" following that incident, and failed to inform the juvenile court. Filing 154 at 117.

Wang Anderson also alleges that, during that time, Y.C.W.'s mental and physical health declined, and that several defendants, including Alegent and

Bhatia, did not provide her with proper care. Filing 154 at 120. Accordingly, Wang Anderson claims, they "interfered with or failed to make efforts to reunify Y.C.W. with her Wang Anderson [sic], and interfered with the parental rights of Wang Anderson with respect to Y.C.W." Filing 154 at 121.

In May 2016, the juvenile court changed the permanency objective for X.C.W. to independent living. Filing 154 at 121. She moved to another foster home, then to an "independent living arrangement," then to a dormitory at the University of Nebraska-Lincoln. Filing 154 at 121. Wang Anderson alleges that during that time, several defendants including Harrington failed to properly supervise or care for X.C.W. Filing 154 at 122. So in December 2016, X.C.W. was returned to her foster home in Blair. Filing 154 at 123. After that, she was sent to another foster placement, where she remained when this complaint was filed. Filing 154 at 124.

Wang Anderson asserts several federal and state-law claims against sixty-nine different defendants. Filing 154 at 1-2. She claims a number of federal constitutional violations, including violation of their rights to due process and familial association, unlawful seizure, a deliberately indifferent failure to protect, retaliation for constitutionally protected activity, violation of Wang Anderson's First Amendment rights, and discrimination against Wang and Wang Anderson because of their Chinese origin. Filing 154 at 124-30, 137-47. She also claims X.C.W. wasn't provided with accommodations required by § 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794. Filing 154 at 147-48. And, she says, she and X.C.W. were denied statutory rights arising under 42 U.S.C. §§ 621 et seq. & 670 et seq. Filing 154 at 150-57. Finally, she asserts state-law claims including negligence, negligent and intentional infliction of emotional distress, and a civil rights claim pursuant to Neb. Rev. Stat. § 20-148. Filing 154 at 131-37, 148-50.

Specifically, Wang Anderson asserts her constitutional policy-or-custom claims (*i.e.* *Monell* claims) against Children's and Alegent, among others. Filing 154 at 126. She asserts state-law negligence claims against all defendants. Filing 154 at 130. She asserts § 1983 claims against all individual defendants based on violation of "substantive due process rights to family integrity" and "deliberate indifference" to X.C.W.'s health and safety needs. Filing 154 at 137, 142-43. She asserts § 20-148 claims against all individual defendants. Filing 154 at 148. And she asserts her emotional distress claims against all defendants. Filing 154 at 148-49.

## STANDARD OF REVIEW

A complaint must set forth a short and plain statement of the claim showing that the pleader is entitled to relief. Fed. R. Civ. P. 8(a)(2). This standard does not require detailed factual allegations, but it demands more than an unadorned accusation. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The complaint need not contain detailed factual allegations, but must provide more than labels and conclusions; and a formulaic recitation of the elements of a cause of action will not suffice. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). For the purposes of a motion to dismiss a court must take all of the factual allegations in the complaint as true, but is not bound to accept as true a legal conclusion couched as a factual allegation. *Id.*

A motion pursuant to Fed. R. Civ. P. 12(b)(1) challenges whether the court has subject matter jurisdiction. The party asserting subject matter jurisdiction bears the burden of proof. *Great Rivers Habitat Alliance v. FEMA*, 615 F.3d 985, 988 (8th Cir. 2010). Rule 12(b)(1) motions can be decided in three ways: at the pleading stage, like a Rule 12(b)(6) motion; on undisputed facts, like a summary judgment motion; and on disputed facts. *Jessie v. Potter*, 516

F.3d 709, 712 (8th Cir. 2008). It appears that the defendants are advancing a "facial attack" to subject matter jurisdiction, based on the pleadings. *See Branson Label, Inc. v. City of Branson, Mo.*, 793 F.3d 910, 914 (8th Cir. 2015). Accordingly, the Court restricts itself to the pleadings and Wang Anderson receives the same protections as she would defending against a motion brought under Rule 12(b)(6). *Hastings v. Wilson*, 516 F.3d 1055, 1058 (8th Cir. 2008).

To survive a motion to dismiss under Rule 12(b)(6), a complaint must also contain sufficient factual matter, accepted as true, to state a claim for relief that is plausible on its face. *Iqbal*, 556 U.S. at 678. A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Id*. Where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but has not shown—that the pleader is entitled to relief. *Id*. at 679.

When deciding a motion to dismiss under Rule 12(b)(6), the Court is normally limited to considering the facts alleged in the complaint. If the Court considers matters outside the pleadings, the motion to dismiss must be converted to one for summary judgment. Rule 12(d). However, the Court may consider exhibits attached to the complaint and materials that are necessarily embraced by the pleadings without converting the motion. *Mattes v. ABC Plastics, Inc.*, 323 F.3d 695, 697 n.4 (8th Cir. 2003). Documents necessarily embraced by the pleadings include those whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the pleading. *Ashanti v. City of Golden Valley*, 666 F.3d 1148, 1151 (8th Cir. 2012).

DISCUSSION

Before addressing the arguments specific to these moving parties, it will be helpful to note one of the Court's previous holdings that is particularly pertinent to these movants: the Court held that Wang Anderson could not assert claims on X.C.W.'s behalf, and dismissed X.C.W.'s claims without prejudice. Filing 481 at 9-13, 36. Many of the claims asserted against these movants are premised on the alleged breach of their duty of reasonable care to X.C.W., and those claims have been dismissed, for the reasons previously explained by the Court. *See* filing 481 at 9-13. Only Wang Anderson's own claims remain at issue here.

CONSTITUTIONAL CLAIMS

The Court will begin with Wang Anderson's constitutional claims, all of which—with one exception—fail, primarily because the moving defendants weren't acting under color of state law. To state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law—and "acting under color of state law requires that the defendant in a § 1983 action have exercised power possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law." *West v. Atkins*, 487 U.S. 42, 48-49 (1988).

The Court extensively discussed the state action requirement in a previous memorandum and order, concluding that X.C.W.'s and Y.C.W.'s caretakers and foster parents had not acted under color of state law. Filing 481 at 17-28. With the exception of Haney, the same is true here: the facts alleged would not support a finding with respect to these defendants' conduct that the state "has exercised coercive power or has provided such significant

encouragement, either overt or covert, that the choice must in law be deemed to be that of the State." *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 52 (1999) (quotations omitted). Action taken by private entities with the mere approval or acquiescence of the State is not state action. *Id.*

In arguing to the contrary, Wang Anderson relies on *West*, in which the Supreme Court held that a physician under contract with the state to provide medical services to inmates at a state-run prison hospital on a part-time basis acted "under color of state law" within the meaning of § 1983 when treating an inmate. 487 U.S. at 44, 57. Wang Anderson likens the position of a juvenile in the legal custody of the state to that of a prison inmate. *See* filing 303 at 12-13; filing 367 at 29-31; filing 377 at 20-21. And she points to *Norfleet v. Ark. Dep't of Human Servs.*, 989 F.2d 289, 292 (8th Cir. 1993) to support the proposition that the state has a constitutional duty to care for children that the state has placed in foster care. Filing 367 at 30; filing 377 at 19.

The Court does not read those cases so broadly. To begin with, the Court does not question *Norfleet*'s holding regarding the state's duty to children the state has placed in foster care—but because neither X.C.W. nor Y.C.W. is a plaintiff here, the claims at issue in this case do not involve a breach of that duty. Wang Anderson's fifth claim for relief, which is premised entirely on alleged deliberate indifference to X.C.W.'s health and safety needs, already stands dismissed in its entirety.[4] Even assuming that X.C.W. or Y.C.W. had been placed in a custodial setting comparable to imprisonment—a matter the Court does not decide—the Court is not persuaded that Wang Anderson can

---

[4] The Court notes that Wang Anderson's briefing could be read to refer to a claim of "deliberate indifference . . . to the family relationship between X.C.W. and Wang Anderson." Filing 367 at 40. Wang Anderson directs the Court to no authority supporting the legal viability of such a claim, nor does the Court understand one to have been pled.

use the state's duty to provide care for X.C.W. and Y.C.W. to bootstrap the defendants' conduct toward *her* into actions "under color of state law."[5]

Nor do Wang Anderson's allegations of conspiracy help her. *See* filing 367 at 33-36. Although § 1983 can only be used to remedy deprivation of rights done under the color of law, a private actor can be liable under § 1983 for conspiring with state officials to violate a private citizen's rights. *Helmig v. Fowler*, 828 F.3d 755, 763 (8th Cir. 2016).[6] But to prove a § 1983 conspiracy claim, a plaintiff must show: (1) that the defendant conspired with others to deprive her of constitutional rights; (2) that at least one of the alleged co-conspirators engaged in an overt act in furtherance of the conspiracy; and (3) that the overt act injured the plaintiff. *Id.* The key inquiry is whether the private party was a willful participant in the corrupt conspiracy: the plaintiff must allege facts sufficient to support the conclusion that the defendants reached an agreement to deprive the plaintiff of constitutionally guaranteed rights. *See id.*; *see also Holmes v. Slay*, No. 17-1309, 2018 WL 3358080, at *5

---

[5] Wang Anderson also claims that Johnson-Gunn "acted as a delegate of the [Juvenile] Court" when she allegedly made decisions regarding family therapy. Filing 303 at 11. That conclusory assertion is unsupported by factual allegations, but even if true, Wang Anderson's claim would fail for a different reason: if Johnson-Gunn was truly a "delegate" of the juvenile court, she would be cloaked with quasi-judicial immunity. *See Myers v. Morris*, 810 F.2d 1437, 1466-67 (8th Cir. 1987), *abrogated on other grounds by Burns v. Reed*, 500 U.S. 478 (1991).

[6] Wang Anderson's complaint suggests that 42 U.S.C. § 1985 is implicated. Filing 154 at 22, 126. But neither her complaint nor her briefing follow up on that citation with allegations or argument supporting the elements of a § 1985(3) claim. *See United Bhd. of Carpenters & Joiners of Am., Local 610, AFL-CIO v. Scott*, 463 U.S. 825, 828-29 (1983). In particular, there's nothing here to suggest a racial or class-based discriminatory animus, *see id.* at 829, or a specific intent to deprive Wang Anderson of a right guaranteed against private impairment, *see Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 274-75 (1993).

(8th Cir. July 10, 2018); *Deck v. Leftridge*, 771 F.2d 1168, 1170 (8th Cir. 1985). And in this case, Wang Anderson's allegation of a conspiracy is conclusory: the factual allegations in the complaint do not directly or indirectly suggest a "meeting of the minds" between the movants and any other defendants. *See Murray v. Lene*, 595 F.3d 868, 870 (8th Cir. 2010); *Smithson v. Aldrich*, 235 F.3d 1058, 1063 (8th Cir. 2000); *Deck*, 771 F.3d at 1170.

Wang Anderson's constitutional claims against Children's and Alegent fail for an additional reason: failure to adequately plead that her injuries resulted from an unconstitutional policy or custom of those nonprofit corporations. *See* filing 154 at 19-20. A corporation acting under color of state law will only be held liable under § 1983 for its own unconstitutional policies: the proper test is whether there is a policy, custom or action by those who represent official policy that inflicts injury actionable under § 1983. *Sanders v. Sears, Roebuck & Co.*, 984 F.2d 972, 975-76 (8th Cir. 1993); *see Smith v. Insley's Inc.*, 499 F.3d 875, 880 (8th Cir. 2007); *Crumpley-Patterson v. Trinity Lutheran Hosp.*, 388 F.3d 588, 590 (8th Cir. 2004).[7]

Wang Anderson has failed to adequately plead such a policy or custom. Instead, her complaint contains a list of 12 conclusory allegations, which she

---

[7] Wang Anderson points to the proposition from *Smith* that part of the inquiry is whether "'an individual representing the company has taken actions which inflict injuries redressable by section 1983.'" Filing 367 at 36 (quoting *Smith*, 499 F.3d at 880). But while a corporation acting under color of state law will be held liable under § 1983 for unconstitutional policies, it "will not be liable on a respondeat superior theory." *Smith*, 499 F.3d at 880. Read in context, whether an individual was "representing the company" within the meaning of *Smith* is not determined under agency law, but by whether the individual was "represent[ing] official policy[.]" *Sanders*, 984 F.2d at 976; *see Smith*, 499 F.3d at 880 (citing *Sanders*, 984 F.2d at 976); *see also Crumpley-Patterson*, 388 F.3d at 590.

attributes collectively to literally every non-individual defendant. Filing 154 at 126-129. That doesn't satisfy Rule 8, to start with: for instance, accusing Children's and Alegent of behaving unlawfully by "influencing, manipulating, or controlling the services and opinions of health care providers" is close to nonsensical. But more importantly, Wang Anderson's entire list of policies and customs is conclusory—she has not alleged any *facts* suggesting the existence of an unconstitutional policy or custom. *See Crumpley-Patterson*, 388 F.3d at 590; *see also Kelly v. City of Omaha, Neb.*, 813 F.3d 1070, 1076 (8th Cir. 2016). The facts of her own case are not enough to show the existence of a policy or custom. *See Ulrich v. Pope Cty.*, 715 F.3d 1054, 1061 (8th Cir. 2013).

In sum, the defendants (again, with the exception of Haney) are alleged to have engaged in the wholly prosaic task of providing medical care to two troubled teenagers presented to them for treatment. Their treatment decisions effected Wang Anderson—sometimes directly, but mostly collaterally. Whether direct or collateral, however, those effects were not the consequence of any joint activity with the state. *See Magee v. Trustees of Hamline Univ., Minn.*, 747 F.3d 532, 536 (8th Cir. 2014).

Haney, however, is another matter. Rightly or wrongly, Haney is alleged to have been "employed by Douglas County and/or Project Harmony" to look into the charges that X.C.W. or Y.C.W. had been abused or neglected. *See* filing 154 at 8, 43. In other words, Wang Anderson alleges that Haney was engaged by the state, not simply to provide medical care, but to investigate the accusations the state had directed at Wang Anderson. And unlike simple medical treatment, that *would* be a public function delegated by the state, entwined with governmental policies. *See Brentwood Acad. v. Tennessee Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 296 (2001). The Court recognizes that Haney may well dispute Wang Anderson's description of her duties, or

who employed her, at Project Harmony. But on the face of the complaint, Wang Anderson has sufficiently alleged that Haney acted under color of state law.[8]

NEGLIGENCE CLAIMS

Next, the Court turns its attention to Wang Anderson's state-law negligence claims. The Court again notes, at the outset, that any claims Wang Anderson purports to assert on X.C.W.'s behalf have been dismissed—and they composed the bulk of Wang Anderson's negligence claims. Any remaining negligence claims, asserted by Wang Anderson on her own behalf, will be dismissed for two reasons. First, as the Court has previously explained, Wang Anderson's negligence claims fail to satisfy the undemanding standard of Rule 8(a). Filing 481 at 13-14. Second, the Court finds no basis to conclude that these defendants owed a tort duty to Wang Anderson.

In a negligence action, a plaintiff must establish the defendant's duty to protect the plaintiff from injury, a failure to discharge that duty, and damages proximately caused by the failure to discharge that duty. *Bell v. Grow With Me Childcare & Preschool LLC*, 907 N.W.2d 705, 713 (Neb. 2018). The threshold issue in any negligence action is whether the defendant owes a legal duty to the plaintiff. *Id*. And whether a legal duty exists for actionable negligence is a question of law dependent on the facts in a particular situation. *Id*.

---

[8] The Children's Defendants also argue that Wang Anderson's claims against Haney are barred by a 2-year statute of limitations because "most, if not at [sic] all of the actions can be said to sound in medical malpractice." Filing 250 at 48 (citing Neb. Rev. Stat. § 25-222). Perhaps so, but what's left are the § 1983 claims, which are subject to a 4-year statute of limitations. *See Owens v. Okure*, 488 U.S. 235, 243, 249-50 (1989); *Lounsbury v. Jeffries*, 25 F.3d 131, 134 (2d Cir. 1994); *Gray v. Lacke*, 885 F.2d 399, 408 (7th Cir. 1989); *Bridgeman v. Nebraska State Pen*, 849 F.2d 1076, 1077-78 (8th Cir. 1988); Neb. Rev. Stat. § 25-207.

The negligence claims asserted against these defendants arise out of their provision of professional medical services—in other words, they're malpractice claims. *See* filing 303 at 8-9; filing 367 at 45-53; filing 377 at 26-33. And traditionally, a physician's duty to exercise the applicable standard of care arises out of the physician-patient relationship. *Olson v. Wrenshall*, 822 N.W.2d 336, 341 (Neb. 2012). This relationship is said to arise when the physician undertakes treatment of the patient. *Id.*; *Flynn v. Bausch*, 469 N.W.2d 125, 128 (Neb. 1991). The existence of such a relationship is a question of fact, but it is the plaintiff's burden to establish facts to show that the relationship came into existence. *Flynn*, 469 N.W.2d at 129. And that relationship, when established, engenders a duty to the patient and, in certain cases, to third parties who may be subject to serious risks associated with a patient's treatment or condition. *Olson*, 822 N.W.2d at 128.

But there was no such relationship between these defendants and Wang Anderson.[9] The Nebraska Supreme Court has reserved ruling on whether there are ever circumstances in which medical malpractice liability can exist absent an underlying physician-patient relationship. *See Flynn*, 469 N.W.2d at

_____

[9] Wang Anderson does suggest that the Children's Defendants and the Alegent Defendants had a professional relationship with her arising out of "family therapy." Filing 367 at 50-51; filing 377 at 29-30. But her argument is self-defeating, because she contends that the defendants were negligent in *not* providing family therapy that included her. Filing 367 at 51; filing 377 at 30. It's hard to see how *not* providing treatment can create a treatment relationship. Meanwhile, Wang Anderson doesn't argue that Johnson-Gunn had a professional relationship with her, despite the fact that Johnson-Gunn actually *did* include Wang Anderson in family therapy. Filing 303 at 8-9. But even then, the facts alleged are insufficient—it is clear from Johnson-Gunn's ejection of Wang Anderson from therapy, among other things, that Wang Anderson was present as part of X.C.W.'s treatment, not so Johnson-Gunn could treat Wang Anderson's own mental health needs.

128; *see also Regier ex rel. Regier v. Good Samaritan Hosp., Kearney*, 651 N.W.2d 210, 214 (Neb. 2002). The Court finds, however, that such circumstances are not alleged here. As a matter of public policy, *see McReynolds v. RIU Resorts & Hotels, S.A.*, 880 N.W.2d 43, 47 (Neb. 2016), a tort duty should not be imposed upon medical professionals charged with diagnosis and treatment of allegedly abused children because such a duty would conflict with their far more important duty toward those children. *Ryder v. Mitchell*, 54 P.3d 885, 891-93 (Colo. 2002); *P.T. v. Richard Hall Cmty. Health Care Ctr.*, 837 A.2d 436, 442-44 (N.J. Super. 2002); *see Zamstein v. Marvasti*, 692 A.2d 781, 789 (Conn. 1997); *Doe v. McKay*, 700 N.E.2d 1018, 1021-25 (Ill. 1998); *Althaus ex rel. Althaus v. Cohen*, 756 A.2d 1166, 1168-71 (Pa. 2000); *Tyner v. State, Dep't of Soc. & Health Servs., Child Protective Servs.*, 963 P.2d 215, 225-26 (Wash. Ct. App. 1998), *rev'd on other grounds*, 1 P.3d 1148 (Wash. 2000); *see also Sahid v. Chambers*, 655 N.Y.S.2d 20, 20 (App. Div. 1997); *cf. Mower v. Baird*, No. 20160149, 2018 WL 3322749, at *3-24 (Utah July 5, 2018).[10]

"Under a rule imposing a duty of care to third parties, therapists would feel compelled to consider the possible effects of treatment choices on third parties and would have an incentive to compromise their treatment because of the threatened liability." *Doe*, 700 N.E.2d at 1023. But that "would be fundamentally inconsistent with the therapist's obligation to the patient." *Id*. at 1023-24. It is not difficult to imagine a situation where imposing a duty of the sort Wang Anderson urges, to preserve and promote the parent-child

---

[10] The Court is aware of some division of authority regarding a duty to third parties in the narrow circumstance of "therapists who misdiagnose or give rise to false memories or fabricated allegations of childhood sexual abuse." *Mower*, 2018 WL 3322749, at *23 (collecting cases). But obviously, no such circumstances are alleged here.

relationship, would create an irreconcilable conflict for a treatment provider whose professional judgment led to the conclusion that such a course was not in the child's best interests. Furthermore, when treatment is ongoing, a third party's lawsuit would raise difficult issues regarding the doctor-patient privilege that could interfere with the treatment relationship. *Id.* at 1024. As the Supreme Court of Pennsylvania persuasively concluded,

> [t]here are certainly compelling arguments that a person falsely accused of child abuse should have a remedy in law and our decision today would not prevent all such actions against liable parties. However, the societal interest in encouraging treatment of child abuse victims and maintaining the trust and confidentiality within the therapist/patient relationship dictates against the imposition of a duty of care beyond that owed to the patient.

*Althaus*, 756 A.2d at 1171 (citation omitted).[11] The Court finds that were the Nebraska Supreme Court confronted with these circumstances, that court would likewise hold that these defendants owed no legal duty to Wang Anderson. Her negligence claims will be dismissed as to them.

## NEB. REV. STAT. § 20-148

Wang Anderson also purports to assert civil rights claims pursuant to § 20-148. Filing 154 at 148. But § 20-148 is a procedural statute designed to allow

---

[11] At some point in X.C.W.'s and Y.C.W.'s treatment, therapy probably shifted from treatment and investigation of abuse to more general mental health treatment. There is a difference between treatment for abuse and for other mental health needs, but it doesn't change the result. *See Ryder*, 54 P.3d at 891-93.

plaintiffs to bypass administrative procedures in discrimination actions against private employers. *Potter v. Bd. of Regents of the Univ. of Nebraska*, 844 N.W.2d 741, 750 (Neb. 2014); *see Biby v. Bd. of Regents of Univ. of Nebraska at Lincoln*, 340 F. Supp. 2d 1031, 1036 (D. Neb. 2004), *aff'd*, 419 F.3d 845 (8th Cir. 2005). While Wang Anderson has stated a claim under § 1983 against Haney, she cannot assert that claim under § 20-148. *See McKenna v. Julian*, 763 N.W.2d 384, 390-91 (Neb. 2009). Wang Anderson's 20-148 claims will be dismissed.

## EMOTIONAL DISTRESS CLAIMS

Wang Anderson claims that these defendants are liable for negligence and intentional infliction of emotional distress. But as the Court has previously explained, Wang Anderson's emotional distress claims do not satisfy Rule 8(a), and she has not alleged the required degree of emotional distress for either tort. Filing 481 at 29-33. Nor has she alleged that these defendants engaged in conduct of the "outrageous and extreme" variety necessary to prove intentional infliction of emotional distress. *See* filing 481 at 34-35. Those claims will be dismissed as to these defendants.

## ROOKER-FELDMAN DOCTRINE

Finally, the Court notes the argument advanced in the Alegent Defendants' reply brief that Wang Anderson's claims are barred by the *Rooker-Feldman* doctrine. Filing 404 at 7-9; *see D.C. Court of Appeals v. Feldman*, 460 U.S. 462 (1983); *Rooker v. Fid. Tr. Co.*, 263 U.S. 413 (1923). Under that doctrine "lower federal courts are precluded from exercising appellate jurisdiction over final state-court judgments," *Lance v. Dennis*, 546 U.S. 459, 463 (2006), and the Alegent Defendants contend that the juvenile court's orders qualify. But as

a matter of motion practice, including a new argument in a reply brief is improper. *See Torgeson v. Unum Life Ins. Co. of Am.*, 466 F. Supp. 2d 1096, 1121 (N.D. Iowa 2006). And even if the Alegent Defendants' *Rooker-Feldman* argument was properly presented, it is without merit.

*Rooker-Feldman* holds that pursuant to 28 U.S.C. § 1257, federal district courts lack subject-matter jurisdiction over "cases brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments." *Shelby Cty. Health Care Corp. v. S. Farm Bureau Cas. Ins. Co.*, 855 F.3d 836, 840 (8th Cir. 2017). But § 1257 does not "stop a district court from exercising subject-matter jurisdiction simply because a party attempts to litigate in federal court a matter previously litigated in state court." *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 293 (2005). "If a federal plaintiff presents some independent claim, albeit one that denies a legal conclusion that a state court has reached in a case to which he was a party, then there is jurisdiction and state law determines whether the defendant prevails under principles of preclusion." *Id.* (cleaned up).

Given the narrow scope of the *Rooker-Feldman* doctrine, the Court concludes it is inapplicable here, at least as to the claims asserted against the Alegent Defendants. The Court has not been asked to review and reject the juvenile court's orders, even if Wang Anderson's claims are inconsistent with some of the juvenile court's conclusions. *See Dornheim v. Sholes*, 430 F.3d 919, 923-24 (8th Cir. 2005); *Heartland Acad. Cmty. Church v. Waddle*, 335 F.3d 684, 689 (8th Cir. 2003); *see also Kovacic v. Cuyahoga Cty. Dep't of Children & Family Servs.*, 606 F.3d 301, 310 (6th Cir. 2010); *PJ ex rel. Jensen v. Wagner*, 603 F.3d 1182, 1194 (10th Cir. 2010); *Brokaw v. Weaver*, 305 F.3d 660, 668-69 (7th Cir. 2002); *Ernst v. Child & Youth Servs. of Chester Cty.*, 108 F.3d 486,

491-92 (3d Cir. 1997). So, those claims are not barred by § 1257.[12]

IT IS ORDERED:

1.  Johnson-Gunn's motion to dismiss (filing 217) is granted.

2.  The Children's Defendants motion to dismiss (filing 249) is granted in part and in part denied.

3.  The Alegent Defendants' motion to dismiss (filing 254) is granted.

4.  Wang Anderson's § 1983 claim against Haney, based on alleged violation of her right to due process, may proceed.

5.  All other claims as to the moving defendants are dismissed.

6.  Johnson-Gunn, Children's, Harrington, Vance, Beals, Ruma, Alegent, and Bhatia are dismissed as parties.

Dated this 15th day of August, 2018.

BY THE COURT:

John M. Gerrard
United States District Judge

---

[12] To be clear: *Rooker-Feldman* may be implicated by other claims against other defendants, if those claims were more directly disposed of by the juvenile court in a final judgment.