# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEBRASKA

CATHERINE YANG WANG
ANDERSON,

                Plaintiff,

vs.

THE STATE OF NEBRASKA, et al.,

                Defendants.

4:17-CV-3073

MEMORANDUM AND ORDER

This matter is before the Court on the motion to dismiss and motion to strike (filing 221) filed by Douglas County, Nebraska and Chad Miller, Mark Gentile, Brenda Wheeler, and Amy Schuchman (collectively, the "County Defendants"). The Court will grant the motion to dismiss in part and deny it in part, and will deny the motion to strike.

## I. BACKGROUND

The plaintiff, Catherine Yang Wang Anderson (Wang Anderson) is the mother of two girls, X.C.W. and Y.C.W. Filing 154 at 2. Wang Anderson's husband, Bo Wang (Wang) is their father. Filing 154 at 2. X.C.W. was a minor when this case was filed, and Wang Anderson is suing both in her own capacity and as "next friend" of X.C.W. Filing 154 at 2. Douglas County is a political subdivision of the State of Nebraska. Filing 154 at 3. Gentile was a lieutenant with the Douglas County Sheriff's Office, and Wheeler and Miller were sheriff's office deputies. Filing 154 at 6-7. Miller was also the school resource officer at Millard West High School. Filing 154 at 7. Schuchman was a deputy Douglas County Attorney. Filing 154 at 19.

Very generally, Wang Anderson alleges that X.C.W. was unlawfully made a ward of the State of Nebraska and held by the State against her will. Filing 154 at 2. But it was Y.C.W. who first drew the attention of authorities. According to Wang Anderson, Y.C.W. had an "inappropriate" personal relationship with a teacher at her high school, Millard West, because Y.C.W. was permitted and encouraged to confide in him about personal problems. Filing 154 at 24-28. According to the teacher, Y.C.W. told him she had sexual identity issues. Filing 154 at 35.

Wang Anderson blames Y.C.W.'s friendship with her teacher for a "breakdown" in her own relationship with Y.C.W., who reported to school officials on October 8, 2013 that Wang Anderson had threatened her. Filing 154 at 28. Shortly after that, Miller spoke to Y.C.W. about her report. Filing 154 at 28. Miller and another deputy went to Wang Anderson's home and spoke with her, but didn't enter the home. Filing 154 at 28-29. They didn't tell Wang Anderson about Y.C.W.'s reported threat. Filing 154 at 29.

On the same day, Gentile and another officer went to Wang Anderson's home to make contact with X.C.W., who was home. Filing 154 at 29. Gentile spoke to X.C.W. privately, and according to Wang Anderson, X.C.W. told Gentile that she had heard no threat to Y.C.W., and speculated that Y.C.W. might have made up the report. Filing 154 at 29. Gentile specifically asked X.C.W. whether she felt unsafe with Wang Anderson, and X.C.W. said she didn't. Filing 154 at 29. Wang Anderson alleges that she reported concerns about Y.C.W.'s friendship with her teacher to Gentile, but that Gentile did not investigate those concerns. Filing 154 at 30.

Gentile asked Wang Anderson to go to Millard West to speak with a guidance counselor and Y.C.W., among others. Filing 154 at 30. At that meeting, Miller told Wang Anderson that Y.C.W. had reported being

threatened. Filing 154 at 30. Wang Anderson denied the accusation. Filing 154 at 30. Wang Anderson also communicated her concerns about Y.C.W.'s relationship with her teacher to Miller, who—according to Wang Anderson—also failed to investigate. Filing 154 at 30, 33.

Based on Y.C.W.'s report that she didn't feel safe going home, Gentile and Miller removed Y.C.W. from Wang Anderson's residence and took her to Project Harmony for a temporary foster placement. Filing 154 at 33. Gentile had also observed that when Wang Anderson answered the door, she had been wearing a rubber glove, and suspected that Wang Anderson might be mentally ill. Filing 154 at 29-31. Investigators from the Nebraska Department of Health and Human Services (DHHS) went to Wang Anderson's residence that evening, and reported hazardous conditions. Filing 154 at 35.

So, after X.C.W. went to school the next day, Wheeler placed X.C.W. in the temporary custody of DHHS. Filing 154 at 36. Wheeler and a DHHS case worker went to Wang Anderson's house, and Wheeler took Y.C.W.'s cell phone for evidentiary purposes. Filing 154 at 35. X.C.W. and Y.C.W. were placed with the same foster parent, and both girls were evaluated at Project Harmony. Filing 154 at 34, 37, 43. Wang Anderson alleges that the evaluations were inadequate, and that no evidence was generated of any injuries—but, if there was such evidence, it was unlawfully concealed by various defendants, including Douglas County and Schuchman. Filing 154 at 43.

A juvenile proceeding was initiated in the Separate Juvenile Court of Douglas County, Nebraska, by a deputy Douglas County Attorney. Filing 154 at 44. The petition alleged—Wang Anderson says wrongly—that X.C.W. and Y.C.W. had been subjected to inappropriate discipline, not provided with safe housing, deprived of proper parental care and support, and that Wang Anderson had been seen acting in a manner consistent with untreated mental

health needs. Filing 154 at 44-45. Specifically, Wang Anderson asserts that Wheeler and Miller failed to disclose to the juvenile court that X.C.W. did not feel unsafe at home. Filing 154 at 37. An ex parte juvenile court order placed the girls in the temporary custody of DHHS, then after a hearing, the juvenile court continued DHHS's temporary custody. Filing 154 at 45-46. Wang Anderson blames Douglas County, in part, for the alleged violation of her right to due process occasioned by the delay in holding a hearing. Filing 154 at 47.

Wang Anderson claims that both girls began to show signs of "mental, emotional and physical distress" that went unnoted and untreated. Filing 154 at 48-49. Both girls were diagnosed with mental health disorders; Wang Anderson claims the diagnoses were inaccurate. Filing 154 at 52. She also alleges, as a basis for liability, that the girls' mental health providers did not encourage them to communicate with her, and that both girls were told they had a right to refuse contact with her. Filing 154 at 53.

X.C.W. was sent to a program for treating eating disorders. Filing 154 at 54. She was partially hospitalized—her time was split between the hospital and her foster home. Filing 154 at 54-55. On the suggestion of the girls' therapists, DHHS recommended to the juvenile court that all parental visitation be therapeutic, and the juvenile court agreed. Filing 154 at 57. But visitation between Wang Anderson and Y.C.W. was suspended. Filing 154 at 57. Wang Anderson alleges that Y.C.W.'s therapists approved "certain ways of life, behaviors or actions that were inappropriate, morally corruptive, harmful and detrimental. . . ." Filing 154 at 58.

On January 28, 2014, the Douglas County Attorney petitioned the juvenile court to terminate Wang and Wang Anderson's parental rights. Filing 154 at 75. Schuchman filed those petitions. Filing 154 at 75. The juvenile court dismissed the termination petitions, but the girls were finally adjudicated as

being juveniles within the meaning of Neb. Rev. Stat. § 43-247(3). Filing 154 at 81. And visitation was ordered. Filing 154 at 82.

Schuchman filed a notice of appeal from the adjudication, assigning error to the juvenile court's dismissal of the termination allegations. Filing 154 at 87; filing 222-5 at 31-32. The juvenile court later entered a "permanency planning order" that established a permanency objective of reunification, although the order also placed strict limitations on Wang Anderson's contact with the children. Filing 154 at 92. Schuchman also appealed that order, assigning error to the juvenile court's appointment of counsel for Wang without a finding of indigency. Filing 154 at 93; filing 222-7 at 6.

The Nebraska Court of Appeals eventually affirmed the permanency planning order, holding that the State had waived its argument with respect to appointment of counsel for Wang by not raising it in the trial court. Filing 222-7 at 7-8.[1] The court also affirmed the adjudication order. Filing 222-5 at 42. The court held that it was "clear that the State proved by a preponderance of the evidence" that Wang Anderson had been "subjecting [X.C.W. and Y.C.W.] to dangerous and inappropriate discipline, failing to provide proper parental care and support for [X.C.W. and Y.C.W.], and . . . observed to be acting in a manner consistent with untreated mental health needs." Filing 222-5 at 36. But, the court explained, "parental rights should be terminated only in the absence of any reasonable alternative and as the last resort." Filing 222-5 at 42 (cleaned up). And, the court found, the "point of last resort" had not been reached in the case. Filing 222-5 at 42.

Meanwhile, X.C.W. had been held out of school during her eating disorder program. Filing 154 at 60. Her condition had deteriorated and more

---

[1] The Court may take judicial notice of public records without converting a motion to dismiss to a motion for summary judgment. *Levy v. Ohl*, 477 F.3d 988, 991 (8th Cir. 2007).

intensive treatment was recommended. Filing 154 at 68. She was placed at the Laureate Psychiatric Clinic and Hospital in Tulsa, Oklahoma. Filing 154 at 73. Eventually, X.C.W. was discharged from Laureate and put into a new foster placement, and she continued treatment for her eating disorder at Children's Hospital in Omaha. Filing 154 at 83-84, 86.

Sometimes, X.C.W.'s foster parents were unable to take her to Children's, so transportation was provided by Camelot Transportation. Filing 154 at 89. She rode with other passengers, some adult men. Filing 154 at 89. According to Wang Anderson, X.C.W. was "lured, sexually abused and sexually exploited" by another passenger. Filing 154 at 90. Or, to be more specific, a juvenile court filing indicates that the two had exchanged telephone numbers and texted one another, and eventually X.C.W. sent him a nude picture of herself and expressed romantic feelings toward him. Filing 154 at 90.

X.C.W.'s anorexia relapsed, and she was again hospitalized. Filing 154 at 91-92. In November 2014, she was placed at Remuda Ranch, a treatment facility in Arizona. Filing 154 at 94. Wang Anderson alleges that at Remuda Ranch—and generally throughout X.C.W.'s mental health treatment— X.C.W.'s care providers didn't appropriately include X.C.W.'s family in her therapy. Filing 154 at 96. Eventually, visitation was cut off, allegedly in retaliation for Wang Anderson's efforts to contact X.C.W. and participate in her treatment. Filing 154 at 99.

After discharge from Remuda Ranch, X.C.W. was returned to her previous foster placement. Filing 154 at 102. She was not, over Wang Anderson's objection, placed with relatives, despite a rule Wang Anderson says should have preferred such a placement. Filing 154 at 100. Then, X.C.W. was permitted to attend a Project Everlast meeting at which, Wang Anderson alleges, X.C.W. was again "lured and sexually assaulted or sexually exploited

by an unknown adult male during and after the lunch hour." Filing 154 at 108-09. Wang Anderson says the incident wasn't discovered for a week, and alleges that X.C.W. was injured. but no treatment was provided, and no law enforcement investigation was initiated. Filing 154 at 109-10.

Starting in June 2015, Wang Anderson was permitted to participate in family therapy, but she was excluded again after she "tried to address the pertinent and urgent topic of sex trafficking with X.C.W." Filing 154 at 113. Specifically, Wang Anderson alleges that she brought up "the seriousness and life-threatening consequences of being sexually abused and sexually trafficked with X.C.W. during a family therapy session, to try to educate and protect her." Filing 154 at 119. But the therapist asked Wang Anderson to leave, Wang Anderson alleges, instead of "assist[ing] Wang Anderson in discussing this important and germane topic with X.C.W." Filing 154 at 119. Then, Wang Anderson alleges, the therapist "departed from the therapeutic standard of care" by, allegedly, making "suggestions to X.C.W. regarding how to safely or legally engage in prostitution, shortly after X.C.W. had been sold for money." Filing 154 at 119.

Meanwhile, X.C.W. was allowed by her foster parents—who lived in Blair, Nebraska—to work part-time in a Blair restaurant. Filing 154 at 115-16. Sometimes she walked to and from work. Filing 154 at 115. Wang Anderson complained to various authorities about instances in which X.C.W. was seen "scantily dressed," and she alleges that various defendants ignored "the attire X.C.W. was permitted . . . to wear" by her foster parents. Filing 154 at 115-16. And according to Wang Anderson, X.C.W. arranged to be picked up by a man who, again, "sexually abused and exploited" her. Filing 154 at 115-16.

In May 2016, the juvenile court changed the permanency objective for X.C.W. to independent living. Filing 154 at 121. She moved to another foster

home, then to an "independent living arrangement," then to a dormitory at the University of Nebraska-Lincoln. Filing 154 at 121. But in December 2016, she was returned to her foster home in Blair. Filing 154 at 123. After that, she was sent to another foster placement, where she remained when this complaint was filed. Filing 154 at 124.

Wang Anderson asserts several federal and state-law claims against sixty-nine different defendants, on behalf of herself and X.C.W. Filing 154 at 1-2. She claims a number of federal constitutional violations, including violation of their rights to due process and familial association, unlawful seizure, a deliberately indifferent failure to protect, retaliation for constitutionally protected activity, violation of Wang Anderson's First Amendment rights, and discrimination against Wang and Wang Anderson because of their Chinese origin. Filing 154 at 124-30, 137-47. She also claims X.C.W. wasn't provided with accommodations required by § 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794. Filing 154 at 147-48. And, she says, she and X.C.W. were denied statutory rights arising under 42 U.S.C. §§ 621 et seq. & 670 et seq. Filing 154 at 150-57. Finally, she asserts state-law claims including negligence, negligent and intentional infliction of emotional distress, and a civil rights claim pursuant to Neb. Rev. Stat. § 20-148. Filing 154 at 131-37, 148-50.

Specifically, as to the County Defendants, Wang Anderson asserts:

1. A § 1983 claim premised on 4th and 14th Amendment violations against Wheeler, Miller, and Gentile (filing 154 at 124-26);[2]

---

[2] Although Wang Anderson did not specifically identify Gentile in the heading for this claim, filing 154 at 124, Gentile was expressly targeted by its supporting allegations, filing 154 at 124-26, so the Court assumes his omission from the heading was an oversight.

2. Policy-or-custom claims (*Monell* claims) against Douglas County (filing 154 at 126);

3. State-law negligence claims against all defendants (filing 154 at 130);

4. A § 1983 claim based on violation of the "substantive due process rights to family integrity and the parent-child relationship" against all "Individual Defendants" (filing 154 at 137);

5. A § 1983 claim based on deliberate indifference to X.C.W.'s serious health and safety needs against all "Individual Defendants" (filing 154 at 142-43);

6. A § 1983 claim based on "retaliation for protected activity" against Douglas County, Wheeler, Gentile, and Miller (filing 154 at 143);

7. A discrimination claim pursuant to 42 U.S.C. § 2000d against Wheeler and Gentile (filing 154 at 145);

8. Section 20-148 "civil rights" claims against all defendants (filing 154 at 148);

9. Negligent and intentional infliction of emotional distress claims against all defendants (filing 154 at 149);

10. A § 1983 claim based on violation of 42 U.S.C. § 621 *et seq.* against Douglas County (filing 154 at 150); and

11. A § 1983 claim based on violation of 42 U.S.C. § 670 *et seq.* against Douglas County (filing 154 at 153).

The County Defendants move to dismiss all those claims <u>except</u> the *Monell* claims pursuant to Fed. R. Civ. P. 12(b)(1) and (6). Filing 221.

## II. STANDARD OF REVIEW

A complaint must set forth a short and plain statement of the claim showing that the pleader is entitled to relief. Fed. R. Civ. P. 8(a)(2). This standard does not require detailed factual allegations, but it demands more than an unadorned accusation. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The complaint need not contain detailed factual allegations, but must provide more than labels and conclusions; and a formulaic recitation of the elements of a cause of action will not suffice. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). For the purposes of a motion to dismiss a court must take all of the factual allegations in the complaint as true, but is not bound to accept as true a legal conclusion couched as a factual allegation. *Id.*

A motion pursuant to Rule 12(b)(1) challenges whether the court has subject matter jurisdiction. The party asserting subject matter jurisdiction bears the burden of proof. *Great Rivers Habitat Alliance v. FEMA*, 615 F.3d 985, 988 (8th Cir. 2010). Rule 12(b)(1) motions can be decided in three ways: at the pleading stage, like a Rule 12(b)(6) motion; on undisputed facts, like a summary judgment motion; and on disputed facts. *Jessie v. Potter*, 516 F.3d 709, 712 (8th Cir. 2008). The County Defendants are advancing a "facial attack" to subject matter jurisdiction, based on the pleadings or documents that are judicially noticeable. *See Branson Label, Inc. v. City of Branson, Mo.*, 793 F.3d 910, 914 (8th Cir. 2015). Accordingly, the Court restricts itself to the pleadings and Wang Anderson receives the same protections as she would defending against a motion brought under Rule 12(b)(6). *Hastings v. Wilson*, 516 F.3d 1055, 1058 (8th Cir. 2008).

To survive a motion to dismiss under Rule 12(b)(6), a complaint must also contain sufficient factual matter, accepted as true, to state a claim for relief that is plausible on its face. *Iqbal,* 556 U.S. at 678. A claim has facial

plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Id.* Where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but has not shown—that the pleader is entitled to relief. *Id.* at 679.

## III. DISCUSSION

Before addressing the parties' arguments claim-by-claim, the Court reiterates one of its previous holdings: the Court has already held that Wang Anderson could not assert claims on X.C.W.'s behalf, and dismissed X.C.W.'s claims without prejudice. Filing 481 at 9-13, 36. Many of the claims asserted against these movants are premised on the alleged breach of their duties to X.C.W., and those claims have been dismissed, for the reasons previously explained by the Court. Filing 481 at 9-13. Only Wang Anderson's own claims remain at issue here.

### 1. 42 U.S.C. § 1983 - Unlawful Seizure and Familial Association

The first of Wang Anderson's claims asserted against the County Defendants—specifically, Wheeler, Miller, and Gentile—is a constitutional claim premised on "procedural due process, unlawful seizure, and familial association." Filing 154 at 124. Essentially, Wang Anderson claims that X.C.W.'s initial removal from her home was unconstitutional. *See* filing 154 at 125. The County Defendants argue that that Wang Anderson's claims are barred by *Heck v. Humphrey*, 512 U.S. 477 (1994). Filing 223 at 16.

In *Heck*, the Supreme Court held that

> when a state prisoner seeks damages in a § 1983 suit, the district
> court must consider whether a judgment in favor of the plaintiff

would necessarily imply the invalidity of his conviction or sentence; if it would, the complaint must be dismissed unless the plaintiff can demonstrate that the conviction or sentence has already been invalidated. But if the district court determines that the plaintiff's action, even if successful, will *not* demonstrate the invalidity of any outstanding criminal judgment against the plaintiff, the action should be allowed to proceed, in the absence of some other bar to the suit.

512 U.S. at 487 (emphasis in original) (footnotes omitted).

Thus, in order to recover damages for an allegedly unconstitutional conviction or imprisonment, or for other harm caused by actions whose unlawfulness would render a conviction or sentence invalid, a plaintiff must prove that the conviction or sentence has been reversed on direct appeal, declared invalid by an appropriate state tribunal, or called into question by a federal court's issuance of a writ of habeas corpus. *Id*. at 486-87. This has come to be known as the "favorable termination" requirement of *Heck*. See *Marlowe v. Fabian*, 676 F.3d 743, 745 (8th Cir. 2012).

The County Defendants argue that Wang Anderson's constitutional claims are *Heck*-barred as a result of the juvenile court proceedings. The Court is not persuaded. *Heck* bars a § 1983 action where the suit would necessarily imply the invalidity of the plaintiff's "conviction or sentence." 512 U.S. at 487. But what "conviction or sentence" is at issue here? The County Defendants rely on the adjudication and the permanency planning order, each of which were appealed to the Nebraska Court of Appeals—but each of those orders was based at least in part on evidence generated after X.C.W. was initially removed from Wang Anderson's home.

A careful examination of *Heck* is instructive. The Supreme Court expressly noted in *Heck* that "if the district court determines that the plaintiff's action, even if successful, will *not* demonstrate the invalidity of any outstanding criminal judgment against the plaintiff, the action should be allowed to proceed, in the absence of some other bar to the suit." *Id*. at 487. The example the *Heck* Court provided was that "a suit for damages attributable to an allegedly unreasonable search may lie even if the challenged search produced evidence that was introduced in a state criminal trial resulting in the § 1983 plaintiff's still-outstanding conviction." *Id*. at 487 n.7. "Because of doctrines like independent source and inevitable discovery, and especially harmless error," the Supreme Court explained, "such a § 1983 action, even if successful, would not *necessarily* imply that the plaintiff's conviction was unlawful." *Id*. The Supreme Court was "careful in *Heck* to stress the importance of the term 'necessarily.'" *Nelson v. Campbell*, 541 U.S. 637, 647 (2004); *accord Skinner v. Switzer*, 562 U.S. 521, 534 (2011). So, generally, plaintiffs can recover damages proximately caused by a Fourth Amendment violation. *Cty. of Los Angeles, Calif. v. Mendez*, 137 S. Ct. 1539, 1548 (2017)

The Court sees little reason, in this context, to distinguish between an unlawful search and an unlawful seizure: the fact that evidence may later have been generated to justify a juvenile adjudication does not mean that sufficient cause existed for seizure at the outset, and so a claim that the initial seizure was unlawful does not *necessarily* imply that the subsequent adjudication was invalid. *See Eidson v. State of Tennessee Dep't of Children's Servs.*, 510 F.3d 631, 639-40 (6th Cir. 2007); *see also Moore v. Sims*, 200 F.3d 1170, 1171-72 (8th Cir. 2000); *see generally Hughes v. Lott*, 350 F.3d 1157, 1160-61 (11th Cir. 2003); *cf. In re Interest of Noah B.*, 891 N.W.2d 109, 124 (Neb. 2017) (holding that the doctrine of claim preclusion should not be strictly applied in abuse and

neglect cases when doing so would fail to protect children from continuing abuse or neglect, even where new allegations in a supplemental petition were known to the State and could have been raised as grounds for a previous adjudication); *In re Interest of R.G.*, 470 N.W.2d 780, 791 (Neb. 1991), *disapproved on other grounds by O'Connor v. Kaufman*, 582 N.W.2d 350, 355 (Neb. 1998) (insufficient evidence to support emergency detention does not deprive juvenile court of jurisdiction where evidence at later hearing is sufficient to support continued detention); *In re Damien S.*, 815 N.W.2d 648, 655 (Neb. Ct. App. 2012) (decisions at detention hearing are only temporary as detention order will be revisited at adjudication hearing).

Moreover, *Heck* was premised on statutory interpretation: the Supreme Court held that § 1983 was unavailable where a criminal conviction was extant because "Congress [had] determined that habeas corpus is the appropriate remedy for state prisoners attacking the validity of the fact or length of their confinement, and that specific determination must override the general terms of § 1983." 512 U.S. at 482; *accord Wallace v. Kato*, 549 U.S. 384, 392 (2007). That rationale has little application in the context of a juvenile neglect proceeding, where federal habeas relief is unavailable to challenge the juvenile court's rulings. *See Lehman v. Lycoming Cty. Children's Servs. Agency*, 458 U.S. 502, 508-16 (1982); *United States ex rel. Mueller v. Missouri Div. of Family Servs.*, 123 F.3d 1021, 1023-24 (8th Cir. 1997); *Amerson v. Iowa, Dep't of Human Servs. by Palmer*, 59 F.3d 92, 94-95 (8th Cir. 1995).

The County Defendants cite no authority directly supporting the proposition that a juvenile adjudication based on allegations of neglect can bar a subsequent § 1983 action based on the initial removal, and concede that they are asking the Court to extend *Heck* beyond its holding. *See* filing 223 at 17.

The Court declines that invitation, and concludes that Wang Anderson's claims based on X.C.W.'s emergency removal from her home are not *Heck*-barred.[3]

And, so far as the Court can tell, the County Defendants' *Heck v. Humphrey* argument is the only argument in their brief directed at Wang Anderson's first claim for relief. *See* filing 223 at 19-20. That said, with X.C.W.'s claim having been dismissed, it's hard to tell the difference between Wang Anderson's first claim for relief ("sever[ing] familial association without due process of law under the Fourth Amendment") and her fourth claim for relief (violating the "substantive due process right to family integrity"). Filing 154 at 125, 137. Nor is it entirely clear to the Court what a Fourth Amendment "familial association" claim would even entail. *See generally Doe v. Heck*, 327 F.3d 492, 518 n.23 (7th Cir. 2003) (explaining difference between Fourth Amendment seizure and Fourteenth Amendment familial relations claim). But the Court sees no need to dismiss Wang Anderson's first claim for relief as duplicative in the absence of any argument directed squarely at that issue. Accordingly, that claim may proceed against Wheeler, Miller, and Gentile.[4]

---

[3] The Court notes that the County Defendants appear to back away from *Heck* in their reply brief, instead making passing reference to the *Rooker-Feldman* doctrine, and more generally issue or claim preclusion, along with a discussion of the Full Faith and Credit Clause. Filing 380 at 6-12. *Rooker-Feldman* isn't applicable here, for much the same reason *Heck* isn't. *See* filing 487 at 6-7. And the Court isn't persuaded to wade into whether and how issue or claim preclusion applies to some or all of Wang Anderson's claims when that argument was raised only in the County Defendants' reply brief, depriving Wang Anderson of a chance to meaningfully respond. *See Torgeson v. Unum Life Ins. Co. of Am.*, 466 F. Supp. 2d 1096, 1121 (N.D. Iowa 2006).

[4] Each individual defendant was sued in both an official and individual capacity, but the Court's ruling will not distinguish between those capacities because it wasn't invited to do so by the pleadings or the briefing. But because a claim against an official in an official capacity

## 2. *Monell* Claims

Douglas County does not ask for Wang Anderson's second claim for relief to be dismissed. Accordingly, it will proceed.[5]

## 3. State-Law Negligence Claims

Next, the County Defendants argue, with respect to Wang Anderson's state-law negligence claims (and, in fact, with respect to all her state-law claims) that they are barred by Wang Anderson's failure to plead compliance with the requirements of the Nebraska Political Subdivisions Tort Claims Act, Neb. Rev. Stat. § 13-901 *et seq.* (PSTCA). Filing 223 at 8-13; *see* filing 154 at 130, 148-49. Under Nebraska law, the filing or presentment of a claim to the appropriate political subdivision, while it is not a jurisdictional prerequisite, is a condition precedent to commencement of a suit under the PSTCA. *Keller v. Tavarone*, 628 N.W.2d 222, 230 (Neb. 2001). And failure to present a claim in compliance with the PSTCA warrants dismissal. *See id.* at 232-33.

But such noncompliance must be raised as an affirmative defense. *Wise v. Omaha Pub. Sch.*, 714 N.W.2d 19, 22 (Neb. 2006). So, it can only be asserted in a Rule 12(b)(6) motion when, on the face of the complaint, allegations are included which could be the subject of the affirmative defense. *See Weeder v.*

---

is the same as a claim against the entity for which the official is an agent, and prospective injunctive relief is off the table, the *Monell* claims and the individual capacity claims are really the only ones that matter. *See Kentucky v. Graham*, 473 U.S. 159, 165, 167 n.14 (1985).

[5] The Court notes, for the sake of clarity, that Wang Anderson *also* asserts policy-or-custom claims against Douglas County under the heading of her fourth claim for relief, filing 154 at 142, despite that claim expressly being asserted only "Against all Individual Defendants," filing 154 at 137. It's not clear how "Individual Defendants" are distinguished from any other defendants if Douglas County is an "individual defendant"—providing yet another example of how Wang Anderson's shotgun pleading makes it difficult to tell who's being sued for what.

*Cent. Cmty. Coll.*, 691 N.W.2d 508, 515 (Neb. 2005). And in this case, the operative complaint is silent with respect to Wang Anderson's compliance with the PSTCA. *See* filing 154; *see also Weeder*, 691 N.W.2d at 515. Accordingly, whether Wang Anderson complied with the PSTCA cannot be decided on a motion to dismiss. *See id.*; *see also Wise*, 714 N.W.2d at 22.[6]

But the County Defendants also argue with respect to Wang Anderson's negligence claims—and again, in fact, with respect to all her state-law claims—that Schuchman is entitled to quasi-judicial immunity. Filing 223 at 14-16. With that, the Court agrees. Under Nebraska law, a public prosecutor, acting within the general scope of her official authority in making a determination whether to file a criminal prosecution, is exercising a quasi-judicial and discretionary function, and where she acts in good faith she is immune from suit for an erroneous or negligent determination. *Koch v. Grimminger*, 223 N.W.2d 833, 837 (Neb. 1974). And that immunity extends to the decisions of a county attorney in the filing of juvenile petitions. *Koepf v. York Cty.*, 251 N.W.2d 866, 870 (Neb. 1977); *accord Gallion v. Woytassek*, 504 N.W.2d 76, 83 (Neb. 1993); *cf. Billups v. Scott*, 571 N.W.2d 603, 607 (Neb. 1997).

All of Wang Anderson's allegations against Schuchman involve her performance of her duties—her filing of a petition for termination of parental rights, and her prosecution of appeals to the Nebraska Court of Appeals. Each

---

[6] The Court recognizes that before adoption of the Nebraska Rules of Pleading in Civil Actions, a plaintiff's burden to prove compliance with the PSTCA could be tested by demurrer. *See Millman v. Cty. of Butler*, 458 N.W.2d 207, 218 (Neb. 1990). But the Nebraska Supreme Court expressly held in *Weeder*—relying on federal rules of civil procedure—that noncompliance with the PSTCA can be raised on a motion to dismiss only when the necessary facts appear on the face of the complaint. 691 N.W.2d at 515; *see also, e.g., Schmidt v. United States*, 933 F.2d 639, 640 (8th Cir. 1991).

of those allegations falls in the heartland of state-law quasi-judicial immunity. It is true that such immunity is limited: it "would not protect a prosecutor who, knowing that a particular charge is groundless in law or in fact, nonetheless intentionally files a charge and thus acts through a corrupt motive." *Koch*, 223 N.W.2d at 714. But Wang Anderson has not alleged that Schuchman acted in bad faith, *see Koepf*, 251 N.W.2d at 869, nor has she alleged the ultimate facts from which such a conclusion could be inferred, *see Koch*, 223 N.W.2d at 714. So, she is entitled to state-law quasi-judicial immunity.

There is also a broader problem: as the Court has previously explained at some length, Wang Anderson's negligence claims fail to satisfy Rule 8(a), and the complaint fails to state a negligence claim against *any* defendant because it does not present any of the defendants fair notice of which allegations are made against them. Filing 481 at 13-14. "In sum," the Court found, "Wang Anderson's complaint is deficient, because it fails to provide any given defendant with fair notice of what that defendant is alleged to have done that was negligent." Filing 481 at 17. That finding applies with equal force here. Accordingly, the Court will dismiss Wang Anderson's state-law negligence claims.

### 4. 42 U.S.C. § 1983 - DUE PROCESS RIGHT TO FAMILY INTEGRITY

Wang Anderson's next claim is premised on the alleged violation of her "substantive due process rights to family integrity and the parent-child relationship" by "all Individual Defendants." Filing 154 at 137. That apparently includes Douglas County, too. *See supra* n.5. The County Defendants' primary argument is that this claim is *Heck*-barred. Filing 223 at 21-22. The Court rejects this argument for the reasons stated above.

But the County Defendants also argue that Schuchman is entitled to prosecutorial immunity from this claim, and from Wang Anderson's other

federal-law claims—and with that, for many of the same reasons explained above, the Court agrees. Prosecutors are absolutely immune from liability under § 1983 for their conduct in initiating a prosecution and in presenting the State's case insofar as that conduct is intimately associated with the judicial phase of the criminal process. *Woodworth v. Hulshof*, 891 F.3d 1083, 1089 (8th Cir. 2018). And that immunity extends to initiating juvenile dependency and neglect proceedings. *Martin v. Aubuchon*, 623 F.2d 1282, 1285 (8th Cir. 1980); *accord Myers v. Morris*, 810 F.2d 1437, 1452 (8th Cir. 1987), *abrogated on other grounds by Burns v. Reed*, 111 S. Ct. 1934 (1991).

So, Schuchman is entitled to absolute prosecutorial immunity for the allegations against her in Wang Anderson's complaint, and the Court will dismiss the federal claims against her. Wang Anderson's fourth claim for relief may proceed against the other County Defendants.

### 5. 42 U.S.C. § 1983 - DELIBERATE INDIFFERENCE TO HEALTH AND SAFETY

Next, Wang Anderson alleges that "All Individual Defendants" were deliberately indifferent to X.C.W.'s serious health and safety needs, in violation of the Due Process Clause of the Fourteenth Amendment. This claim will be dismissed for several reasons.

First, although Wang Anderson makes reference to "Plaintiffs" suffering injury, filing 154 at 143, it's clear that this claim is premised wholly on X.C.W.'s constitutional rights. Accordingly, it stands dismissed because X.C.W. is not prosecuting it herself. Additionally, for the reasons explained above, Schuchman is entitled to prosecutorial immunity from this claim.

Finally, Wang Anderson's factual allegations simply do not state a claim against the County Defendants on these grounds: there are no factual allegations to suggest that any of the County Defendants were indifferent to X.C.W.'s needs—much less the required allegations of "official conduct or

inaction . . . so egregious or outrageous that it is conscience-shocking." *See James ex rel. James v. Friend*, 458 F.3d 726, 730 (8th Cir. 2006). Wang Anderson relies on a theory that the County Defendants failed to protect X.C.W. by removing her from her mother's care, and were deliberately indifferent to her "medical need" not to be separated from her mother. Filing 351 at 40. But even if there was a risk of harm associated with X.C.W.'s removal from the home, nothing alleged by Wang Anderson would permit a reasonable inference that the County Defendants "were aware of facts from which an inference could be drawn that a substantial risk of serious harm existed" or that they "actually drew that inference." *See id*.

Accordingly, this claim will be dismissed as to all the County Defendants.

6. 42 U.S.C. § 1983 - RETALIATION FOR PROTECTED ACTIVITY

Wang Anderson's next claim for relief presents a moving target for the County Defendants—or specifically, Douglas County, Wheeler, Gentile, and Miller. (Schuchman isn't targeted by this claim.)

In Wang Anderson's brief, she represents her theory as being that the County Defendants "retaliated against her for exercising her First Amendment right to free speech by making reports to them about harassment by her neighbors and regarding her concerns about Y.C.W.'s relationship with [her teacher]." Filing 351 at 41. The problem is that nothing in Wang Anderson's complaint remotely resembles that theory: the complaint clearly sets forth a claim that Wang Anderson was retaliated against for asserting her rights *in the juvenile court proceedings*. *See* filing 154 at 143-44. And of course, Wheeler, Gentile, and Miller were only involved in the initial removal of Y.C.W. and X.C.W. from the home, and they aren't alleged to have had anything to do with the case after that. So, the complaint plainly fails to state a claim as to them.

Without Wheeler, Gentile, and Miller, there's nothing to connect Douglas County with the claim either. And in any event, Wang Anderson hasn't identified any policy or custom of Douglas County related to any alleged retaliation. *See Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 694-95 (1978). So, the Court agrees with the County Defendants that this claim is insufficiently pleaded. *See* filing 223 at 24.

### 7. 42 U.S.C. § 2000D DISCRIMINATION CLAIM

Next, Wang Anderson claims that Wheeler and Gentile discriminated against her in violation of Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d, which prohibits discrimination in federally assisted programs based on race, color, or national origin. She claims that Wheeler and Gentile did not conduct a fair investigation "and failed to consider and recognize that the characteristics of Wang Anderson and her residence observed by these Defendants were consistent with the traditions, customs, and mores of Chinese culture." Filing 154 at 146.

But § 2000d "requires a plaintiff to show that a forbidden reason was the but-for cause of a denial of benefits." *Abdull v. Lovaas Inst. for Early Intervention Midwest*, 819 F.3d 430, 433 (8th Cir. 2016). Only allegations of intentional discrimination are sufficient. *Alexander v. Sandoval*, 532 U.S. 275, 280 (2001); *Mumid v. Abraham Lincoln High Sch.*, 618 F.3d 789, 794 (8th Cir. 2010); *see Thompson By & Through Buckhanon v. Bd. of Special Sch. Dist. No. 1*, 144 F.3d 574, 581 (8th Cir. 1998). Wang Anderson's conclusory allegation that "[o]n information and belief, said Defendants acted with malice," filing 154 at 147, is not enough to "plausibly suggest" a "discriminatory state of mind," *see Iqbal*, 556 U.S. at 683.

Furthermore, as the County Defendants argue, courts have uniformly concluded that individual employees can't be personally liable under Title VI,

because they weren't the entities receiving federal assistance. *See Rodgers v. Univ. of Missouri Bd. of Curators*, 56 F. Supp. 3d 1037, 1047 (E.D. Mo. 2014), *aff'd as modified sub nom. Rodgers v. Curators of Univ. of Missouri Sys.*, 634 F. App'x 598 (8th Cir. 2015); *see also Shotz v. City of Plantation, Fla.*, 344 F.3d 1161, 1171 (11th Cir. 2003); *Buchanan v. City of Bolivar, Tenn.*, 99 F.3d 1352, 1356 (6th Cir. 1996); *Methelus v. Sch. Bd. of Collier Cty., Fla.*, 243 F. Supp. 3d 1266, 1282 (M.D. Fla. 2017); *Brooks v. Skinner*, 139 F. Supp. 3d 869, 885 (S.D. Ohio 2015); *Callum v. CVS Health Corp.*, 137 F. Supp. 3d 817, 844 (D.S.C. 2015); *Pollard v. Georgetown Sch. Dist.*, 132 F. Supp. 3d 208, 229-30 (D. Mass. 2015); *Faiaz v. Colgate Univ.*, 64 F. Supp. 3d 336, 364 (N.D.N.Y. 2014); *Barnett v. Baldwin Cty. Bd. of Educ.*, 60 F. Supp. 3d 1216, 1234-35 (S.D. Ala. 2014); *Delbert v. Duncan*, 923 F. Supp. 2d 256, 261 (D.D.C. 2013), *aff'd,* No. 13-5135, 2013 WL 6222987 (D.C. Cir. Nov. 14, 2013); *C.S. v. Couch*, 843 F. Supp. 2d 894, 905 n.14 (N.D. Ind. 2011); *Karlen ex rel. J.K. v. Westport Bd. of Educ.*, 638 F. Supp. 2d 293, 302 (D. Conn. 2009); *Washington v. Jackson State Univ.*, 532 F. Supp. 2d 804, 811 (S.D. Miss. 2006); *Kelly v. Rice*, 375 F. Supp. 2d 203, 208 (S.D.N.Y. 2005); *Jackson v. Univ. of New Haven*, 228 F. Supp. 2d 156, 158 n.4 (D. Conn. 2002); *Steel v. Alma Pub. Sch. Dist.*, 162 F. Supp. 2d 1083, 1085 (W.D. Ark. 2001); *Powers v. CSX Transp., Inc.*, 105 F. Supp. 2d 1295, 1311-12 (S.D. Ala. 2000); *Farm Labor Org. Comm. v. Ohio State Highway Patrol*, 95 F. Supp. 2d 723, 741 (N.D. Ohio 2000), *aff'd and remanded,* 308 F.3d 523 (6th Cir. 2002); *Farmer v. Ramsay*, 41 F. Supp. 2d 587, 592 (D. Md. 1999); *Wright v. Butts*, 953 F. Supp. 1343, 1350 (M.D. Ala. 1996); *Jackson v. Katy Indep. Sch. Dist.*, 951 F. Supp. 1293, 1298 (S.D. Tex. 1996); *Young v. Pierce*, 544 F. Supp. 1010, 1015 (E.D. Tex. 1982); *cf. Fitzgerald v. Barnstable Sch. Comm.*, 555 U.S. 246, 257 (2009); *Cox v. Sugg*, 484 F.3d 1062, 1066 (8th Cir. 2007).

The Court agrees with the overwhelming weight of authority on this point. Wang Anderson very vaguely alleges that she was discriminated against "under one or more programs or activities receiving Federal financial assistance, including, without limitation, child welfare services." Filing 154 at 146. Even assuming the sufficiency of this non-specific allegation as a general matter, the Court is unable to reasonably infer that individual officers of the Douglas County Sheriff's Office are somehow "program[s] or activit[ies] receiving federal financial assistance." *See* § 2000d.

Simply put, Wang Anderson sufficiently pleads neither intentional discrimination nor that Wheeler and Gentile are proper defendants. So, this claim will be dismissed as to them.

## 8. SECTION 20-148

The Court has previously explained why § 20-148 provides no claim for Wang Anderson. Filing 481 at 28-29. That conclusion applies with even more force to the County Defendants: § 20-148 expressly excludes "any political subdivision," and does not reach individuals acting in their capacities as public officials. *Cole v. Clarke*, 598 N.W.2d 768, 772 (Neb. Ct. App. 1999); *see Potter v. Bd. of Regents of the Univ. of Nebraska*, 844 N.W.2d 741, 750 (Neb. 2014); *Sinn v. City of Seward*, 523 N.W.2d 39, 49-50 (Neb. Ct. App. 1994). This claim will be dismissed.

## 9. EMOTIONAL DISTRESS CLAIMS

The Court has also previously explained that Wang Anderson's emotional distress claims do not satisfy Rule 8(a), and she has not alleged the required degree of emotional distress for either tort. Filing 481 at 29-33. Nor has she alleged that these defendants engaged in conduct of the "outrageous

and extreme" variety necessary to prove intentional infliction of emotional distress. *See* filing 481 at 34-35. These claims will also be dismissed.

### 10. 42 U.S.C. § 621 *ET SEQ*.

Wang Anderson asserts a claim against Douglas County for allegedly violating provisions of the Stephanie Tubbs Jones Child Welfare Services Program, 42 U.S.C. § 621 *et seq*. Filing 154 at 150. The stated purpose of that program is to

> promote State flexibility in the development and expansion of a coordinated child and family services program that utilizes community-based agencies and ensures all children are raised in safe, loving families, by--
>
>> (1) protecting and promoting the welfare of all children;
>>
>> (2) preventing the neglect, abuse, or exploitation of children;
>>
>> (3) supporting at-risk families through services which allow children, where appropriate, to remain safely with their families or return to their families in a timely manner;
>>
>> (4) promoting the safety, permanence, and well-being of children in foster care and adoptive families; and
>>
>> (5) providing training, professional development and support to ensure a well-qualified child welfare workforce.

§ 621. Douglas County contends that program doesn't create a private right of action. Filing 223 at 26-28. The Court agrees.

> Like substantive federal law itself, private rights of action to enforce federal law must be created by Congress. The judicial task

is to interpret the statute Congress has passed to determine whether it displays an intent to create not just a private right but also a private remedy. Statutory intent on this latter point is determinative. Without it, a cause of action does not exist and courts may not create one, no matter how desirable that might be as a policy matter, or how compatible with the statute. Raising up causes of action where a statute has not created them may be a proper function for common-law courts, but not for federal tribunals.

*Alexander*, 532 U.S. at 286-87 (citations and quotations omitted); *see Osher v. City of St. Louis*, No. 17-2401, slip op. at 5 (8th Cir. Sept. 6, 2018).

So, to find an individually enforceable federal right, the Court must consider whether (1) Congress intended the statutory provision to benefit the plaintiff. (2) the asserted right is not so vague and amorphous that its enforcement would strain judicial competence; and (3) the provision clearly imposes a mandatory obligation upon the states. *Midwest Foster Care & Adoption Ass'n v. Kincade*, 712 F.3d 1190, 1195 (8th Cir. 2013) (citing *Blessing v. Freestone*, 520 U.S. 329, 340 (1997). But nothing short of an unambiguously conferred right to support a cause of action brought under § 1983 will do. *Id*. at 1196 (citing *Doe v. Gonzaga*, 536 U.S. 273, 283 (2002)); *see Osher*, slip op. at 6. It is insufficient to show merely that a particular statute intended to benefit the putative plaintiff. *Osher*, slip op. at 6.

Here, Wang Anderson relies on § 622, filing 154 at 151-152, which sets forth a detailed set of standards that a State's plan for child welfare services

must meet in order for the State to be eligible for payment under the program.[7] For instance, the State's plan must coordinate services under the plan with other programs; describe the services to be funded and how the State plans to improve them; recruit ethnically and racially diverse foster and adopting families; and provide assurances to the Secretary of Health and Human Services that it is operating a statewide information system, a case review system, and a service program that helps children by promoting appropriate reunification or adoption. *See* § 622(b)(1)-(8). The State must also, among other things, "ensure a coordinated strategy to identify and respond to the health care needs of children in foster care placements, including mental health and dental health needs," outlining particular specific areas of concern. § 622(b)(15)(A).

Many of those provisions were undoubtedly intended to benefit foster children—but the statute does not contain rights-creating language that is phrased in terms of the persons benefited. Rather, the statute focuses on the person regulated rather than the individuals protected, and thus creates no implication of an intent to confer rights on a particular class of persons." *See Osher*, slip op. at 6. The statute is also crowded with language such as "diligent recruitment" that is undefined, but not susceptible to ready judicial standard-setting. *See* § 622(b)(7). And the Court notes that any mandate imposed by the statute is diluted, as the Secretary's authority to enforce it is constrained if the State is in "substantial conformity" with its requirements. *See* 42 U.S.C. § 1320a-2a.

---

[7] Having found no private right of action, the Court need not consider whether or how Douglas County—as opposed to the State DHHS—might have been subject to these requirements. *See* § 622(b)(1) (requiring a single organizational unit to be responsible for child welfare services.)

In sum, the Court agrees with authority (particularly, post-*Doe* authority) holding that § 622 creates no privately enforceable right of action. *Carson P. ex rel. Foreman v. Heineman*, 240 F.R.D. 456, 542-44 (D. Neb. 2007); *see M.B. by Eggemeyer v. Corsi*, No. 2:17-CV-4102, 2018 WL 327767, at *14-16 (W.D. Mo. Jan. 8, 2018); *BK v. New Hampshire Dep't of Health & Human Servs.*, 814 F. Supp. 2d 59, 71-72 (D.N.H. 2011); *D.G. ex rel. Stricklin v. Henry*, 594 F. Supp. 2d 1273, 1275-80 (N.D. Okla. 2009); *Olivia Y. ex rel. Johnson v. Barbour*, 351 F. Supp. 2d 543, 556-657 (S.D. Miss. 2004); *Charlie H. v. Whitman*, 83 F. Supp. 2d 476, 484-85 (D.N.J. 2000); *see also Alger v. Cty. of Albany, New York*, 489 F. Supp. 2d 155, 158 (N.D.N.Y. 2006); *cf. Midwest Foster Care & Adoption Ass'n v. Kincade*, 712 F.3d 1190, 1195-1200 (8th Cir. 2013); *31 Foster Children v. Bush*, 329 F.3d 1255, 1268-74 (11th Cir. 2003). *But see Brian A. ex rel. Brooks v. Sundquist*, 149 F. Supp. 2d 941, 949 (M.D. Tenn. 2000); *Marisol A. by Forbes v. Giuliani*, 929 F. Supp. 662, 681-82 (S.D.N.Y. 1996), *aff'd sub nom. Marisol A. v. Giuliani*, 126 F.3d 372 (2d Cir. 1997); *Kenny A. ex rel. Winn v. Perdue*, 218 F.R.D. 277, 292 (N.D. Ga. 2003).

### 11. 42 U.S.C. § 670 *ET SEQ.*

Finally, in a similar vein, Wang Anderson alleges that Douglas County violated provisions of 42 U.S.C. § 670 *et seq*., which set standards for federal payments for foster care and adoption assistance "[f]or the purpose of enabling each State to provide, in appropriate cases, foster care and transitional independent living programs for children . . . , adoption assistance for children with special needs, kinship guardianship assistance, and prevention services or programs. . . ." § 670. Douglas County again argues that the statutes relied upon by Wang Anderson do not create a private right of action, and again, the Court agrees.

Wang Anderson relies primarily upon §§ 671, 675, and 675a. Filing 154 at 154-57. Section 671 is similar to § 622, requiring a State receiving federal funding to, among other things: establish and maintain standards for foster homes, conduct financial audits, engage (with some exceptions) in "reasonable efforts" to reunify families, provide for case plans and case review procedures, investigate prospective foster parents, provide health insurance for foster children, provide notice of a removal to extended family, enroll foster children in school, and keep siblings together. § 671(a). Section 675 is a definitional section, defining relevant terms such as "case plan" and "case review system." *See* § 675(1) & (5). And § 675a imposes additional case plan and case review system requirements, requiring the State to document its efforts at family placement, ensure that the continuing propriety of a child's placement is reviewed, and document steps taken to oversee foster parents and the child's activities. § 675(a). The case plan for a foster child over age 14 is also required to include a document describing the child's rights, and an acknowledgement by the child that she was provided with a copy of the document. § 675(b).

But to the extent that any of those provisions are privately enforceable, they're not enforceable by Wang Anderson. Most of the injuries claimed in the complaint are injuries to X.C.W. or even Y.C.W., none of which can be asserted by Wang Anderson. *See* filing 154 at 154-57. She doesn't have standing to assert claims that X.C.W. and Y.C.W. were neglected in foster care, or that her Chinese relatives were discriminated against. The only provision clearly relevant to Wang Anderson's rights—the provision requiring reasonable efforts at reunifying families—is just as clearly not privately enforceable. *Suter v. Artist M.*, 503 U.S. 347, 363 (1992);[8] *see Carson P.*, 240 F.R.D. at 535-45. In

---

[8] The Court is aware of the so-called "*Suter* fix" enacted by Congress in the wake of that decision. *See* 42 U.S.C. §§ 1320a-2 & 1320a-10. But those sections expressly preserve *Suter*'s

sum, considering the principles explained at length above, the Court cannot discern any right arising under § 670 *et seq.*, that is assertable *by Wang Anderson*, for which there is any basis to find a private right of enforcement.

## IV. CONCLUSION

Accordingly, the Court will grant the County Defendants' motion to dismiss in part, and deny it in part. Specifically, the following claims may proceed against (some) of the County Defendants: the § 1983 unlawful seizure claim against Wheeler, Miller, and Gentile; the *Monell* claims against Douglas County; and the § 1983 family integrity claim against Wheeler, Miller, Gentile, and Douglas County. All the other claims addressed in this memorandum and order are dismissed, as are all the claims against Schuchman.

The County Defendants also move the Court to strike Wang Anderson's prayer for punitive damages because, as best the Court can tell, they believe punitive damages are not recoverable from all the parties on all of the claims for which she seeks such damages. *See* filing 223 at 33-34. That's undoubtedly so. *See City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 271 (1981). But for the Court to sharpen its blue pencil, and try to list in the margins of the complaint which claims and defendants might allow for punitive damages, would just add another layer of complication to an already overwrought proceeding. And there's no reason to sort out damages at this stage.

As a final matter, the County Defendants have also moved the Court to strike Wang Anderson's jury demand. But the scope of both the jury demand and the motion is unclear. The complaint simply says "Jury Demand" in the

---

holding with respect to "reasonable efforts." *See id. Suter* remains highly relevant here. *See Does v. Gillespie*, 867 F.3d 1034, 1044-45 (8th Cir. 2017) (explaining the *Suter* fix); *see also Carson P.*, 240 F.R.D. at 537-39 (same).

caption. Filing 154 at 1. That's certainly sufficient for purposes of Fed. R. Civ. P. 38(b), *see* NECivR 38.1, but it doesn't tell the Court whether Wang Anderson really expects to try *all* her claims to a jury. And it has been held, for instance, that the Seventh Amendment guarantees a right to a jury trial on the merits of an action seeking legal relief under § 1983. *City of Monterey v. Del Monte Dunes at Monterey, Ltd.*, 526 U.S. 687, 709 (1999). But that right is not unlimited. *See id.* at 722. And it's not necessary to resolve that now.

So, the Court will deny the County Defendants' motion to strike Wang Anderson's prayer for punitive damages and her jury demand, without prejudice to reasserting those issues when necessary—that is, when it's clear which (if any) of Wang Anderson's claims will be tried, and precisely what questions those claims will ask the trier of fact to answer.

IT IS ORDERED:

1. The County Defendants' motion to dismiss (filing 221) is granted in part and denied in part, as set forth above.

2. Amy Schuchman is terminated as a party.

3. The County Defendants' motion to strike (filing 221) is denied.

Dated this 12th day of September, 2018.

BY THE COURT:

John M. Gerrard
United States District Judge

- 30 -