IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| CATHERINE YANG WANG ANDERSON,<br><br>Plaintiff,<br><br>vs.<br><br>THE STATE OF NEBRASKA, et al.,<br><br>Defendants. | 4:17-CV-3073<br><br>MEMORANDUM AND ORDER |

This matter is before the Court on the motion to dismiss (filing 264) filed by Nebraska Families Collaborative (NFC) and Daniel Little, Deanna "Nina" Sheller, Sara Smith, Evan Winans, Melissa Nance, Nicole Paul, Anna Richardson, David Newell, Anne Petzel, and Jennifer Richey (collectively, the NFC Defendants). The Court will grant that motion in part and deny it in part.

BACKGROUND

The plaintiff, Catherine Yang Wang Anderson (Wang Anderson) is the mother of two girls, X.C.W. and Y.C.W. Filing 154 at 2. Wang Anderson's husband, Bo Wang (Wang) is their father. Filing 154 at 2. X.C.W. was a minor when this case was filed, and Wang Anderson sued both in her own capacity and as "next friend" of X.C.W. Filing 154 at 2.

NFC is a nonprofit corporation that Wang Anderson alleges "had a contract with [the Nebraska Department of Health and Human Services (NDHHS)] to provide case management and an individualized system of care for families and their children and youth who are wards of NDHHS involved in the Child Welfare or Juvenile Court System." Filing 154 at 7. Newell was the chief executive officer of NFC. Filing 154 at 6. Sheller, Smith, Winans,

Little, Nance, Richardson, Paul, Petzel, and Richey were all employed by NFC in one capacity or another, such as family engagement specialist, family permanency specialist, family permanency specialist supervisor, or family permanency director. Filing 154 at 8-11.

Very generally, Wang Anderson alleges that X.C.W. was unlawfully made a ward of the State of Nebraska and held by the State against her will. Filing 154 at 2. But it was Y.C.W. who first drew the attention of authorities. According to Wang Anderson, Y.C.W. had an "inappropriate" personal relationship with a teacher at her high school because Y.C.W. was permitted and encouraged to confide in him about personal problems. Filing 154 at 24-28. According to the teacher, Y.C.W. told him she had sexual identity issues. Filing 154 at 35. Wang Anderson blames Y.C.W.'s friendship with her teacher for a "breakdown" in her own relationship with Y.C.W., who reported to school officials on October 8, 2013 that Wang Anderson had threatened her. Filing 154 at 28.

Based on Y.C.W.'s report that she didn't feel safe going home, sheriff's officers removed Y.C.W. from Wang Anderson's residence and took her to Project Harmony for a temporary foster placement. Filing 154 at 33. One of the sheriff's deputies observed that when Wang Anderson answered the door, she was wearing a rubber glove, and suspected that Wang Anderson might be mentally ill. Filing 154 at 29-31. Investigators from the NDHHS went to Wang Anderson's residence that evening, and reported hazardous conditions. Filing 154 at 35. So, after X.C.W. went to school the next day, she was also placed in the temporary custody of NDHHS. Filing 154 at 36. Wang Anderson alleges, however, that X.C.W. told Sheller that she felt safe with her mother and wanted to go home. Filing 154 at 43.

X.C.W. and Y.C.W. were placed with the same foster parent, and both girls were evaluated at Project Harmony. Filing 154 at 34, 37, 43. A juvenile proceeding was initiated in the Separate Juvenile Court of Douglas County, Nebraska. Filing 154 at 44. The petition alleged—Wang Anderson says wrongly—that X.C.W. and Y.C.W. had been subjected to inappropriate discipline, not provided with safe housing, deprived of proper parental care and support, and that Wang Anderson had been seen acting in a manner consistent with untreated mental health needs. Filing 154 at 44-45. An ex parte juvenile court order placed the girls in the temporary custody of NDHHS, then after a hearing, the juvenile court continued NDHHS's temporary custody. Filing 154 at 45-46.

Wang Anderson claims that both girls began to show signs of "mental, emotional and physical distress" that went unnoted and untreated, by NFC, Smith, and Winans among others. Filing 154 at 48-49; *see* filing 154 at 65. Both girls were diagnosed with mental health disorders; Wang Anderson claims the diagnoses were inaccurate. Filing 154 at 52. She also alleges, as a basis for liability, that the girls' mental health providers did not encourage them to communicate with her, and that both girls were told they had a right to refuse contact with her. Filing 154 at 53. As a general matter, Wang Anderson complains about the failure to provide or facilitate visitation or family therapy throughout the pendency of the juvenile proceeding, and accuses several of the NFC Defendants, among others, of being responsible for that. Filing 154 at 41-42, 47, 62-64, 70-75, 81, 86-88, 94. As a corollary, she also alleges that several of the NFC Defendants failed to promote family reunification to the girls' therapists as a goal of therapy. Filing 154 at 42.

X.C.W. was sent to a program for treating eating disorders. Filing 154 at 54. She was partially hospitalized—her time was split between the hospital

and her foster home. Filing 154 at 54-55. On the suggestion of the girls' therapists, NDHHS recommended to the juvenile court that all parental visitation be therapeutic, and the juvenile court agreed. Filing 154 at 57. But visitation between Wang Anderson and Y.C.W. was suspended. Filing 154 at 57. Wang Anderson alleges that Y.C.W.'s therapists approved "certain ways of life, behaviors or actions that were inappropriate, morally corruptive, harmful and detrimental. . . ." Filing 154 at 58.

On January 28, 2014, the Douglas County Attorney petitioned the juvenile court to terminate Wang and Wang Anderson's parental rights. Filing 154 at 75. The juvenile court dismissed the termination petitions, but the girls were adjudicated as being juveniles within the meaning of Neb. Rev. Stat. § 43-247(3). Filing 154 at 81. And visitation was ordered. Filing 154 at 82.

Meanwhile, X.C.W. had been held out of school during her eating disorder program. Filing 154 at 60. Wang Anderson blames NFC, Smith, and Winans, among others, for harming X.C.W.'s education. Filing 154 at 60-61, 80. But her medical condition had deteriorated, and more intensive treatment was recommended. Filing 154 at 68. Wang Anderson alleges that several of the NFC Defendants were responsible for not properly coordinating or arranging for X.C.W.'s health care services. Filing 154 at 68-69. X.C.W. was placed at the Laureate Psychiatric Clinic and Hospital in Tulsa, Oklahoma. Filing 154 at 73.

Wang Anderson alleges that her contact with X.C.W. at Laureate was frustrated by the failure of several of the NFC Defendants to provide Laureate with a juvenile court order providing for visitation and family therapy. Filing 154 at 74. She also alleges that NFC, Winans, and Smith failed to provide Laureate with accurate or complete information about her. Filing 154 at 76. And she alleges that X.C.W.'s therapist at Laureate thought X.C.W. should

have contact with her parents, but Smith never arranged for it or told the juvenile court. Filing 154 at 79.

Eventually, X.C.W. was discharged from Laureate and put into a new foster placement, and she continued treatment for her eating disorder at Children's Hospital in Omaha. Filing 154 at 83-84, 86. Sometimes, X.C.W.'s foster parents were unable to take her to Children's, so transportation was provided by Camelot Transportation. Filing 154 at 89. She rode with other passengers, some adult men. Filing 154 at 89. According to Wang Anderson, X.C.W. was "lured, sexually abused and sexually exploited" by another passenger. Filing 154 at 90. Or, to be more specific, a juvenile court filing indicates that the two had exchanged telephone numbers and texted one another, and eventually X.C.W. sent him a nude picture of herself and expressed romantic feelings toward him. Filing 154 at 90. Wang Anderson blames NFC, Richardson, Paul, and Little for not permitting Wang Anderson to arrange for X.C.W.'s transportation, not properly supervising X.C.W., and for allowing X.C.W. to have a phone. Filing 154 at 89-90, 105. And she blames NFC, Richardson, and Paul for failing to have the incident investigated or prevent future contact between X.C.W. and the man. Filing 154 at 105.

X.C.W.'s anorexia relapsed, and she was again hospitalized. Filing 154 at 91-92. X.C.W. blames several of the NFC Defendants for not acting to provide X.C.W. with proper care. Filing 154 at 91-92. In November 2014, she was placed at Remuda Ranch, a treatment facility in Arizona. Filing 154 at 94. Wang Anderson alleges that at Remuda Ranch—and generally throughout X.C.W.'s mental health treatment—X.C.W.'s care providers didn't appropriately include X.C.W.'s family in her therapy. Filing 154 at 96, 106. She blames NFC, Little, Richardson, and Paul for allegedly refusing to comply with the juvenile court's visitation order or arrange for visitation. Filing 154 at 95.

In particular, she alleges that Richardson lied to counsel in the juvenile court proceeding in an email indicating that X.C.W. didn't want to make a telephone call to her parents. Filing 154 at 96. Eventually, visitation was cut off, allegedly in retaliation for Wang Anderson's efforts to contact X.C.W. and participate in her treatment. Filing 154 at 99.

The juvenile court also ordered that school records and information should be provided to Wang Anderson and Wang only through a family permanency specialist—essentially, preventing Wang Anderson from communicating with school personnel. Filing 154 at 92. And the juvenile court ordered Wang Anderson to communicate with all the girls' service providers, including the family permanency specialist, only through counsel or her guardian ad litem. Filing 154 at 92. Wang Anderson claims that order violated her First Amendment rights—but, she also alleges that the order wouldn't have been entered had the NFC Defendants arranged necessary services and provided her with information in the first place. Filing 154 at 93.

After discharge from Remuda Ranch, X.C.W. was returned to her previous foster placement. Filing 154 at 102. She was not, over Wang Anderson's objection, placed with her Chinese relatives, despite statutory and regulatory provisions Wang Anderson says should have preferred such a placement. Filing 154 at 100. Wang Anderson accuses the NFC defendants of breaking those rules and discriminating against them for being Chinese. Filing 154 at 83, 100; *see* filing 154 at 102.

Then, X.C.W. was permitted to attend a Project Everlast meeting at which, Wang Anderson alleges, X.C.W. was again "lured and sexually assaulted or sexually exploited by an unknown adult male during and after the lunch hour." Filing 154 at 108-09. Wang Anderson blames NFC, Little, Richardson, and Paul for allowing X.C.W. to attend the meeting, allegedly

without providing for an "appropriate safety plan." Filing 154 at 108-09. Wang Anderson says the incident wasn't discovered for a week, and alleges that X.C.W. was injured, but no treatment was provided, and no law enforcement investigation was initiated, by NFC, Richardson, and Paul among others. Filing 154 at 109-10. Wang Anderson claims the incident wasn't discovered because NFC, Richardson, and Paul weren't monitoring X.C.W.'s text messages. Filing 154 at 109. Wang Anderson generally accuses X.C.W.'s foster parents of being incompetent, and alleges that several of the NFC Defendants knew that but arranged for X.C.W.'s placement with them anyway. Filing 154 at 85-86, 91, 102-03, 113.

Starting in June 2015, Wang Anderson was permitted to participate in family therapy, but she was excluded again after she "tried to address the pertinent and urgent topic of sex trafficking with X.C.W." Filing 154 at 113. Wang Anderson alleges that she was "interrupted and cut off" because NFC, Richardson, and Paul failed to appropriately address the "critical incident" Wang Anderson says occurred. Filing 154 at 111. Specifically, Wang Anderson alleges that she brought up "the seriousness and life-threatening consequences of being sexually abused and sexually trafficked with X.C.W. during a family therapy session, to try to educate and protect her." Filing 154 at 119. But the therapist asked Wang Anderson to leave, Wang Anderson alleges, instead of "assist[ing] Wang Anderson in discussing this important and germane topic with X.C.W." Filing 154 at 119. Then, Wang Anderson alleges, the therapist "departed from the therapeutic standard of care" by, allegedly, making "suggestions to X.C.W. regarding how to safely or legally engage in prostitution, shortly after X.C.W. had been sold for money." Filing 154 at 119. But she *also* alleges that NFC, Richey, and Petzel acted "with deliberate

indifference to X.C.W.'s serious health needs" by later discharging the same therapist. Filing 154 at 120.

A juvenile court hearing was scheduled for August 18, 2015, to address disposition and permanency planning. Filing 154 at 114. But the hearing was continued into October because, Wang Anderson alleges, of the "inconsistency and incompleteness" of the report provided to the court by NFC, Richey, Richardson, and Petzel. Filing 154 at 114. That delay, Wang Anderson claims, "directly caused harm to X.C.W. and Wang Anderson." Filing 154 at 115.

Meanwhile, X.C.W. was allowed by her foster parents—who lived in Blair, Nebraska—to work part-time in a Blair restaurant. Filing 154 at 115-16. Sometimes she walked to and from work. Filing 154 at 115. Wang Anderson complained to various authorities, including several of the NFC Defendants, about how X.C.W. was being exposed to "dangerous clientele" at the restaurant, and instances in which X.C.W. was seen "scantily dressed." Filing 154 at 115. She alleges that they ignored "the attire X.C.W. was permitted . . . to wear" by her foster parents. Filing 154 at 116. And according to Wang Anderson, X.C.W. arranged to be picked up by a man who, again, "sexually abused and exploited" her. Filing 154 at 115-16. Wang Anderson blames the NFC defendants, who allegedly "failed to provide necessary transportation for X.C.W. and allowed her unmonitored and unsupervised access to electronic communication devices and the internet." Filing 154 at 117. And she contends that NFC, Petzel, and Richey failed to bring the incident to the juvenile court's attention. Filing 154 at 117.

It's not completely clear from the complaint what was happening with Y.C.W. during much of that time. But Wang Anderson alleges that "from October 8, 2013 through April 8, 2016," most of the NFC defendants failed to provide for Y.C.W.'s needs, and her health declined. Filing 154 at 120.

In May 2016, the juvenile court changed the permanency objective for X.C.W. to independent living. Filing 154 at 121. Wang Anderson alleges that happened, in part, because NFC, Richey, and Petzel "presented false, misleading, or inaccurate information" to the juvenile court, although it's not clear what that was. Filing 154 at 121. X.C.W. moved to another foster home, then to an "independent living arrangement," then to a dormitory at the University of Nebraska-Lincoln. Filing 154 at 121. Wang Anderson claims that the NFC Defendants should have known X.C.W. was too vulnerable for independent living, and failed to provide for her care. Filing 154 at 122. In December 2016, X.C.W. was returned to her foster home in Blair. Filing 154 at 123. After that, she was sent to another foster placement, where she remained when this complaint was filed. Filing 154 at 124.

Wang Anderson asserts several federal and state-law claims against sixty-nine different defendants, on behalf of herself and X.C.W. Filing 154 at 1-2. She claims a number of federal constitutional violations, including violation of their rights to due process and familial association, unlawful seizure, a deliberately indifferent failure to protect, retaliation for constitutionally protected activity, violation of Wang Anderson's First Amendment rights, and discrimination against Wang and Wang Anderson because of their Chinese origin. Filing 154 at 124-30, 137-47. She also claims X.C.W. wasn't provided with accommodations required by § 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794. Filing 154 at 147-48. And, she says, she and X.C.W. were denied statutory rights arising under 42 U.S.C. §§ 621 *et seq.* & 670 *et seq.* Filing 154 at 150-57. Finally, she asserts state-law claims including negligence, negligent and intentional infliction of emotional distress, and a civil rights claim pursuant to Neb. Rev. Stat. § 20-148. Filing 154 at 131-37, 148-50.

In particular, as to the NFC Defendants, Wang Anderson asserts:

1. A § 1983 claim based on Fourth Amendment unlawful seizure against Sheller (filing 154 at 124);
2. Policy-or-custom § 1983 claims against NFC (filing 154 at 126);
3. State-law negligence claims against all defendants (filing 154 at 130);
4. A § 1983 claim based on violation of the "substantive due process rights to family integrity and the parent-child relationship" against all "Individual Defendants" (filing 154 at 137);
5. A § 1983 claim based on deliberate indifference to X.C.W.'s serious health and safety needs against all "Individual Defendants" (filing 154 at 142-43);
6. A § 1983 claim based on "retaliation for protected activity" against NFC, Richey, and Petzel (and perhaps Paul and Richardson too)[1] (filing 154 at 143);
7. A discrimination claim pursuant to 42 U.S.C. § 2000d against NFC, Winans, Smith, Paul, Richardson, Richey, and Petzel (and perhaps Sheller) (filing 154 at 145);
8. A claim under § 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, against NFC, Richardson, and Paul (and perhaps Smith) (filing 154 at 147);

---

[1] At more than one place in the complaint, specific defendants are identified in the heading of a claim for relief, but additional defendants are named in the body of the claim. *E.g.*, filing 154 at 143-44, 145-46, 147. That's sloppy pleading, but the NFC Defendants' arguments don't require the Court to sort it out at this point—so, the confusion is only noted here parenthetically.

9. Section 20-148 "civil rights" claims against all defendants (filing 154 at 148);
10. Negligent and intentional infliction of emotional distress claims against all defendants (filing 154 at 149);
11. A § 1983 claim based on violation of 42 U.S.C. § 621 *et seq.* against NFC and Newell (filing 154 at 150); and
12. A § 1983 claim based on violation of 42 U.S.C. § 670 *et seq.* against NFC and Newell (filing 154 at 153).

The NFC Defendants move to dismiss all of Wang Anderson's claims against them pursuant to Fed. R. Civ. P. 12(b)(1) and (6). Filing 264.

STANDARD OF REVIEW

A complaint must set forth a short and plain statement of the claim showing that the pleader is entitled to relief. Fed. R. Civ. P. 8(a)(2). This standard does not require detailed factual allegations, but it demands more than an unadorned accusation. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The complaint need not contain detailed factual allegations, but must provide more than labels and conclusions; and a formulaic recitation of the elements of a cause of action will not suffice. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). For the purposes of a motion to dismiss a court must take all of the factual allegations in the complaint as true, but is not bound to accept as true a legal conclusion couched as a factual allegation. *Id.*

A motion pursuant to Rule 12(b)(1) challenges whether the court has subject matter jurisdiction. The party asserting subject matter jurisdiction bears the burden of proof. *Great Rivers Habitat Alliance v. FEMA*, 615 F.3d 985, 988 (8th Cir. 2010). Rule 12(b)(1) motions can be decided in three ways: at the pleading stage, like a Rule 12(b)(6) motion; on undisputed facts, like a

summary judgment motion; and on disputed facts. *Jessie v. Potter*, 516 F.3d 709, 712 (8th Cir. 2008). The NFC Defendants are advancing a "facial attack" to subject matter jurisdiction, based on the pleadings or documents that are judicially noticeable. *See Branson Label, Inc. v. City of Branson, Mo.*, 793 F.3d 910, 914 (8th Cir. 2015). Accordingly, the Court restricts itself to the pleadings and Wang Anderson receives the same protections as she would defending against a motion brought under Rule 12(b)(6). *Hastings v. Wilson*, 516 F.3d 1055, 1058 (8th Cir. 2008).[2]

To survive a motion to dismiss under Rule 12(b)(6), a complaint must also contain sufficient factual matter, accepted as true, to state a claim for relief that is plausible on its face. *Iqbal,* 556 U.S. at 678. A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Id.* Where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but has not shown—that the pleader is entitled to relief. *Id.* at 679.

## DISCUSSION

Before addressing the NFC Defendants' arguments more specifically, the Court reiterates one of its previous holdings: the Court has already held that Wang Anderson could not assert claims on X.C.W.'s behalf, and dismissed X.C.W.'s claims without prejudice. Filing 481 at 9-13, 36. Many of the claims asserted against these movants are premised on the alleged breach of their

---

[2] Wang Anderson nonetheless submitted an index of evidence in opposing the NFC Defendants' motion, at least some of which isn't judicially noticeable. *See* filing 443. The Court hasn't considered that evidence, other than to note that it's not inconsistent with the Court's findings based on the complaint.

duties to X.C.W., and those claims have been dismissed, for the reasons previously explained by the Court. Filing 481 at 9-13. That specifically includes X.C.W.'s claim for deliberate indifference to her medical needs, in its entirety. Filing 493 at 19. Only Wang Anderson's own claims remain at issue here.

CONSTITUTIONAL CLAIMS - STATE ACTION

Wang Anderson asserts various constitutional claims pursuant to § 1983. But the NFC Defendants were not employees of either the state or a political subdivision of the state, and "[t]o state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, *and must show that the alleged deprivation was committed by a person acting under color of state law*." *West v. Atkins*, 487 U.S. 42, 48 (1988) (emphasis supplied). "[A]cting under color of state law requires that the defendant in a § 1983 action have exercised power possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law." *West*, 487 U.S. at 49 (quotation omitted).

A private actor can be considered to act under color of state law "if, though only if, there is such a close nexus between the State and the challenged action that seemingly private behavior may be fairly treated as that of the State itself." *Brentwood Acad. v. Tennessee Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 295 (2001) (quotation omitted). This "close nexus" exists where the private party is "a willful participant in joint activity with the State in denying a plaintiff's constitutional rights." *Magee v. Trustees of Hamline Univ., Minn.*, 747 F.3d 532, 536 (8th Cir. 2014) (quotation omitted). Thus, to survive a motion to dismiss, a "plaintiff must plausibly allege a mutual understanding, or a meeting of the minds, between the private party and the state actor." *Id.* In doing so, the plaintiff must allege something more than "multiple contacts"

between the private party and the state; rather, she must plead "specific facts plausibly connecting" the alleged concerted action to the alleged violation. *Id.*

Inquiry into the nexus between the state and the challenged action "is necessarily fact intensive," *Ramirez-Peyro v. Holder*, 574 F.3d 893, 901 (8th Cir. 2009), but the Supreme Court has identified "a host of facts that can bear on the fairness of" attributing the challenged action to the state, *see Brentwood Acad.*, 531 U.S. at 296.

> We have, for example, held that a challenged activity may be state action when it results from the State's exercise of coercive power, when the State provides significant encouragement, either overt or covert, or when a private actor operates as a willful participant in joint activity with the State or its agents. We have treated a nominally private entity as a state actor when it is controlled by an agency of the State, when it has been delegated a public function by the State, when it is entwined with governmental policies, or when government is entwined in its management or control.

*Id.* (cleaned up).

The NFC Defendants argue that Wang Anderson's complaint doesn't sufficiently allege that they are state actors. Filing 265 at 8. The Court is, at least at this stage of the proceedings, not persuaded. True, in some previous orders, the Court has found that various defendants in this case weren't state actors. *See* filing 481 at 17-28 (foster parents); filing 486 at 12-15 (medical providers). But NFC is a different matter.

Based on Wang Anderson's complaint, the best description of the function performed by NFC's employees is that they were juvenile

caseworkers—that the NDHHS has outsourced a function that has, traditionally, been performed by employees of the State's child welfare agency. True, mere public buyers of contract services do not convert the service providers into public actors by paying for services rendered. *Id.* at 299. But the State is obliged to respect the interest of parents in the care, custody, and control of their children. *See In re Hope L.*, 775 N.W.2d 384, 400-01 (Neb. 2009). It's axiomatic that the State can't avoid that obligation by outsourcing its management of juvenile dependency cases. *Cf. Evans v. Newton*, 382 U.S. 296, 299-302 (1966); *cf. also Gilmore v. City of Montgomery*, 417 U.S. 556, 565-69 (1974). And in fact, it's apparent that the State *isn't* avoiding that obligation—it's actually what NFC was hired to do. Most of the NFC defendants, if their job titles are indicative, are charged with "family engagement" or "family permanency" in one form or another. *See* filing 154 at 8-11.

But "when private individuals or groups are endowed by the State with powers or functions governmental in nature, they become agencies or instrumentalities of the State and subject to its constitutional limitations." *Evans*, 382 U.S. at 299. Here, NFC's participation in the case relied on its contract with the State; NFC was performing what the Court considers to be a traditional public function—the job of a state family services caseworker; and Wang Anderson was forced to engage with them, and was dependent upon them, because of government authority. *See Smith v. Insley's Inc.*, 499 F.3d 875, 880 (8th Cir. 2007). That states a claim for state action, at least at this point in the proceedings.

The NFC Defendants' reliance on *Rendell-Baker v. Kohn*, 457 U.S. 830 (1982) is unpersuasive. In that case, as the Supreme Court later explained,

> an apparently private school provided education for students whose special needs made it difficult for them to finish high school.

The record, however, failed to show any tradition of providing public special education to students unable to cope with a regular school, who had historically been cared for (or ignored) according to private choice. It was true that various public school districts had adopted the practice of referring students to the school and paying their tuition, and no one disputed that providing the instruction aimed at a proper public objective and conferred a public benefit. But we held that the performance of such a public function did not permit a finding of state action on the part of the school unless the function performed was exclusively and traditionally public, as it was not in that case.

*Brentwood Acad.,* 531 U.S. at 302-03. This case, however, is at the pleading stage, not the proving stage, so the "record" consists of the complaint—and the complaint describes the NFC Defendants as performing a public function. The Court finds that Wang Anderson has sufficiently pleaded that the NFC Defendants acted under color of state law.

### STATE LAW CLAIMS

The NFC Defendants also argue that the Court should dismiss Wang Anderson's remaining state-law claims. The Court agrees, for all the reasons it has explained in its previous orders. As the Court has previously explained at some length, Wang Anderson's negligence claims fail to satisfy Rule 8(a), and the complaint fails to state a negligence claim against *any* defendant because it does not present any of the defendants fair notice of which allegations are made against them. Filing 481 at 13-14. Her § 20-148 claims fail because § 20-148 is a procedural statute that does not create any new substantive rights. Filing 481 at 28. And Wang Anderson's emotional distress

claims do not satisfy Rule 8(a), she has not alleged the required degree of emotional distress for either tort, and she has not alleged that these defendants engaged in conduct of the "outrageous and extreme" variety necessary to prove intentional infliction of emotional distress. *See* filing 481 at 29-35. So, the Court will dismiss Wang Anderson's state-law claims.

IT IS ORDERED:

1. The NFC Defendants' motion to dismiss (filing 264) is granted in part, and in part denied.

2. Wang Anderson's state-law claims, and her § 1983 claim for deliberate indifference, are dismissed as to the NFC defendants.

Dated this 28th day of September, 2018.

BY THE COURT:

John M. Gerrard
United States District Judge