## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEBRASKA

CATHERINE YANG WANG
ANDERSON,

              Plaintiff,

vs.

THE STATE OF NEBRASKA, et al.,

              Defendants.

4:17-CV-3073

MEMORANDUM AND ORDER

This matter is before the Court on plaintiff Catherine Yang Wang Anderson's Motion for Reconsideration and for Leave to File Second Amended Complaint (filing 510). Wang Anderson asks the Court to reconsider—and to allow her to plead over—the Court's previous orders granting several defendants' motions to dismiss. But the Court finds no basis to reconsider its previous rulings, and concludes that Wang Anderson's second amended complaint would be futile. Accordingly, the Court will deny her motion.

## I. BACKGROUND

As set forth in Wang Anderson's operative complaint, Wang Anderson is the mother of two girls, X.C.W. and Y.C.W. Filing 154 at 2. Wang Anderson's husband, Bo Wang (Wang) is their father. Filing 154 at 2. X.C.W. was a minor when this case was filed, and Wang Anderson sued both in her own capacity and as "next friend" of X.C.W. Filing 154 at 2.

Very generally, Wang Anderson alleges that X.C.W. was unlawfully made a ward of the State of Nebraska and held by the State against her will. Filing 154 at 2. But it was Y.C.W. who first drew the attention of authorities. Millard Public Schools (MPS) is the public school district where X.C.W. was

attending school—specifically, Millard West High School—when the events giving rise to this litigation began. Filing 154 at 11-12, 23. According to Wang Anderson, Y.C.W. had an "inappropriate" personal relationship with Matthew Heys, her history teacher, because Y.C.W. was permitted and encouraged to confide in him about personal problems.[1] Filing 154 at 24-28. Y.C.W. told Heys she had sexual identity issues. Filing 154 at 35. Heys never attempted to communicate with Wang Anderson about Y.C.W.'s problems. Filing 154 at 35. Heys later explained that he did not believe Wang Anderson would understand, and that she "would be very angry and would hurt [Y.C.W.] if she found out." Filing 154 at 36.

Wang Anderson alleges that Y.C.W. communicated confidentially with Heys beginning in August or September 2013, by email and text message, despite the fact that Y.C.W. was no longer in his history class. Filing 154 at 26. Heys did not report this communication to anyone until October, when he told a school counselor after Wang Anderson found out about it. Filing 154 at 27. And according to Wang Anderson, Millard West Principal Gregory Tiemann and Millard West counselor Susan Hancock knew about Y.C.W.'s communication with Heys and failed to stop it, despite being asked to do so by Wang Anderson. Filing 154 at 27. Wang Anderson also alleges that MPS has "policies, practices, customs or usages . . . which essentially allowed teachers to act as counselors or confidants for students, in violation of the rights of parents . . . to direct the education and moral development of their children." Filing 154 at 28. Wang Anderson blames Y.C.W.'s friendship with Heys for a "breakdown" in her own relationship with Y.C.W. Filing 154 at 28.

After Wang Anderson drove Y.C.W. to school on October 8, 2013, she

---

[1] This will be addressed below as well, but it bears emphasizing from the outset: the Court finds no reason whatsoever to believe Heys had an inappropriate relationship with Y.C.W.

went directly to Heys, who took her to Hancock to report that Wang Anderson had threatened her. Filing 154 at 28. The Sarpy County deputy sheriff assigned to Millard West as the school resource officer spoke to Y.C.W. shortly thereafter. Filing 154 at 28. Officers went to Wang Anderson's home, where they told her about Y.C.W.'s allegations. Filing 154 at 30. Wang Anderson denied them, and law enforcement asked her to go to Millard West to meet to a counselor about them, which she did. Filing 154 at 30.

The meeting at Millard West included Wang Anderson, Hancock, and the resource officer, who said that Y.C.W. had made a number of reports, including that Wang Anderson had threatened to shoot her. Filing 154 at 30. Wang Anderson denied those reports. Filing 154 at 30. Wang Anderson explained her own concerns about the friendship between Y.C.W. and Heys, but according to Wang Anderson, Hancock disregarded them. Filing 154 at 30. Based on Y.C.W.'s report that she didn't feel safe going home, sheriff's officers removed her from Wang Anderson's residence and took her to Project Harmony for a temporary foster placement with Susan Derr. Filing 154 at 33-34.

One of the sheriff's deputies observed that when Wang Anderson answered the door, she was wearing a rubber glove, and suspected that Wang Anderson might be mentally ill. Filing 154 at 29-31. Investigators from the Nebraska Department of Health and Human Services (NDHHS) went to Wang Anderson's residence that evening, and reported hazardous conditions. Filing 154 at 35. So, after X.C.W. went to school the next day, she was also placed in the temporary custody of the NDHHS. Filing 154 at 36.

NDHHS case management was handled by the Nebraska Families Collaborative (NFC), a nonprofit corporation that Wang Anderson alleges "had a contract with [the Nebraska Department of Health and Human Services (NDHHS)] to provide case management and an individualized system of care

for families and their children and youth who are wards of NDHHS involved in the Child Welfare or Juvenile Court System." Filing 154 at 7. David Newell was the chief executive officer of NFC. Filing 154 at 6. Daniel Little, Deanna "Nina" Sheller, Sara Smith, Evan Winans, Melissa Nance, Nicole Paul, Anna Richardson, Anne Petzel, and Jennifer Richey (collectively, with Newell, the "NFC defendants") were all employed by NFC in one capacity or another, such as family engagement specialist, family permanency specialist, family permanency specialist supervisor, or family permanency director. Filing 154 at 8-11.

X.C.W. was also placed in foster care with Derr, and both girls were evaluated at Project Harmony. Filing 154 at 34, 37, 43. Wang Anderson alleges that Suzanne Haney, M.D., a physician employed by either Douglas County or Project Harmony,[2] examined X.C.W. and Y.C.W. there, and that she was negligent in evaluating and treating them. Filing 154 at 43.

But, Wang Anderson also alleges, X.C.W. told Sheller she felt safe with her mother and wanted to go home. Filing 154 at 43. Nonetheless, a juvenile proceeding was initiated in the Separate Juvenile Court of Douglas County, Nebraska. Filing 154 at 44. The petition alleged—Wang Anderson says wrongly—that X.C.W. and Y.C.W. had been subjected to inappropriate discipline, not provided with safe housing, deprived of proper parental care and support, and that Wang Anderson had been seen acting in a manner consistent with untreated mental health needs. Filing 154 at 44-45. An ex parte juvenile court order placed the girls in the temporary custody of the NDHHS, then after a hearing, the juvenile court continued the NDHHS's temporary custody. Filing 154 at 45-46.

---

[2] The record suggests elsewhere that Haney is Project Harmony's medical director. Filing 548-1 at 1.

Wang Anderson claims that both girls began to show signs of "mental, emotional and physical distress" that went unnoted and untreated, by NFC, Smith, and Winans among others. Filing 154 at 48-49; *see* filing 154 at 65. Both girls were diagnosed with mental health disorders; Wang Anderson claims the diagnoses were inaccurate. Filing 154 at 52. She also alleges, as a basis for liability, that the girls' mental health providers did not encourage them to communicate with her, and that both girls were told they had a right to refuse contact with her. Filing 154 at 53. As a general matter, Wang Anderson complains about the failure to provide or facilitate visitation or family therapy throughout the pendency of the juvenile proceeding, and accuses several of the NFC defendants, among others, of being responsible for that. Filing 154 at 41-42, 47, 62-64, 70-75, 81, 86-88, 94. As a corollary, she also alleges that several of the NFC defendants failed to promote family reunification to the girls' therapists as a goal of therapy. Filing 154 at 42.

X.C.W. was admitted to a program at Children's Hospital and Medical Center for treatment of eating disorders. Filing 154 at 54. Wang Anderson alleges that Martin Harrington, M.D. (psychiatrist and program director) and Kara Beals (a licensed independent mental health practitioner employed by Children's) assessed X.C.W. on intake and departed from the standard of care when doing so. Filing 154 at 54. X.C.W. was partially hospitalized as part of the eating disorders program—her time was split between the hospital and her foster home. Filing 154 at 54-55. Wang Anderson claims that X.C.W.'s participation in the Children's eating disorders program actually worsened her condition, and that she should have been treated without the partial hospitalization. Filing 154 at 55, 59. She also claims that Children's, Harrington, and Beals violated her constitutional rights as a parent by admitting X.C.W. without her permission. Filing 154 at 59, 61. And she alleges

X.C.W. was prescribed medications without parental consent. Filing 154 at 66.

On the suggestion of the girls' therapists at that time, DHHS recommended to the juvenile court that all parental visitation be therapeutic, and the juvenile court agreed. Filing 154 at 57. Wang Anderson alleges that Y.C.W.'s therapists approved "certain ways of life, behaviors or actions that were inappropriate, morally corruptive, harmful and detrimental. . . ." Filing 154 at 58. She also claims her right to visitation with X.C.W. was interfered with by Children's, Harrington, Beals, and Children's psychologist Michael Vance, damaging the parent-child relationship. Filing 154 at 63-64. That visitation, she says, "was essential to X.C.W.'s reunification with her parents," and "family therapy was an 'integral' part of X.C.W.'s recovery from her eating disorder and the standard of care for such a disorder." Filing 154 at 71-72.

On January 28, 2014, the Douglas County Attorney petitioned the juvenile court to terminate Wang and Wang Anderson's parental rights. Filing 154 at 75. The juvenile court dismissed the termination petitions, but the girls were finally adjudicated as being juveniles within the meaning of Neb. Rev. Stat. § 43-247(3). Filing 154 at 81. Visitation was ordered. Filing 154 at 82.

Meanwhile, X.C.W. had been held out of school during her eating disorder program. Filing 154 at 60. Her condition had deteriorated and more intensive treatment was recommended. Filing 154 at 68. Wang Anderson alleges that several of the NFC defendants were responsible for not properly coordinating or arranging for X.C.W.'s health care services. Filing 154 at 68-69. X.C.W. was placed at the Laureate Psychiatric Clinic and Hospital in Tulsa, Oklahoma. Filing 154 at 73. Family therapy was not provided at Laureate, allegedly because Harrington and Beals failed to arrange it or inform Laureate of its importance. Filing 154 at 75. Harrington and Beals were also among those whom Wang Anderson alleges "failed to provide Laureate Psychiatric

staff with accurate or sufficient information regarding X.C.W.'s parents." Filing 154 at 76.

Wang Anderson also alleges that her contact with X.C.W. at Laureate was frustrated by the failure of several of the NFC defendants to provide Laureate with a juvenile court order providing for visitation and family therapy. Filing 154 at 74. She also alleges that NFC, Winans, and Smith failed to provide Laureate with accurate or complete information about her. Filing 154 at 76. And she alleges that X.C.W.'s therapist at Laureate thought X.C.W. should have contact with her parents, but Smith never arranged for it or told the juvenile court. Filing 154 at 79.

Eventually, X.C.W. was discharged from Laureate and put into a new foster placement, with Jennice Reid-Hansen and Tyler Hansen. Filing 154 at 84. According to Wang Anderson, Reid-Hansen and Hansen provided foster care services "pursuant to a contract or agreement with the State of Nebraska, NDHHS, NFC, or KVC [Behavioral Healthcare Nebraska, Inc.]" Filing 154 at 18. Wang Anderson's allegations against KVC arise out of X.C.W.'s placement with Reid-Hansen and Hansen. *See* filing 154 at 84-85.

X.C.W. continued treatment for her eating disorder at Children's Hospital in Omaha. Filing 154 at 83-84, 86. Sometimes, Reid-Hansen and Hansen were unable to take X.C.W. to Children's, so transportation was provided by Camelot Transportation. Filing 154 at 89. She rode with other passengers, some adult men. Filing 154 at 89. According to Wang Anderson, X.C.W. was "lured, sexually abused and sexually exploited" by another passenger. Filing 154 at 90. Or, to be more specific, a juvenile court filing indicates that the two had exchanged telephone numbers and texted one another, and eventually X.C.W. sent him a nude picture of herself and expressed romantic feelings toward him. Filing 154 at 90. Wang Anderson

blames NFC, Richardson, Paul, and Little for not permitting Wang Anderson to arrange for X.C.W.'s transportation, not properly supervising X.C.W., and for allowing X.C.W. to have a phone. Filing 154 at 89-90, 105. And she blames NFC, Richardson, and Paul for failing to have the incident investigated or prevent future contact between X.C.W. and the man. Filing 154 at 105.

X.C.W.'s anorexia relapsed, and she was again hospitalized. Filing 154 at 91-92. X.C.W. blames several of the NFC defendants for not acting to provide X.C.W. with proper care. Filing 154 at 91-92. In November 2014, she was placed at Remuda Ranch, a treatment facility in Arizona. Filing 154 at 94. Wang Anderson alleges that while at Remuda Ranch—and generally throughout X.C.W.'s mental health treatment—X.C.W.'s care providers didn't appropriately include X.C.W.'s family in her therapy. Filing 154 at 96. Harrington and Beals are among those singled out for failing to implement family therapy. Filing 154 at 81, 86.

Wang Anderson also blames NFC, Little, Richardson, and Paul for allegedly refusing to comply with the juvenile court's visitation order or arrange for visitation. Filing 154 at 95. In particular, she alleges that Richardson lied to counsel in the juvenile court proceeding in an email indicating that X.C.W. didn't want to make a telephone call to her parents. Filing 154 at 96. Eventually, visitation was cut off, allegedly in retaliation for Wang Anderson's efforts to contact X.C.W. and participate in her treatment. Filing 154 at 99. Wang Anderson complains that Harrington, Beals, and Christina Johnson-Gunn, M.S., L.M.H.P. all "failed to encourage X.C.W. or Y.C.W. to engage in visitation or other contact with Wang Anderson." Filing 154 at 88. And she says ongoing failure to provide family therapy—attributable to Children's, Harrington, and Beals, among others—was contrary to the standard of care and unconstitutional. Filing 154 at 56, 106-07.

After discharge from Remuda Ranch, X.C.W. was returned to Reid-Hansen and Hansen. Filing 154 at 102. She was not, over Wang Anderson's objection, placed with relatives, despite a rule Wang Anderson says should have preferred such a placement. Filing 154 at 100. Wang Anderson accuses the NFC defendants of breaking those rules and discriminating against them for being Chinese. Filing 154 at 83, 100; *see* filing 154 at 102. Then, X.C.W. was permitted to attend a Project Everlast meeting at which, Wang Anderson alleges, X.C.W. was again "lured and sexually assaulted or sexually exploited by an unknown adult male during and after the lunch hour." Filing 154 at 108-09. Wang Anderson says the incident wasn't discovered for a week, and alleges that X.C.W. was injured, but no treatment was provided, and no law enforcement investigation was initiated, by NFC, Richardson, or Paul, among others. Filing 154 at 109-10. Wang Anderson claims the incident wasn't discovered because NFC, Richardson, and Paul weren't monitoring X.C.W.'s text messages. Filing 154 at 109. Wang Anderson generally accuses X.C.W.'s foster parents of being incompetent, and alleges that several of the NFC defendants knew that but arranged for X.C.W.'s placement with them anyway. Filing 154 at 85-86, 91, 102-03, 113. And Harrington is among those that Wang Anderson blames for failing "to have an appropriate safety plan in place or communicate any such plan to Project Everlast when X.C.W. attended the March 14, 2015 meeting." Filing 154 at 109.

For a period of time, "family therapy" was arranged, by Harrington among others, that included X.C.W.'s foster parent, rather than Wang Anderson or Wang, as the family member. Filing 154 at 97. This was, according to Wang Anderson, contrary to the standard of care and unconstitutional. Filing 154 at 97. At around the same time, several defendants, including Children's and Harrington, allegedly refused to provide health information

about X.C.W. and Y.C.W. to Wang Anderson, despite being asked for it. Filing 154 at 104.

Starting in June 2015, Wang Anderson was permitted to participate in family therapy with Johnson-Gunn. Filing 154 at 113. But Wang Anderson was excluded again after she "tried to address the pertinent and urgent topic of sex trafficking with X.C.W." Filing 154 at 113. Specifically, Wang Anderson alleges that she brought up "the seriousness and life-threatening consequences of being sexually abused and sexually trafficked with X.C.W. during a family therapy session, to try to educate and protect her." Filing 154 at 119. But Johnson-Gunn asked Wang Anderson to leave, Wang Anderson alleges, instead of "assist[ing] Wang Anderson in discussing this important and germane topic with X.C.W." Filing 154 at 119. Then, Wang Anderson alleges, Johnson-Gunn "departed from the therapeutic standard of care" by, allegedly, making "suggestions to X.C.W. regarding how to safely or legally engage in prostitution, shortly after X.C.W. had been sold for money." Filing 154 at 119.

In January 2016, several officials and care providers—including Harrington—allegedly "agreed and decided to terminate effective ongoing health care provided by [Johnson-Gunn] for X.C.W. and ongoing services for the family." Filing 154 at 120. Despite having accused Johnson-Gunn of departing from the standard of care by encouraging sex trafficking, Wang Anderson also claims that NFC, Richey, and Petzel acted "with deliberate indifference to X.C.W.'s serious health needs" by removing Johnson-Gunn as the family therapist, falling below the standard of care and violating X.C.W.'s constitutional rights. Filing 154 at 120.

Meanwhile, X.C.W. was allowed by Reid-Hansen and Hansen—who lived in Blair, Nebraska—to work part-time in a Blair restaurant. Filing 154 at 115-16. Sometimes she walked to and from work. Filing 154 at 115. Wang Anderson

complained to various authorities about instances in which X.C.W. was seen "scantily dressed," and she alleges that various defendants ignored "the attire X.C.W. was permitted . . . to wear" by Reid-Hansen and Hansen. Filing 154 at 115-16. And according to Wang Anderson, X.C.W. arranged to be picked up by a man who, again, "sexually abused and exploited" her. Filing 154 at 115-16. Wang Anderson blames the NFC defendants, who allegedly "failed to provide necessary transportation for X.C.W. and allowed her unmonitored and unsupervised access to electronic communication devices and the internet." Filing 154 at 117. And she contends that NFC, Petzel, and Richey failed to bring the incident to the juvenile court's attention. Filing 154 at 117.

It's not completely clear from the complaint what was happening with Y.C.W. during much of that time. But Wang Anderson alleges that "from October 8, 2013 through April 8, 2016," most of the NFC defendants failed to provide for Y.C.W.'s needs, and her health declined. Filing 154 at 120.

In May 2016, the juvenile court changed the permanency objective for X.C.W. to independent living. Filing 154 at 121. Wang Anderson alleges that happened, in part, because NFC, Richey, and Petzel "presented false, misleading, or inaccurate information" to the juvenile court, although it's not clear what that was. Filing 154 at 121. X.C.W. moved to another foster home, then to an "independent living arrangement," then to a dormitory at the University of Nebraska-Lincoln. Filing 154 at 121. Wang Anderson claims that the NFC defendants should have known X.C.W. was too vulnerable for independent living, and failed to provide for her care. Filing 154 at 122. In December 2016, she was returned to Reid-Hansen and Hansen in Blair. Filing 154 at 123. After that, she was sent to another foster placement, where she remained when this complaint was filed. Filing 154 at 124.

Wang Anderson asserted several federal and state-law claims against

sixty-nine different defendants, on behalf of herself and X.C.W. Filing 154 at 1-2. She claimed a number of federal constitutional violations, including violation of their rights to due process and familial association, unlawful seizure, a deliberately indifferent failure to protect, retaliation for constitutionally protected activity, violation of Wang Anderson's First Amendment rights, and discrimination against Wang and Wang Anderson because of their Chinese origin. Filing 154 at 124-30, 137-47. She also claimed X.C.W. wasn't provided with accommodations required by § 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794. Filing 154 at 147-48. And, she said, she and X.C.W. were denied statutory rights arising under 42 U.S.C. §§ 621 *et seq.* & 670 *et seq.* Filing 154 at 150-57. Finally, she asserted state-law claims including negligence, negligent and intentional infliction of emotional distress, and a civil rights claim pursuant to Neb. Rev. Stat. § 20-148. Filing 154 at 131-37, 148-50.

The Court dismissed many of those claims. As most relevant to Wang Anderson's motion to reconsider and for leave to amend, the Court dismissed the negligence claims asserted against X.C.W.'s foster parents, *see* filing 481, some of X.C.W.'s medical care providers, *see* filing 485, KVC, *see* filing 490, and the NFC defendants, *see* filing 502. And the Court dismissed the constitutional claims asserted against MPS, Heys, Tiemann, and Hancock (the Millard defendants). *See* filing 498.

## II. STANDARD OF REVIEW

The Court should freely give leave to amend a complaint when justice so requires. Fed. R. Civ. P. 15(a)(2); *see Kozlov v. Associated Wholesale Grocers, Inc.*, 818 F.3d 380, 394 (8th Cir. 2016). But parties do not have an absolute right to amend their pleadings, even under this liberal standard. *Sherman v. Winco Fireworks, Inc.*, 532 F.3d 709, 715 (8th Cir. 2008); *see Sorace v. United*

*States*, 788 F.3d 758, 767 (8th Cir. 2015). And futility is a valid basis for denying leave to amend. *Munro v. Lucy Activewear, Inc.*, 899 F.3d 585, 589 (8th Cir. 2018), *cert. denied*, 139 S. Ct. 941 (2019).

When the Court denies leave on the basis of futility, it means the Court has reached the legal conclusion that the amended complaint could not withstand a motion to dismiss under Fed. R. Civ. P. 12(b)(6). *Id.* at 589. To survive a motion to dismiss under Rule 12(b)(6), a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face. *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009). While the Court must accept as true all facts pleaded by the non-moving party and grant all reasonable inferences from the pleadings in favor of the non-moving party, *Gallagher v. City of Clayton*, 699 F.3d 1013, 1016 (8th Cir. 2012), a pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action will not do. *Iqbal,* 556 U.S. at 678.

A plaintiff's motion to amend the complaint will be granted if she shows that such an amendment would be able to save an otherwise meritless claim. *Munro*, 899 F.3d at 589. But permission to amend may be withheld if the plaintiff does not have colorable grounds for relief. *Doe ex rel. Doe v. Sch. Dist. of City of Norfolk*, 340 F.3d 605, 616 (8th Cir. 2003).


## III. DISCUSSION

Wang Anderson's motion is directed at reviving her negligence claims against the following sets of defendants: (1) the NFC defendants; (2) Reid-Hansen, Hansen, and Derr; (3) KVC; and (4) Children's, Harrington, Haney, Beals, and Johnson-Gunn (collectively, the Children's defendants). Filing 510 at 1. In addition, Wang Anderson seeks to undo the dismissal of her constitutional claims against the Millard defendants. Filing 510 at 1-2.

It is, however, not entirely clear to the Court what Wang Anderson's

combined motion for reconsideration and for leave to amend is asking for, precisely—that is, it's not clear whether Wang Anderson is arguing that the claims she wants reinstated should be reinstated because she contends the Court was wrong in the first place, or because she *now* states a claim for relief in her proposed amended complaint. *See* filing 511 at 2-4. That also means it's unclear whether her motion for leave to amend is meant to resuscitate *other* claims that the Court dismissed, but are repleaded in her proposed amended complaint—her brief discusses none of them in particular. *See* filing 511 at 5. And her reply brief exacerbates the confusion. *E.g.* filing 551 at 12, 18-19.

The Court is not persuaded that Wang Anderson can file an enormous proposed amended complaint and simply assert that it "cures the deficiencies which the Court found in her Amended Complaint," filing 511 at 5, without actually explaining *how*. Below, the Court's *discussion* will be largely limited to the claims for which Wang Anderson seeks reconsideration—that is, the Court's decision will actually discuss the claims that Wang Anderson's briefing also actually discusses.

## 1. THE NFC DEFENDANTS

The NFC defendants argue that Wang Anderson's request to amend her negligence claims against them should be denied for two reasons: first, because they don't satisfy Fed. R. Civ. P. 8, and second, because they did not owe a legal duty to Wang Anderson. The Court agrees on both points.

## (a) Rule 8

The Court dismissed Wang Anderson's negligence claims against the NFC defendants because those claims did not contain the "short and plain statement of the claim showing that the pleader is entitled to relief" required by Rule 8(a), and did not present them with fair notice of which allegations

were made against them. Filing 502 at 16 (citing filing 481 at 13-14). The Court explained that

> there is nothing short or plain about Wang Anderson's complaint. The effect of the pleading is essentially to provide every defendant with "notice" that they're expected to defend every decision they made over the course of 4 years. It's the very model of a "kitchen sink" or "shotgun" complaint—in which a plaintiff brings every conceivable claim against every conceivable defendant—and it fails to state a claim for relief because it does not provide fair notice of the grounds for the claims made against a particular defendant.

Filing 481 at 14. Wang Anderson's response to that criticism is to double down: her 160-page, 545-paragraph amended complaint (filing 154) has become a 264-page, 658-paragraph proposed second amended complaint (filing 510-1). That's moving in the wrong direction.

So, it's not surprising that Wang Anderson's proposed second amended complaint is still a dog's breakfast. A fair part of the problem is Wang Anderson's insistence on reasserting claims the Court has already dismissed. No doubt, that's to preserve them for appeal. *See* filing 551 at 2. Fair enough.[3] But Wang Anderson's determination to preserve even the most obviously deficient claims, such as her attempt to assert claims on behalf of X.C.W., leaves the complaint stranded somewhere between muddled and

---

[3] It might not be necessary, but the rule is confusing. *See Acuity v. Rex, LLC*, No. 18-1735, 2019 WL 3049027, at *2 (8th Cir. July 12, 2019). *But see Tolen v. Ashcroft*, 377 F.3d 879, 882 n.2 (8th Cir. 2004). The Court won't fault Wang Anderson for not taking the risk—at least, on issues where there's at least a colorable argument to preserve for appeal.

incomprehensible. That's particularly true of the assertions of tort duty, because they're far different for Wang Anderson and X.C.W.—but the proposed second amended complaint leaves them jumbled together.

"Rule 8 is both a floor and a ceiling: it can be violated by a complaint that pleads too little and by a complaint that pleads too much." *Residential Funding Co., LLC v. Acad. Mortg. Corp.*, 59 F. Supp. 3d 935, 947 (D. Minn. 2014) (cleaned up). Wang Anderson is trying to fix her amended complaint by pleading even more than last time—but that just exacerbates the lack of clarity that was the problem in the first place. Wang Anderson ends up charging NFC with 51 different ways—some of which are exceptionally broad—in which it allegedly breached a tort duty to someone.[4] Filing 510-1 at 132-39. And Wang Anderson spends another 49 pages assigning similar laundry lists to each of the other NFC defendants. *See* filing 510-1 at 139-187.

But the purpose of Rule 8(a) is to give the defendants fair notice of what the claim is and the grounds on upon which it rests. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Apparently, Wang Anderson's idea of giving the defendants "fair notice" is to place them on notice that they should be prepared to defend every decision they made between 2013 and 2017. In the Court's view, that's not sufficient. And even if the Court wanders into those weeds with Wang Anderson, the Court finds no duty of care owed by the NFC defendants to Wang Anderson, as distinguished from X.C.W.[5]

---

[4] And the last of them—which is representative of allegations of breach leveled against each defendant—is that NFC's duty was breached by "each of the other acts or omissions of NFC stated in the earlier portions of this complaint." Filing 510-1 at 139. So, the list of each way in which a duty was breached really doesn't list each of them at all.

[5] The Court has noted Wang Anderson's citation to *Connelly v. City of Omaha*, 816 N.W.2d 742, 762 (Neb. 2012), as support for the proposition that she can maintain an individual claim

(b) Duty to Wang Anderson

In order to prevail in a negligence action, a plaintiff must establish the defendant's duty to protect the plaintiff from injury, a failure to discharge that duty, and damages proximately caused by the failure to discharge that duty. *Bell v. Grow With Me Childcare & Preschool LLC*, 907 N.W.2d 705, 713 (Neb. 2018). The threshold issue in any negligence action is whether the defendant owes a legal duty to the plaintiff. *Id.* And whether a legal duty exists for actionable negligence is a question of law dependent on the facts in a particular situation. *Id.* Wang Anderson identifies what she claims are 7 different sources of a duty of care owed to her by the NFC defendants. Filing 551 at 15; *see* filing 510-1 at 127-31. But none of them avail her.

*(i) General Duty of Reasonable Care*

To begin with, Wang Anderson relies on a "general duty of care," filing 551 at 15, apparently based on NFC's "affirmative conduct" that "created a risk of harm to Wang Anderson and her children, such that NFC had a general duty to exercise reasonable care toward Wang Anderson and her children," filing 510-1 at 128.[6] But the problem is that the ordinary duty of reasonable care is

---

for negligence towards X.C.W. based on her own damages for unspecified "economic damages and the loss of X.C.W.'s services." Filing 510-1 at 242. The Court is not persuaded that statutory interpretation case can be read so broadly. But even so, the sort of derivative claim Wang Anderson is referring to is premised on physical injury. *See* Restatement (Second) of Torts § 436A (1965). Wang Anderson does not connect the NFC defendants' alleged negligence, to a physical injury to X.C.W., to any economic damages or loss of services to Wang Anderson.

[6] While Wang Anderson has alleged different sources of duty for some of the NFC defendants, it appears that her general assertions with respect to NFC itself encompass the rest—so, the Court will use them to frame the discussion.

expressly conditioned on the actor's having engaged in conduct that creates a risk of *physical* harm to another. *Bell*, 907 N.W.2d at 714 (citing Restatement (Third) of Torts: Liability for Physical and Emotional Harm § 7 (2010)).

X.C.W. might (or might not) be able to claim she was placed at risk of physical harm by the NFC defendants. *Cf. Koepf v. York Cty.*, 251 N.W.2d 866, 870-71 (Neb. 1977). But Wang Anderson certainly can't. And liability for negligently inflicted *emotional* harm is subject to other, more restricted principles—specifically, the tort of negligent infliction of emotional distress—that the Court has already held do not apply here. *See* filing 502 at 17 (citing filing 481 at 29-35); *cf.* Restatement (Third) § 46 cmt. a.

### (ii) Statutory and Regulatory Duties

Next, Wang Anderson points to "certain statutes and regulations" including, "without limitation," six different statutory schemes and three entire titles of the Nebraska Administrative Code. Filing 551 at 15; filing 510-1 at 128. A court may determine that a statute gives rise to a tort duty to act in the manner required by the statute where the statute is enacted to protect a class of persons which includes the plaintiff, the statute is intended to prevent the particular injury that has been suffered, and the statute is intended by the Legislature to create a private liability as distinguished from one of a public character. *Claypool v. Hibberd*, 626 N.W.2d 539, 545 (Neb. 2001); *accord Stonacek v. City of Lincoln*, 782 N.W.2d 900, 909 (Neb. 2010). But where the Legislature has not by its express terms or by implication provided for civil tort liability, under principles of judicial restraint, it is prudent that the Court not do so. *Stonacek*, 782 N.W.2d at 909.

As the Court has previously said about the foster care rules Wang Anderson cites, "nothing in the applicable statutes and regulations . . . 'expressly or by implication indicates that they create a private tort liability.'"

Filing 481 at 15-16 (quoting *Stonacek*, 782 N.W.2d at 910). The Court explained that the primary purpose of the foster care statutes and regulations is the protection of foster children—and inferring an actionable tort duty to the natural parents of foster children "would place contradictory and impossible demands on foster parents and others in the juvenile justice system." Filing 481 at 16. The NFC defendants are precisely the "others in the juvenile justice system" that the Court was considering.

Wang Anderson specifically cites only a single provision of the Nebraska Juvenile Code—Neb. Rev. Stat. § 43-283.01—but makes (extremely) general reference to its implementing regulations in Neb. Admin. Code, Title 390. Filing 551 at 15; filing 510-1 at 128. Examination of the Nebraska Juvenile Code, however, makes it evident that the purpose of the Code is the welfare of *juveniles*. It is true that when a juvenile is adjudicated pursuant to Neb. Rev. Stat. § 43-247, the NDHHS may be asked to prepare a "plan for the care, placement, services, and permanency which are to be provided to such juvenile *and his or her family*." Neb. Rev. Stat. § 43-285(2)(a) (emphasis supplied). But, "[t]he health and safety of the juvenile shall be the paramount concern in the proposed plan." *Id*. Similarly, the specific section relied upon by Wang Anderson provides that "reasonable efforts shall be made to preserve and reunify families prior to the placement of a juvenile in foster care to prevent or eliminate the need for removing the juvenile from the juvenile's home and to make it possible for a juvenile to safely return to the juvenile's home." § 43-283.01(2). But the same section begins with the admonition that "[i]n determining whether reasonable efforts have been made to preserve and reunify the family and in making such reasonable efforts, the juvenile's health and safety are the paramount concern." § 43-283.01(1).

The rest of the Nebraska Juvenile Code is to the same effect. Neb. Rev.

Stat. § 43-246 is worth considering in its entirety:

Acknowledging the responsibility of the juvenile court to act to preserve the public peace and security, the Nebraska Juvenile Code shall be construed to effectuate the following:

(1) To assure the rights of all juveniles to care and protection and a safe and stable living environment and to development of their capacities for a healthy personality, physical well-being, and useful citizenship and to protect the public interest;

(2) To provide for the intervention of the juvenile court in the interest of any juvenile who is within the provisions of the Nebraska Juvenile Code, with due regard to parental rights and capacities and the availability of nonjudicial resources;

(3) To remove juveniles who are within the Nebraska Juvenile Code from the criminal justice system whenever possible and to reduce the possibility of their committing future law violations through the provision of social and rehabilitative services to such juveniles and their families;

(4) To offer selected juveniles the opportunity to take direct personal responsibility for their individual actions by reconciling with the victims through juvenile offender and victim mediation and fulfilling the terms of the resulting agreement which may require restitution and community service;

(5) To achieve the purposes of subdivisions (1) through (3) of this section in the juvenile's own home whenever possible, separating the juvenile from his or her parent when necessary for his or her welfare, the juvenile's health and safety being of paramount concern, or in the interest of public safety and, when

temporary separation is necessary, to consider the developmental needs of the individual juvenile in all placements, to consider relatives as a preferred potential placement resource, and to make reasonable efforts to preserve and reunify the family if required under section 43-283.01;

(6) To promote adoption, guardianship, or other permanent arrangements for children in the custody of the Department of Health and Human Services who are unable to return home;

(7) To provide a judicial procedure through which these purposes and goals are accomplished and enforced in which the parties are assured a fair hearing and their constitutional and other legal rights are recognized and enforced;

(8) To assure compliance, in cases involving Indian children, with the Nebraska Indian Child Welfare Act; and

(9) To make any temporary placement of a juvenile in the least restrictive environment consistent with the best interests of the juvenile and the safety of the community.

In other words, while the Nebraska Juvenile Code should be construed with "due regard to parental rights," that is not its preeminent purpose—and under Nebraska law, "consideration of the Legislature's purpose in enacting a statute is central to the analysis of whether the statute defines a duty in tort and creates private civil liability." *Stonacek*, 782 N.W.2d at 909. The focus of the Nebraska Juvenile Code is on the welfare of juveniles, and nothing in the code explicitly creates a private tort liability. *See id*. Moreover, the Court must consider the "explicit remedies provided" in the Nebraska Juvenile Code, "because the remedy informs us about the scope of the duty." *Id*. And the execution of the Nebraska Juvenile Court is, obviously, entrusted to the

Juvenile Courts. *See* § 43-247.

To the extent that the Nebraska Juvenile Court provides for parents, it is because the welfare of parents and juveniles is intertwined, and because parents have constitutional rights that the State is bound to respect. *See In re Xavier H.*, 740 N.W.2d 13, 24-25 (Neb. 2007). Family reunification is a goal when it serves the interests of the juvenile. *See* 43-283.01(1). But even if the Court assumes that the Nebraska Juvenile Code was enacted to protect a class of persons including Wang Anderson, and that some provision of it was intended to prevent the injury that Wang Anderson alleges—there is no basis to conclude that the Nebraska Juvenile Code was intended by the Legislature to create a private liability as distinguished from one of a public character. *See Claypool*, 626 N.W.2d at 545.

Wang Anderson also points the Court to statutory provisions that describe the duties of an NDHHS case manager, Neb. Rev. Stat. § 68-1212, and provide for foster parent licensing, Neb. Rev. Stat. § 71-1902; and regulatory provisions implementing social service and welfare programs, Neb. Admin. Code Titles 474 and 479. Filing 551 at 15; filing 510-1 at 128. It suffices to say that the Court can find nothing there establishing a tort duty under the principles set forth above. She also directs the Court to federal statutes, but even if the Court was persuaded that federal statutes could give rise to tort liability under state law, the Court has already rejected Wang Anderson's attempt to assert claims under them directly. Filing 493 at 24-29.[7] The Court is wholly unpersuaded that federal statutes which were not intended to be privately enforceable under federal law should, nonetheless, be privately

---

[7] Wang Anderson cites one federal statute here that the Court has not discussed previously—42 U.S.C. § 1396a. Filing 510-1 at 128. But that section, which describes the requirements for a state Medicaid plan, has no apparent connection to Wang Anderson.

enforceable under state law—particularly given the Nebraska Supreme Court's focus on legislative intent as the *sine que non* of statutorily created tort duties. *See Claypool*, 626 N.W.2d at 545-46.

In sum, under the principles that the Nebraska Supreme Court has established for determining when a statute or regulation gives rise to a tort duty, there is no basis to conclude that any of the statutes or regulations Wang Anderson cites here gave rise to a tort duty owed *to her* by the NFC defendants.

### (iii) Duty Based on Prior Conduct

Next, Wang Anderson claims a "duty based on prior conduct creating a risk of harm," which she apparently premises on the Restatement (Third) § 39. Filing 551 at 15. But that section of the Restatement (Third) provides that "[w]hen an actor's prior conduct, even though not tortious, creates a continuing risk of *physical* harm of a type characteristic of the conduct, the actor has a duty to exercise reasonable care to prevent or minimize the harm." *Id.* (emphasis supplied). As the Court has already explained, Wang Anderson faced no risk of physical harm.

### (iv) Special Relationship

Even when an actor's conduct does not create a risk of physical harm, the actor may still owe an affirmative duty of care based on a special relationship. *Bell*, 907 N.W.2d at 719. Wang Anderson contends that

> NFC had a special relationship with Wang Anderson and her children, such that NFC owed Wang Anderson Y.C.W. and X.C.W. a duty of reasonable care with regard to the risks that arose within those special relationships. Those relationships included: a) a party in control of contact, communication and other access

between a parent and minor child. NFC was responsible to coordinate and monitor the care and placement of X.C.W. and Y.C.W. NFC was also responsible to maintain and implement a plan to reunify X.C.W. and Y.C.W. with Wang Anderson.

Filing 510-1 at 129; *see* filing 551 at 15. But it is hard to connect those relationships—at least, insofar as they connected the NFC defendants and Wang Anderson—with a special relationship that has been recognized as giving rise to a tort duty. *See* Restatement (Third) § 40(b); *see also Rodriguez v. Catholic Health Initiatives*, 899 N.W.2d 227, 235-36 (Neb. 2017)

Wang Anderson and the NFC defendants might both have had special relationships with X.C.W. and Y.C.W.—but that does not mean that Wang Anderson and the NFC defendants had any special relationship with each other. While the NFC defendants might stand in something resembling a custodial relationship with respect to an adjudicated juvenile, there is no legal basis to extend that relationship to Wang Anderson. And to infer the existence of one would create the same "contradictory and impossible demands" the Court previously observed.

### (v) Duty Based on Undertaking

Wang Anderson's next stop on her tour of the Restatement (Third) of Torts is § 42, which provides that

An actor who undertakes to render services to another and who knows or should know that the services will reduce the risk of physical harm to the other has a duty of reasonable care to the other in conducting the undertaking if:

(a) the failure to exercise such care increases the risk of harm beyond that which existed without the undertaking, or

(b) the person to whom the services are rendered or another relies on the actor's exercising reasonable care in the undertaking.

*See* filing 551 at 15; filing 510-1 at 129. But that, again, rests on a risk of *physical* harm Wang Anderson didn't face, and imposed no duty on the NFC defendants with respect to Wang Anderson.

### *(vi) Duty Based on Undertaking to Third Party*

Similarly, the Restatement (Third) § 43 provides that under certain circumstances, "[a]n actor who undertakes to render services to another and who knows or should know that the services will reduce the risk of physical harm to which a third person is exposed has a duty of reasonable care to the third person in conducting the undertaking. . . ." Wang Anderson claims to be the "third person" affected by the NFC defendants' undertaking to provide services to X.C.W. and Y.C.W.—but she, again, omits the term "physical harm" from her argument. *See* filing 551 at 15; filing 510-1 at 129-30.

### *(vii) Duty Based on Contract*

Finally, Wang Anderson relies on the contractual relationship between the NDHHS and NFC, and claims that the NFC defendants assumed a duty of reasonable care in performing their obligations under that agreement. Filing 551 at 15; filing 510-1 at 130-31. In some circumstances, violation of a contractual duty may give rise to a tort action for non-economic losses resulting from negligent performance of the contract. *See Lesiak v. Cent. Valley Ag Co-op., Inc.*, 808 N.W.2d 67, 82 (Neb. 2012).

But there was, of course, no contractual relationship or privity of contract between Wang Anderson and the NFC defendants. The duty of reasonable care in the performance of a contract generally does not extend to third parties absent fraud or other facts establishing such a duty. *Lawyers Title Ins. Corp. v. Hoffman*, 513 N.W.2d 521, 525 (Neb. 1994); *Nebraska Beef, Ltd. v. Universal Sur. Co.*, 607 N.W.2d 227, 234 (Neb. Ct. App. 2000); *see Moglia v. McNeil Co.*, 700 N.W.2d 608, 617-18 (Neb. 2005); *see also J.L. Healy Const. Co. v. State, Dep't of Roads*, 463 N.W.2d 813, 817 (Neb. 1990); *cf. Erickson v. U-Haul Int'l, Inc.*, 738 N.W.2d 453, 462 (Neb. 2007); *Danler v. Rosen Auto Leasing, Inc.*, 609 N.W.2d 27, 32 (Neb. 2000). And the Court has already extensively discussed why the "other facts" alleged here do not establish such a duty to Wang Anderson. The contractual arrangement between the NDHHS and NFC did not create one.

(c) Conclusion—NFC Defendants

In sum, the Court reasserts its conclusion that Wang Anderson's proposed second amended complaint fails to meet the requirements of Rule 8. The Court further agrees with the NFC defendants that the complaint does not state a negligence claim against them because it does not allege facts that the Nebraska Supreme Court would recognize as establishing a duty to Wang Anderson—the only real party in interest here.

2. THE FOSTER PARENTS

Given the Court's discussion of the negligence claims asserted against the NFC defendants, it should be no surprise that the Court finds no negligence claims stated against Reid-Hansen, Hansen, or Derr either. The Court previously discussed, at length, its conclusion that while foster parents may owe a tort duty to foster children, they do not owe a duty to the natural parents

of foster children. Filing 481 at 13-17. Wang Anderson takes the same tack in attempting to salvage her claims against the foster parents as she did with the NFC defendants, so she runs into the same shoals.

### (a) Rule 8

To begin with, Wang Anderson runs into the same Rule 8 problem: she alleges, for instance, that Derr had a duty of reasonable care to Wang Anderson "[d]uring the time period from October 8, 2013 through June 19, 2017," which she allegedly breached by such things as "failing to provide appropriate and necessary care, protection and a safe and stable living environment for Y.C.W. or X.C.W.," "not communicating or working cooperatively as a team member with the worker, parents, and service providers toward the goals of the case plan," and "each of the other acts or omissions of Derr stated in the earlier portions of this complaint." Filing 510-1 at 198-201. Reid-Hansen and Hansen face similar (and even longer) lists. *See* filing 510-1 at 202-10. So, as with the NFC defendants, Wang Anderson's idea of giving the foster parents "fair notice" of the grounds for her claims, *see WireCo WorldGroup, Inc. v. Liberty Mut. Fire Ins. Co.*, 897 F.3d 987, 992 (8th Cir. 2018), is to charge them with defending nearly every decision they made between 2013 and 2017.

### (b) Duty to Wang Anderson

Nor has Wang Anderson changed the Court's mind about the foster parents' tort duty. As with the NFC defendants, she now points to the "risk of harm" allegedly created by their conduct, without identifying a risk of *physical* harm. Filing 510-1 at 198-99, 202-04. She points to the same regulatory framework discussed above which the Court has already found not to create a tort duty to her. Filing 510-1 at 198, 202; *see* filing 481 at 15-17. Nor did she have a contractual relationship with any of the foster parents. *See* filing 510-1

at 199-200, 203. And she asserts a "common law duty of care" allegedly owed her, filing 510-1 at 200, 204-05—but the principles of Nebraska law upon which common law tort duties are founded have already been discussed. Simply put, nothing in the amended complaint alters the Court's previous conclusion that the foster parents owed no tort duty to Wang Anderson. Filing 481 at 15-17.

### 3. KVC

The Court's discussion of Wang Anderson's negligence claims against the foster parents is also dispositive of her claim against KVC. So far as the Court can tell, Wang Anderson's claim against KVC arises entirely from its alleged placement of X.C.W. and Y.C.W. in foster care, and supervision of their foster care. But she still hasn't satisfied Rule 8, for the reasons explained above—and that problem is even more significant for KVC, because Wang Anderson still hasn't managed any clarity about with whom KVC allegedly contracted, or who allegedly hired Hansen and Reid-Hansen. *See* filing 490 at 10-12. And, as the Court previously noted, the lack of a legal duty from the foster parents to Wang Anderson "applies with even greater force to a defendant that (may have) hired or supervised those foster parents." Filing 490 at 12 n.6.

### 4. THE CHILDREN'S DEFENDANTS

Finally, Wang Anderson's negligence claim against the Children's defendants is no different from the others. Her allegations against each of the Children's defendants are too broad—and too poorly distinguished between her own claims and X.C.W.'s claims—to effectively provide any notice of what her own claims actually are. *See* filing 510-1 at 212, 230-31, 233-35, 237-38, 240-41. And as the Court previously explained, " a tort duty should not be imposed upon medical professionals charged with diagnosis and treatment of allegedly abused children because such a duty would conflict with their far more

important duty toward those children." Filing 486 at 17-20. None of the Children's defendants undertook to treat Wang Anderson's own medical needs, as opposed to X.C.W.'s, and that is ultimately fatal to Wang Anderson's claim that they owed her a duty of reasonable care.[8]

### 5. The Millard Defendants

Changing tacks, Wang Anderson seeks to revive her constitutional claims against the Millard defendants. But she does not succeed.

### (a) Unlawful Seizure Claim

First, Wang Anderson does remedy one of the problems with her "Procedural Due Process, Unlawful Seizure, and Familial Association" claim: this time, she included Y.C.W.'s removal from her home as part of the claim. Filing 510-1 at 119-120; *see* filing 498 at 7. And it is Y.C.W. whose contact with the Millard defendants is at issue. But Wang Anderson adds nothing else—so, she has added nothing to undermine the Court's conclusion that none of the facts she alleged "show[ed] that Heys, Hancock, or Tiemann behaved wrongfully." Filing 498 at 8. As the Court explained,

> Wang Anderson's theory rests on the unwarranted assumption
> that it's *per se* inappropriate for a male high school teacher to have
> a friendly, trusting relationship with a female student. She cites
> no authority for that proposition. There are, unfortunately, many

---

[8] The Court again notes, with respect to Johnson-Gunn in particular, that the *facts* alleged demonstrate that her relationship with Wang Anderson in "family therapy" was not a doctor-patient relationship. Filing 486 at 18 n.9. And that's further demonstrated by noting that none of the alleged breaches of duty asserted by Wang Anderson against Johnson-Gunn involve mistreatment of Wang Anderson's own medical needs. Filing 510-1 at 230-31.

examples of teacher-student relationships that breached professional boundaries. But there are no allegations that this was one of those—and there are many more examples of young adults who've benefited from the support and guidance of responsible teachers, coaches, and counselors. Neither the law nor common sense require a teacher to turn away from, or violate the trust of, a student who confides in him about a personal crisis. There are professional duties associated with such a situation, of course—but nothing alleged here breached those duties.

Filing 498 at 8. The Court stands by that reasoning.

### (b) *Monell* Claim

Next, Wang Anderson tries to fix the problem with her *Monell* claim against MPS, which the Court dismissed because she had "not alleged any *facts* suggesting the existence of an unconstitutional policy or custom." Filing 498 at 9. Now, she asserts that MPS had

the policy, practice, custom, usage and/or procedure of condoning or allowing its teachers to form and maintain inappropriate relationships with MPS students, including allowing students to repeatedly confide in them regarding sexual matters, which interfered with and/or undermined students' relationships with their own parents and violated parents' rights to direct the education and moral upbringing of their children.

Filing 510-1 at 122. But the *facts* supporting that conclusion are the same as she previously pled, and do not suffice.

To begin with, the underlying facts she alleges are simply those describing Wang Anderson's interaction with Heys—and, as the Court has repeatedly said, there is "no reason whatsoever to believe Heys had an inappropriate relationship with Y.C.W.," despite Wang Anderson's insistence to the contrary. *See* filing 498 at 2 n.1. She can't base *Monell* liability against MPS on a policy or custom of permitting behavior that's not actually unlawful. MPS cannot be liable unless one of the other Millard defendants is individually liable for an underlying substantive claim. *See Brockinton v. City of Sherwood, Ark.*, 503 F.3d 667, 674 (8th Cir. 2007).

Furthermore, while Wang Anderson claims this was "a pattern of conduct, not an isolated incident," filing 510-1 at 122, proving a governmental custom requires "a pattern of persistent and widespread practices which become so permanent and well settled as to have the effect and force of law." *Brockinton*, 503 F.3d at 674 (cleaned up). But Wang Anderson alleges only the school district's tolerance of an association between a single teacher and particular student. That single course of conduct does not establish a widespread custom. *See Slaven v. Engstrom*, 848 F. Supp. 2d 994, 1008 (D. Minn. 2012), *aff'd,* 710 F.3d 772 (8th Cir. 2013).[9]

---

[9] Wang Anderson also suggests that the "course of conduct" she alleges would *now* be in violation of MPS policies. Filing 511 at 4. Even if that were true, it's not at all clear why a policy against such conduct *now* would prove it was wrongful *then*. But the Court's own review of those policies does not support Wang Anderson's claim that they would have been implicated. *See* Policies & Rules of the Millard Pub. Sch. Dist. §§ 4153 & 4153.1. The only new rule Heys would purportedly have breached is the requirement that teachers use MPS-approved communications systems to contact students, instead of text messaging. *See* § 4153.1. But the Court's understanding is that MPS simply replaced text messaging with a different messaging application that maintains a record of the messages sent and received. *See* Joe Dejka, *New Millard policy prohibits texting between teachers and students, dirty jokes*

Finally, Wang Anderson's theory of liability rests on the premise that Tiemann, the school principal, was a "policymaker" for *Monell* purposes. Filing 510-1 at 8. But that bare conclusion is insufficient: whether a particular official has final policymaking authority is a question of state law, *see Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 737 (1989), and Wang Anderson directs the Court to no authority suggesting that a high school principal is a "policymaker" for a school district under Nebraska law. The Court's own review of state law suggests the contrary: policymaking authority for a Class III school district like MPS rests with the school board, not a school principal charged with implementing the Board's policies. *See* Neb. Rev. Stat. §§ 79-526 & 79-534; *see also Manning v. Dakota Cty. Sch. Dist. No. 22-0011*, 782 N.W.2d 1, 10 (Neb. 2010); Policies & Rules of the Millard Pub. Sch. Dist. §§ 2000 & 2100.50 (explaining that district administration "is responsible for the direction, coordination and control of students and staff . . . within the guidelines established by Board policy" and the school principal is "responsible for *implementing* district programs, policies, and procedures").

(c) Family Integrity Claim

Finally, Wang Anderson asks the Court to permit the reassertion of her substantive due process "family integrity" claim against the Millard defendants. Filing 511 at 3-4. But to begin with, she still has a Rule 8 problem—particularly because while she at least *tried* to clarify her negligence claim, she made no similar effort with her "family integrity claim." *See* filing 498 at 11; *compare* filing 154 at 137-42, *with* filing 510-1 at 242-48. So, for instance, she's still alleging that the Millard defendants should be held liable

_____

*and gifts*, Omaha World-Herald, Jul. 16, 2018, https://bit.ly/2KmONXp. And in any event, that's no reason to find that text messaging was somehow inappropriate at the time.

for "[f]ailing and refusing to place X.C.W. with her Chinese relative," as if the Millard defendants had anything to do with that. Filing 510-1 at 243.

And more substantively, Wang Anderson still hasn't established any causation between the conduct of the Millard defendants and removal of X.C.W. and Y.C.W. from her home, given the independent decision of other authorities to intervene and initiate removal. Filing 498 at 8, 11-12. And she has still fundamentally failed to allege facts suggesting "the sort of 'conscience-shocking' misconduct required to prove a substantive due process claim." Filing 498 at 12. Accordingly, Wang Anderson's "family integrity" claim will stand dismissed as to the Millard defendants.

## 6. REMAINING AMENDMENTS

As noted above, the Court's not certain what Wang Anderson intends by other changes and additions made by her proposed amended complaint, when those amendments are not made to allegations or claims that her motion and brief expressly seek to have reinstated. But the Court has reviewed them, *see generally* filing 510 at 2-6, and finds nothing to merit the filing of the proposed amended complaint.

Most of the proposed amendments have been discussed above. Wang Anderson does propose some substantial amendments to her allegations regarding the Reliable Rock defendants, *see* filing 510-1 at 43-44, but the Court reads those new allegations as relating to the standard of care for those defendants and its allegedly negligent breach, which means they do not affect the Court's determination that the Reliable Rock defendants owed no legal duty to Wang Anderson, *see* filing 516 at 9-10. Wang Anderson's attempts to parse out her allegations of negligence against different defendants are insufficient, for the same reasons the Court discussed above.

And to the extent that Wang Anderson proposes otherwise-anodyne

amendments, the Court is not persuaded that they warrant leave to file her entire proposed amended complaint. The Court is not required to conduct a line-by-line examination of a proposed amended complaint of this size, just to identify any acceptable edits. The Court will not restart the pleading stage of this case—again—for the sake of technical edits.

## IV. CONCLUSION

Wang Anderson's Motion for Reconsideration and for Leave to File Second Amended Complaint (filing 510) will be denied. She has failed to plead over the deficiencies that led to previous dismissals of her claims, and her proposed amended complaint is, therefore, futile. The protracted pleading stage of this case is, at last, *over*. It needs to progress.

IT IS ORDERED:

1. Wang Anderson's Motion for Reconsideration and for Leave to File Second Amended Complaint (filing 510) is denied.

2. This matter is referred to the Magistrate Judge for case progression.

Dated this 5th day of August, 2019.

BY THE COURT:

John M. Gerrard
Chief United States District Judge